## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREW LECHTER; SYLVIA THOMPSON; LAWSON F. THOMPSON; RUSSELL DALBA; and KATHRYN DALBA, on behalf of themselves and all other similarly situated, | ) ) ) ) ) ) ) | CASE NO. _____ |
| | ) | |
| *Plaintiffs*, | ) | **JURY DEMAND** |
| | ) | |
| v. | ) | |
| | ) | |
| APRIO, LLP f/k/a HABIF, AROGETI & WYNNE, LLP; ROBERT GREENBERGER; SIROTE & PERMUTT, P.C.; BURR & FORMAN, LLP; BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, P.C.; SMITH, LEWIS & HALEY, LLP; DAVID C. SMITH; FOREVER FORESTS LLC; NANCY ZAK; JAMES JOWERS;  LARGE & GILBERT, INC.; CLOWER KIRSCH & ASSOCIATES, LLC; JIM R. CLOWER, SR.; TENNILLE & ASSOCIATES, INC.; ATLANTIC COAST CONSERVANCY, INC.; ROBERT D. KELLER; and GEORGIA ALABAMA LAND TRUST, INC. f/k/a GEORGIA LAND TRUST, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| *Defendants.* | ) | |

1

## <u>ORIGINAL CLASS ACTION COMPLAINT</u>

Andrew Lechter, Sylvia Thompson, Lawson F. Thompson, Russell Dalba, and Kathryn Dalba (collectively "*Plaintiffs*") file this Original Class Action Complaint to assert claims, on behalf of themselves and all other similarly situated, against Defendants Aprio, LLP f/k/a Habif, Arogeti & Wynne, LLP; Robert Greenberger; Sirote & Permutt, P.C.; Burr & Forman, LLP; Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.; Smith Lewis & Haley, LLP; David C. Smith; Forever Forests LLC; Nancy Zak; James Jowers; Large & Gilbert, Inc.; Clower Kirsch & Associates, LLC; Jim R. Clower, Sr.; Tennille & Associates, Inc.; Atlantic Coast Conservancy, Inc.; Robert D. Keller; and Georgia Alabama Land Trust, Inc. f/k/a Georgia Land Trust, Inc. (collectively "*Defendants*") and state as follows:

1.     This case involves the development and implementation of a fraudulent scheme to sell a flawed and defective tax savings strategy: a Syndicated Conservation Easement Strategy (the "*SCE Strategy*").

2.     Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes.  When such easements are placed on property in strict compliance with Section 170(h) of the Internal Revenue Code (the "*Code*"), donors of such easements may realize a noncash charitable contribution deduction for the value by which the easement impairs the fair market

value of the property.  When properly implemented, conservation easements can and do confer legitimate tax advantages to the donor.

3.      In this case, however, Defendants' SCE Strategy—spearheaded by the Aprio Defendants—was fatally flawed from the outset.  Rather than guide Plaintiffs through a legitimate conservation easement transaction, the Defendants utilized a prepackaged collection of misrepresentations, omissions, deficient form documents, and bogus appraisals to promote, sell and implement a defective tax product that the Internal Revenue Service (the "*IRS*") has taken the position did not and could not deliver on its promises, as structured and implemented.

4.      The Defendants' numerous errors and omissions were egregious.  In working together to draft the various documents necessary for the implementation of the SCE Strategy, the Defendants ignored directives from the IRS.  As explained in detail herein, the Defendants wholly failed to satisfy the IRS's requirements for the Conservation Easement Deeds, the Appraisal Summary (Forms 8283), and the Baseline Documentation Reports.   These requirements were clear and unambiguous and the Defendants knew or should have known that (1) they failed to properly prepare these necessary documents and (2) every one of these failures, ***standing alone***, prevented the SCE Strategy from generating a legitimate and legal charitable contribution deduction from a conservation easement donation.

5.      In addition, as detailed herein, the non-appraiser Defendants hand-picked the appraisers to be used for the SCE Strategy **and then directed them** as to what value the appraisers should reach in appraising the conservation easement donations and the methodology the appraisers should employ to get to that artificial value.  And the Appraiser Defendants[1] went right along and cast aside their professional obligations and duties.  Indeed, the appraisals used in connection with the SCE Strategy were a complete sham and contained grossly inflated valuations.  All of the Defendants (including the Appraiser Defendants) knew that these grossly inflated appraisals would be used by the Plaintiffs and the Class to claim charitable contribution deductions from the SCE Strategy that, unbeknownst to Plaintiffs and the Class, were completely unsupportable.

6.      Based on the IRS's clear warnings, Defendants knew that, as the SCE Strategy was structured, the IRS would take the position that the promised tax benefits of the SCE Strategy were improper, and yet Defendants continued to market and profit from the SCE Strategy well after these warnings.  The Defendants convinced hundreds, if not thousands, of clients to execute the SCE Strategy, which generated substantial tax deductions on the part of their trusting clients that the IRS has disallowed at the partnership level and indicated its intent to disallow at the individual level.

---

[1] The "*Appraiser Defendants*" are defined at Paragraph 57(d) herein.

7.     To deliver these bogus tax benefits to Plaintiffs and the Class, Defendants employed and organized entities and individuals to execute their pre-planned scheme to convince clients to execute the SCE Strategy.  Defendants and their co-conspirators used the mail and/or wires to develop, promote, sell, and implement the SCE Strategy, which Defendants knew to be fatally flawed.  This association of entities and individuals to promote and implement the SCE Strategy thereby constitutes a racketeering enterprise.

8.     This racketeering enterprise injured Plaintiffs and the Class by causing them to pay substantial fees and transaction costs, be exposed to interest and penalties from the IRS, and incur additional accounting and legal fees and expenses to deal with the IRS fallout, all resulting from Plaintiffs claiming charitable contribution deductions on their federal and state tax returns based on the defective SCE Strategy and Defendants' advice, recommendations, and assistance in connection therewith.

9.     There were only minor, if any, variations in the misrepresentations by the Defendants about the effect of applicable tax law standards to the members of the Class.  And while there are numerous Defendants participating in this unlawful enterprise, the invalidity of the SCE Strategy under these tax provisions, the defects in the SCE Strategy, and the misrepresentations by Defendants and their co-conspirators about the SCE Strategy predominate.  Herein, Plaintiffs do not

simply allege negligence—they allege a common scheme for tax fraud, in which Defendants knew the SCE Strategy, as structured, would fail if challenged by the IRS despite Defendants' representations to the contrary.

## I.
## JURISDICTION AND VENUE

10.　　This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 confers diversity jurisdiction upon this Court, as at least one member of the proposed Class are citizens of states that are different from at least one Defendants' state(s) of citizenship, and the aggregate amount in controversy exceeds $5,000,000.　In addition, this Court has jurisdiction over Plaintiffs' claims based on 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337, which provide jurisdiction for violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1961 *et seq*.; and 29 U.S.C. § 1367, which provides jurisdiction for supplemental state claims, including common-law fraud and conspiracy claims.

11.　　Personal jurisdiction comports with due process under the United States Constitution, the long-arm statute of Georgia, and the provisions of 18 U.S.C. § 1965(b) and (d).

12.　　Without limiting the generality of the foregoing, each Defendant (directly or through agents who were at the time acting with actual and/or apparent authority and within the scope of such authority) has:

(a)    transacted business in Georgia;

(b)    contracted to supply or obtain services in Georgia;

(c)    availed themselves intentionally of the benefits of doing business in
       Georgia;

(d)    produced, promoted, sold, marketed, and/or distributed their products
       or services in Georgia and, thereby, have purposefully profited from
       their access to markets in Georgia;

(e)    caused tortious damage by act or omission in Georgia;

(f)    caused tortious damage in Georgia by acts or omissions committed
       outside such jurisdiction while (i) regularly doing business or
       soliciting business in such jurisdiction, and/or (ii) engaging in other
       persistent courses of conduct within such jurisdiction, and/or (iii)
       deriving substantial revenue from goods used or consumed or services
       rendered in such jurisdiction;

(g)    committed acts and omissions that Defendants knew or should have
       known would cause damage (and, in fact, did cause damage) in
       Georgia to Plaintiffs and members of the Class while (i) regularly
       doing or soliciting business in such jurisdiction, and/or (ii) engaging
       in other persistent courses of conduct within such jurisdiction, and/or

(iii) deriving substantial revenue from goods used or consumed or services rendered in such jurisdiction;

(h)     engaged in a conspiracy with others doing business in Georgia that caused tortious damage in Georgia; and/or

(i)     otherwise had the requisite minimum contacts with Georgia such that, under the circumstances, it is fair and reasonable to require Defendants to come to Court to defend this action.

13.     Venue is proper under 28 U.S.C. § 1391, because, *inter alia*, a substantial part of the events or acts giving rise to the causes of action alleged in this Complaint arose in, among other places, this District, and the harmful effects of Defendants' fraud and wrongful conspiracy were felt in, among other places, this District.  In addition, venue is proper under 18 U.S.C. § 1965 because all Plaintiffs reside in this District.

## II.
## PARTIES

14.     Plaintiff Andrew Lechter is an individual and a citizen of Fulton County, Georgia. This Plaintiff resides in Fulton County, Georgia within this District.

15.     Plaintiff Sylvia Thompson is an individual and a citizen of Georgia. This Plaintiff resides in Cobb County, Georgia within this District.

16.    Plaintiff Lawson F. Thompson is an individual and a citizen of Georgia. This Plaintiff resides in Cobb County, Georgia within this District. Sylvia and Lawson F. Thompson are collectively referred to herein as the "*Thompson Plaintiffs*."

17.    Plaintiff Russell Dalba is an individual and a citizen of Georgia. This Plaintiff resides in Fulton County, Georgia within this District.

18.    Plaintiff Kathryn Dalba is an individual and a citizen of Georgia. This Plaintiff resides in Fulton County, Georgia within this District.   Russell and Kathryn Dalba are collectively referred to herein as the "*Dalba Plaintiffs*."

19.    Defendant Aprio LLP f/k/a Habif, Arogeti & Wynne, LLP ("*Aprio*") is a limited liability partnership organized and existing under the laws of Georgia with its principal place of business at 5 Concourse Parkway, Suite 1000, Atlanta, Georgia 30328.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

20.    Defendant Robert Greenberger is an individual and a citizen of Georgia, residing at 1102 Trailridge Lane, Dunwoody, Georgia 30038.   This Defendant is or was during the relevant period an employee and/or partner of Aprio.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.  Aprio and Robert Greenberger are collectively referred to herein as the "*Aprio Defendants*."

21.    Defendant Sirote & Permutt, P.C. is a professional corporation organized and existing under the laws of Alabama with its principal place of business at 2311 Highland Avenue South, Birmingham, AL  35205.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  This Defendant may be served with process by serving its Alabama registered agent W.T. Carlisle at

2311 Highland Avenue South, Birmingham, AL  35205.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

22.    Defendant Burr & Forman, LLP is a limited liability partnership organized and existing under the laws of Alabama with its principal place of business at 420 20th Street North, Suite 3400, Birmingham, Alabama 35203.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business and maintains a designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.   Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of

fair play and substantial justice and is consistent with due process of law.  This Defendant may be served with process by serving its registered agent Erich Durlacher at 171 17th Street NW, Suite 1100, Atlanta, Georgia 30363.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

23.    Defendant Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. is a professional corporation organized and existing under the laws of Tennessee with its principal place of business at 165 Madison Avenue, 20th Floor, Memphis, TN 38103.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.   Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.   This

Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  This Defendant may be served with process by serving its registered agent Linda Klein at 3414 Peachtree Road, Suite 1600, Atlanta, Georgia 30326.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

24.     Defendant Smith, Lewis & Haley, LLP was a limited liability partnership organized and existing under the laws of Georgia with its principal place of business at 901 North Broad Street, #350, Rome, Georgia 30161.  Upon information and belief, this firm dissolved.  This Defendant is being sued pursuant to O.C.G.A. § 14-4-161.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.  This Defendant may be served with process under O.C.G.A. § 14-4-161(b) through David C. Smith at 1324 E. Deer Creek Drive, Crossville, TN 38571.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

25.     Defendant David C. Smith is an individual and a citizen of Tennessee, residing at 1324 E. Deer Creek Drive, Crossville, TN 38571.  This Defendant is or

was during the relevant period an employee and/or partner of Smith, Lewis & Haley, LLP (now dissolved).  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.  At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia. Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

26.    Defendant Forever Forests, LLC is a limited liability company organized and existing under the laws of Georgia with its principal place of business at 1058 Dornell Road, Ball Ground, Georgia.  This Defendant may be

served with process through its registered agent Nancy Zak at 1058 Dornell Road, Ball Ground, Georgia  30107.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

27.    Defendant Nancy Zak is an individual and a citizen of Georgia, residing at 1058 Dornell Road, Ground Ball, Georgia.  This Defendant is or was during the relevant period an employee and/or member of Forever Forests LLC.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

28.    Defendant James Jowers is an individual and a citizen of Georgia, residing at 2805 Autumn Drive, Canton, Georgia 30115.  This Defendant is or was during the relevant period an employee and/or member of Forever Forests.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

29.    Defendant Large & Gilbert, Inc. is a corporation organized and existing under the laws of Georgia with its principal place of business at 6849 Peachtree Dunwoody Road NE, Building A-2, Atlanta, Georgia 30328.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

30.    Defendant Clower Kirsch & Associates, LLC is a limited liability company organized and existing under the laws of Georgia with its principal place

of business at 289 Culver Street South, Lawrenceville, Georgia  30046.  This Defendant may be served with process through its registered agent Roxanne Kirsch at 289 Culver Street South, Lawrenceville, Georgia 30046.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

31.    Defendant Jim R. Clower, Sr. is an individual and a citizen of Georgia, residing at 2665 North Crestview Drive, Grayson, Georgia 30017.  This Defendant is or was during the relevant period an employee and/or member of Clower Kirsch & Associates, LLC.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

32.    Defendant Tennille & Associates, Inc. is a corporation organized and existing under the laws of North Carolina with its principal place of business at 820 State Farm Road, Suite B, Boone, North Carolina 28607.  This Court has personal jurisdiction over this Defendant pursuant to the Constitution and laws of the United States and the State of Georgia.   At all relevant times, this Defendant has done and is doing business in the State of Georgia, but does not maintain a regular place of business or current designated agent upon whom service may be made in this civil action.  As described hereafter, this Defendant has contracted with a Georgia resident, and either party was to perform the contract in whole or in part in the State of Georgia.  Additionally, this Defendant has committed torts, in whole or in part, in the State of Georgia, including intentional tortious acts directed

at a resident of the State of Georgia, where the brunt of the harm was felt.  This Defendant's conduct in the State of Georgia has been committed by officers, directors, employees, and/or agents of this Defendant acting within the scope of their employment or agency.  This Defendant has purposefully availed itself of the benefits and protections of the laws of the State of Georgia and could reasonably anticipate being subject to the jurisdiction of courts of the State of Georgia.  This suit against this Defendant will not offend traditional notions of fair play and substantial justice and is consistent with due process of law.  This Defendant may be served with process through its North Carolina registered agent and President Pattie Tennille at 820 State Farm Road, Suite B, Boone, North Carolina, 28607.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

33.     Defendant Atlantic Coast Conservancy, Inc. is a nonprofit corporation organized and existing under the laws of Georgia with its principal place of business at 72 South Main Street, Jasper, Georgia 30143.  This Defendant may be served with process through its registered agent Robert D. Keller at 72 South Main Street, Jasper, Georgia 30143.   In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

34.     Defendant Robert D. Keller is an individual and a citizen of Georgia, residing at 4805 Highway 53 West, Jasper, Georgia  30143.  This Defendant is or

was during the relevant period an employee and/or principal of Atlantic Coast Conservancy, Inc.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

35.    Defendant Georgia-Alabama Land Trust, Inc. f/k/a Georgia Land Trust, Inc. is a nonprofit corporation organized and existing under the laws of Georgia with its principal place of business at 226 Old Ladiga Road, Piedmont, AL 36272.  This Defendant may be served with process through its registered agent Tammy Morrow at 521 John Hand Road, Cedartown, Georgia  30125.  In addition, venue and jurisdiction as to this Defendant are proper in this District under 18 U.S.C. § 1965.

### III.
### FACTUAL BACKGROUND

36.    Plaintiffs, on their own behalf and on behalf of the Class, as herein defined, bring this action against Defendants seeking the recovery of damages that Plaintiffs and the Class sustained in connection with their participation in the SCE Strategy.  Plaintiffs, on their own behalf and on behalf of the Class, bring claims for breach of fiduciary duty, negligence, negligent misrepresentation, disgorgement, fraud, violations of the Racketeer Influenced and Corrupt Organizations Act ("*RICO*"), 18 U.S.C. §§1961–1968, violations of the Georgia RICO statute, O.C.G.A. § 16-4-1, *et seq*., negligence/professional malpractice, negligent misrepresentation, breaches of fiduciary duty, disgorgement, fraud,

aiding and abetting, and civil conspiracy. Plaintiffs and the Class seek compensatory damages against Defendants for damages arising from the SCE Strategy the Defendants, the Sponsors (defined at note 8 herein) and Other Participants[2] jointly and in concert developed, promoted, sold, and implemented.

**A.     The History and Purpose of Conservation Easements.**

37.    A conservation easement is a legal agreement between a landowner and another party, generally a land trust or government agency, that permanently restricts the development and/or use of land with the purpose of achieving certain conservation or preservation goals.

38.    In the federal tax context, while a taxpayer may take a deduction for any charitable contribution made during the taxable year (subject to certain limitations), a deduction is generally not allowed for a taxpayer's contribution of a partial interest in property. The Code provides for certain exceptions where a deduction for the donation of a partial interest in property is permitted, one of which is for the donation of a "qualified conservation contribution."

39.    A "qualified conservation contribution" is defined as a contribution (1) of a qualified real property interest, (2) to a qualified organization, (3) made exclusively for conservation purposes. Before a deduction can be claimed,

---

[2] The "*Other Participants*" include individuals and entities such as managers, appraisers, attorneys, accountants, brokers, referral sources, engineers, and others not named as Defendants herein who assisted Defendants in designing, promoting, selling, and implementing the SCE Strategy.

however, certain criteria must be met.  As set out herein, the SCE Strategy failed to comply with the requirements necessary to create a qualified conservation contribution.

**B.    The SCE Strategy.**

> **1.    The Structure of the SCE Strategy.**

40.    The SCE Strategy involves the use of an entity taxed as a partnership under subchapter K of the Code (*i.e.*, the "*Syndicates*").  To achieve this end, Defendants and the Sponsors formed the Syndicates as limited liability companies ("*LLCs*") under state law, which are taxed as a partnership (*i.e.* a pass-through entity) for federal tax purposes.  Defendants' use of an entity taxed as a partnership allowed Defendants to market and sell the SCE Strategy, and the promised tax deductions, to clients who would otherwise be unable to participate.

41.    An entity taxed as a partnership (like an LLC) is not liable for income tax.  Instead, its partners are liable for income tax in their separate or individual capacities based on the income, losses, deductions, or credits that flow through to them from the partnership.  Charitable contributions are one item that flows through to the individual partners under the Code.

42.    Although a partnership does not pay federal income tax, it still has filing and reporting requirements.  Specifically, a partnership is required to file an annual return (*i.e.*, Form 1065) that reports the partnership's income, deductions,

gain, losses, etc.  The partnership is also required to furnish statements, known as Schedule K-1s, to its members (and the IRS) that report each member's distributive share of partnership income or loss and separately stated items, among other things.

43.     The members then report on their individual tax returns their share of partnership income, loss and/or separately stated items, as they are contained on the Schedule K-1 provided to them by the partnership.  In the case of the SCE Strategy, the Plaintiffs and the Class (*i.e.*, the members of the Syndicate) reported the charitable deductions from the SCE Strategy based on the Schedule K-1 received from the respective Syndicate in which they were a member, as they are required by law to do.  The Aprio Defendants prepared these Schedule K-1s, as discussed further herein, in furtherance of and pursuant to the conspiracy between all of the Defendants, the Sponsors, and the Other Participants.

44.     Defendants and the Sponsors planned the steps of the SCE Strategy in advance and these steps were uniform across the Plaintiffs and the Class in every material way:

(a)     First, the Sponsors form or purchase a majority ownership interest in a limited liability company (*i.e.*, the Syndicate) or otherwise obtain the authority to control and direct the Syndicate.  The Syndicate either already holds sufficient real property or the Syndicate acquires

sufficient real property to implement the SCE Strategy steps discussed below.[3]

(b)    Second, the Defendants and Sponsors conduct a "due diligence" period.  During this time, the Defendants and Sponsors hand-pick an appraiser to perform an appraisal of the real property to purportedly provide a valuation of the conservation easement restriction based on the "Highest and Best Use" of the land.  The appraisers were fully aware the appraisals would be used to promote and sell the SCE Strategy to potential participants, including Plaintiffs.  During the due diligence period, other consultants purportedly assist with conservation management and other services in connection with the "Conservation Easement Option" discussed later herein.  Legal counsel also assists in the promotion, sale, and implementation of the SCE Strategy.  This legal counsel also assists by preparing a Legal Opinion (with respect to Defendant Sirote & Permutt, P.C. ("_Sirote_")) supporting the promised tax benefits of the Conservation Easement Option; preparing and assisting with the preparation of the necessary

---

[3] With respect to the SCE Strategy implemented by the Aprio/Effingham Team (defined and described at Paragraph 58 herein), there was one large piece of land that was initially purchased from which the Aprio/Effingham Team carved out whatever size tract they needed for each particular SCE Strategy transaction. While this land was located in Georgia, other members of the Class participated in SCE Strategy transactions involving land located in other states.

corporate, real estate, and other transactional documents; and/or making themselves available to speak to potential participants about the SCE Strategy.  With respect to Sirote, the Legal Opinion is used to promote and sell the SCE Strategy, and Sirote had full knowledge of and in fact consented to the Legal Opinion being used for this purpose.

(c)     Third, the Syndicate offers up to approximately 95% to 99% of the interests in the Syndicate to potential participants in exchange for cash.    The Defendants and the Sponsors explain the Conservation Easement Option in detail in the marketing materials sent to each potential participant (the "*Promotional Materials*") and tout the tax benefits of the conservation easement for potential participants.

(d)     Fourth, the participants purchase a majority of the membership interests in the Syndicate.  The end result is the Syndicate (which holds the critical property) is owned 95-99% by the participants, and the remainder by the original Syndicate member(s).

(e)     Fifth, the Manager of the Syndicate determines that a conservation easement is the appropriate and preferred use of the land.  The Syndicate members then accept the Manager's decision.

(f)     Sixth, one of the Appraiser Defendants prepares an appraisal (the "*Appraisal*" or the "*Appraisals*")), which supports the decision to conserve the land and determines the value of the conservation easement.

(g)     Seventh, the Defendants and Sponsors prepare a Conservation Easement Deed.

(h)     Eighth, the Defendants and Sponsors prepare a Baseline Documentation Report for the Syndicate, which ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift.

(i)     Ninth, the conservation easement is then donated to a Land Trust.

45.     The donation of the conservation easement is reported as a charitable contribution and valued by the Syndicate according to the Appraisal.  The value of the charitable contribution is reported as a charitable contribution deduction on the Syndicate's tax return (prepared by the Aprio Defendants).  The amount of the charitable contribution deduction reported on the Syndicate's tax return equals the purported decrease in the property's appraised value resulting from the restriction placed on the property as a result of the conservation easement.  This deduction is then allocated to each Syndicate member based on their respective ownership

interests in the Syndicate.   Each Syndicate member reports their allocated deduction on their individual tax return.

46.    Defendants (either directly or indirectly) promised, represented to, and assured the Plaintiffs and the Class that these tax deductions were in full compliance with Section 170(h) of the Code and all other relevant and applicable laws, rules and regulations.

47.    The Syndicate members' ability to elect to use the subject property in a variety of different ways was intended to establish the *bona fides* of the arrangement.  However, upon information and belief, in all of the Syndicates used in the SCE Strategy, the conservation easement was the selected use of the subject property because, in reality, the purported commercial viability of the subject property was nonexistent.

48.    In reality (and unbeknownst to Plaintiffs and the Class), the SCE Strategy, as structured by Defendants and the Sponsors, amounts to nothing more than a sale of grossly overvalued and ineffectively structured and supported federal tax deductions that the IRS was already carefully scrutinizing and indicating to professional advisors it would disallow.

49.    In developing, promoting, selling, and implementing the SCE Strategy, Defendants made (or caused others to make) uniform written statements about the allowance and amount of federal and state tax deductions the Plaintiffs

and the Class were legally entitled to claim based on their participation in the SCE Strategy. These statements were false, as set out in detail further below. As a result of these false statements made by or caused by Defendants, the Plaintiffs and the Class unwittingly claimed wholly improper tax deductions on their federal and state tax returns. Defendants made these statements, and caused others to make these statements, to Plaintiffs and the Class despite the fact that Defendants knew or had reason to know they were false.

50. As part of their pre-planned scheme, the Defendants' and Sponsors' hand-picked appraisers prepared and provided grossly overvalued appraisals. Defendants furnished, and caused others to furnish, untrue and inaccurate statements regarding value to clients, including the "fair market value" of the conservation easements. These valuations were then used to claim the large tax deductions that flowed through the Syndicates to the Plaintiffs and the Class. The Appraiser Defendants were in no way independent and did not prepare independent, good faith appraisals. Instead, as part of the scheme, they intentionally allowed the other Defendants direct the methodologies used and values reached in the Appraisals for the purpose of effecting the SCE Strategy and convincing Plaintiffs and the Class to participate in the SCE Strategy. The Sponsors, the Law Firm Defendants,[4] and the Aprio Defendants worked closely

---

[4] The Law Firm Defendants are defined at note 9 herein.

with the Appraiser Defendants to prepare the Appraisals, including determining the "Highest and Best Use" of the property, the value of the donated property interests, the fair market value of the conservation easements, and the amount of the charitable contribution deduction.

51.     The Defendants, the Sponsors, and Other Participants knew or should have known that the IRS would take the position that the charitable contribution deductions from the SCE Strategy were improper, as structured, due to *inter alia* the lack of support for the inflated appraisals of the donated property interests, the failure to substantiate a valid conservation purpose, the failure to substantiate the conservation deduction in the Appraisal Summary Form 8283, the failure of an easement enforceable in perpetuity, the promise of legal tax deductions worth many times more than the amount paid into the Syndicates, and the Defendants' and the Sponsors' failure to comply with the necessary requirements for proper conservation easement charitable contribution deductions.  Despite these issues, the Defendants, the Sponsors, and the Other Participants continued to promote, sell and implement the SCE Strategy and advise Plaintiffs and the Class that the SCE Strategy was legal and legitimate.

52.     It was not reasonable to expect that Plaintiffs and the Class were knowledgeable and they were not, in fact, knowledgeable about complex tax matters and tax planning.  Indeed, that is why Plaintiffs and members of the Class

relied on and trusted the Defendants – *i.e.*, the purported experts.  Plaintiffs and the Class detrimentally relied on Defendants and upon Defendants' repeated unequivocal representations that the SCE Strategy was a completely legal tax-advantaged charitable contribution within the meaning of Code § 170(h), which specifically provides that conservation easements, *if done properly and legally*, create legitimate charitable contributions for income tax purposes.

53.     Unbeknownst to Plaintiffs and the Class, the Defendants, the Sponsors, and the Other Participants entered into undisclosed, improper business arrangements with each other.   These arrangements destroyed the independence of each Defendant and resulted in the Defendants working in furtherance of their own best interests rather than the best interests of their clients.  Each of the Defendants, the Sponsors, and the Other Participants knew or should have known that the IRS would take the position that the SCE Strategy, as structured, did not comply with §170(h) of the Code and was, in reality, nothing more than an illegal and abusive tax shelter.

54.     As part of and in furtherance of the Defendants' scheme, the Aprio Defendants prepared the Syndicates' tax returns, which reported the total amount of charitable deductions.  The Aprio Defendants then determined the amount of each Plaintiff's and member of the Class's charitable deductions, issued a K-1 to each Plaintiff and member of the Class, and advised Plaintiffs and the Class to

report the charitable deductions on their federal and state tax returns for the years in question.  Plaintiffs and the Class followed the Aprio Defendants' advice and instructions (which mirrored the advice and representations from the other Defendants and the Sponsors) and signed and filed their tax returns reporting the charitable deductions.

55.    The Defendants, the Sponsors, and the Other Participants held themselves out as experts in the area of conservation easements and complex tax matters and planning and therefore by providing false and inaccurate information to Plaintiffs and the Class, the Defendants, the Sponsors, and the Other Participants ensured that Plaintiffs and the Class would sign and file federal and state tax returns using and reporting the charitable deductions purportedly generated by the SCE Strategy.  Despite the fact the Defendants, the Sponsors, and the Other Participants knew the IRS was heavily scrutinizing and challenging syndicated conservation easements for potential abuse, the Defendants, the Sponsors, and the other Participants forged ahead and continued to advise, promote, and encourage Plaintiffs and the Class to utilize the SCE Strategy to offset income on their tax returns.

2.       **The Aprio SCE Strategy Team.**

      a.       **The Aprio Defendants.**

56.   The Aprio Defendants were the key organizer of the teams that promoted, sold, and implemented the SCE Strategy at issue in this case. As the "largest independent, full-service CPA-led professional services firm based in Atlanta, Georgia,"[5] the Aprio Defendants not only had at their disposal hundreds of existing clients who were potential participants in the SCE Strategy, but also had the reputation and "brand name" to attract additional potential participants who were not otherwise already clients of the Aprio Defendants. With respect to the SCE Strategy, the Aprio Defendants pursued both of these objectives. The Aprio Defendants knew they could not implement the SCE Strategy alone. However, their unique position allowed the Aprio Defendants to choose which sponsors they wanted to use to implement the SCE Strategy. Indeed, sponsors clamored to partner with the Aprio Defendants to implement the SCE Strategy. By way of example, the Aprio Defendants teamed up with sponsors, Evrgreen Management Group, Inc. ("*Evrgreen*")[6] and Effingham Managers, LLC ("*Effingham*"),[7] to work on the SCE Strategy. The Aprio Defendants assisted and advised the Sponsors at every stage of the implementation of the SCE Strategy, including reviewing and

---

[5] *See* https://www.aprio.com/about/

[6] Evrgreen is owned and controlled by Matt Campbell ("*Campbell*").

[7] Effingham is owned and controlled by Derek Hutcheson ("*Hutcheson*").

approving the Promotional Materials and assisting in the preparation of the Conservation Easement Deeds, Appraisals, and IRS Appraisal Summary Forms (Form 8283).  The Aprio Defendants also prepared the partnership tax returns for each Syndicate used in the SCE Strategy, as well as the K-1s sent to each Plaintiff and Class Member containing the charitable contribution deduction to be reported on the individual tax returns as a result of the SCE Strategy.

### b.    The Aprio/Evrgreen Team.

57.    The following team of key players worked together with the Aprio Defendants in implementing the SCE Strategy:

(a)    Evrgreen.  Evrgreen was the "sponsor" of the SCE Strategy that was promoted, sold and implemented by the Aprio/Evrgreen team. Evrgreen worked with the Defendants to develop, market, sell, and implement the SCE Strategy.  Evrgreen also purported to provide services to each such Syndicate to investigate the investment options for the property, including the Conservation Easement Option. Evrgreen also purported to provide conservation management and project management services for each such Syndicate.  Evrgreen organized and distributed all of the Promotional Materials for each such Syndicate and assisted with the preparation and drafting of all such documents.  Evrgreen also worked with the other Defendants to

prepare the Appraisals, Conservation Easement Deeds, and Baseline Documentation Reports.

(b)    Environmental Resources Fund, LLC ("*Environmental Resources*").[8] This entity was formed by Evrgreen and Campbell to act as the Manager of the Syndicates.  Environmental Resources was also a minority member of each Syndicate.  As Manager, it would make the decision to move forward with the Conservation Easement Option. Environmental Resources was paid a fee by the Syndicates out of the money paid in by Plaintiffs and the Class.

(c)    Smith, Lewis & Haley, LLP ("*SLH*") and David C. Smith ("*Smith*")(collectively the "*SLH Defendants*").  SLH is a law firm that provided advice and services regarding real estate matters and tax matters and Smith was the partner in charge of such services.  The SLH Defendants reviewed and contributed to the preparation of the Promotional Materials and the organization of each such Syndicate. They also provided other advice and services in connection with the Conservation Easement Option.  These Defendants also worked with other Defendants (including the Aprio Defendants and the Land Trust

---

[8] The sponsors that the Aprio Defendants worked with, including Evrgreen, Campbell, Effingham, Hutcheson and Environmental Resources, are collectively referred to herein as the "*Sponsors*."

Defendants), as well as the Sponsors, to prepare and approve the Conservation Easement Deeds, Baseline Documentation Reports, and Appraisals.

(d)   Clower, Kirsch & Assocs. and Jim R. Clower, Sr. (collectively the "*Clower Defendants*") and Tennille & Associates, Inc. ("*Tennille*"). These appraisal firms performed the appraisals to support the valuation of the conservation easement and the charitable contribution deduction taken by each Syndicate (which, in turn, flowed through to each member in the Syndicates).  These Defendants are referred to herein as the "*Appraiser Defendants*."  The Appraiser Defendants also signed the Appraisal Summary (IRS Form 8283) as the appraiser declaring the legitimacy of the claimed charitable contribution deduction.

(e)   Atlantic Coast Conservancy ("*ACC*") and Robert D. Keller ("*Keller*") (collectively the "*ACC Defendants*").  ACC is the land trust to which each Syndicate donated its conservation easement and is owned, managed, and controlled by Keller.  The ACC Defendants worked on the preparation of the Conservation Easement Deeds.  These Defendants also prepared preliminary studies and inspections that concluded that each respective property would satisfy one or more of

the "conservation purposes" defined under § 170 of the Code. Evrgreen used the conclusions reached in these preliminary studies in the Promotional Materials sent to potential participants. The ACC Defendants also prepared the Baseline Document Reports, which were filed with each Syndicate's IRS Appraisal Summary Form 8283 and tax return and which confirmed that the property contained at least one of the conservation conditions required under § 170 of the Code and, therefore, the conservation easement was in compliance with the Code. The ACC Defendants also provided a letter to each such Syndicate confirming the donation and representing that the Syndicate would receive a full tax deduction for the value of the conservation easement donated and also countersigned the Appraisal Summary (IRS Form 8283) to help substantiate the charitable contribution deduction in accordance with Code Section 170(h).

      **c.**      **The Aprio/Effingham Team.**

58.    The following team of key players also worked together with the Aprio Defendants in implementing the SCE Strategy:

    (a)    <u>Effingham</u>. Effingham was the "sponsor" of the SCE Strategy that was promoted, sold, and implemented by the Aprio/Effingham team. Effingham worked with the Defendants to develop, market, sell, and

implement the SCE Strategy.  Effingham also purported to investigate the investment options for the property, including the Conservation Easement Option.  Effingham also purported to provide conservation management and project management services.  Effingham organized and distributed all of the Promotional Materials for each such Syndicate and assisted with the preparation and drafting of all such documents.  Effingham also worked on the preparation of the Appraisals, Conservation Easement Deeds, and Baseline Documentation Reports.

(b)    Forever Forests, LLC ("*Forever Forests*").  This entity was formed by Nancy Zak to act as the Project Manager of the Syndicates.  Forever Forests assisted in the structuring and execution of the Conservation Easement Option for each such Syndicate and provided project oversight, facilitated communications between professional and other team members, reviewed project documentation and offered recommendations for due diligence and regulatory compliance. Forever Forests, Nancy Zak and James Jowers are collectively referred to herein as the "*Forever Forests Defendants*."

(c)    Burr & Forman, LLP ("*Burr Forman*").  This law firm provided legal advice and services in connection with the SCE Strategy.  It assisted

in the preparation of the Promotional Materials, transaction documents, Appraisals, Baseline Documentation Reports, and the Conservation Easement Deeds and provided further advice and services throughout the development, promotion, sale, and implementation of the SCE Strategy.

(d)   Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. ("*Baker Donelson*") and Large & Gilbert, Inc. ("*Large & Gilbert*").   Baker Donelson is a law firm, and Large & Gilbert is an accounting firm. These professional firms provided advice and services regarding the preparation of the Appraisal Summary Form 8283 for each Syndicate. As discussed below, each of these Appraisal Summary Forms 8283 were improperly prepared and resulted in the disallowance of the charitable contribution deductions.

(e)   Sirote.   Sirote is a law firm[9] that provided advice and services in connection with the SCE Strategy, including drafting operating agreements and other legal documents and reviewing documents provided and/or prepared by other team members.   Sirote also reviewed and assisted with the preparation of the Conservation Easement Deeds, the Baseline Documentation Reports and the

---

[9] The SLH Defendants, Baker Donelson, Burr Forman and Sirote are collectively referred to herein as the "*Law Firm Defendants*".

Appraisals.   In addition, Sirote prepared Legal Opinions purporting to support the *bona fides* of the charitable contribution deductions generated from the SCE Strategy and concluding that the deductions would more likely than not be accepted by the IRS, if challenged. Sirote knew that its Legal Opinions would be used in the promotion, sale, and implementation of the SCE Strategy.   Sirote, in fact, intended for its Legal Opinions to be used for this purpose and consented to its Legal Opinions to be used for this purpose.   As further set out in Paragraphs 173-179 herein, these Legal Opinions were flawed and inaccurate and were nothing more than a promotional tool to be used to convince potential participants to engage in the SCE Strategy.

(f)     Tennille.  Tennille is the appraisal firm that performed the appraisals to support the valuation of the conservation easement charitable contribution deduction taken by each Syndicate used in the Effingham SCE Strategy transactions (which, in turn, flowed through to each member in the Syndicates).

(g)     The ACC Defendants and Georgia Alabama Land Trust ("*GLT*") (collectively the "*Land Trust Defendants*").  ACC and GLT are the land trusts to which the Syndicates donated their conservation

easement.  The Land Trust Defendants worked on the preparation of the Conservation Easement Deeds.  They also prepared preliminary studies and inspections that concluded that each respective property would satisfy one or more of the "conservation purposes" defined under § 170 of the Code.  Effingham used the conclusions reached in these preliminary studies in the Promotional Materials provided to potential participants.  The Land Trust Defendants also prepared the Baseline Document Reports for each Syndicate, which were filed with each Syndicate's Appraisal Summary (Form 8283) and tax return and which confirmed that the property contained at least one of the conditions required under § 170 of the Code and, therefore, the conservation easement was in compliance with the Code.  The Land Trust Defendants also provided a letter to each such Syndicate confirming the donation and representing that the Syndicate would receive a full tax deduction for the value of the conservation easement donated.

59.    In accordance with their pre-planned scheme, the Defendants, the Sponsors, and Other Participants jointly worked to design, promote, and sell the SCE Strategy to potential clients, including Plaintiffs and the Class Members, and then jointly worked together to execute the steps of the SCE Strategy.  The

Defendants, the Sponsors, and the Other Participants never disclosed to Plaintiffs that they had conspired to fraudulently, recklessly, or negligently design, promote, sell, and implement the SCE Strategy.  Nor did they disclose to the Plaintiffs that they were in no way independent from each other.

**C.     The IRS warns the Defendants regarding potential abuses of syndicated conservation easements.**

60.     As early as 1984, the IRS warned professional advisors and promoters of conservation easements that the overvaluation of charitable contributions was improper and would not be tolerated.  (IRS News Release, IR-81-122).  The Senate Finance Committee was aware of and concerned about tax shelter promoters exploiting opportunities to offset income through inflated valuations of donated property.  Congress recognized that tax shelter promoters knew it was not possible for the IRS to detect most instances of excessive deductions.  And because of the subjective nature of valuation, tax shelter promoters could promote and sell transactions that claim excessive charitable deductions and rely on the "audit lottery" to attempt to conceal the inflated charitable contribution deduction from the IRS.  Because of these concerns, the Senate Finance Committee made it clear to professional advisors that stronger substantiation and overvaluation provisions should be applicable to charitable contributions of property.

61.     Congress took action to address the problem of overvaluing charitable contributions in the Deficit Reduction Act of 1984 ("*DEFRA*").  DEFRA set forth

specific provisions for the substantiation of charitable contributions, including instructing the Secretary to prescribe regulations under §170(a)(1) of the Code to require any individual, closely held corporation or personal service corporation claiming a deduction under §170 of the Code for charitable contributions to obtain a Qualified Appraisal for the property contributed and to attach an Appraisal Summary to the return on which the deduction is first claimed for such contribution; such Qualified Appraisal was to specifically disclose the cost basis, acquisition date of the contributed property, and such additional information as the Secretary may prescribe in such regulations. DEFRA §155(a)(1)(C) specifically requires the inclusion of cost basis on the Appraisal Summary.

62.   The Secretary complied with Congress' mandate by promulgating regulations pursuant to DEFRA §155(a). The relevant regulation reiterates that no deduction under §170 shall be allowed with respect to a charitable contribution unless the substantiation requirements are met. These Treasury Regulations require a fully completed Appraisal Summary (Form 8283) to be attached to the return and provides a list of what the Appraisal Summary must include, specifically including the identification of the cost basis of the property.

63.   These regulations made it clear to professional advisors and promoters/sponsors of conservation easements that their failure to comply with the substantiation requirements would result in the disallowance of the claimed

deduction and expressly requires that a charitable deduction may be allowed only if the contribution is verified in the manner specified by the Treasury Regulations.

64.   Simply stated, the Defendants were put on notice as early as 1984 that the failure to set forth the cost basis of the donated property on the Form 8283 results in the complete disallowance of the charitable deduction.

65.   In 2004,[10] the IRS officially identified conservation easements as purportedly generating deductions that the IRS would carefully scrutinize and eventually disallow if certain circumstances were present, including *inter alia*, failure to substantiate the fair market value of the tax benefit and other valuation issues.   At that time, the IRS advised professional advisors and promoters that it would aggressively pursue back-taxes and enormous penalties from taxpayers who claimed disallowed deductions from conservation easements.

66.   In 2006, the IRS officially put professional advisors and promoters of conservation easements on notice of what constitutes a "Qualified Appraisal" and a "Qualified Appraiser," including, for example, requiring a Qualified Appraisal to be consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ("USPAP") as developed by the Appraisal Standards Board of the Appraisal Foundation.

---

[10] *See* IRS Notice 2004-41 (July 12, 2004).

67.     Even in the face of these warnings, the Defendants and the Sponsors continued to aggressively promote and heavily profit from conservation easements. In fact, Defendants eventually moved into syndicated conservation easements, which greatly expanded the "market" for these Defendants by now making the SCE Strategy available to individuals who were not individually able to participate in a capital-heavy conservation easement transaction.

68.     In 2016, the IRS once again advised professional advisors that it was heavily scrutinizing these transactions and would disallow tax deductions if certain circumstances existed, and taxpayers who claimed disallowed deductions would pay a heavy price.  In December 2016, the IRS issued Notice 2017-10, which designated certain syndicated conservation easements (like the SCE Strategy) as listed transactions.  Specifically, the Notice listed transactions where members in pass-through entities receive promotional material offering the possibility of a charitable contribution deduction worth at least two and a half times their contribution.

69.  By 2019, the IRS added syndicated conservation easement transactions (like the SCE Strategy) to its "Dirty Dozen" list of tax scams to avoid.[11]

---

[11]     *See*     https://www.irs.gov/newsroom/abusive-tax-shelters-trusts-conservation-easements-make-irs-2019-dirty-dozen-list-of-tax-scams-to-avoid

**D.**     **The Plaintiffs Engage In the SCE Strategy.**

**1.**     **The Dalba Plaintiffs engage in the SCE Strategy through the Maple Landing Syndicate for the tax year 2011.**

**a.**     **The Steps of the Maple Landing Syndicate Transaction.**

70.     On April 23, 2008, WDHL Investments, LLC ("*WDHL*") LDHL Investments, LLC ("*LDHL*") and Julienton Investments, LLC ("*Julienton*") formed Maple Landing, LLC (the "*Maple Landing Syndicate*").  At the time of formation, WDHL, Julienton and LDHL each owned 33% of the Maple Landing Syndicate and Effingham owned 1%.[12]  WDHL, LDHL, and Julienton are referred to herein as the "*Majority Members*".  Effingham Managers, LLC was also designated as Manager.[13]  In April 2010, the Hutchesons contributed 283.42 acres of property in Effingham County, Georgia to the Maple Landing Syndicate.

71.     The Maple Landing Syndicate, through the Majority Members, offered up to 99% of the ownership interests in the Maple Landing Syndicate (*i.e.*, up to the Majority Members' entire interest) pursuant to Promotional Materials dated June 11, 2010.  The Maple Landing Syndicate represented that the Maple Landing Syndicate and the Manager had investigated several potential uses for the property with focus on two primary options:  (1) to hold the property for future

---

[12] WDHL, LDHL, and Julienton were owned by W. Darrel Hutcheson, Derek Hutcheson (collectively the "*Hutchesons*"), and James Toby Roberts, Sr., respectively.

[13] Effingham was, in turn, owned by the Majority Members of the Maple Landing Syndicate and was managed by James Toby Roberts, Sr.

residential land development (the "*Investment Proposal*"), and (2) to place the property into a conservation easement (the "*Conservation Proposal*").  The Manager would make the initial decision on which use of the property would provide the most benefits to the members of the Maple Landing Syndicate and the members then had a right to object to the Managers' proposal.

72.    A Legal Opinion from Sirote was also provided with the Promotional Materials.  Notably, this Legal Opinion is addressed to Maple Landing, LLC, but thereafter instead of referencing Maple Landing, the Legal Opinion instead refers to River's Edge Landing, LLC ("*River's Edge*").[14]  This is clear evidence that the Legal Opinion Sirote prepared in connection with the Maple Landing transaction was generated from a "cookie cutter" template for which Sirote merely needed to enter certain transaction-specific (but non-substantive) fields.[15]

73.    All of the Promotional Materials and the Sirote Legal Opinion were designed to convince potential participants that the SCE Strategy, through the Maple Landing Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement.   The Promotional Materials were prepared jointly by the Managers of the Maple Landing Syndicate and Sirote (and reviewed

---

[14]   River's Edge is an SCE Strategy transaction that is identical in all materials respects to the Maple Landing SCE Strategy transaction and like Maple Landing, has been petitioned in Tax Court Docket #1111-18.

[15] The Sirote Legal Opinion is discussed further at Paragraphs 173-179 herein.

and approved by the Aprio Defendants) for the sole purpose of convincing potential participants to participate in the SCE Strategy through the Maple Landing Syndicate, thus generating enormous fees for these Defendants, the Sponsors, and the Other Participants.

74.     The Dalba Plaintiffs were one of the potential participants to whom the Maple Landing Syndicate sent the Promotional Materials.

75.     The Promotional Materials advised the Dalba Plaintiffs, among other things, that:

(a)     The Maple Landing Syndicate was organized to "own, manage, and/or hold for investment" the real estate.

(b)     The Maple Landing Syndicate's "investment objectives in connection with its business are (i) to preserve and protect the Company's capital; (ii) to manage the use and operation of the Property; and (iii) to realize possible capital appreciation in the value of the Property".

(c)     Despite these "investment objectives," "the [Maple Landing Syndicate] may, however, grant a conservation easement over the Property in order to preserve the Property."

(d)     The Maple Landing Syndicate will maintain an "Operating Reserve" in the amount of $136,350 "to provide the [Maple Landing Syndicate] with capital necessary to pay anticipated [Maple Landing Syndicate]

expenses and to have funds necessary to operate, including on-going legal and accounting expenses."

(e)     The Operating Reserve will be funded with the money paid by the participants in the SCE Strategy like the Dalba Plaintiffs.

(f)     The Maple Landing Syndicate and the Manager have investigated several potential uses for the property, with the focus on two primary options.  The first option is to hold the property for future residential land development (*i.e.*, the Investment Proposal).  The second option is to place the property into a conservation easement (*i.e.*, the Conservation Easement Proposal), which would result in a charitable contribution deduction for those who participated in the SCE Strategy through the Maple Landing Syndicate.

(g)     The Maple Landing Syndicate Manager has engaged an appraiser (*i.e.*, Tennille) and has begun negotiations with a land trust (*i.e.*, GLT).

(h)     "The granting of the conservation easement could have significant tax benefits."

(i)     "As part of making any recommendation on proceeding with the Conservation Proposal, the Manager intends to obtain additional information on the development potential of the Property and the benefits to the Members of holding the Property for development."

(j)     With respect to the "Conservation Proposal," the Manager will make the decision on whether to pursue it and then each Member will have the opportunity to object to this decision in writing.

76.     As noted above, the Maple Landing Syndicate Manager furnished the Sirote Legal Opinion with the Promotional Materials.   The Maple Landing Syndicate Manager represented that the Legal Opinion covered "tax issues with respect to the formation of the [Syndicate], the transfer of the Property to the Company, and the sale of the Units."  The Promotional Materials "urged" potential participants to read the Sirote Legal Opinion, which concluded that it was more likely than not that the promised tax treatment would be sustained by the IRS if the Maple Landing Syndicate or any of its members were audited.

77.     The Maple Landing Syndicate, the Manager, Sirote, and the Aprio Defendants hand-picked Tennille as the appraiser to perform a valuation of the real estate.  As part of its "diligence" (and afterwards as well), the Maple Landing Syndicate purportedly also received advice and consultation from the Forever Forests Defendants for the purpose of supporting the value of the Highest and Best Use of the real estate for land development.  All of these advisors were paid by the Maple Landing Syndicate or another affiliated entity.

78.     The Dalba Plaintiffs consulted with Aprio tax advisor Bob Greenberger, who advised the Dalba Plaintiffs that the SCE Strategy complied

with the requirements of Code Section 170(h) and, as a result, they could legally report this allocated charitable contribution deduction provided by the SCE Strategy. The Aprio Defendants also told the Dalba Plaintiffs that the SCE Strategy was a routine and legal tax-advantaged structure used by Aprio partners and numerous Aprio clients.

79. Based on the Promotional Materials, the Legal Opinion from Sirote, and the Defendants' and Effingham's advice and representations, the Dalba Plaintiffs invested $42,000 in the Maple Landing Syndicate on December 23, 2010.

80. Subsequently, the Manager elected to move forward with the "Conservation Proposal."

81. The Maple Landing Syndicate members then "approved" the Manager's decision to place a conservation easement on the real estate and to contribute the conservation easement to GLT.

82. On November 24, 2010, GLT prepared and provided a Baseline Documentation Report to the Maple Landing Syndicate, which was verified as accurate by GLT and the Maple Landing Syndicate and filed with the Form 8283 and the Maple Landing Syndicate's tax return. The purpose of this report is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose. GLT concluded in this report that

it is in the best interest of the Maple Landing Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to GLT. More importantly, GLT set out the conditions on the property that will be preserved by the conservation easement and concluded that these conditions meet the conservation purpose of §170 of the Code.

83.    On or about December 20, 2010, Tennille submitted the final Appraisal to further support the valuation of the land for its purported Highest and Best Use as a high density residential development and valued the conservation easement at $6,791,000.  The final Appraisal had an effective date of December 20, 2010, and, as required, was attached to the Maple Landing Syndicate's tax return.

84.    The Maple Landing Syndicate conveyed the conservation easement to the GLT on December 30, 2010.

85.    The Conservation Easement Deed, dated December 30, 2010, was verified and signed by David R. Roberts of Tennille (as the appraiser) and by the Deputy Director of GLT (on behalf of GLT).

86.    On December 30, 2010, GLT provided the Maple Landing Syndicate with a letter documenting the conveyance and advising the Maple Landing Syndicate that its contribution to GLT "is fully tax deductible."  This letter was

also filed with the Maple Landing Syndicate's tax return, along with the Baseline Documentation Report and Appraisal Summary Form 8283.

87.    The Conservation Easement Deed language was jointly prepared and approved by Sirote, the Aprio Defendants, the Manager, and GLT.

88.    As a result of the conservation easement conveyance to GLT, the Maple Landing Syndicate purportedly received an allowable charitable contribution deduction of $6,791,000, which then flowed through and was allocated to each of the members in the Maple Landing Syndicate, including the Dalba Plaintiffs, in proportion to their relative ownership interest in the Maple Landing Syndicate.

89.    On or about March 9, 2011, the Aprio Defendants prepared the Appraisal Summary (Form 8283) and, as required, attached it to the Maple Landing Syndicate's tax return.   Roberts of Tennille (as the appraiser) and a representative of GLT (on behalf of GLT) verified the Appraisal Summary (Form 8283) as accurate and signed it.   The Aprio Defendants represented to the IRS in the Appraisal Summary Form 8283 that the easement was placed on the property to protect the property.

90.    On or about March 30, 2011, the Aprio Defendants prepared the tax return for Maple Landing LLC.   The tax return reported a charitable contribution deduction of $6,791,000.   As required, the Aprio Defendants attached to the Maple

Landing Syndicate's return a copy of the Appraisal, the Appraisal Summary Form 8283, the Baseline Documentation Report, and the GLT letter confirming the donation.

91.    In addition, the Aprio Defendants prepared a K-1 for each of the investors of the Maple Landing Syndicate, including the Dalba Plaintiffs, which reported the amount of charitable contribution deduction allocated to each of the members of the Maple Landing Syndicate.   The K-1 prepared for the Dalba Plaintiffs reported a charitable contribution deduction of $162,984.   The Aprio Defendants advised the Dalba Plaintiffs to report this charitable contribution deduction on their individual tax returns for 2010.

92.    The Aprio Defendants prepared the Dalba Plaintiffs' Appraisal Summary Form 8283 and attached the Appraisal for use in their individual tax returns, which reported the charitable contribution deduction of $162,984.   The Aprio Defendants then advised the Dalba Plaintiffs that the Appraisal Summary (Form 8283) would substantiate the charitable deduction and allow the Dalba Plaintiffs to claim the charitable contribution deduction on their individual tax returns.

93.    The Dalba Plaintiffs followed the advice of the Defendants, including specifically the Aprio Defendants, and reported the charitable contribution deduction of $162,984 on their individual tax returns for 2010.

      b.     **The 2010 Maple Landing Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

94.    On or about October 29, 2012, Maple Landing, LLC received an IRS Notice indicating that the Maple Leaf Syndicate partnership tax return for the 2010 tax year return was selected for audit.

95.    Effingham hired Aprio and Sirote to represent the Maple Landing Syndicate in the audit and tax court. Of course, Aprio and Sirote had a serious conflict of interest since they were promoters of the SCE Strategy; worked closely with Defendants to promote, sell and implement the SCE Strategy; and assisted in the preparation of the Appraisal, the Conservation Easement Deed, the Promotional Materials, and the Baseline Documentation Reports. Moreover, Sirote wrote the Legal Opinion that purported to bless the legality and legitimacy of the conservation easement donation. The Aprio Defendants also specifically advised the Dalba Plaintiffs to participate in the SCE Strategy; prepared the Maple Landing Syndicate's tax return and K-1s, which reported the charitable contribution deduction; and prepared the Appraisal Summary Form 8283, in which the Aprio Defendants intentionally did not disclose the "cost basis" of the property as required.

96.    On November 25, 2014, Derek Hutcheson (as the Tax Matters Partner of the Maple Landing Syndicate) sent a letter to all of the members of the Maple

52

Landing Syndicate enclosing the IRS Revenue Agent Report dated November 17, 2014 (the "*Maple Landing RAR*").  The Maple Landing RAR concluded that the entire charitable contribution deduction ($6,791,000) generated by the SCE Strategy for the Maple Landing Syndicate was to be disallowed at the partnership level for a number of reasons, which further evidences the IRS's intent to similarly disallow the charitable contribution deductions at the individual level for members of the Maple Landing Syndicate.

97.     In the November 25, 2014 letter to all members of the Maple Landing Syndicate with which he enclosed the Maple Landing RAR, Derek Hutcheson continued to reassure the members that there was nothing to worry about.  He stated that he "does not agree with any of the conclusions reached in the report" and that he "plan[s] to contest and appeal the findings as the Tax Matter Partner for the LLC."  He further reassured the members of the Maple Landing Syndicate that "[i]t is important to remember that this report is issued in connection with the very first stage of the IRS process, and tax counsel [Sirote] has advised us that the report marks only the beginning of the proceedings."

98.     On or about October 31, 2017, the IRS issued an FPAA for the Maple Landing Syndicate's 2010 tax year.  The FPAA adopted the findings contained in the Maple Landing RAR.  A Tax Court petition was filed by Effingham on January 29, 2018, Docket #1996-18.

99.     On December 10, 2018, the IRS filed a motion for summary judgment in the Maple Landing Syndicate case, arguing the same points raised in the Maple Landing RAR. That motion is currently awaiting decision.[16]

**2.      The Thompson Plaintiffs engage in the SCE Strategy through the Mossy Rock Syndicate for the tax year 2011.**

**a.      The Steps of the Mossy Rock Syndicate Transaction.**

100.    The Thompson Plaintiffs received Promotional Materials from Evrgreen dated October 20, 2011, regarding participating in Mossy Rock, LLC (the "_Mossy Rock Syndicate_"), a company managed by Environmental Resource.

101.    In the Promotional Materials, the original members of the Mossy Rock Syndicate offered to sell roughly 95% of the ownership rights in the Mossy Rock Syndicate.  One of the stated purposes of the Promotional Materials was to raise capital to redeem 3,438,527 shares of the 3,619,502 shares owned by the four original members of the Mossy Rock Syndicate.

102.    These Promotional Materials were prepared by the SLH Defendants and Evrgreen and reviewed and approved by the Aprio Defendants.

103.    The Promotional Materials advised the Thompson Plaintiffs, among other things, that:

---

[16] The IRS motion for summary judgment will almost certainly be partially granted, consistent with similar rulings on Oakhill Woods and Belair Woods on nearly identical facts since Hutcheson created approximately ten identical deals consisting of subparcels of the eased property in Maple Landing, Belair Woods, Oakhill Woods and several other transactions.

(a)     The Mossy Rock Syndicate will make a number of decisions with respect to the tax treatment of particular transactions on the Mossy Rock Syndicate's tax return.

(b)     The Mossy Rock Syndicate and its Manager have investigated several potential uses for the property, with the focus on two primary options: (1) hold the property for future development as a single family residential neighborhood (the "_Investment Proposal_"), and (2) place the property into a conservation easement (the "_Conservation Easement Proposal_"), which would result in a charitable contribution deduction equal to more than 2.5 times the amount the Thompson Plaintiffs paid into the Mossy Rock Syndicate.  The Manager will make the initial decision on which use of the property would provide the most benefit to the members of the Mossy Rock Syndicate.  The members will then vote on the Manager's decision.

(c)     The Investment Proposal indicates that the property could successfully support the construction of at least 158 residential parcels under current zoning.

(d)     The Conservation Proposal indicates that the Mossy Rock Syndicate has investigated the feasibility of granting a conservation easement on the property to achieve certain business and tax objectives.  The

Mossy Rock Syndicate retained Evrgreen to assist with the evaluation of potential investment opportunities, and in particular with the possibility of placing a conservation easement on the property. The Mossy Rock Syndicate has negotiated with ACC concerning the placement of the conservation easement, if elected by the Manager and supported by the members of the Mossy Rock Syndicate. Placement of the conservation easement should permit the Mossy Rock Syndicate to receive a charitable contribution deduction pursuant to §170(h) of the Code.

(e)    A preliminary study and inspection of the property by ACC has indicated that the property will satisfy one or more of the "conservation purposes" defined under Treasure Regulation §1.170A-14(d).

(f)    The Defendants and Evrgreen jointly prepared, reviewed and approved a draft of the Deed of Easement (*i.e.*, the Conservation Easement Deed), which is available for inspection upon request to the Manager.

(g)    The Mossy Rock Syndicate also procured and reviewed a copy of a "Preliminary Appraisal Report" for the property prepared by the Clower Defendants, which concludes that a grant of the conservation

easement to ACC will entitle the Mossy Rock Syndicate to a charitable contribution easement deduction in the approximate amount of $17,685,000.00. A copy of the Preliminary Appraisal Report is available from the Manager upon request.

(h)   If the Mossy Rock Syndicate decides to conserve the property by contributing a conservation easement to ACC, a tax-exempt land trust, the Mossy Rock Syndicate's members will receive a charitable contribution deduction equal to more than 2.5 times the amount each member, including the Thompson Plaintiffs, paid to the Mossy Rock Syndicate.

104.   Defendants supported the Promotional Materials with an Initial Appraisal prepared by the Clower Defendants, a preliminary study and inspection of the property by ACC, and a draft copy of the Deed of Easement prepared by ACC, Evrgreen, the SLH Defendants and the Aprio Defendants.

105.   The Clower Defendants, Evrgreen's and the Aprio Defendants' hand-picked appraiser, performed an initial Appraisal of the real estate for the Mossy Rock Syndicate. In the Promotional Materials, the Defendants and Evrgreen indicate that this initial Appraisal will be made available to any potential participants who desired to review it.

106.   Based on the Promotional Materials and the Defendants' and Evrgreen's advice and representations confirming these written representations, the Thompson Plaintiffs paid $19,000 to the Mossy Rock Syndicate on December 7, 2011.

107.   Environmental Resource, as the Mossy Syndicate's Manager, then made the initial decision that the Conservation Proposal will provide the most benefit to the members.

108.   The Mossy Rock Syndicate members "voted" to follow the Manager's decision to place a conservation easement on the real estate and to contribute the conservation easement to ACC.

109.   The Conservation Easement Deed, dated December 16, 2011, was verified and signed by the Clower Defendants (as the appraiser) and Robert D. Keller (as the President of ACC).   The SLH Defendants, the Aprio Defendants, ACC, and Evrgreen worked jointly to prepare and approve the Conservation Easement Deed.

110.   On December 19, 2011, the Clower Defendants submitted a final Appraisal to further support the valuation of the land for its purported Highest and Best Use as a high-density single family residential development and valued the conservation easement at $17,685,000.   The final Appraisal had an effective date

of December 7, 2011, and, as required, was attached to the Mossy Rock Syndicate's tax return.

111. On December 28, 2011, ACC prepared and provided a Baseline Documentation Report to the Mossy Rock Syndicate, which was verified as accurate by ACC and the Mossy Rock Syndicate and filed with the Appraisal Summary (Form 8283) and the Mossy Rock Syndicate's tax return. The purpose of this report is to ascertain the conservation values of the property at the date of donation and to substantiate the purported conservation purpose. ACC concluded in this report that it is in the best interest of the Mossy Rock Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to ACC. More importantly, ACC set out the conditions on the property that will be preserved by the conservation easement and concludes that these conditions meet the conservation purpose of §170 of the Code.

112. The Mossy Rock Syndicate conveyed the conservation easement to ACC on December 28, 2011.

113. On December 28, 2011, ACC provided the Mossy Rock Syndicate with a letter documenting the conveyance and advising the Mossy Rock Syndicate that its contribution to ACC "is fully tax deductible."

114. As a result of the conservation easement conveyance to ACC, the Mossy Rock Syndicate purportedly received an allowable charitable contribution

deduction of $17,685,000, which then flowed through and was allocated to each of the members of the Mossy Rock Syndicate, including the Thompson Plaintiffs, in proportion to their relative ownership interest in the Mossy Rock Syndicate.

115. The charitable contribution deduction that was allocated to the Thompson Plaintiffs was more than 2.5 times the amount they paid into the Mossy Rock Syndicate.

116. The Aprio Defendants prepared the Appraisal Summary (Form 8283). The Clower Defendants (as the Appraiser) and Defendant Keller (on behalf of the ACC) verified the Appraisal Summary as accurate and signed it under penalties of perjury. The Aprio Defendants represented to the IRS in the Appraisal Summary (Form 8283) that the easement was placed on the property to protect wildlife habitats.

117. On or about April 7, 2012, the Aprio Defendants prepared and filed the tax return for Mossy Rock Preserve, LLC and such return was signed by Greenberger as paid preparer. The tax return reported a charitable contribution deduction of $17,685,000. As required, the Aprio Defendants attached to the Mossy Rock Syndicate's return a copy of the Appraisal, Appraisal Summary (Form 8283), the Baseline Documentation Report, and the ACC letter confirming the donation as fully tax deductible.

118.   In addition, the Aprio Defendants prepared a K-1 for each of the members of the Mossy Rock Syndicate, including the Thompson Plaintiffs, which reported the amount of charitable contribution deduction allocated to each of the members of the Mossy Rock Syndicate.   The K-1 prepared for the Thompson Plaintiffs reported a charitable contribution deduction of $92,835.00.   The Aprio Defendants also provided the Appraisal Summary (Form 8283) to the Thompson Plaintiffs for use on their individual returns.   The Aprio Defendants advised the Thompson Plaintiffs to report this charitable contribution deduction on their individual tax returns for 2011.

119.   The Thompson Plaintiffs followed the advice of the Defendants, including specifically the Aprio Defendants, and reported the charitable deduction of $92,835.00 on their individual tax returns for 2011.

> **b.**   **The 2011 Mossy Rock Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

120.   On or about April 9, 2014, the Mossy Rock, LLC Tax Matters Partner received an IRS Notice indicating that its 2011 tax year return was selected for audit.

121.   Evrgreen hired Aprio and Sirote to represent the Mossy Rock Syndicate in the audit and tax court.   Of course, Aprio and Sirote had a serious conflict of interest since they were promoters of the SCE Strategy; worked closely

with Defendants to develop, promote, sell and implement the SCE Strategy; and assisted in the preparation of the Conservation Easement Deed, the Appraisal, the Promotional Materials, and the Baseline Documentation Report.  Moreover, Sirote was further conflicted due to the fact that it wrote Legal Opinions that purported to bless the legality and legitimacy of the conservation easement donation generated by the SCE Strategy.  In addition, the Aprio Defendants had prepared the Mossy Rock Syndicate's tax return and K-1s, which reported the charitable contribution deduction; advised the Thompson Plaintiffs to report the charitable deduction (as reflected on the K-1) on their individual tax returns; and prepared and filed the Appraisal Summary (Form 8283), wherein the Aprio Defendants intentionally failed to disclose the "cost basis" and the fair market value of the property as required.

122.  On January 12, 2015, the Mossy Rock Syndicate Tax Matters Partner sent a letter to all of its members enclosing the IRS Revenue Agent Report dated December 11, 2014 (the "*Mossy Rock RAR*").[17]  The Mossy Rock RAR concluded that the entire charitable contribution deduction ($17,685,000) generated by the SCE Strategy for the Mossy Rock Syndicate was to be disallowed at the

---

[17] Despite the fact that the Mossy Rock Syndicate and the Maple Landing Syndicate had different Sponsors, Managers, and Tax Matter Partners, the cover letters to their members enclosing their respective RARs were virtually identical – a clear indication that these letters were prepared by the Aprio Defendants and/or Sirote.

partnership level for a number of reasons, which further evidences the IRS's intent to similarly disallow the charitable contribution deductions at the individual level for members of the Mossy Rock Syndicate.

123.   In the January 12, 2015 letter to all members of the Mossy Rock Syndicate with which he enclosed the Mossy Rock RAR, the Tax Matters Partner continued to reassure the members that there was nothing to worry about.   He stated that he "does not agree with any of the conclusions reached in the report" and that he "plan[s] to contest and appeal the findings as the Tax Matter Partner for the LLC."   He further reassured the members of the Mossy Rock Syndicate that "[i]t is important to remember that this report is issued in connection with the very first stage of the IRS process, and tax counsel [Sirote] has advised us that the report marks only the beginning of the proceedings."

124.   On or about October 10, 2017, the IRS issued an FPAA for the Syndicate's 2011 tax year.   The FPAA contained the same findings as the Mossy Rock RAR from three years earlier.

### 3.   Lechter engages in the SCE Strategy through the Oakhill Woods Syndicate for the tax year 2010.

#### a.   The Steps of the Oakhill Woods Syndicate Transaction.

125.   On   October   31,   2008,   WDHL,   LDHLLDHL,   Julienton,   and Effingham formed Oakhill Woods, LLC (the "*Oakhill Syndicate*").   At the time of formation, WDHL, LDHL, and Julienton each owned 33% of the Oakhill

Syndicate and Effingham owned 1%.  WDHL, LDHL and Julienton are referred to herein as the "*Majority Members*."   Effingham was also designated as the managing member.   The Oakhill Syndicate subsequently acquired 380 acres of property in Effingham County, Georgia.

126.   The Oakhill Syndicate, through the Majority Members, offered up to 99% of the ownership interests in the Oakhill Syndicate (*i.e.*, up to the Majority Members' entire interest) pursuant to Promotional Materials dated June 11, 2010. The Oakhill Syndicate represented that the Oakhill Syndicate and the Manager had investigated several potential uses for the property with focus on two primary options: (1) to hold the property for future development as a single family residential neighborhood (the "*Investment Proposal*") and (2) to place the property into a conservation easement (the "*Conservation Proposal*").   The Manager would make the initial decision on which use of the property would provide the most benefits to the members of the Oakhill Syndicate and the members then had a right to object to the Manager's proposal.

127.   The Promotional Materials were designed and used to convince potential participants that the SCE Strategy, through the Oakhill Syndicate, provided a legal and legitimate way to save on taxes through a conservation easement.   The Promotional Materials were prepared jointly by the Managers of the Oakhill Syndicate and Sirote (and reviewed and approved by the Aprio

Defendants) for the sole purpose of convincing potential participants to participate in the SCE Strategy through the Oakhill Syndicate, thus generating enormous fees for these Defendants, the Sponsors, and the Other Participants.

128.   Lechter was one of the potential participants to whom the Oakhill Syndicate sent the Promotional Materials.

129.   The Promotional Materials advised Lechter, among other things, that:

(a)   The Oakhill Syndicate is organized to "own, manage and/or hold for investment" the real estate.

(b)   The Oakhill Syndicate's "investment objectives in connection with its business are (i) to preserve and protect the Company's capital; (ii) to manage the use and operation of the Property; and (iii) to realize possible capital appreciation in the value of the Property."

(c)   Despite these "investment objectives," "the [Oakhill Syndicate] may, however, grant a conservation easement over the Property in order to preserve the Property."

(d)   The Oakhill Syndicate will maintain an "Operating Reserve" in the amount of $114,000 "to provide the [Oakhill Syndicate] with capital necessary to pay anticipated [Oakhill Syndicate] expenses and to have funds necessary to operate, including on-going legal and accounting expenses."

(e)     The Operating Reserve will be funded with the money paid by the participants in the SCE Strategy like Lechter.

(f)     The Oakhill Syndicate and the Managers have investigated several potential uses for the property, with the focus on two primary options. The first option is to hold the property for future residential land development (*i.e.*, the Investment Proposal).  The second option is to place the property into a conservation easement (*i.e.*, the Conservation Easement Proposal), which would result in a charitable contribution deduction for those who participated in the SCE Strategy through the Oakhill Syndicate.

(g)     The Oakhill Syndicate Managers have engaged an appraiser (*i.e.*, Tennille) and have begun negotiations with a land trust (*i.e.*, GLT).

(h)     "The granting of the conservation easement could have significant tax benefits."

(i)     "As part of making any recommendation on proceeding with the Conservation Proposal, the Managers intend to obtain additional information on the development potential of the Property and the benefits to the Members of holding the Property for development."

(j)     With respect to the Conservation Proposal, the Managers will make the decision on whether to pursue it and then each Member will have the opportunity to object to this decision in writing.

130.   The Oakhill Syndicate, the Managers, Sirote, and the Aprio Defendants hand-picked Tennille as the appraiser to perform a valuation of the real estate.  As part of its "diligence" (and afterwards as well), the Oakhill Syndicate purportedly also received advice and consultation from the Forever Forests Defendants for the purpose of supporting the value of the Highest and Best Use of the real estate for land development and the value of the conservation easement. All of these advisors were paid by the Oakhill Syndicate or another affiliated entity.

131.   Lechter consulted with Forever Forests Defendants who advised Lechter that the SCE Strategy complied with the requirements of Code Section 170(h) and, as a result, they could legally report this allocated charitable contribution deductions provided by the SCE Strategy.

132.   Based on the Promotional Materials and the Defendants' and Effingham's advice and representations that confirmed these written statements, Lechter paid $141,312.00 to the Oakhill Syndicate on or about August 3, 2010, to participate in the SCE Strategy.

133.   Subsequently, the Managers elected to move forward with the Conservation Proposal.

134.   The Oakhill Syndicate members then "approved" the Managers' decision to place a conservation easement on the real estate and to contribute the conservation easement to GLT.

135.   The conservation easement deed, dated December 7, 2010, was verified and signed by Roberts of Tennille (as the appraiser) and the Deputy Director of GLT (on behalf of GLT).  The Conservation Easement Deed language was jointly prepared and approved by Sirote, the Aprio Defendants, the Managers, Effingham, and GLT.

136.   On or about December 7, 2010, GLT prepared and provided a Baseline Documentation Report to the Oakhill Syndicate, which was verified as accurate by GLT and the Oakhill Syndicate and filed with the Appraisal Summary (Form 8283) and the Oakhill Syndicate's tax return.  The purpose of this report is to ascertain the conservation values of the property at the date of donation and substantiate the purported conservation purpose.  GLT concluded in this report that it is in the best interest of the Oakhill Syndicate to place a conservation easement on the property and to donate the easement as a charitable gift to GLT.  More importantly, GLT set out the conditions on the property that will be preserved by

the conservation easement and concluded that these conditions meet the conservation purpose of § 170 of the Code.

137. The Oakhill Syndicate conveyed the conservation easement to GLT on December 7, 2010.

138. On or about December 7, 2010, GLT provided the Oakhill Syndicate with a letter documenting the conveyance and advising the Oakhill Syndicate that its contribution to GLT "is fully tax deductible." This letter is also filed with the Oakhill Syndicate's tax return, along with the Baseline Documentation Report and Form 8283.

139. On or about December 20, 2010, Tennille submitted the final Appraisal to further support the valuation of the land for its purported Highest and Best Use as a residential subdivision and valued the conservation easement at $7,949,000.00. The final Appraisal had an effective date of December 20, 2010, and, as required, was attached to the Oakhill Syndicate's tax return.

140. As a result of the conservation easement conveyance to GLT, the Oakhill Syndicate purportedly received an allowable charitable contribution deduction of $7,949,000.00, which then flowed through and was allocated to each of the members in the Oakhill Syndicate, including Lechter, in proportion to their relative ownership interest in the Oakhill Syndicate.

141.   On or about April 28, 2011, the Aprio Defendants prepared the Appraisal Summary (Form 8283) and, as required, attached it to the Oakhill Woods, LLC tax return and Lechter's individual tax return.  Roberts of Tennille (as the appraiser) and the Deputy Director of GLT (on behalf of GLT) verified the Appraisal Summary (Form 8283) as accurate and signed it.  The Aprio Defendants represented to the IRS in the Appraisal Summary Form 8283 that the easement was placed on the property to protect natural habitat of environmental importance.

142.   On or about May 5, 2011, the Aprio Defendants prepared the tax return for Oakhill Woods, LLC.  The tax return reported a charitable contribution deduction of $7,949,000.00.  As required, the Aprio Defendants attached to the Oakhill Syndicate's return a copy of the Appraisal, the Appraisal Summary Form 8283, the Baseline Documentation Report, and GLT letter confirming the donation.

143.   In addition, the Aprio Defendants prepared a K-1 for each of the members of the Oakhill Syndicate, including Lechter, which reported the amount of charitable contribution deduction allocated to each of the members.  The K-1 prepared for Lechter reported a charitable contribution deduction of $635,920.00. The Aprio Defendants advised Lechter to report this charitable contribution deduction on his individual tax return for 2010.

144.   The Aprio Defendants provided the Appraisal Summary Form 8283 and appraisal to Lechter for use on his individual tax return, which reported the

charitable contribution deduction of $635,920.00. The Aprio Defendants then advised Lechter that the Appraisal Summary Form 8283 substantiated the charitable contribution deduction and allowed Lechter to claim the charitable deduction on his individual tax return.

145.   Lechter followed the advice of the Defendants, including specifically the Aprio Defendants, and reported the charitable deduction of $635,920.00 on his individual tax return for 2010.

> **b.     The 2010 Oakhill Syndicate Tax Return is Audited and the IRS Disallows the Charitable Contribution Deduction at the Partnership Level.**

146.   The IRS notified the Oakhill Syndicate that its 2010 partnership return has been selected for audit. Effingham hired Aprio and Sirote to represent the Oakhill Syndicate in the audit and tax court. Of course, Aprio and Sirote had a serious conflict of interest since they were promoters of the SCE Strategy; worked closely with Defendants and Sponsors to develop, promote, sell and implement the SCE Strategy; and assisted in the preparation of the Conservation Easement Deed, the Appraisal, the Promotional Materials, and the Baseline Documentation Report. Moreover, Sirote was further conflicted due to the fact that it wrote Legal Opinions that purported to bless the legality and legitimacy of the conservation easement donation generated by the SCE Strategy. In addition, the Aprio Defendants prepared the Oakhill Syndicate's tax return and K-1s, which reported the charitable

contribution deduction; advised Lechter to report the charitable deduction (as reflected on the K-1) on his individual tax return; and prepared and filed the Appraisal Summary (Form 8283), wherein the Aprio Defendants intentionally failed to disclose the "cost basis" and the fair market value of the property as required.

147.   After being under examination, the Oakhill Syndicate received a 60-day letter on June 27, 2016 notifying Sirote that the charitable contribution deduction was being reduced to $40,473.00 from $7,949,000.00.

148.   On or about July 12, 2016, Effingham (pursuant to and in furtherance of the conspiracy between all of the Defendants, the Sponsors, and the Other Participants) sent a letter to Lechter informing him that the deduction was disallowed *without telling him the primary basis for disallowance* – *i.e.*, the failure of the Aprio Defendants to properly substantiate the deduction by reason of omitting the cost basis from the Form 8283.

149.   Over 14 months later, on or about September 22, 2017, the IRS issued an FPAA for the Oakhill Syndicate's 2010 tax year.

150.   The Tax Matters Partner of the Oakhill Syndicate then challenged the denial of the deduction with the filing of a Petition in Tax Court.  On February 13, 2020, the United States Tax Court issued a Memorandum Opinion granting summary judgment in favor of the United States on the issue of whether the

Oakhill Syndicate complied with the requirements for filing its Appraisal Summary (Form 8283). In so holding, the Tax Court found that the Oakhill Syndicate failed to report its "cost or adjusted basis" and thus failed to attach to its partnership return a properly completed Form 8283. The Tax Court further found that the Oakhill Syndicate did not offer any explanation for its failure in the Form 8283 attachments. The Tax Court further held that the Oakhill Syndicate's failure was not cured by submitting materials after being informed that the IRS sought to deny its deduction because the Oakhill Syndicate had originally submitted "an intentionally incomplete Form 8283" as opposed to simply failing to submit one at all. In this regard, the Tax Court took issue with the fact that the Oakhill Syndicate "supplied the relevant information three years after its return was filed and only upon learning that the IRS examination might have an unhappy ending."

151. In denying the Oakhill Syndicate's argument that it should be deemed to have "substantially complied", the Tax Court noted that "Oakhill…took the position that the 379 acres had appreciated by more than 800% during the previous 3 ½ years amid the worst real estate crisis since the Great Depression. This is precisely the sort of information that Congress wished the IRS to have, and Oakhill's refusal to supply this information contravenes the 'essential requirements of the governing statute.'" Giving short shrift to the Oakhill Syndicate's argument that the IRS could have ascertained the cost basis from its Form 1065, the Tax

Court noted: "Oakhill's 2010 tax return was 35 pages long and the attached appraisal (excluding addenda) was 143 pages long. Where the taxpayer states on Form 8283 that basis information will not be provided, revenue agents cannot be required to sift through hundreds of pages of complex returns looking for possible clues about what the taxpayer's cost basis might be."

152.   The Tax Court further concluded that "[t]his was not a case of inadvertent omission, but of a conscious election not to supply the required information."

### E.   The SCE Strategy was Fatally Flawed.

153.   As the IRS has now recognized, and the Tax Court has confirmed in the last two years, the SCE Strategy was fatally flawed from the outset. The Defendants and Sponsors prepared documents for the execution of the SCE Strategy that were strewn with errors (and discussed in detail below) and, thus, failed to meet the specific requirements set out in the Code. Unbeknownst to Plaintiffs and the Class, the Defendants worked together with the Sponsors to prepare the Appraisals, the Appraisal Summary Forms 8283, the Conservation Deeds, and the Baseline Documentation Reports. As purported experts in their respective fields, each of the Defendants was aware or should have been aware of the plethora of defects and errors in each of these documents discussed herein.

1.      **The SCE Strategy Used Sham Appraisals that Violated USPAP and the Code in Numerous Respects and Were Prepared Pursuant to the Directions of the Other Defendants.**

154.    The primary factor in appraising a conservation easement is the comparison of the property's fair market value before and after the contribution of a conservation easement based on the property's "highest and best use," defined as the reasonable and probable use that supports the highest present value of the property.

155.    The Sponsors and the Defendants, including the Appraiser Defendants themselves, represented to the Plaintiffs and the Class that the Appraiser Defendants were professional appraisers who would provide independent and objective valuations of the conservation easements generated by the SCE Strategy based on their independent determination of the "highest and best use" for each subject property.

156.    In reality, however, the Appraisals were a complete sham.   The Sponsors and Defendants hand-picked the Appraiser Defendants and then directed them as to what the "highest and best use" was for each subject property; they then further guided the Appraiser Defendants on the specific value they needed to reach and the methodologies they should employ to reach that value.   In these regards, the Appraiser Defendants completely shirked their professional duties and obligations and instead blindly went along with the directions of the Defendants.

None of the Defendants ever disclosed to the Plaintiffs and the Class the Appraiser Defendants' conflicts of interest and complete dereliction of their professional duties and obligations.

157.   To satisfy the Defendants and to arrive at the valuations they directed (and to ensure they kept enjoying the lucrative fees paid for these Appraisals), the Appraiser Defendants were grossly negligent and intentionally deceitful in each of the Appraisals by making inappropriate assumptions, utilizing inappropriate methodologies, and using various flawed techniques to improperly inflate the value of the conservation easements.  These inflated values, in turn, caused Plaintiffs and the Class to unknowingly claim inflated and improper tax deductions arising from their participation in the SCE Strategy.  By way of example, each of the Appraiser Defendants committed *inter alia* the following errors in the Appraisals:

(a)   Utilizing "comparable sales" that were not in fact comparable;

(b)   Inaccurately reporting the data from the comparable sales that were used;

(c)   Ignoring the sales of actual easements in reaching their valuation;

(d)   Failing to conduct any financial feasibility analysis, supply and demand analysis, or reasonably probability analysis as required by applicable Code provisions and related regulations;

(e)     Failing to address the additional requirement that the highest and best use be "reasonably probable";

(f)     Valuing the subject property, which was raw, undeveloped land, as if it was already developed property;

(g)     Failing to consider existing legal or regulatory restrictions on the development and/or use of the subject property;

(h)     Failing to properly apply the principle of substitution in valuing the land at its "highest and best use";

(i)     Violating numerous standards set by the USPAP; and

(j)     Improperly acting as an advocate rather than as an independent appraiser.

158.   With these numerous errors, the Appraiser Defendants (pursuant to the direction and with the assistance of the other Defendants) overstated the fair market value of the conservation easements by hundreds of thousands, if not millions, of dollars, which in turn resulted in the Plaintiffs and the Class unknowingly grossly overstating their tax deduction.

159.   In addition, none of the Defendants ever disclosed to the Plaintiffs and the Class that Roberts of the Tennille firm – one of the Appraiser Defendants – was suspended for his role in preparing various sham appraisals during the year prior to the Appraisal he performed for the Maple Landing Syndicate.   Nor did the

Defendants ever disclose to the Plaintiffs and the Class new material developments such as  (1) that Clower of the Clower Defendants – another Appraisal Defendant – was sued in a summons enforcement proceeding by the IRS for his role in preparing appraisals in connection with the SCE Strategy and (2) that Sirote and the Aprio Defendants informed the IRS that they agreed the Tennille/Roberts Appraisals were a sham and they would not rely on these Appraisals in any future discussions or negotiations with the IRS.   Although these developments occurred after Plaintiffs had engaged in the SCE Strategy, they are still material omissions of fact, as they affected Plaintiffs' subsequent actions in continuing to rely upon the Defendants and their representations.   These two appraisers, Clower of the Clower Defendants and Roberts of Tennille, prepared all of the Appraisals for the SCE Strategy and, thus, these material omissions damaged the entire Class (including Plaintiffs).

160.   In light of the Appraiser Defendants' purported professional experience and education, they knew or should have known that the manner in which they valued the conservation easements was contrary to the regulations promulgated by the Internal Revenue Service, violated the professional standards for real estate appraisers, and resulted in gross valuation overstatements for the easements they appraised.

Case 1:20-cv-01325-AT   Document 1   Filed 03/26/20   Page 79 of 175

161.  Under Section 170(f)(11) of the Code, a charitable contribution deduction from the donation of a conservation easement must be supported by a "qualified appraisal."  A "qualified appraisal" is one that "is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed."  The numerous egregious errors identified above, beginning with the fact that the Appraiser Defendants allowed the other Defendants to completely dictate the values reached and methodologies employed in the Appraisals, sufficiently demonstrate that the Appraisals had no chance of satisfying the requirements for a "qualified appraisal".  And the Defendants knew or should have known that the IRS would take the position that the charitable contribution deductions generated from the SCE Strategy should be disallowed on that basis alone.

162.  In sum, the Appraiser Defendants knowingly prepared the Appraisals for use by the Defendants and the Sponsors in marketing and selling the SCE Strategy to participants (*i.e.*, Plaintiffs and the Class) and knowingly allowed the Defendants to improperly guide and direct the Appraiser Defendants in preparing the Appraisals for this purpose.  In addition, the Appraiser Defendants knew that the Syndicates and the SCE Strategy participants would attach their Appraisals and Appraisal Summary (Forms 8283) to the tax returns of the Syndicates and participants, as required by the Code, to substantiate the charitable contribution

deductions reported by the Syndicates and ultimately claimed by the Plaintiffs and the Class on their individual tax returns.

**2.     The Conservation Easement Deeds Were Improperly Prepared and Violated the Code's Specific Requirements.**

163.   The Conservation Easement Deeds were prepared by the Defendants with full knowledge of the requirements under the Code and related Regulations for a legal and legitimate conservation easement donation.  Despite this knowledge and the explicit nature of the requirements of the Code and the IRS's related Regulations, the Defendants failed to prepare the Conservation Easement Deeds to conform to the Code and applicable Regulations. As a result, the SCE Strategy failed to generate legitimate and legal charitable contribution deductions for the Plaintiffs and the Class.

164.   In order for a conservation easement donation to comply with the Code, it must be perpetual, as required by Reg. Section 1.170A-14(g)(6)(i).  Thus, a conservation easement donation may only allow permitted uses of the landowner's retained interests that are consistent with the "conservation purposes" set out in the Conservation Easement Deed.   Here, all of the Conservation Easement Deeds for the Syndicates involved in the Plaintiffs' SCE Strategy transactions permitted retained uses by the landowners that were inconsistent with the stated conservation purposes and, thus, on this basis alone, failed to satisfy the

perpetuity requirement, as well as the requirement that the conservation easement donation be exclusively for conservation purposes.

165. A conservation easement donation can also fail to satisfy the perpetuity requirement when the sales proceeds clause in the Conservation Easement Deed does not ensure that the donee (*i.e.*, the Land Trust) would receive an amount on any sale of the property at least equal to its proportionate share based on the amount of the charitable deduction as compared to the value of the entire property at the time of the donation. In drafting the conservation easement deeds for the SCE Strategy, the Defendants made critical errors by deviating from the specific requirements of the IRS regulation and providing that the Land Trust would get too little of the sales proceeds in the event of a sale. This resulted in another failure to meet the perpetuity requirement.

166. Third, a conservation easement donation can fail to satisfy the perpetuity requirement where the Conservation Easement Deed reserves development sites without determining a specific location, also known as "floating" development sites. This results in the ability to change the boundaries or location of the easement and, thus, change what property is subject to the easement's restrictions. Those Conservation Easement Deeds prepared by the Defendants in connection with the SCE Strategy that contained such "floating" development sites violated the perpetuity requirement as well.

167.   The Defendants all worked closely together to draft the language of the Conservation Easement Deeds.  They were aware that the Plaintiffs and the Class desired for the conservation easement donation to result in a legal and legitimate tax deduction.  And Defendants were no doubt aware (or should have been aware) of the perpetuity requirement under the Code and the various ways discussed above by which this requirement could be violated.  The Plaintiffs and the Class relied on the Defendants' experience and expertise in effectuating and implementing the SCE Strategy for a valid tax deduction, including in drafting the Conservation Easement Deeds.

### 3.     The Appraisal Summary (Form 8283) Violated the IRS's Clear Requirements.

168.   In furtherance of and pursuant to the conspiracy between all of the Defendants, the Sponsors and the Other Participants, the Aprio Defendants prepared the required Appraisal Summary (Form 8283) for the Syndicates.  These forms, which were also verified and signed by the Appraiser Defendants and the Land Trust Defendants, reported the gross valuation overstatements as to the valuation of the conservation easements to the IRS.  The Sponsors, in turn, provided those gross valuation overstatements to the individual SCE Strategy participants who used the Appraisal Summary (Form 8283) to support the charitable contribution deductions they claimed on their returns.

169.   If the Appraisal Summary (Form 8283) does not report the cost basis of the property, the claimed deductions from the SCE Strategy will be summarily disallowed for failure to properly substantiate the deduction.  This requirement was codified as early as 1984.  Despite the clear direction from the IRS regarding what needed to be included in the Appraisal Summary (Form 8283), the Defendants did not report the cost basis of the property and other required information for the Syndicates involved in the SCE Strategy transactions.

170.   The failure on the part of the Defendants to provide the cost basis of the property and other required information was an intentional omission intended to conceal the inflated nature of the Appraisals.   Based on the IRS's clear requirements for the Appraisal Summary (Form 8283), there is no doubt that the Defendants knew or should have known that their failure would result in the Plaintiffs' and the Class's deductions being disallowed.

**4.        The Baseline Documentation Reports Were Grossly Deficient.**

171.   Where a donor of a conservation easement retains rights to the property subject to the easement, which could impair the conservation interests, the donor is required to document the condition of the property at the time of the gift, commonly referred to as the "baseline documentation," in a way that presents an accurate representation of the protected property at the time of the transfer.

172.   The Baseline Documentation Reports prepared by the Land Trusts (with the direct assistance and guidance of the other Defendants) were deficient in numerous respects and failed to satisfy the IRS's documentation requirements. These deficiencies include (1) relying on the Appraisals that the Defendants knew were a sham to support the conservation value of the subject property and (2) failing to sufficiently substantiate an exclusive conservation purpose.  Based on the Defendants' expertise in their related fields and knowledge of the sham nature of the Appraisals and the numerous problems with the stated conservation purpose for each of the SCE Strategy transactions, there is no reasonable explanation for the Defendants' failure to properly prepare the Baseline Documentation Reports other than an intentional or grossly negligent act of deceit. Defendants knew these deficiencies would result in the Plaintiffs and the Class claiming charitable contribution deductions on their individual tax returns that the IRS would claim were invalid.

**F.     The Sirote Legal Opinion Used In The Promotion And Implementation Of The Effingham-Sponsored SCE Strategy Transactions Contained Numerous Misrepresentations And Omissions.**

173.   As previously mentioned, Sirote prepared Legal Opinions in connection with Effingham-sponsored SCE Strategy transactions, including for the Maple Landing Syndicate in which the Dalba Plaintiffs participated.  Each of the Legal Opinions that Sirote prepared in connection with the SCE Strategy was

generated from a "cookie cutter" template for which Sirote merely needed to enter certain transaction-specific (but non-substantive) fields. These Legal Opinions did not differ in any material, substantive way. In the Maple Land Syndicate Legal Opinion, Sirote expressly acknowledged that it was acting as counsel to the Syndicate and that the Legal Opinion was "**DRAFTED TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTION(S) OR MATTER(S) ADDRESSED IN THE OPINION**" (emphasis and capitalization in original). Sirote further acknowledged that its Legal Opinion was a "marketed opinion" with respect to IRS Circular 230, which means that Sirote was required to (1) determine the facts, (2) relate the facts to the law, (3) evaluate all of the significant federal tax issues and reach a conclusion with respect to each such issue, and (4) reach an overall conclusion regarding the tax treatment of the transaction.

174. In the Legal Opinion, Sirote acknowledged that the Syndicate may make a conservation easement donation to GLT that was intended to be a "qualified conservation contribution" under Section 170(h) of the Code. Sirote further represented that it had reviewed and interpreted the "relevant provisions of the Code, Regulations (including Temporary and Proposed Regulations) promulgated thereunder, existing judicial decisions, and current administrative rulings and procedures issued by the [IRS]...."

175. The Legal Opinion further stated that "it is contemplated that the Manager will recommend to the Members that the [Syndicate] encumber the [subject property] by granting the Conservation Easement to GLT" and that the Syndicate "will claim a Contribution Deduction pursuant to Code Sections 170(a) and (h) in an amount equal to the fair market value of the Conservation Easement", which will then be "allocated to the Members under the terms and conditions of the Operating Agreement and the applicable provisions of Subchapter K of the Code."

176. In connection with preparing the Legal Opinion, Sirote stated that it reviewed the Promotional Materials, the Appraisals, the Conservation Easement Deeds, the Land Trust letters regarding the conservation easement donations, the Baseline Document Reports, a Reliance Letter from Darrel Hutcheson of Effingham, and numerous other transaction documents.

177. Despite the fact that Sirote purported to have obtained all relevant facts, reviewed all transaction documents, and analyzed all applicable laws and regulations (and despite the fact that Sirote played a key role in actually drafting many of the transactional documents for the Effingham-sponsored SCE Strategy transactions including the Conservation Easement Deeds, Baseline Documentation Reports, and Appraisals), the Maple Land Syndicate Legal Opinion contains the following incorrect and insupportable conclusions:

(a)     The grant of the conservation easement in the SCE Strategy transactions resulted in the Syndicate "giving up a real and substantial interest in property";

(b)     The Conservation Easement Deed supports the assumption that the conservation easements were contributed "exclusively for conservation purposes;"

(c)     The Appraisal constitutes a Qualified Appraisal under Treas. Reg. § 1.170A-13(c);

(d)     The Syndicate will file an accurate and complete Appraisal Summary (Form 8283);

(e)     Based on the Conservation Easement Deeds and the Baseline Documentation Reports, the conservation easement satisfies the conservation purpose requirement of Section 170(h)(1)(C) of the Code;

(f)     Based on the Conservation Easement Deeds and other transaction documents, the conservation easement donation will meet the IRS's perpetuity requirement;

(g)     The Baseline Documentation Reports meet the IRS's substantiation requirements;

(h)    It is more likely than not that an accuracy-related penalty shall **not** apply under Section 6662 or 6662A of the Code; and

(i)    "[I]f the Conservation Easement is contributed to GLT, each Member [of the Maple Landing Syndicate] will be entitled to a charitable contribution deduction based upon their allocable share of the 'fair market value' of the Conservation Easement."

178.    Based on Sirote's legal expertise and the fact that it assisted in drafting many of the transactional documents for the Effingham-sponsored SCE Strategy transactions including the Conservation Easement Deeds, Baseline Documentation Reports, and Appraisals, Sirote was aware of or should have been aware of all of the issues and deficiencies identified by the IRS with respect to the Maple Landing Syndicate SCE Strategy transaction and, further, that these issues and deficiencies were not consistent with Sirote's conclusions identified above. Sirote nonetheless failed to discuss or disclose any of these issues and deficiencies in the Legal Opinion.

179.    Sirote also failed to disclose to the Dalba Plaintiffs or any other member of the Class that it was not an independent law firm, but was rather part of the conspiracy to develop, promote, sell, and implement the SCE Strategy.

**G.     The IRS Audits the Syndicate Tax Returns.**

180.   As set out in Paragraphs 94-99, 120-124, and 146-152 herein, each of the charitable contribution deductions taken by the Syndicates discussed herein have been challenged by the IRS, and the IRS has made clear its intent to disallow the deductions claimed by the Syndicates.  As a result, the IRS has made it clear that it intends to similarly disallow the charitable contribution deductions that flowed through these Syndicates to the Plaintiffs' and each member of the Class's individual tax returns.

181.   Accordingly, the IRS has made clear its intent to assess the Plaintiffs and the Class (1) substantial back-taxes, (2) accuracy-related penalties under Section 6662 for a substantial valuation misstatement, which is a 40% penalty for a "gross valuation misstatement" (*i.e.*, a valuation misstatement of 200% or more) as in this case, and (3) substantial interest on the tax and penalties.  The Plaintiffs' and each member of the Class's damages also include the amounts paid into the Syndicates, other transaction costs, professional fees and expenses, and additional legal and accounting fees and expenses incurred by the Plaintiffs and the Class in connection with the IRS audits and tax court proceedings.

**H.     In 2017, The Aprio Defendants Notify Participants In the SCE Strategy Of An IRS Summons And Continue To Withhold Material Information From Plaintiffs And Members Of The Class.**

182.   In early 2017, the Aprio Defendants sent a letter to its clients who participated in the SCE Strategy.  In this letter, the Aprio Defendants notified these clients that the IRS had served a summons on Aprio in March 2014 seeking production of all tax returns and related tax files and workpapers prepared in conjunction therewith for certain SCE Strategy transactions in 2010, 2011, and 2012.  The Aprio Defendants indicated that they had challenged the subpoena, but were ordered to fully comply with the summons by February 23, 2017, and that they intended to turn all of the documents over to the IRS by this deadline.

183.   Upon information and belief, all of these documents were, in fact, turned over the IRS as stated in this letter.

184.   Importantly, despite undertaking to send this communication to its clients who participated in the SCE Strategy, the Aprio Defendants continued to withhold from these clients: (1) the Aprio Defendants own conflicts of interest as promoters of the SCE Strategy, (2) that Aprio partner Greenberger was under investigation by the IRS for his role in promoting the SCE Strategy, (3) that one of the appraisers used in connection with the SCE Strategy had been previously suspended (Roberts of the Tennille firm) in the year prior to his preparation of appraisals for the SCE Strategy for preparing sham appraisals, and (4) the other

appraiser (Clower of the Clower Defendants) was embroiled in a summons enforcement proceeding with the IRS for his role in preparing appraisals in connection with the SCE Strategy.

**IV.**
**CONSPIRACY ALLEGATIONS**

185.   Each of the Defendants, Sponsors, and the Other Participants involved in the SCE Strategy (collectively, the "*Co-Conspirators*") executed by Plaintiffs and the Class conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of receiving and splitting substantial fees (the "*Co-Conspirators' Arrangement*").   The receipt of those fees was the Co-Conspirators' primary, if not sole, motive in the development and execution of the SCE Strategy. Further, the amount of fees earned by the Co-Conspirators was not tied to or reflective of the amount of time and effort they expended in providing professional advice and services.  The Co-Conspirators designed the SCE Strategy and unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the SCE Strategy.

186.   The Co-Conspirators each had a financial, business and property interest in inducing the Plaintiffs and the Class to enter into the SCE Strategy and to do so, fraudulently promised, opined and assured that the SCE Strategy would legally reduce Plaintiffs' and the Class's income taxes.   Further, the Co-Conspirators' Arrangement gave each of the participating Co-Conspirators a

significant pecuniary interest in the advice and professional services they would render.

187. The Co-Conspirators entered into the Co-Conspirators' Arrangement, whereby they agreed and had a meeting of the minds that they would work together as a team - with each team member assigned certain roles and responsibilities - to develop, market, sell, and implement the SCE Strategy.

188. Here, the Co-Conspirators conspired to perpetrate a fraud on Plaintiffs and the Class and to breach duties owed to Plaintiffs and the Class, each with knowledge of the object of the conspiracy. In addition, the Co-Conspirators authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Co-Conspirators. Each Co-Conspirator committed at least one overt act in furtherance of the unlawful conspiracy. Each of the Co-Conspirators had particular roles and responsibilities in connection with the design, marketing, sale, and implementation of the SCE Strategy, as discussed at Paragraph 221 herein.

189. The Sponsors recruited the Appraiser Defendants for their critical role in the SCE Strategy. Although each of the Appraiser Defendants purported to act independently and provide a good faith valuation of the parcels at issue in accordance with applicable professional standards, each of the Appraiser Defendants were aware that the Co-Conspirators would use the Appraisals in the

promotion, sale, and implementation of the SCE Strategy.  Each of the Appraiser Defendants allowed the Aprio Defendants, the Law Firm Defendants and the Sponsors to control, direct, and/or affect the conclusions reached and the methodologies used in each of the Appraisals.  The Appraiser Defendants were in no way independent and willingly joined into the Co-Conspirators' Arrangement.

190.   As part of the pre-planned scheme, the Sponsors also recruited the Land Trust Defendants to accept the donation of the easements.

191.  The Defendants and Sponsors knew that the purpose of these donations was to implement the SCE Strategy.  The Defendants and Sponsors also knew that the SCE Strategy, as structured, would not and could not serve its intended purpose of providing a legitimate and legal tax deduction, but nonetheless stood willing and ready to fulfill their role in the Co-Conspirators' Arrangement.

192.  The Law Firm Defendants were a key component of the Co-Conspirators' Arrangement.  The Law Firm Defendants worked closely with the Aprio Defendants and the Sponsors on all aspects of the design and development of the SCE Strategy, the structuring of each Syndicate and transaction, tax compliance, and the purported due diligence.  The Law Firm Defendants drafted and/or approved the SCE transaction documents beginning with the purchase of property from landowners, continuing with the Promotional Materials provided to potential participants, and all the documents necessary to complete the SCE

Case 1:20-cv-01325-AT   Document 1   Filed 03/26/20   Page 94 of 175

Strategy and execute the donations to the Land Trust Defendants, including the Conservation Easement Deeds, Baseline Reports, Appraisals, and Legal Opinion (with respect to Sirote).  The Law Firm Defendants also assisted in preparing and approving all Promotional Materials.  They were involved as promoters of the SCE Strategy, identified potential targets, and made themselves available to speak to any potential participants or referral sources who had questions about the SCE Strategy.

## V.
## CLASS ALLEGATIONS

193.  Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(b)(l)(A), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of themselves and the nationwide class of all persons (the "*Class Members*" or the "*Class*") defined below against all Defendants:

> All Persons who, for any tax year from January 1, 2008 to the present, inclusive, have been assessed back-taxes, penalties, and/or interest by the Internal Revenue Service as a result of their involvement, either directly or indirectly through an ownership stake in another entity, in a Syndicated Conservation Easement designed, marketed, sold, implemented (including but not limited to preparing tax returns and K-1s for the participants) or managed by the Aprio Defendants and/or the Sponsors.  Excluded from the Class are:  Defendants, Defendants' parents, subsidiaries, affiliates, partners, and employees; anyone receiving referral fees from the SCE Strategy transactions; federal governmental entities; the Sponsors; the Sponsors' parents, subsidiaries, affiliates, partners, and employees; the Other Participants; and the Other Participants' parents, subsidiaries, affiliates, partners, and employees.

194.   Plaintiffs believe the Class consists of over 1,500 Class Members geographically dispersed throughout the United States such that joinder is impracticable. These Class Members may be identified from information and records maintained by the Defendants or third parties.

195.   The Individual Plaintiffs and the Class Members each and all have tangible and legally protectable interests at stake in this action.

196.   The claims of the Individual Plaintiffs and the Class Members have a common origin and share a common basis. The claims of all Class Members originate from the same fraudulent transaction predicated by the Defendants.

197.   The Individual Plaintiffs state a claim for which relief can be granted that is typical of the claims of the Class Members. Thus, the class representatives have been the victims of the same illegal acts as each member of the class.

198.   If brought and prosecuted individually, each of the Class Members would necessarily be required to prove the instant claim upon the same material and substantive facts, upon the same remedial theories and would be seeking the same relief.

199.   The claims and remedial theories pursued by the Individual Plaintiffs are sufficiently aligned with the interests of the Class Members to ensure that the universal claims of the alleged class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

200.    There are questions of law and fact common to the alleged class. Such common questions include, *inter alia*:

(a)    Whether the Defendants, Sponsors, and the Other Participants defrauded Plaintiffs by advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter, the SCE Strategy;

(b)    Whether the Defendants, Sponsors, and the Other Participants defrauded Plaintiffs  by advising Plaintiffs and members of the Class that all or a portion of the "value" of the donated property interest as set out in the respective Appraisals was deductible as a charitable contribution under the Code;

(c)    Whether the Defendants, Sponsors, and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the charitable contribution deductions from the SCE Strategy would comply with Section 170(h) of the Code and therefore would reduce the taxable income of Plaintiffs and the Class;

(d)    Whether the Defendants, Sponsors, and the Other Participants defrauded Plaintiffs by advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(e)     Whether the Defendants, Sponsors, and the Other Participants conspired and/or aided and abetted each other in furtherance of the unlawful acts alleged herein and incorporated by reference;

(f)     Whether the Defendants, Sponsors, and the Other Participants engaged in a pattern of racketeering activity in violation of RICO and/or Georgia's RICO statute ("*Georgia RICO*") codified at O.C.G.A. §16-4-1, *et seq.* based on the unlawful acts alleged herein and incorporated by reference;

(g)     Whether the Defendants', Sponsors', and the Other Participants' overt and/or predicate acts in furtherance of the conspiracy and/or aiding and abetting, based on the unlawful acts alleged herein and incorporated by reference, resulted in or proximately caused and causes injury to the Plaintiffs' and Class Members' business or property or irreparably harmed and harms the Plaintiffs and the alleged class and if so, the appropriate relief to which they are entitled;

(h)     Whether the Defendants', Sponsors', and Other Participants' actions, based on the unlawful acts alleged herein and incorporated by reference, constitute mail and/or wire fraud; and

(i)     Whether the Defendants, Sponsors, and Other Participants have been unjustly enriched through the unlawful acts alleged herein and incorporated by reference.

201.   Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members of the Class who are not parties to the action or could substantially impair or impede their ability to protect their interests.

202.   The Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final relief with respect to the Class as a whole. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the alleged Class which would establish incompatible standards of conduct for the party opposing the Class. Such incompatible standards, inconsistent or varying adjudications on what, of necessity, would be the same essential facts, proof and legal theories, would create and allow to exist inconsistent and incompatible rights within the Class.  Further, the failure to permit this cause to proceed as a class action under Rule 23(b)(1)(A) would be contrary to the beneficial and salutary public policy of judicial economy in avoiding a multiplicity of similar actions.  The Plaintiffs also allege that questions of law and fact applicable to the Class predominate over individual questions and that a class

action is superior to other available methods for the fair and efficient adjudication of the controversy. Therefore, certification is appropriate under Rule 23(b)(3). Failure to permit this action to proceed under Rule 23 would be contrary to the public policy encouraging the economies of attorney and litigant time and resources.

203.   The named Plaintiffs allege that they are willing and prepared to serve the Court and proposed Class in a representative capacity with all of the obligations and duties material thereto.

204.   The self-interests of the named Class representatives are co-extensive with and not antagonistic to those of the absent Class Members. The proposed representatives will undertake to well and truly protect the interests of the absent Class Members.

205.   The named Plaintiffs have engaged the services of counsel indicated below. Plaintiffs' counsel are experienced in complex class litigation involving *inter alia* tax issues and will adequately prosecute this action and will assert, protect, and otherwise represent well the named Class representatives and absent Class Members.

206.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class

is impracticable. There will be no difficulty in the management of this action as a class action.

207.   The Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other Class Members.

## VI.
## ALLEGATIONS RELATING TO RICO AND GEORGIA RICO

208.   Plaintiffs are "persons" within the meaning of 18 U.S.C. §1964(c) and O.C.G.A. § 16-14-6(c).

209.   At all times relevant hereto, each of Plaintiffs and the Defendants were and are "persons" within the meaning of 18 U.S.C. §1961(3).

### A.   Enterprise

210.   An enterprise need not be a specific legal entity but rather may be "any union or group of individuals associated in fact although not a legal entity."

211.   In this case, the enterprise ("*Enterprise*") for RICO and Georgia RICO purposes consists of (1) the Defendants; (2) the Sponsors; (3) the Other Participants; and (4) all other persons and entities that associated to solicit persons to participate in the SCE Strategy for the purpose of generating and sharing fees and commissions generated from the SCE Strategy and alleged tax liability reduction it purported to provide.

212.   These individuals and entities individually and through their agents represented to their victims that the charitable contribution deduction purportedly generated by the SCE Strategy arose from a *bona fide* conservation easement entitling Plaintiffs and members of the class to a noncash charitable contribution deduction under Section 170(h) and relevant regulations.  In reality, the noncash charitable contribution deductions purportedly generated by the SCE Strategy did not qualify as legitimate tax deductions under the Code, and the SCE Strategy, as structured, could not support the promised tax benefits.  The SCE Strategy and the Co-Conspirators' Arrangement to design, promote, sale, and implement it were devised solely to facilitate the generation of significant fees and commissions to the Defendants without regard to the best interests of their clients (*i.e.*, the Plaintiffs and the Class).  The Defendants, the Sponsors, and the Other Participants have made millions of dollars orchestrating the Co-Conspirators' Arrangement.

213.   Defendants and the Sponsors sought out as clients those persons, like Plaintiffs and other Class Members, that had high taxable income and sufficient cash flow available to participate in the Syndicates; the Defendants and the Sponsors then capitalized on the Co-Conspirators' Arrangement to convince the clients to execute the SCE Strategy, for the primary purpose of providing significant revenue for Defendants and the Sponsors.  Unbeknownst to Plaintiffs and the Class, there was no legitimate basis for the large noncash charitable

contribution deductions resulting from highly inflated appraisals essential for the success of the Co-Conspirators' Arrangement that purportedly supported the value of the deductions generated by the SCE Strategy.

214.   The Defendants, the Sponsors, and the Other Participants engaged in a common plan, transaction and course of conduct described herein in connection with the design, promotion, sale and implementation of the SCE Strategy.   The Defendants, the Sponsors, and the Other Participants knowingly or recklessly engaged in acts, transactions, practices and a course of business that operated as a fraud upon the Plaintiffs and the Class, the primary purpose and effect of which was to generate huge fees and commissions by fraudulently selling a series of transactions under the guise of generating a legal and legitimate noncash charitable contribution deduction.

215.   While the Defendants, the Sponsors, and the Other Participants participated in the Enterprise and were a part of it, the Defendants, the Sponsors, and the Other Participants also had an existence separate and distinct from the Enterprise.

216.   Defendants, the Sponsors, and the Other Participants maintained an interest in and control of the Enterprise and also conducted or participated in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

217.   Defendants, the Sponsors, and the Other Participants' control and participation in the Enterprise were necessary for the successful operation of Defendants' scheme. The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engaged.

## B.   Operation of the RICO Enterprise

218.   Syndicated conservation easement deals caught the attention of unscrupulous professionals for three reasons: (1) these deals purported to generate tax deductions that, due to provisions in the Code, could substantially reduce an individual's tax liability;[18] (2) the rules involved were highly technical and thus unlikely to be understood by laypersons, like the Plaintiffs and members of the Class, who were thus also unlikely to question the advice being offered by reputable professionals who were alleged experts in the area; (3) due to a rampant oversupply of unproductive real estate that was devalued in the 2008-2009 recession, a vast supply of deals was available to participants in a buffet like

---

[18] The deduction for a qualified conservation easement under Code Section 170(h) is a noncash charitable contribution deduction. A noncash charitable contribution deduction is unique because, unlike most itemized deductions, it is not subject to the alternative minimum tax ("*AMT*"). Since there is no risk of AMT, the tax benefits flowing from a 170(h) deduction are especially valuable. A taxpayer with $500,000.00 of adjusted gross income could use these deductions to reduce his or her tax to $25,000, thereby enabling the taxpayer in this example to have an effective tax rate of 5%.

fashion;[19] and (4) a group of eager under-employed real estate appraisers, short on engagements in the wake of the 2008-2009 recession, that were willing to engage in fictitious valuations under the guise of a subject property's highest and best use that was wildly inflated.

219.   Tax deductible conservation easements are allowed for taxpayers that meet the requirements of Code Section 170(h).  However, Section 170(h) has a rigorous set of qualification criteria that Defendants did not meet with respect to the SCE Strategy, as set out in detail herein.  Nevertheless, conservation easements are spelled out in the Tax Code itself, specifically Code Section 170(h), giving professional advisors a hook upon which to lure potential participants that would otherwise steer clear of these transactions.  Conservation easement promoters had no difficulty convincing potential participants of the validity of the deduction because they pointed to Code Section 170(h).  This "illusion of validity" is what the Defendants fraudulently used to persuade and mislead the Plaintiffs to agree to participate in the SCE Strategy.

220.   The Defendants, the Sponsors, and the Other Participants had to convince the clients and prospective clients of the validity of the SCE Strategy – which was easy since it is specifically allowed and described in Section 170(h) of

---

[19] Some states like Georgia also had the presence of a state tax credit for conservation easements. Credits, unlike deductions, offer participants a dollar for dollar reduction of tax.

the Code, notwithstanding that, unbeknownst to Plaintiffs and the Class, 170(h) of

the Code did not contemplate the use of partnerships to realize these tax benefits.

221.   Each of the Defendants and Sponsors were vital to the implementation

of the SCE Strategy, played an important role in the success of the Enterprise, and

either controlled the Enterprise or knowingly implemented the decisions of others

in the Enterprise, to wit:

(a)   The Aprio Defendants:  The Aprio Defendants were the key organizer

of the teams that promoted, sold, and implemented the SCE Strategy

at issue in this case.   Capitalizing on their "brand name" and

reputation and their inventory of existing and potential clients, the

Aprio Defendants conducted "dog and pony shows" for eager

sponsors who wanted to partner with the Aprio Defendants to market

and implement the SCE Strategy.  The Aprio Defendants drafted or

participated in the drafting of all transaction documents, including

*inter alia* the Promotional Materials, Conservation Easement Deeds,

Appraisals, and Baseline Documentation Reports.   The Aprio

Defendants also prepared each Syndicate tax return and the respective

K-1s associated with those tax returns with full knowledge of the fact

and the intent that these K-1s would be used by each Plaintiff and

member of the Class to claim defective and flawed charitable contribution deductions on their individual tax returns.

(b)     <u>The Sponsors:</u>  The Sponsors held themselves out as the "experts" in conservation easements (and specifically syndicated conservation easements).  They used this self-promotion not only to ensnare potential participants in the SCE Strategy, but to also to help build the team of co-conspirators that were necessary to implement the SCE Strategy, resulting in enormous fees and commissions to the Sponsors and Defendants and other members of the conspiracy.  The Sponsors played numerous roles in the conspiracy to design, promote, sell and implement the SCE Strategy.  First, they actively sought out firms and professionals to team up with them and the Aprio Defendants for purposes of promoting, selling, and implementing the SCE Strategy. Second, they worked with the Defendants in drafting the necessary documents for the SCE Strategy, including *inter alia* the Promotional Materials, Legal Opinions (with respect to Effingham and the Sirote Legal Opinions), and real estate transactional documents.  The Sponsors also directly participated in the preparation and drafting of the Appraisals, as well as the drafting of the Conservation Easement Deeds.  Third, they made themselves available to directly answer

questions from potential participants and professional advisors who could refer clients to the Sponsors.

(c)   <u>The Appraiser Defendants:</u>   The Appraiser Defendants prepared the Appraisals that purported to support the conservation purpose of the conservation easement donation, as well as the value of the donation.   The Appraiser Defendants also prepared the Appraisals with full knowledge and the intent that the valuations contained in the Appraisals would be used by the Plaintiffs to claim charitable contribution deductions on their tax returns.   The Appraiser Defendants allowed the other Defendants and the Sponsors to direct and dictate the values reached and the methodologies employed in the Appraisals in violation of the Appraiser Defendants' professional obligations and duties.   The Appraiser Defendants further knew that the Appraisals were flawed and the valuations contained therein were grossly inflated.

(d)   <u>The Land Trust Defendants:</u> The Land Trust Defendants assisted in the implementation of the SCE Strategy by providing assistance in drafting the deed language for the donation of the conservation easement and preparing the baseline reports that purported to support the conservation purpose of the conservation easement.   These

Defendants profited enormously from the SCE Strategy by accepting huge donations of interests in real estate in connection with the SCE Strategy, together with substantial amounts of cash that were used to compensate the officers of the Land Trust Defendants.

(e)   <u>The Law Firm Defendants:</u>      The Law Firm Defendants provided legal advice and services in connection with the SCE Strategy to each of the Syndicates and Sponsor Defendants, including *inter alia* providing consulting services regarding the Promotional Materials and the ultimate donation of the conservation easement, and drafting or participating in the drafting of all necessary documentation including the Legal Opinions (with respect to Sirote), Appraisals, Baseline Documentation Reports, and Conservation Easement Deeds.  These Defendants also made themselves available for consultation directly with potential participants regarding the *bona fides* of the SCE Strategy.

(f)   <u>Large & Gilbert:</u> This Defendant provided consulting services to each Effingham Syndicate, including preparation of preliminary development plans, assisting in the structuring and execution of the Conservation Easement Option for each such Syndicate, providing project oversight, facilitating communications between professionals

and other team members, reviewing project documentation and offering recommendations for due diligence and regulatory compliance.

(g)     <u>The Forever Forest Defendants</u>: The Forever Forests Defendants sent Promotional Materials on the SCE Strategy to Aprio clients and various other persons for the Effingham-sponsored SCE Strategy transactions. The Forever Forests Defendants also repeatedly sent additional marketing emails to Plaintiffs and Class Members that contained illustrations of tax savings to be realized by participating in the SCE Strategy. In addition to these promotional activities, the Forever Forests Defendants provided "project management" services to the Syndicates involved in the Effingham-sponsored SCE Strategy transactions. The Forever Forests Defendants also assisted in the preparation of the Appraisal Summary (Forms 8283) and the decision to omit the cost basis from these submissions to the IRS. Nancy Zak of Forever Forests was sued by the United States in December 2018 in an effort to enjoin her from continuing to promote illegal and abusive tax shelters.

222.    The Defendants and the Sponsors intended to commit wire and/or mail fraud in connection with the design, promotion, sale and implementation of

Case 1:20-cv-01325-AT   Document 1   Filed 03/26/20   Page 110 of 175

the SCE Strategy because the IRS has made it clear to professional advisors, including the Defendants, that it intends to disallow any deductions for conservation easement donations implemented in the manner the SCE Strategy was implemented, as further set out in detail herein.  The Defendants' and the Sponsors' racketeering activity in designing, promoting, selling, and implementing the SCE Strategy involved numerous false and misleading misrepresentations and omissions that amount to a scheme or artifice to defraud.

223.   Unfortunately, the IRS has disallowed the charitable deductions at the partnership (*i.e.*, the Syndicate) level and made clear its intent to also disallow the charitable contribution deductions at the individual level and assess Plaintiffs and the Class with back taxes, interest, and penalties for the underpayment of taxes due to filing tax returns reflecting the promised tax benefits of the SCE Strategy. Moreover, the Plaintiffs and the Class have incurred and will continue to incur substantial amounts of accounting and legal fees in connection with the audits and tax court proceedings regarding their individual tax returns and their related partnership tax returns.

224.   Plaintiffs and the Class, who were fully reliant on the advice and representations of the credentialed professionals like the Defendants, were "collateral damage" of the Co-Conspirators' scheme to extract huge fees and commissions.  Plaintiffs were fully reliant on the Defendants, the Sponsors, and the

Other Participants.   Plaintiffs trusted they were being advised, counseled and directed by those professionals who represented themselves as experts and highly experienced with these types of transactions.   The Defendants and their co-conspirators received large amounts of fees and commissions for personal use/gain while at all times assuring Plaintiffs they were in full compliance with the applicable IRS rules and regulations, and other applicable legal requirements.

## C.    Predicate Acts

225.   With respect to the activities alleged herein, the Defendants, the Sponsors, and the Other Participants acted at all times with malice toward the Plaintiffs and the Class, intending to engage in the conduct complained of for the benefit of Defendants and their co-conspirators and with knowledge that such conduct was unlawful.   Such conduct was done with actionable wantonness and reckless disregard for the rights of Plaintiffs and the Class, as well as the laws to which the Defendants and their co-conspirators are subject, the same amounting to actionable wantonness.

226.   With respect to the activities alleged herein, each Defendant and each of their co-conspirators agreed to the operation of the transaction or artifice to deprive Plaintiffs and the Class of property interests.   In furtherance of these agreements, each of them also agreed to interfere with, obstruct, delay or affect

interstate commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants were not entitled.

227.   With respect to the overt acts and activities alleged herein, each Defendant conspired with each other, the Sponsors, and the Other Participants, and with others not named as Defendants herein, to violate 18 U.S.C. §1962(c) and O.C.G.A. §16-4-4(b), all in violation of 18 U.S.C. §1962(d) and Georgia law. Each Defendant agreed and conspired with each other Defendant and their co-conspirators to participate, directly or indirectly, in interfering with, obstructing, delaying or affecting commerce by attempting to obtain and/or actually obtaining property interests to which the Defendants and their co-conspirators were not entitled.

228.   The numerous predicate acts of wire and/or mail fraud in addition to other fraudulent acts, are part of separate fraudulent transactions by the Defendants and their co-conspirators designed to defraud the Individual Plaintiffs and the Class of money and property interests under false pretenses. As victims of these unlawful patterns of illegal activity, Plaintiffs and members of the Class have and continue to suffer losses as a result of these activities.  The acts that caused injuries to the Plaintiffs and members of the Class were performed for financial gain.

229.   In carrying out the overt acts and fraudulent transactions described above, the Defendants and their co-conspirators engaged in, *inter alia*, conduct in

violation of federal laws, including 18 U.S.C. §§1343-1346, and 18 U.S.C. §1961 *et seq. See also* O.C.G.A. §16-4-3(5)(C).

230.   Section 1961(1) of RICO provides that "racketeering activity" means any act indictable under any of the following provisions of Title 18, United States Code: §1341 (relating to mail fraud), §1343 (relating to wire fraud) and §1346 (relating to scheme or artifice to defraud).

231.   Section 16-4-3(5)(C) of the Official Code of Georgia Annotated provides that "racketeering activity" means, *inter alia*, "any conduct defined as 'racketeering activity' under 18 U.S.C. Section 1961(1)."

**D.     Violations of 18 U.S.C. §§ 1341 and 1343.**

232.   Plaintiffs repeat and reallege each and every prior allegation in this Complaint as if fully set forth herein.

233.   For the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises, the Defendants and their co-conspirators, in violation of 18 U.S.C. §§ 1341 and 1343, transmitted and received by wire and/or mail matter and things therefrom including but not limited to contracts, instructions, correspondence, and other transmittals.

234.   The Defendants' and their co-conspirators' violations of 18 U.S.C. §§ 1341 and 1343 are too numerous to list exhaustively. However, by way of

illustration but not limitation, Plaintiffs provide the following representative examples of predicate acts related to these 18 U.S.C. §§ 1341 and 1343 violations:

(a)     November 16, 2010 email from Robert Greenberger of Aprio to Russell Dalba regarding participation in the Maple Landing Syndicate;

(b)     December 18, 2010 emails from James Jowers of Forever Forests to all potential members of Maple Landing Syndicate indicating that the Promotional Materials were not yet finalized but were being review by "the attorney";

(c)     December 20, 2010 emails from James Jowers of Forever Forests to all potential members of Maple Landing Syndicate regarding the status of the Promotional Materials;

(d)     December 21, 2010 email from James Jowers of Forever Forests to Russell Dalba attaching the Maple Landing Syndicate Promotional Materials;

(e)     December 21, 2010 emails from James Jowers of Forever Forests to Russell Dalba regarding "Consent to Conserve" document;

(f)     All other emails in and around December 2010 from James Jowers of Forever Forests to potential participants attaching the Maple Landing Syndicate Promotional Materials;

(g)     December 21, 2010 email from James Jowers of Forever Forests to potential participants in the Maple Landing Syndicate warning them that they "risk…losing their spot if we do not hear from you in a timely fashion";

(h)     December 22, 2010 email from James Jowers of Forever Forests to Russell Dalba regarding participation in the Maple Landing Syndicate;

(i)     December 22, 2010 email from James Jowers of Forever Forests to Russell Dalba containing wire instructions for payment to Maple Landing Syndicate;

(j)     December 22, 2010 email from James Jowers of Forever Forests to all potential members of the Maple Landing Syndicate regarding corrected wiring instructions;

(k)     December 30, 2010 emails from Nancy Zak of Forever Forests to all members of the Maple Landing Syndicate informing them that the Manager's decision to conserve the property was approved by a majority of the members;

(l)     February 1, 2011 email from James Jowers of Forever Forests to all members of Effingham-sponsored SCE Strategy Syndicates informing them *inter alia*, that Forever Forests ", as well as the attorneys and

accountants, are working diligently to be sure that you receive the K-1 and all pertinent documents in a timely manner";

(m)   December 20, 2011 email from Matt Campbell of Evrgreen to all members of the Mossy Rock Syndicate informing them that the Manager has selected the Conservation Easement Proposal;

(n)   March 19, 2012 email from Mark Picket of Environmental Resource to all members of the Mossy Rock Syndicate regarding status of preparation of K-1s by Aprio;

(o)   May 22, 2014 email from Matt Campbell of Evrgreen to all members of the Mossy Rock Syndicate regarding the IRS Audit of the Syndicate's 2011 tax return and the retention of Aprio and Sirote to defend against the audit;

(p)   November 25, 2014 letter from Derek Hutcheson (as the Tax Matters Partner of the Maple Landing Syndicate) to all Members of the Syndicate enclosing the IRS Revenue Agent Report dated November 17, 2014;

(q)   January 12, 2015 letter from the Mossy Rock Syndicate Tax Matters Partner to all Members of the Syndicate enclosing the IRS Revenue Agent Report dated December 11, 2014;

116

(r)     All other letters from the Tax Matters Partner of any SCE Strategy Syndicate to all Members of such Syndicate enclosing an IRS Revenue Agent Report;

(s)     January 17, 2017 email from Jennifer Surrett of Sirote to all members of the Maple Landing Syndicate attaching letter of same date from Derek Hutcheson to all members of the Maple Landing Syndicate regarding status of IRS audit;

(t)     January 26, 2017 email from Mark Picket of Evrgreen to all members of the Mossy Rock Syndicate regarding IRS Notice 2017-10;

(u)     The undated letter sent by Aprio to all clients in early 2017 regarding the status of the IRS summons enforcement proceeding against Aprio;

(v)     February 16, 2017 email from Jennifer Surrett of Sirote to all members of the Maple Landing Syndicate attaching letter of same date from Derek Hutcheson to all members of the Maple Landing Syndicate regarding status of IRS audit;

(w)     June 20, 2017 email from Lisa Cantrell of Forever Forests to all members of the Maple Landing Syndicate regarding IRS Notice 2017-29 and IRS Form 8886;

(x)   August 14, 2017 email from Jennifer Surrett of Sirote to all members of the Maple Landing Syndicate regarding RERI issue and status of tax court proceedings;

(y)   August 25, 2017 email from Derek Hutcheson to Russell Dalba regarding IRS Form 8918;

(z)   September 8, 2017 email from Mark Pickett of Evrgreen to all "Direct and Indirect" Members of the Mossy Rock Syndicate regarding IRS Notice 2017-10 and IRS Form 8886;

(aa)   December 22, 2017 email from Mark Pickett of Evrgreen to all members of the Mossy Rock Syndicate the IRS issuance of an FPAA;

(bb)   January 9, 2019 email from Derek Hutcheson to Russell Dalba discussing status of IRS proceedings;

(cc)   November 20, 2019 email from Matt Campbell of Environmental Resource to all members of the Mossy Rock Syndicate regarding status of IRS audit and Form 8283 issues;

(dd)   All K-1s prepared by the Aprio Defendants for members of any SCE Syndicate sponsored or managed by Effingham or Evrgreen or any of their affiliates;

(ee)   All Appraisals prepared by any of the Appraiser Defendants on property owned by any SCE Syndicate sponsored or managed by

Effingham or Evrgreen or any of their affiliates and sent by email or mail to any potential or actual member of such Syndicate;

(ff)   All Legal Opinions prepared by Sirote and transmitted by email to any potential or actual members in any SCE Syndicate sponsored or managed by Effingham or any of its affiliates;

(gg)   All template Form 8886s sent by email from Forever Forest or any other Defendant, Sponsor, or Other Participant to any member of any SCE Syndicate sponsored or managed by Effingham or Evrgreen or any of their affiliates;

(hh)   All Form 8886s prepared in 2017 by Forever Forest or any other Defendant, Sponsor, or Other Participant and transmitted via mail or wire for any SCE Syndicate sponsored or managed by Effingham or Evrgreen or any of their affiliates;

(ii)   All other mailed or emailed communications between any of the Defendants, Sponsors, or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by Effingham or Evrgreen or any of their affiliates regarding the promotion of the SCE Strategy;

(jj)   All other mailed or emailed communications between any of the Defendants, Sponsors, or Other Participants and any potential or

actual member of any SCE Syndicate sponsored or managed by Effingham or Evrgreen or any of their affiliates regarding the implementation of the SCE Strategy; and

(kk)   All other mailed or emailed communications between any of the Defendants, Sponsors, or Other Participants and any potential or actual member of any SCE Syndicate sponsored or managed by Effingham or Evrgreen or any of their affiliates regarding the audit of any such Syndicate.

235.   Each of the documents that the Defendants and their co-conspirators sent by wire and/or mail to Plaintiffs and members of the Class served at least two roles in the Enterprise.  First, many of these documents, standing alone, were fraudulent.  The Defendants and their co-conspirators knew the tax treatment contemplated by their communications was inaccurate.  Second, all of these documents were used to advance the fraudulent scheme that the Defendants and their co-conspirators perpetrated on Plaintiffs and the Class.

236.   The Defendants' and their co-conspirators' efforts in connection with executing or attempting to execute their transactions to defraud and to obtain money by means of false pretenses, representations or promises, including without limitation acts done in violation of 18 U.S.C. §§ 1341 and 1343, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).

237.   In those matters and things sent or delivered by wire, through other interstate electronic media, and/or by mail Defendants and their co-conspirators falsely and fraudulently misrepresented and fraudulently suppressed material facts from Plaintiffs and the Class as described above, in violation of 18 U.S.C. §§ 1341 and 1343.   These acts, in addition to false and fraudulent misrepresentations communicated outside the interstate wire and mail systems, also fall within the definition of racketeering activity under O.C.G.A. §16-4-3(5)(C).  Defendants' and their co-conspirators' fraudulent statements and omissions include but are not limited to the following:

(1)     Orchestrating, from a tax standpoint, the design, development, implementation, operation, and management of the SCE Strategy;

(2)     Advising Plaintiffs and the members of the Class to engage in the SCE Strategy in order to receive favorable tax benefits;

(3)     Advising and recommending that Plaintiffs and members of the Class engage in an illegal and abusive tax shelter;

(4)     Failing to advise Plaintiffs and members of the Class that the SCE Strategy was an illegal and abusive tax shelter;

(5)     Failing to disclose existing published authority that indicated the purported tax benefits of the SCE Strategy were improper and not

allowable for federal income tax purposes because of the failure of the SCE Strategy to strictly conform to Code Section 170(h);

(6)    Advising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(7)    Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not comply with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions;

(8)    Failing to advise Plaintiffs and members of the Class that the SCE Strategy did not meet the strict requirements for a qualified conservation easement under Section 170(h) of the Code;

(9)    Advising Plaintiffs and the members of the Class that the donations of the conservation easements met the requirements of Section 170(h) of the Code and therefore provided lawful and legitimate tax benefits for the Plaintiffs and the Class;

(10)    Failing to advise Plaintiffs and the members of the Class that the donations of the conservation easements did not meet the requirements of Section 170(h) of the Code and therefore did not provide lawful and legitimate tax benefits for the Plaintiffs and the Class;

(11)     Advising Plaintiffs and members of the Class that they would receive substantial tax advantages in the form of charitable contribution deductions by engaging in the SCE Strategy;

(12)     Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to disallow the tax benefits that were promised from the SCE Strategy;

(13)     Advising Plaintiffs and members of the Class that the SCE Strategy complied with Section 170(h) of the Code and therefore the donations of conservation easements would provide legal and allowable tax deductions;

(14)     Failing to advise Plaintiffs and members of the Class that the IRS had expressed its clear intent to conclude that the SCE Strategy did not comply with Section 170(h) of the Code and therefore the donations of conservation easements would not provide legal and allowable tax deductions;

(15)     Failing to advise Plaintiffs and members of the Class that the Appraisals were significantly inflated, thereby grossly inflating the Section 170(h) deduction;

(16)     Advising Plaintiffs and members of the Class that the Appraisals complied with §170 of the Code, applicable tax laws and regulations, appraisal industry standards, regulations and rules;

(17)     Failing to advise Plaintiffs and members of the Class that the Appraisals did not comply with §170 of the Code, applicable tax laws and regulations, and appraisal industry standards, regulations and rules;

(18)     Advising Plaintiffs and the members of the Class to sign and file tax returns reporting the tax deductions and benefits of the SCE Strategy;

(19)     Failing to advise Plaintiffs and the members of the Class not to sign and file tax returns reporting the tax deductions and benefits of the SCE Strategy because the IRS had expressed its clear intent to disallow them as improper and illegal;

(20)     Advising, instructing, and assisting in the preparation of the tax returns for Plaintiffs and members of the Class that reported the donations of the conservation easements as charitable contribution deductions;

(21)     Failing to advise Plaintiffs and members of the Class not to report the donations of the conservation easements as charitable contribution deductions;

(22)     Advising Plaintiffs and members of the Class that their tax returns, which reported the charitable contribution deductions, were prepared pursuant to and/or complied with IRS guidelines and established legal authorities;

(23)     Failing to advise Plaintiffs and members of the Class that their tax returns, which reported the charitable contribution deductions, did not comply with IRS guidelines and established legal authorities;

(24)     Failing to disclose to Plaintiffs and members of the Class that if they filed tax returns that reported the charitable contribution deductions, the IRS would take the position that Plaintiffs and members of the Class would be liable for taxes, penalties and/or interest, if audited;

(25)     Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed, if audited;

(26)     Making and endorsing the statements and representations contained in the Defendants' and their co-conspirators' written advice, instructions, and recommendations; and

(27)     Failing to advise Plaintiffs and members of the Class that each of the Defendants, the Sponsors, and the Other Participants were not "independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy, a

strategy that largely depended upon the IRS not auditing a particular transaction for it to be successful.

238.   The predicate acts, including the predicate acts of wire and mail fraud, are continuing. The Defendants and their co-conspirators, on their own and as part of a common fraudulent scheme and conspiracy, defrauded Plaintiffs as set out above.

239.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material.  Plaintiffs and the Class were injured as a result of the Defendants' and their co-conspirators' misrepresentations and omissions in carrying out the transactions and subsequently filing tax returns based on the Defendants' (and their co-conspirators') improper advice and their fraudulent and false misrepresentations and omissions.

240.   The Defendants and their co-conspirators made continual use of wire transmissions, in addition to communications made outside the interstate wire systems, to effectuate their fraudulent scheme.  In addition to using in person, telephonic, and other means of communication to make fraudulent statements, the

Defendants and their co-conspirators transmitted numerous specific fraudulent statements to Plaintiffs and the Class through the mail, by fax, and/or by email.

241.   The Defendants and their co-conspirators intentionally and knowingly made these material misrepresentations and intentionally and knowingly suppressed material facts from Plaintiffs and the Class for the purpose of deceiving them and thereby obtaining financial gain. The Defendants and their co-conspirators either knew or recklessly disregarded that the misrepresentations and omissions described above were material. Plaintiffs and the Class were injured as a result of the misrepresentations and omissions in carrying out the SCE Strategy and subsequently filing tax returns based on the Defendants' (and their co-conspirators') fraudulent and false misrepresentations and omissions.

242.   As set forth above, there are numerous specific examples of the predicate acts of fraud, including wire and mail fraud, committed by Defendants and their co-conspirators pursuant to their transactions to defraud Plaintiffs.

243.   Plaintiffs have therefore been injured in their business or property as a result of the Defendants' and their co-conspirators' overt acts and racketeering activities.

## E.   Pattern of Racketeering Activity

244.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

245.   As set forth above, the Defendants and their co-conspirators have engaged in a "pattern of racketeering activity," as defined in §1961(5) of RICO and O.C.G.A. §16-14-3(4), by committing and/or conspiring to commit at least two such acts of racketeering activity, as described above, within the past ten years (and within the past five years with respect to the Georgia RICO Statute).  Each such act of racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results impacting upon similar victims, including Plaintiffs and the Class.

246.   The multiple acts of racketeering activity committed and/or conspired to by Defendants and their co-conspirators, as described above, were related to each other and amount to and pose a threat of continued racketeering activity, and, therefore, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).  Plaintiffs allege that the course of conduct engaged in by the Defendants and their co-conspirators constituted both "continuity" and "relatedness" of the racketeering activity, thereby constituting a pattern of racketeering activity, as that term is defined in 18 U.S.C. §1961(5) and O.C.G.A. §16-14-3(4).  Plaintiffs can show the relatedness prong because the predicate acts have "similar purposes, results, participants, or methods of commission or are related to the affairs of the Enterprise."  All predicate acts had the same purpose of utilizing the Enterprise to misrepresent the nature of the

transactions underlying the SCE Strategy so that the Defendants and their co-conspirators could defraud Plaintiffs.  Plaintiffs allege that the continuity of the pattern of racketeering activity is "closed-ended" inasmuch as a series of related predicate offenses extended since for at least 9 years (a substantial period of time).  Moreover, the continuity of the pattern of racketeering can also be established under "open-ended continuity" as the predicate offenses are part of the Enterprise's regular way of doing business, and the predicates are attributed to Defendants' and their co-conspirators' operations as part of a long-term association that existed for criminal purposes.  Further, the last act of racketeering activity that is alleged as the basis of Plaintiffs' claims occurred within four years of a prior act of racketeering.

247.  Plaintiffs and the Class therefore have been injured in their business or property as a result of Defendants' and their co-conspirators' overt acts and racketeering activities as described above and throughout this Complaint.

## VII.
## PLAINTIFFS' CLAIMS WERE
## TIMELY FILED OR, ALTERNATIVELY, THE DISCOVERY
## RULE AND EQUITABLE TOLLING DEFERRED ACCRUAL
## OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS

248.  Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

249.   The causes of action asserted by Plaintiffs against Defendants herein are timely filed because Plaintiffs' claims first accrued within the applicable limitation period for each claim.

250.   In the alternative, the causes of action asserted by Plaintiffs against Defendants herein are timely filed as the discovery rule and/or equitable tolling deferred accrual of the respective statutes of limitation for such causes of action.

251.   Plaintiffs did not and could not discover the wrongful acts of the Defendants or the injuries caused by the wrongful acts of the Defendants alleged herein more than two years prior to the filing of this lawsuit.

252.   Prior to and up until the timeframe referenced in the immediately preceding paragraphs, Defendants and their co-conspirators continued to advise Plaintiffs that the charitable contribution deductions generated by the SCE complied with all applicable tax laws and regulations and would be accepted by the IRS.   Defendants and their co-conspirators further advised Plaintiffs that they should be represented in the IRS proceedings by firms that had clear conflicts of interest, *i.e.*, the Aprio Defendants and Sirote.  In making these representations and providing this advice, the Defendants and their co-conspirators made false representations and concealed material facts relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy.   In reliance on these representations and advice, Plaintiffs and the members of the Class were delayed

and deterred from bringing their claims against Defendants at an earlier date. Defendants' and their co-conspirators' concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

253.   Plaintiffs and the members of the Class exercised due diligence in pursuing discovery of their claims during the time period that commenced with Defendants rendering faulty advice and continued through Tax Court proceedings that are ongoing.

## VIII.
## TOLLING OF STATUTES OF LIMITATIONS AS TO ALL DEFENDANTS DUE TO FRAUDULENT CONCEALMENT

254.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

255.   The causes of action asserted by Plaintiffs, and on behalf of the Class, against Defendants are timely filed as Defendants and their co-conspirators fraudulently concealed the injuries and wrongful conduct alleged herein.

256.   The Defendants and their co-conspirators had actual knowledge of the injuries and wrongful conduct alleged herein, but concealed the injuries and wrongful acts and omissions alleged herein by intentionally remaining silent and/or making misrepresentations about the injuries and their wrongful conduct despite having a duty to inform Plaintiffs of such injuries and wrongful acts and omissions. The Defendants' and their co-conspirators' silence and misrepresentations

prevented Plaintiffs from discovering their injuries and the Defendants' wrongful acts and omissions.

257.   Defendants and their co-conspirators further advised Plaintiffs that they should be represented in the IRS proceedings by firms that had clear conflicts of interest, *i.e.*, the Aprio Defendants and Sirote.   In providing this advice, the Defendants and their co-conspirators made false representations and concealed material facts relating to Defendants' wrongdoing and the numerous flawed aspects of the SCE Strategy.   In reliance on these representations and this advice, Plaintiffs and the members of the Class were delayed and deterred from bringing their claims against Defendants earlier.   Defendants' and their co-conspirators' concealment therefore prevented Plaintiffs and the members of the Class from discovery of the nature of their claims.

258.   The Defendants and their co-conspirators had a fixed purpose to conceal the wrongful conduct and injuries. Plaintiffs and the members of the Class reasonably relied on the Defendants' and their co-conspirators' silence and misrepresentations to the detriment of Plaintiffs and the members of the Class.

## IX.
## TOLLING OF STATUTE OF LIMITATIONS
## AS TO THE DEFENDANTS DUE TO CONTINUOUS
## REPRESENTATION/CONTINUING TORT DOCTRINES

259.   Plaintiffs repeat, reallege, and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

260.   The causes of action asserted by Plaintiffs against the Defendants are timely filed pursuant to the Continuous Representation/Continuing Tort Doctrines. In addition, the Defendants breached the fiduciary duties they owed to Plaintiffs and the members of the Class because, among other things, the Defendants and their co-conspirators failed to disclose the wrongful conduct and injuries alleged herein and concealed such wrongful conduct and injuries.

261.   Until the filing of this lawsuit, Defendants and their co-conspirators continued to advise Plaintiffs and the members of the Class, and Plaintiffs and members of the class continued to rely on Defendants' and their co-conspirators' advice, that the SCE Strategy was lawful and that the Tax Matters Partner would prevail against the IRS on behalf of Plaintiffs and Class Members.

## X.
## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF RICO 18 U.S.C. §1962(C)
### (By all Plaintiffs and the Class Against all Defendants)

262.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

263.   Section 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly

or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

264.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

265.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

266.   The Defendants, who are associated with and are part of the Enterprise, conduct and have conducted the Enterprise's affairs through a pattern of racketeering activity, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants seek and have sought to deprive Plaintiffs and members of the Class of money and property rights. In order to successfully execute their scheme in the manner set forth in this Complaint, Defendants must have a system that allows Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allows the Defendants this access.

267.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and members of the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

268.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of federal laws, including *inter alia* 18 U.S.C. §§ 1341, 1343 and 1346, and 18 U.S.C. §1961, *et seq.* as set forth more fully above.

269.   Therefore, Defendants have each engaged in "racketeering activity" which is defined in §1961(1) of RICO to mean "any act which is indictable under", *inter alia*, 18 U.S.C. §1341 (relating to mail fraud) and 18 U.S.C. §1343 (relating to wire fraud).

270.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and members of the Class have been injured in their business or property as described herein.

**COUNT II**
**VIOLATIONS OF RICO 18 U.S.C. §1962(D)**
**(By Conspiring to Violate 18 U.S.C. §1962(C))**
**(By All Plaintiffs and The Class Against All Defendants)**

271.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

272.   This claim for relief arises under 18 U.S.C. §1964(a) of RICO and seeks relief from the Defendants' activities described herein for violations of 18 U.S.C. §1962(d) for their conspiracy to violate 18 U.S.C. §1962(c).

273.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

274.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

275.   Absent Defendants' conspiracy and joint efforts with their co-conspirators, Defendants' scheme would not be successful. Acting jointly, Defendants and their co-conspirators have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

276.   Defendants have also violated §1962(d) by conspiring to violate 18 U.S.C. §1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the §1962(c) Enterprise(s) described previously through a pattern of racketeering activity.

277.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate 18 U.S.C. §1962(c) in violation of §1962(d) by various third parties not named as Defendants herein, such as the Sponsors and Other Participants.

278.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Plaintiffs and the Class of money and other property interests.

279.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of a violation of 18 U.S.C. §1962(d) by conspiring to violate 18 U.S.C. §1962(c), but also they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

280.   The Defendants and their co-conspirators have engaged in the commission of and continue to commit overt acts and the following described unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including:

    (a)    Multiple instances of mail fraud violations of 18 U.S.C. § 1341;

    (b)    Multiple instances of wire fraud violations of 18 U.S.C. § 1343; and

    (c)    Multiple instances of travel in interstate commerce to attempt to and to actually commit mail fraud and wire fraud.

281.   As a proximate result of Defendants' and their co-conspirators' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

## COUNT III
## VIOLATIONS OF GEORGIA RICO
## (By All Plaintiffs And The Class Against All Defendants)

282.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

283.   O.C.G.A. §§ 16-14-4(a) and (b)  provides that "[i]t shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money" and "it shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity."

284.   Plaintiffs incorporate, as though fully set out herein, their allegations regarding the Enterprise.

285.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

286.   The Defendants, who are employed by and/or associated with and a part of the Enterprise, conduct the Enterprise's affairs through racketeering, as set forth in this Complaint. Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights. In order to successfully execute their

scheme in the manner set forth in this Complaint, Defendants needed a system that allowed Defendants to access their victims in a manner to effectuate the fraudulent transactions. The Enterprise allowed the Defendants this access.

287.   With respect to the activities alleged herein, the Defendants have acted at all times with malice toward Plaintiffs and the Class in their efforts to acquire and maintain an interest in an Enterprise that affects interstate commerce.

288.   In carrying out the overt acts and fraudulent scheme described above, the Defendants have engaged in conduct in violation of Georgia state law as set forth more fully above.

289.   Therefore, Defendants have each engaged in "racketeering activity" as set out in §16-14-3(5)(C) of Georgia RICO.

290.   As a proximate result of Defendants' unlawful pattern of illegal fraudulent conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

**COUNT IV**
**CONSPIRACY TO VIOLATE GEORGIA RICO (O.C.G.A.  §16-14-4(C))**
**(By All Plaintiffs And The Class Against All Defendants)**

291.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

292.   This claim for relief arises under and seeks relief from the Defendants' activities described herein as part of their conspiracy to violate O.C.G.A. §§ 16-14-4(a) and (b).

293.   Plaintiffs incorporate, as if fully set forth herein, their allegations regarding the Enterprise.

294.   Plaintiffs incorporate, as if fully set forth herein, their allegations that Defendants have engaged in a pattern of racketeering activity.

295.   Absent Defendants' conspiracy and joint efforts, Defendants' scheme would not be successful. Acting jointly with their co-conspirators, Defendants have and have possessed greater power, have been able to exert greater influence, have been able to successfully engage in the activities set forth herein, and have had greater ability to conceal their activities.

296.   The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise(s) described previously through racketeering activity.

297.   Defendants, their employees, and multiple agents have been joined in the conspiracies to violate O.C.G.A. §§ 16-14-4(a) and (b) by various third parties not named as Defendants herein, such as the Sponsors and Other Participants.

298.   As demonstrated in detail above, the Defendants and their co-conspirators have engaged in numerous overt and predicate fraudulent racketeering

acts in furtherance of the conspiracy including systemic fraudulent practices designed to defraud the Individual Plaintiffs and the Class of money and other property interests.

299.   The nature of the above described acts, material misrepresentations, and omissions in furtherance of the conspiracy give rise to an inference that Defendants not only agreed to the objective of conspiring to violate, but they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

300.   The Defendants have sought to and have engaged in the commission of and continue to commit overt acts and unlawful racketeering predicate acts that have and continue to generate income or proceeds received by Defendants from such pattern of racketeering activity, including acts that involve a scheme or artifice to defraud as set forth more fully in Paragraphs 225 through 243 *supra*.

301.   As a proximate result of Defendants' conduct as described above, Plaintiffs and the Class have been injured in their business or property as described herein.

## COUNT V
## NEGLIGENCE/PROFESSIONAL MALPRACTICE
### (By All Plaintiffs And The Class Against The Aprio Defendants)

302.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

303.   As professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Aprio Defendants owed Plaintiffs and the members of the Class a duty to comply with the applicable standards of care and the applicable provisions of their codes of professional responsibility.

304.   The Aprio Defendants failed to meet those applicable standards of care.   The Aprio Defendants' failure to meet the standard of care proximately caused damages to the Plaintiffs as set forth elsewhere in this Complaint.

305.   The Aprio Defendants' failures to meet the applicable standards of care constitute negligence.

306.   The Aprio Defendants' actions rise to the level of gross negligence. Accordingly, Plaintiffs and the members of the Class seek punitive/exemplary damages against the Aprio Defendants, jointly and severally.

307.   The Aprio Defendants' negligence/gross negligence was a proximate cause of the damages for Plaintiffs and members of the Class.   In reasonable reliance on the Aprio Defendants' professional advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums of money to participate in the SCE Strategy; (2) paid fees to the Defendants, the Sponsors, and Other Participants for professional advice and services; (3) did not avail themselves of legitimate tax savings opportunities; (4) filed federal and state tax

returns that reflected charitable contribution deductions in connection with the SCE Strategy; and (5) failed to file a qualified amended return.

308.   But for the Aprio Defendants' negligence/gross negligence, Plaintiffs and members of the Class would not have hired the Defendants, the Sponsors, and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums of money to participate in the SCE Strategy, paid substantial fees in connection with the SCE Strategy,  filed and signed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and spent substantial funds in connection with IRS audits and  Tax Court proceedings.

309.   As a result of the Aprio Defendants' negligent and grossly negligent acts and omissions, Plaintiffs and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

310.   The Aprio Defendants' negligence/gross negligence proximately caused damages to Plaintiffs and members of the Class in that they (1) paid substantial funds to participate in the SCE Strategy, (2) paid significant fees to the Defendants, the Sponsors, and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) spent substantial funds in connection with the audits and Tax Court proceedings, (5) lost

the opportunity to avail themselves of other legitimate tax-savings opportunities, and (6) have and will continue to incur substantial additional costs to rectify the situation.

311.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT VI
## NEGLIGENT MISREPRESENTATION
### (By All Plaintiffs And The Class Against
### All Defendants, In The Alternative To The Fraud Claim)

312.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

313.   During the course of their representation of Plaintiffs and members of the Class, Defendants each negligently made affirmative representations, including those misrepresentations and omissions detailed in Count IX below, that were incorrect, improper, or false; negligently made misleading omissions of material fact; and negligently gave improper, inaccurate, and wrong recommendations, advice, instructions, and opinions to Plaintiffs and members of the Class.   In addition, each Defendant is liable for each negligent misrepresentation and omission made by each of their co-conspirators.

314.  Defendants either knew or reasonably should have known that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong.  Defendants either knew or reasonably should have known that their failures to disclose material information to Plaintiffs and members of the Class were improper and wrong and would mislead Plaintiffs and members of the Class.

315.  Plaintiffs and members of the Class reasonably relied upon the Defendants' representations and advice.

316.  The Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations were a proximate cause of the damages of the Plaintiffs and members of the Class.  In reasonable reliance on Defendants' advice regarding the SCE Strategy, Plaintiffs and members of the Class: (1) paid substantial sums to participate in the SCE Strategy; (2)  paid substantial fees to the Defendants, the Sponsors, and Other Participants for professional advice and services; (3) did not avail themselves of legitimate tax savings opportunities; (4) filed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy; (5) did not file a qualified amended return; and (6) spent substantial funds in connection with IRS audits and Tax Court proceedings.

317.   But for Defendants' (and their co-conspirators') negligent and grossly negligent misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired the Defendants, the Sponsors, and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial funds to participate in the SCE Strategy, paid substantial fees to the Defendants, the Sponsors, and the Other Participants for professional advice and services, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, and spent substantial funds in connection with IRS audits and Tax Court challenges.

318.   As a result of the Defendants' negligent and grossly negligent misrepresentations and omissions, Plaintiffs and members of the Class incurred substantial additional costs in hiring new tax and legal advisors to rectify the situation.

319.   The Defendants' conduct set forth herein proximately caused Plaintiffs and members of the Class to suffer injury in that Plaintiffs and members of the Class (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants, the Sponsors, and Other Participants for advice and services, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the opportunity to avail themselves of other

legitimate tax-savings opportunities, (5) spent substantial funds in connection with the audits and Tax Court proceedings, and (6) have and will continue to incur substantial additional costs to rectify the situation.

320.   As a proximate cause of the foregoing, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest and costs.

**COUNT VII**
**BREACH OF FIDUCIARY DUTY**
**<u>(By All Plaintiffs And The Class Against The Aprio Defendants)</u>**

321.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

322.   As professional advisors who provided services and advice to Plaintiffs and the members of the Class in connection with the SCE Strategy, the Aprio Defendants became fiduciaries of the Plaintiffs and the members of the Class.  Plaintiffs and the members of the Class placed their trust and confidence in the Aprio Defendants, and the Aprio Defendants had influence and superiority over the Plaintiffs and the members of the Class.  Thus, the Aprio Defendants owed Plaintiffs and the members of the Class the duties of honesty, loyalty, care, and compliance with the applicable codes of professional responsibility.  The Aprio Defendants breached these duties and caused Plaintiffs and members of the Class

harm and injury, including but not limited to their failures to disclose their conflicts of interest.

323.   The Aprio Defendants' breaches were a proximate cause of damages to Plaintiffs and the Class.  In reasonable reliance on the Aprio Defendants' advice regarding the SCE Strategy, Plaintiffs and the Class: (1) paid fees and other monies to the Defendants, the Sponsors, and the Other Participants for tax and appraisal advice; (2) did not avail themselves of legitimate tax savings opportunities; (3) filed federal and state tax returns that reflected deductions for the donations of conservation easements in connection with the SCE Strategy; and (4) spent substantial funds defending the IRS audits and in the Tax Court proceedings.  But for Defendants' breaches, Plaintiffs and the Class would not have hired Defendants, the Sponsors, and the Other Participants for advice on the SCE Strategy, engaged in the SCE Strategy, paid substantial fees and other monies in connection with the SCE Strategy, filed and signed federal and state tax returns that reflected charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file qualified amended returns, and/or spent substantial funds disputing the IRS audits and Tax Court challenges.

324.   As a proximate cause of the foregoing, Plaintiffs have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be

awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT VIII**
**DISGORGEMENT**
**(By All Plaintiffs And The Class Against The Aprio Defendants)**

325.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

326.   As a result of the Aprio Defendants' breach of their fiduciary duties, including but not limited to their failures to disclose their conflicts of interest, they should be required to disgorge all payments received by them from any party including Plaintiffs, any member of the Class, any other Defendant, any Sponsor, and/or any Other Participant for work performed in connection with the SCE Strategy.

327.   Accordingly, the Aprio Defendants must disgorge all such payments in favor of Plaintiffs and members of the Class in an amount far in excess of $75,000.00.   In addition, Plaintiffs and members of the Class seek an award of attorneys' fees, interest, and costs.

**COUNT IX**
**FRAUD**
**(By All Plaintiffs And The Class Against All Defendants)**

328.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

329.   In order to induce Plaintiffs and members of the Class to participate in the  SCE Strategy and pay substantial fees and other monies to the Defendants, the Sponsors, and the Other Participants, Defendants directly and indirectly—through the Sponsors and Other Participants—made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs and members of the Class, including but not limited to:

(1)      Misstating, in light of published authorities, the tax treatment Plaintiffs and members of the Class would receive from the purported charitable contribution made for tax purposes by each Syndicate in the SCE Strategy;

(2)      Advising Plaintiffs and members of the Class that the donation of the conservation easement is fully tax deductible as a qualified charitable contribution deduction;

(3)     Advising Plaintiffs and members of the Class that the Syndicate contributed a qualified real property interest as required to be a valid "qualified conservation contribution";

(4)     Failing to advise Plaintiffs and members of the Class that the value of the conservation easement and associated tax benefits in the SCE Strategy constitute a gross valuation overstatement, thus subjecting Plaintiffs to penalties;

(5)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on appropriate assumptions, data, and methodology;

(6)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants relied on inappropriate assumptions, data, and methodology;

(7)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants complied with §170 of the Code, applicable regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(8)     Failing to advise Plaintiffs and members of the Class that the appraisal commissioned by the Defendants did not comply with §170 of the

Code and regulations thereunder, the USPAP, and with general and substantive real property appraisal standards and practices;

(9)     Advising Plaintiffs and members of the Class that the appraisal commissioned by the Defendants provided accurate valuation statements, including the fair market value of the conservation easement;

(10)    Providing false valuation statements to Plaintiffs and members of the Class, including the fair market value of the conservation easement;

(11)    Failing to advise the Plaintiffs and members of the Class that the Syndicate did not donate a "qualified real property interest" because the property that was the subject of the conservation easement could be modified;

(12)    Failing to advise Plaintiffs and members of the Class that the Syndicates retained or reserved rights to the property that were inconsistent with the conservation purposes of the conservation easement;

(13)    Failing to advise Plaintiffs and members of the Class that the Syndicates did not properly document the condition of the property at the time of the donation;

(14)     Failing to advise Plaintiffs and members of the Class that the Appraiser Defendants were not "qualified appraisers" and did not prepare "qualified appraisals" as required by the Code and Regulations thereunder;

(15)     Advising Plaintiffs and members of the Class that the Syndicates donated a "qualified real property interest";

(16)     Advising Plaintiffs and members of the Class that the Syndicates properly documented the condition of the property at the time of the donation;

(17)     Advising Plaintiffs and members of the Class that the Appraiser Defendants were "qualified appraisers" and prepared "qualified appraisals" as required by the Code and Regulations thereunder;

(18)     Failing to advise Plaintiffs and members of the Class that the Appraiser Defendants relied upon inappropriate assumptions, utilized inappropriate methodology, and used various techniques to improperly inflate the value of the conservation easements;

(19)     Failing to advise Plaintiffs and members of the Class that the Appraiser Defendants incorrectly reached unsupportable and/or predetermined Highest and Best Use conclusions;

(20)     Failing to advise Plaintiffs and members of the Class that the
Appraiser Defendants arrived at the unsupportable Highest and Best
Uses by ignoring local zoning rules and other legal restrictions on
purported developments, physical feasibility, market conditions, and
market data;

(21)     Failing to advise Plaintiffs and members of the Class that the
Appraiser Defendants ignored the sale of conservation easements in
the area of the property in determining the value of the conservation
easement;

(22)     Failing to advise Plaintiffs and members of the Class that the
Appraiser Defendants ignored the proceeds received by the Syndicate
by its sale of membership interests to investors in determining the fair
market value of the conservation easement contribution;

(23)     Failing to advise Plaintiffs and members of the Class that the
Appraiser Defendants failed to employ recent, local or similar sales
that competed with the subject property or would have been
considered "substitutes" for the subject property by potential buyers
when employing the "comparable sales method";

(24)     Advising Plaintiffs and members of the Class that the appraisals
conformed with USPAP;

(25)     Failing to advise Plaintiffs and members of the Class that the appraisals did not follow the USPAP because of the appraisal's flawed methodology, inappropriate data and unsupportable assumptions, among other things;

(26)     Advising Plaintiffs and members of the Class that the appraisals complied with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(27)     Failing to advise Plaintiffs and members of the Class that the appraisals failed to comply with the Code and Regulations thereunder for valuing conservation easements and preparing qualified appraisals;

(28)     Advising Plaintiffs and members of the Class that the charitable deduction was based on the fair market value of the conservation easement;

(29)     Failing to advise Plaintiffs and members of the Class that the charitable deduction was not based on the fair market value of the conservation easement;

(30)     Advising Plaintiffs and members of the Class that the property has specific conservation values that satisfy the Code;

(31)     Failing to advise Plaintiffs and members of the Class that the property did not have specific conservation values that satisfy the Code;

(32)     Advising Plaintiffs and members of the Class that the Highest and Best Use for the property before granting the conservation easement was as a residential development;

(33)     Failing to advise Plaintiffs and members of the Class that the Highest and Best Use for the property before granting the conservation easement was not as a residential development but was in fact recreational or agricultural use only;

(34)     Advising Plaintiffs and members of the Class that the conservation easement restrictions complied with the Code requirement that it must be perpetual;

(35)     Failing to advise Plaintiffs and members of the Class that the conservation easement restrictions did not comply with the Code requirement that it must be perpetual;

(36)     Advising Plaintiffs and members of the Class that the conservation easement met the requirement that it was exclusively for conservation purposes in perpetuity and met at least one of the conservation purposes set out in §170 of the Code;

(37)     Failing to advise Plaintiffs and members of the Class that the conservation easement did not accomplish any of the permissible conservation purposes set out in §170 of the Code and permitted

destruction of other significant conservation easements and, as a result, did not meet the requirement that the conservation easement be exclusively for conservation purposes in perpetuity and meet at least one of the conservation purposes set out in §170 of the Code;

(38)  Failing to advise Plaintiffs and members of the Class that in determining the "Highest and Best Use" of the property as a single family high-density residential development, the appraiser gave deference to a hypothetical development plan supplied by Defendants, without the appraiser performing any actual study of the market that would have shown the lack of demand for such development at that time, resulting in the Defendants controlling the appraisal's conclusions and the determination of the fair market value of the conservation easement;

(39)  Advising Plaintiffs and members of the Class that the appraisals met Treasury Regulations that establish the standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(40)  Failing to advise Plaintiffs and members of the Class that the appraisals did not meet Treasury Regulations that establish the

standards for the valuation of conservation easements for the purposes of claiming a non-cash charitable contribution of a partial interest;

(41)   Advising Plaintiffs and members of the Class that the Highest and Best Use of the Property was determined based on the standards for the valuation of a conservation easement for the purposes of claiming a non-cash charitable contribution of a partial interest, when in fact it did not;

(42)   Advising Plaintiffs and members of the Class that the "after easement" analysis met Treasury Regulations establishing the standards for the valuation of conservation easements, when in fact it did not because it (a) used an incorrect and unsupportable Highest and Best Use conclusion; (b) failed to employ recent, local and similar sales; (c) lacked objectivity and appropriate analysis of after easement sales; (d) lacked consideration of easement sales; and (e) advocated a loss in value due to lost development rights when the market data indicates there is no market for the residential development;

(43)   Failing to advise Plaintiffs that the "before value" is hypothetical and unreasonable and is not an estimate of the fair market value of the land at its Highest and Best Use as of the date of the valuation before the easement conveyance;

(44)     Advising Plaintiffs and members of the Class that the appraisal was done by a qualified appraiser when in fact it was not due to the abundant acceptance of direction by the appraiser from the Syndicate which resulted in an inflated fair market value of the conservation easement;

(45)     Failing to advise Plaintiffs and members of the Class that rather than valuing the property at its Highest and Best Use as of the date of easement contribution, the appraisal used misleading, raw data and attempted to support its flawed conclusions by employing the "income approach to value" with the hypothetical "as if developed" technique, asserting that the residential development and the client's intent support the Highest and Best Use value estimate;

(46)     Advising Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction that should be used on the income tax return was proper;

(47)     Failing to advise Plaintiffs and members of the Class that the value of the conservation easement and thus the value of the charitable contribution deduction to be used on the income tax return was improper;

(48)     Failing to advise Plaintiffs and members of the Class that the "Highest and Best Use" valuation as a high-density residential development was not financially feasible and, therefore, improper;

(49)     Failing to advise Plaintiffs and members of the Class that the appraisal did not comply with Notice 2006-96, which provides guidance related to the definition of "qualified appraisal" and "qualified appraiser";

(50)     Failing to advise Plaintiffs and members of the Class that the appraisal is not a qualified appraisal under §170 of the Code because the Highest and Best Use was improperly determined by the property owner's intent and assumption that the property would be developed without any supporting data or any analysis of financial feasibility;

(51)     Failing to advise the Plaintiffs and members of the Class that the appraisal was not a "qualified appraisal" under §170 of the Code because the appraiser did not address nor analyze the likelihood that the property could be utilized according to the appraiser's Highest and Best Use;

(52)     Advising Plaintiffs and members of the Class that the conservation easement substantiated a valid conservation purpose;

(53)     Advising Plaintiffs and members of the Class that the Deed of Conservation Easement substantiated a valid conservation purpose;

(54)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation Easement did not substantiate a valid conservation purpose;

(55)     Advising Plaintiffs and members of the Class that the Baseline Documentation Report supported a valid conservation purpose on the property;

(56)     Failing to advise Plaintiffs and members of the Class that the Baseline Documentation Report did not support a valid conservation purpose on the property;

(57)     Advising Plaintiffs and members of the Class that the Deed of Conservation protected the land in perpetuity and therefore qualified for a federal charitable deduction;

(58)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation did not protect the land in perpetuity and therefore did not qualify for a federal charitable deduction;

(59)     Advising Plaintiffs and members of the Class that the Deed of Conservation permits activity that is consistent with a valid conservation purpose, including preserving habitat and open space;

(60)     Failing to advise Plaintiffs and members of the Class that the Deed of Conservation permits activity that is inconsistent with a valid

conservation purpose and therefore did not qualify for a federal charitable deduction;

(61)     Failing to advise Plaintiffs and members of the Class that the Appraisal Summary, Form 8283, was not properly prepared and submitted;

(62)     Failing to advise Plaintiffs and members of the Class that the failure to provide the cost basis of the property on the Appraisal Summary, Form 8283, would result in complete disallowance of the charitable deduction;

(63)     Advising Plaintiffs and members of the Class that the substantiation requirements were met and therefore the charitable contribution deduction would be allowed;

(64)     Failing to advise Plaintiffs and members of the Class that the substantiation requirements were not met and, therefore, the charitable contribution deduction would be disallowed;

(65)     Advising Plaintiffs and members of the Class that the Appraisal Summary, Form 8283, was prepared properly and included all information required for the charitable contribution deduction to be allowed;

(66)      Advising Plaintiffs and members of the Class to report the charitable contribution deduction on their individual tax returns;

(67)      Advising Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was proper and accurate and should be used to report the deduction on their individual return;

(68)      Failing to advise Plaintiffs and members of the Class that the K-1 reporting the charitable contribution deduction allocated to each Plaintiff was not accurate and should not be relied upon in reporting the charitable contribution deduction on their individual tax return;

(69)      Preparing and signing the Syndicate's tax return and individual investors' K-1s reporting the charitable contribution deduction based on the fair market value of the conservation easement determination in the appraisal;

(70)      Advising Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be allowed if audited;

(71)      Failing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed if audited;

(72)      Advising Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was different and

distinguishable from other SCE Strategies that the IRS and/or Tax Court had disallowed;

(73)    Failing to advise Plaintiffs and members of the Class, both before and after the IRS audit, that the SCE Strategy they executed was not different and distinguishable from other SCE Strategy that the IRS and/or Tax Court had disallowed;

(74)    Advising Plaintiffs and members of the Class that they should challenge the IRS in the audits and/or Tax Court proceedings because Plaintiffs and members of the Class would prevail and the SCE Strategy would be allowed;

(75)    Failing to advise Plaintiffs and members of the Class that they should not challenge the IRS in audits and/or Tax Court proceedings because Plaintiffs and members of the Class would not prevail and the SCE Strategy would be disallowed;

(76)    Making and endorsing the statements and representations contained in the Defendants', Sponsors', and the Other Participants' written advice, instructions, and recommendations; and

(77)    Failing to advise Plaintiffs and members of the Class that each of the Defendants, Sponsors, and the Other Participants were not

"independent" of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy.

330.   The above affirmative misrepresentations and/or intentional omissions of material fact made by each Defendant were false when made, and the Defendants knew these representations to be false when made with the intention that Plaintiffs and members of the Class would rely upon them to enter into the SCE Strategy, pay substantial funds to participate in the SCE Strategy, and paid substantial fees to the Defendants, the Sponsors, and the Other Participants. In addition, the above affirmative misrepresentations and/or intentional omissions of material fact were committed knowingly by the Defendants with the intent to induce Plaintiffs and members of the Class to enter into the SCE Strategy, paid substantial sums to participate in the SCE Strategy, and pay substantial fees to the Defendants, the Sponsors, and the Other Participants.

331. In reasonable reliance on the Defendants' false affirmative misrepresentations and intentional omissions of material fact regarding the SCE Strategy, Plaintiffs and members of the Class engaged in the SCE Strategy; paid substantial sums to participate in the SCE Strategy; paid substantial fees to the Defendants, the Sponsors, and the Other Participants; did not avail themselves of other legitimate tax savings opportunities; filed federal and state tax returns that

reflected charitable contribution deductions; and spent substantial funds in connection with IRS audits and Tax Court proceedings.

332. But for Defendants' intentional misrepresentations and material omissions described above, Plaintiffs and members of the Class would not have hired the Defendants, the Sponsors, and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants, the Sponsors and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file a qualified amended return, and spent substantial funds in connection with IRS audits and Tax Court challenges.

333. As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants, the Sponsors, and the Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties, (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (5) spent substantial funds in connection with the audits and in Tax Court proceedings, and (6) have and will continue to incur substantial additional costs to rectify the situation.

334.   As a proximate cause of the foregoing injuries, Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT X**
**AIDING AND ABETTING**
**(By All Plaintiffs And The Class Against**
**All Defendants Other Than The Aprio Defendants)**

335.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

336.   As described more fully throughout this Complaint, each of the Defendants aided and abetted the wrongful conduct (including fraud and breaches of fiduciary duty) of each of the other Defendants.  Each Defendant was aware of and agreed to its respective role and responsibility in the overall tortious activity and intentionally provided aid and substantial assistance in the other Defendants' tortious activity.

337.   As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to the Syndicates, (2) paid significant fees to the Defendants, the Sponsors, and Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (5) spent substantial funds in connection

with the audits and in Tax Court proceedings, and (6) have and will continue to incur substantial additional costs to rectify the situation.

338.   As a proximate cause of Defendants' conduct set forth herein, Plaintiffs have suffered injury and damages.  Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial, but in excess of $75,000.00, and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

**COUNT XI**
**NEGLIGENCE/PROFESSIONAL MALPRACTICE**
**(By The Dalba Plaintiffs And The Class Against Sirote)**

339.   Plaintiffs repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

340.  In preparing the Legal Opinion regarding the Maple Landing Syndicate SCE Strategy transaction and intending for Members of the Syndicate to rely on the Legal Opinion in deciding to participate in the SCE Strategy and ultimately claim the charitable contribution deduction generated by the SCE Strategy on their individual tax returns, Sirote owed duties to these Members to comply with the applicable standards of care and the applicable provisions of its code of professional responsibility.

341.   Sirote failed to meet those applicable standards of care and this failure to meet the standard of care proximately caused damages to the Dalba Plaintiffs as set forth elsewhere in this Complaint.

342.   Sirote's failure to meet the applicable standard of care constitutes negligence.

343.   The negligent actions and omissions of Sirote in the preparation and use of the Legal Opinion, as set out in this Complaint, were not undertaken in good faith nor in a manner that Sirote reasonably believed to be in or not opposed to the best interests of the Dalba Plaintiffs.

344.   Further, the actions and omissions of Sirote in the preparation and use of the Legal Opinion, as set out in this Complaint, were not merely negligent but rather constituted willful and wanton misconduct and/or gross negligence. Accordingly, the Dalba Plaintiffs seek punitive/exemplary damages against Sirote.

345.   Sirote's negligence/gross negligence in its preparation and use of the Legal Opinion was a proximate cause of the Dalba Plaintiffs' damages.   In reasonable reliance on the Sirote Legal Opinion, the Dalba Plaintiffs and members of the Class engaged in the SCE Strategy; paid substantial sums to participate in the SCE Strategy; paid substantial fees to the Defendants, the Sponsors, and the Other Participants; did not avail themselves of other legitimate tax savings opportunities; filed federal and state tax returns that reflected charitable

contribution deductions; and spent substantial funds in connection with IRS audits and Tax Court proceedings.

346.  But for Sirote's negligence/gross negligence described above, the Dalba Plaintiffs and members of the Class would not have hired the Defendants, the Sponsors, and the Other Participants for advice and services on the SCE Strategy, engaged in the SCE Strategy, paid substantial sums to participate in the SCE Strategy, paid substantial fees to the Defendants, the Sponsors and the Other Participants in connection with the SCE Strategy, signed and filed federal and state tax returns that reported charitable contribution deductions in connection with the SCE Strategy, failed to avail themselves of other legitimate tax savings opportunities, failed to file a qualified amended return, and spent substantial funds in connection with IRS audits and Tax Court challenges.

347.  As a result of Sirote's conduct set forth herein, the Dalba Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy, (2) paid significant fees to the Defendants, the Sponsors, and the Other Participants, (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties,  (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities, (5) spent substantial funds in connection with the audits and in Tax Court proceedings, and (6) have and will continue to incur substantial additional costs to rectify the situation.

348.   As a proximate cause of the foregoing injuries, the Dalba Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## COUNT XII
## CIVIL CONSPIRACY
## (By All Plaintiffs And The Class Against All Defendants)

349.   Plaintiffs and members of the Class repeat, reallege and incorporate each and every prior factual allegation in the preceding paragraphs as if fully set forth herein.

350.   As described more fully above, the Defendants, the Sponsors, and the Other Participants knowingly acted in concert to design, market, sell, and implement the SCE Strategy.  In furtherance of their conspiracy, the Defendants, the Sponsors, and the Other Participants conspired to perpetrate fraud on the Plaintiffs and members of the Class and to breach fiduciary duties owed to Plaintiffs and members of the Class.  In doing so, the Defendants, the Sponsors, and the Other Participants acted with full knowledge and awareness that the transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions, when the transactions in fact lacked those features that were necessary for a legitimate conservation easement charitable contribution deduction.

351.   The Defendants, the Sponsors, and the Other Participants acted in the respective roles as described above according to a predetermined and commonly understood and accepted plan of action to perpetrate fraud on Plaintiffs and to breach fiduciary duties owed to Plaintiffs, all for the purpose of convincing Plaintiffs and Members of the Class to participate in the SCE Strategy and pay substantial fees.   The Defendants, the Sponsors, and the Other Participants authorized, ratified, and/or affirmed the fraudulent misrepresentations and omissions of material fact that each Defendant, Sponsor, and/or Other Participant made to Plaintiffs and members of the Class.

352.   The acts of the Defendants, the Sponsors, and the Other Participants were contrary to numerous provisions of law, as stated above, and constitute a conspiracy to perpetrate fraud on Plaintiffs and members of the Class and a conspiracy to breach fiduciary duties owed to Plaintiffs and members of the Class.

353.   There was a meeting of the minds between and among the Defendants, the Sponsors, and the Other Participants to commit the unlawful acts alleged herein, including a conspiracy to perpetrate fraud on breach of fiduciary duties owed to Plaintiffs and members of the Class.  The conspiracy to commit these unlawful and fraudulent acts proximately caused and continue to cause damages to Plaintiffs and members of the Class as previously set forth herein.

354.   As a result of Defendants' conduct set forth herein, Plaintiffs and members of the Class have suffered injury in that they (1) paid substantial sums to participate in the SCE Strategy; (2) paid significant fees to the Defendants, the Sponsors, and Other Participants; (3) have been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties; (4) lost the opportunity to avail themselves of other legitimate tax-savings opportunities; (5) spent substantial funds in connection with audits and Tax Court proceedings; and (6) have and will continue to incur substantial additional costs to rectify the situation.

355.   Plaintiffs and members of the Class have been injured in an actual amount to be proven at trial but in excess of $75,000.00 and should be awarded actual and punitive damages in accordance with the evidence, plus attorneys' fees, interest, and costs.

## XI.
## PRAYER FOR RELIEF

356.   Based upon the foregoing, Plaintiffs request that Defendants be cited to appear and answer; that the requested class be certified for trial and/or settlement; and that on final hearing Plaintiffs and the members of the Class have judgment against Defendants, jointly and severally for:

(a)     actual, consequential, and incidental damages;

(b)     disgorgement;

(c)     pre- and post-judgment interest at the highest legal rate allowed by

        law;

(d)     all attorneys' fees and costs in pursuing this matter;

(e)     punitive and treble damages in an amount to be determined at trial;

        and

(f)     such other and further relief, both at law and in equity, to which

        Plaintiffs and the Class may show themselves to be justly entitled.

Respectfully submitted,

/s/ *Jeven R. Sloan*

David R. Deary (to seek admission *pro hac vice)*
W. Ralph Canada, Jr. (to seek admission *pro hac vice*)
Jeven R. Sloan (GA Bar No. 652727)
**LOEWINSOHN FLEGLE DEARY SIMON LLP**
12377 Merit Drive, Suite 900
Dallas, Texas 75251
(214) 572-1700 Telephone
(214) 572-1717 Facsimile
davidd@lfdslaw.com
ralphc@lfdslaw.com
jevens@lfdslaw.com


Edward J. Rappaport (GA Bar No. 594841)
**THE SAYLOR LAW FIRM LLP**
1201 W. Peachtree Street
Suite 3220
Atlanta, GA 30309
(404) 892-4400 Telephone
erappaport@saylorlaw.com


*Attorneys for Plaintiffs*