IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREW LECHTER, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:20-cv-1325-AT |
| APRIO, LLP, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

## I.    Introduction

The practice of claiming charitable deductions through the conveyance of conservation easements has existed for decades; however, the steps a taxpayer must follow to legally qualify for these deductions are complex and often require the involvement of lawyers, accountants, and other tax specialists.  The public policy purpose of allowing charitable tax deductions for conservation easements is similar to that for all charitable deductions -- to recognize and garner support for a charitable purpose for the public good, and in the instance of conservation easements, to support conservation of land for environmental reasons.  This case involves a specific tax saving strategy implemented through the conveyance of conservation easements.  To save money on their taxes, property owners would convey easements on their properties exclusively for conservation purposes and then claim deductions on their tax returns based on the value of each easement.

Plaintiffs in this case all claimed deductions on their individual tax returns based on their participation in one of three conservation easement transactions. In each case, the transaction was between a Limited Liability Corporation — or "Syndicate" — that owned the land subject to the conservation easement, and a Land Trust that received the easement.  Plaintiffs were each members of one of three Syndicates, and claimed deductions on their tax returns in proportion to their partnership interests in the respective Syndicates.  In each case the deductions claimed by the Syndicates were disallowed by the Internal Revenue Service ("IRS") at the partnership level, exposing Plaintiffs to tax liability on the individual level.

In the Amended Complaint, Plaintiffs allege that all Defendants in one way or another materially assisted Plaintiffs in navigating the transactions at issue and falsely represented that the deductions Plaintiffs claimed were lawful when, in fact, Defendants knew that they were not.  Plaintiffs further allege that Defendants — led by the accounting firm Aprio, LLP and one of its employees, Robert Greenberger (collectively, "the Aprio Defendants") — conspired to defraud Plaintiffs and other investors by inducing them to buy into a tax scam, which they refer to as "the SCE Strategy."  Additionally, Plaintiffs seek to represent a class consisting of all persons who were exposed to personal tax liability for any tax year since January 1, 2008 as a result of their participation in syndicated conservation easement transactions managed by Defendants.

Currently pending before the Court are ten Motions to Dismiss Plaintiffs' Amended Complaint, [Docs. 170, 171, 172, 173, 177, 179, 180, 181, 182, 183] and Plaintiffs' Motion to Strike or Disregard Extrinsic Evidence [Doc. 187].

## II.    Background[1]

For ease of reference, the Court has included a table below listing several acronyms that appear throughout this Opinion and Order:

| BDR | Baseline Documentation Report |
|-----|-------------------------------|
| FPAA | Final Partnership Administrative Adjustment |
| RAR | Revenue Agent Report |

### A.    Overview of the SCE Strategy

Plaintiffs' theory is that Defendants advanced a fraudulent scheme to induce Plaintiffs to buy into a flawed tax saving strategy, which Plaintiffs refer to as the SCE Strategy. (Am. Compl., Doc. 155 ¶ 1.) The strategy revolved around donations of conservation easements[2] to Land Trusts. Although tax deductions are generally not allowed for the donation of a partial interest in property, the Internal Revenue Code contains an exception for the donation of a "qualified conservation contribution." (*Id.* ¶ 37). Under the Internal Revenue Code, a qualified contribution is a contribution of (1) a qualified real property interest; (2) to a qualified organization; (3) made exclusively for conservation purposes. (*Id.* ¶ 38);

---

[1]   The relevant facts are drawn from Plaintiffs' Amended Complaint. For purposes of resolving the pending motions to dismiss, the Court must accept the facts alleged in the Amended Complaint as true and construe these facts in the light most favorable to Plaintiffs. *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003).

[2]   Plaintiffs define conservation easements as "encumbrances placed on real estate to preserve property for conservation purposes." (Am. Compl., Doc. 155 ¶ 2.)

*see* 26 U.S.C. § 170(h). The easements are memorialized through a legal agreement between the property owner and the donee — a "qualified organization," such as a Land Trust or government agency — to permanently restrict development on the land to achieve conservation goals. (Am. Compl., Doc. 155 ¶ 36.) When a property owner places a conservation easement on the property in question, and does so in strict compliance with Section 170(h) of the Internal Revenue Code, the property owner can claim a charitable contribution deduction in an amount equal to "the value by which the easement impairs the fair market value of the property." (*Id.* ¶ 2.)

The SCE Strategy involved the use of Limited Liability Companies ("LLCs") that were taxed as partnerships for federal tax purposes, which Plaintiffs refer to as "Syndicates."[3] (*Id.* ¶ 39.). Because the Syndicates were taxed as partnerships, they were not liable for federal income tax; instead, the individual partners were liable for income tax in their individual capacities based on income, losses, deductions, and credits that flowed through to them from the partnership, including charitable contributions. (*Id.* ¶ 40.) Partnerships are also required to file an annual return reporting the partnership's annual "income, deductions, gain, losses, etc." that pass through to the partners, and provide both the individual partners and the IRS with Schedule K-1s reporting each partner's share of the partnership's income and losses. (*Id.* ¶ 41.) The partners are required to report

---

[3] Defendants object to Plaintiffs' use of the phrase "Syndicates." For purposes of this Order, however, the Court will use Plaintiffs' chosen phrase in deference to Plaintiffs in their role as masters of the complaint.

their shares of the partnership's income and losses, as reflected on the Schedule K-1s, on their individual tax returns.  (*Id.* ¶ 42.)

In the Amended Complaint, Plaintiffs describe three conservation easement transactions performed by Defendants for three different Syndicates.  Plaintiffs were members of the Syndicates at issue and, after the transactions were completed, they reported the conservation easements donated by the Syndicates as charitable deductions on their individual tax returns as they were listed on the Schedule K-1s for the Syndicates.  (*Id.*)  Plaintiffs allege that the steps Defendants followed to complete these transactions "were uniform . . . in every material way."  (*Id.* ¶ 43.)

First, the "Sponsors" would either form or obtain a majority ownership interest in a Syndicate.  (*Id.* ¶ 43(a).)  The Syndicate would own the property that would be subject to a conservation easement.  Next, during what Plaintiffs refer to as the "due diligence" period, the Aprio Defendants and the Sponsors would hand pick an appraiser to perform a valuation of the conservation easement restriction, and legal counsel would prepare a Legal Opinion supporting the proposition that donating the easement would result in promised tax benefits.  (*Id.* ¶ 43(b).)  The Syndicate would then offer interests in the Syndicate to individuals such as Plaintiffs — whom Plaintiffs refer to as "participants" in the SCE strategy — in exchange for cash.  (*Id.* ¶ 43(c).)  Up to 95–99% of the shares would be sold to the participants with the remainder held by the original members of the Syndicate.  (*Id.* ¶ 43(d).)  The Manager of the Syndicate would then elect to pursue a

conservation easement on the property held by the Syndicate and the individual members would ratify that decision. (*Id.* ¶ 43(e).) An appraiser would then prepare an appraisal to determine the value of the conservation easement.[4] (*Id.* ¶ 43(f).) The Aprio Defendants and the Sponsors would then prepare a Conservation Easement Deed along with David C. Smith and his now-dissolved firm, Smith, Lewis & Haley, LLP (collectively, "the SLH Defendants"); Sirote & Permutt, P.C. ("Sirote"); and the Land Trusts. (*Id.* ¶ 43(g).) Afterwards, these same individuals and entities would prepare a Baseline Documentation Report ("BDR") for the Syndicate that "ascertains the conservation values, substantiates the purported conservation purpose, and establishes the condition of the property at the time of the gift." (*Id.* ¶ 43(h).) The conservation easement would then be donated to the Land Trust. (*Id.* ¶ 43(i).)

After completing these transactions, the Aprio Defendants would prepare the Syndicates' tax returns and report the donation of the conservation easement as a charitable deduction in an amount based on the value of the appraisal.[5] (*Id.* ¶ 44.) The members would then claim deductions on their individual tax returns. The amount of each member's deduction would be a percentage of the overall value

---

[4] The appraisal would reflect the purported decrease in the property's value based on the restriction on the property resulting from the conservation easement. (*Id.* ¶ 44.) According to Plaintiffs, "[t]he primary factor in appraising a conservation easement is the comparison of the property's fair market value before and after the contribution of a conservation easement based on the property's 'highest and best use,' defined as the reasonable and probable use that supports the highest present value of the property." (*Id.* ¶ 160.)

[5] Treasury regulations require Form 8283 to be attached to the tax return and identify the cost basis for the valuation of the property in the appraisal. (*Id.* ¶ 62.) Failure to provide this information will result in disallowance of the charitable deduction. (*Id.* ¶ 64.)

of the easement based on their percentage share in the Syndicate.  (*Id.*)  According to Plaintiffs, Defendants "promised, represented to, and assured the Plaintiffs and the Class that these tax deductions were in full compliance with Section 170(h) of the Code and all other relevant and applicable laws, rules and regulations."  (*Id.* ¶ 45.)

The IRS has long taken the position that charitable contributions based on inflated appraisals are improper.  (*Id.* ¶ 60) (citing IRS News Release, IR-81-122). However, it was not until December 2016 that the IRS issued IRS Notice 2017-10, which designated certain syndicated conservation transactions as "listed transactions" that are subject to heightened scrutiny.  (*Id.* ¶ 68.)  Under Treasury regulations, a listed transaction is "a transaction that is the same as or substantially similar to one of the types of transactions that the [IRS] has determined to be a tax avoidance transaction and identified by notice, regulation, or other form of published guidance as a listed transaction."  26 C.F.R. § 1.6011-4(b)(2).  However, a transaction's status as a listed transaction does not automatically mean the transaction is unlawful.  *Id.* § 1.6011-4(a).  The IRS specifically designated as listed transactions those in which would-be investors in Syndicates were offered the possibility of a charitable deduction worth two and a half times their contributions to the Syndicate.  (Am. Compl., Doc. 155 ¶ 68.)

### B.     The Maple Landing, Mossy Rock, and Oakhill Woods Transactions

#### 1.     The Maple Landing Transaction

Plaintiffs Russell and Kathryn Dalba ("the Dalba Plaintiffs") invested in the Maple Landing Syndicate after receiving Promotional Materials directed to potential investors.  (*Id.* ¶¶ 74–75, 79.)  Plaintiffs allege that the Promotional Materials were prepared jointly by Sirote and the Managers of the Maple Landing Syndicate.  (*Id.* ¶ 73.)  The Promotional Materials indicated that the Manager of the Syndicate would determine whether to pursue a conservation easement on behalf of the Syndicate and the members of the Syndicate would have an opportunity to object to that decision in writing.  (*Id.* ¶ 75(j).)  The Promotional Materials also indicated that the Syndicate had engaged an Appraiser — Tennille & Associates, Inc. ("Tennille") — and begun negotiations with a Land Trust — Georgia-Alabama Land Trust, Inc. ("GALT") — for this purpose.  (*Id.* ¶ 75(g).)  The materials also included a Legal Opinion prepared by Sirote concluding "that it was more likely than not that the promised tax treatment would be sustained by the IRS if the Maple Landing Syndicate or any of its members were audited."  (*Id.* ¶¶ 72, 76.)

After receiving these materials, the Dalba Plaintiffs invested $50,400 in the Maple Landing Syndicate on December 23, 2010.  (*Id.* ¶ 79.)  The Manager of the Syndicate subsequently elected to pursue a conservation easement on the Maple Landing property, and the members of the Syndicate approved that decision.  (*Id.*

¶¶ 80–81.)  In anticipation of this transaction,[6] on November 24, 2010, GALT prepared a BDR — which was later filed as a part of the Syndicate's tax return along with Form 8283 — in which GALT concluded that the easement satisfied the conservation purposes required by Section 170(h) of the Internal Revenue Code. (*Id.* ¶ 82.)  On or around December 20, 2010, Tennille submitted a final appraisal valuing the conservation easement for Maple Landing at $6,791,000.  (*Id.* ¶ 83.) This was also included with the Syndicate's tax return.

The Maple Landing Syndicate formally conveyed a conservation easement to GALT on December 30, 2010.  (*Id.* ¶ 84.)  The Conservation Easement Deed was executed on that same date.  The Deed was signed by David R. Roberts of Tennille, who performed the appraisal, and the Deputy Director of GALT.  (*Id.* ¶ 85.)  The Deed was jointly prepared and approved by Sirote, the Aprio Defendants, GALT, and the Manager of the Maple Landing Syndicate.  (*Id.* ¶ 87.)  On that same date, GALT provided the Syndicate with a letter confirming the conveyance of the easement and representing that it was "fully tax deductible."  (*Id.* ¶ 86.)  This letter was also included in the Syndicate's tax return, along with the BDR and Form 8283.  (*Id.*)

On or around March 9, 2011, the Aprio Defendants — in collaboration with employees of Forever Forests, LLC ("Forever Forests")[7] — prepared Form 8283

---

[6]  It appears from the face of the Amended Complaint that the BDR was prepared before the Manager of the Maple Landing Syndicate formally elected to pursue a conservation easement.

[7]  Plaintiffs collectively refer to Defendants Nancy Zak, James Jowers, and Forever Forests as "the Forever Forests Defendants."  (*Id.* ¶ 27.)  Plaintiffs allege that the Forever Forests Defendants

and attached it to the Syndicate's tax return.  (*Id.* ¶ 89.)  The Appraiser and a representative of GALT signed Form 8283 and verified that it was accurate.  (*Id.*)  When the Aprio Defendants prepared the Syndicate's tax return, which was on or around March 30, 2011, they reported a charitable contribution deduction of $6,791,000, as reflected  in the appraisal.  (*Id.* ¶ 91.)  They included copies of the appraisal, Form 8283, the BDR, and the letter from GALT with the return.  (*Id.*)  The Aprio Defendants also prepared Schedule K-1s for each member of the Syndicate, which reported each member's share of the charitable contribution deduction in proportion to their interests in the Syndicate.  (*Id.* ¶ 92.)  The K-1 for the Dalba Plaintiffs reported a deduction of $162,984.  The Aprio Defendants advised the Dalba Plaintiffs to report this deduction on their individual tax returns for 2010.  (*Id.*)  The Aprio Defendants also prepared Form 8283 for the Dalba Plaintiffs and advised them that the Form "would substantiate the charitable deduction and allow the Dalba Plaintiffs to claim the charitable contribution deduction on their individual tax returns."  (*Id.* ¶ 93.)  Following this advice, the Dalba Plaintiffs reported a $162,984 charitable contribution deduction on their individual tax returns for 2010.  (*Id.* ¶ 94.)

On or around October 29, 2012, the Maple Landing Syndicate received a notice from the IRS indicating that its 2010 partnership tax return had been selected for an audit.  (*Id.* ¶ 95.)  The Sponsor of the Syndicate hired Aprio and

helped prepare Form 8283 "with advice and assistance" from Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C. ("Baker Donelson") and Large & Gilbert, Inc.  (*Id.* ¶ 89.)

Sirote to represent the Syndicate in the audit and the subsequent Tax Court proceeding. (*Id.* ¶ 96.) On November 25, 2014, the Tax Matters Partner for the Maple Landing Syndicate, Derek Hutcheson,[8] sent a letter to the members of the Syndicate notifying them that the IRS had issued a Revenue Agent Report ("RAR") on November 17, 2014. (*Id.* ¶ 98.) The RAR was enclosed in the letter. The RAR indicated that the IRS would disallow the entire $6,791,000 charitable contribution deduction at the partnership level. (*Id.*) In his letter to the members, Hutcheson "continued to reassure the members that there was nothing to worry about." (*Id.* ¶ 99.) He added that he "'does not agree with any of the conclusions reached in the report' and that he 'plan[s] to contest and appeal the findings as the Tax Matter Partner for the LLC.'" (*Id.*) He also stated, "[i]t is important to remember that this report is issued in connection with the very first stage of the IRS process, and tax counsel [Sirote] has advised us that the report marks only the beginning of the proceedings." (*Id.*)

On or around October 31, 2017, the IRS issued a Final Partnership Administrative Adjustment ("FPAA") for Maple Landing's 2010 tax return adopting the findings in the RAR. (*Id.* ¶ 102.) Several months later, the Sponsor of the Syndicate filed a petition in the United States Tax Court. (*Id.*) The Tax Court granted the IRS's motion for summary judgment on July 9, 2020, and the Maple Landing deduction was disallowed in its entirety. (*Id.* ¶ 103.)

---

[8] Hutcheson is the owner of Effingham Managers, LLC, which is the Maple Landing Syndicate's Sponsor. (*Id.* ¶¶ 56 n.8, 58(a), 70.)

### 2.    The Mossy Rock Transaction

Sylvia and Lawson F. Thompson ("the Thompson Plaintiffs") invested in Mossy Rock after receiving Promotional Materials dated October 20, 2011. (*Id.* ¶¶ 104, 110.) According to Plaintiffs, the Promotional Materials were prepared by the SLH Defendants and Mossy Rock's Sponsor — Evrgreen Management Group, Inc. ("Evrgreen") — and reviewed and approved by the Aprio Defendants. (*Id.* ¶ 106.)

The Promotional Materials indicated that Mossy Rock had negotiated with a Land Trust — Atlantic Coast Conservancy, Inc. ("ACC") — about a conservation easement and that ACC had performed a preliminary study determining that "the property will satisfy one or more of the 'conservation purposes' defined under Treasure Regulation §1.170A-14(d)." (*Id.* ¶¶ 107(d)–(e).) The Promotional Materials also stated that a draft of the Conservation Easement Deed was available to prospective investors for review upon request to the Syndicate Manager. (*Id.* ¶ 107(f).) The draft Deed had been jointly prepared by the SLH Defendants and the Syndicate's Sponsor. (*Id.*) Additionally, the Promotional Materials stated that Jim R. Clower, Sr. and Clower & Associates, LLC (collectively "the Clower Defendants") had completed a "Preliminary Appraisal Report" for the property concluding that conveying a conservation easement to ACC would entitle the Syndicate to a charitable contribution deduction of $17,685,000. (*Id.* ¶ 107(g).) The Preliminary Appraisal Report was also available to prospective investors for inspection upon request. (*Id.*) The Promotional Materials represented that if the Mossy Rock Syndicate pursued a conservation easement its members would be entitled to a

charitable contribution deduction of more than 2.5 times the amount they paid into the Syndicate.  (*Id.* . ¶ 107(h).)

After receiving these materials, the Thompson Plaintiffs paid $19,000 to the Mossy Rock Syndicate on December 7, 2011. (*Id.* ¶ 110.)  The Manager of the Mossy Rock Syndicate subsequently made the decision to pursue a conservation easement, and the members voted to follow that decision.  (*Id.* ¶¶ 111–12.)  On December 16, 2011, the Conservation Easement Deed was signed by the Clower Defendants, and by Defendant Robert D. Keller[9] as a representative of ACC.  (*Id.* ¶ 113.) The Deed was jointly prepared by the SLH Defendants, the Aprio Defendants, the ACC Defendants, and the Sponsor.  (*Id.*)  The Clower Defendants completed a final appraisal on December 19, 2011 with an effective date of December 7, 2011. (*Id.* ¶ 114.)  Just like the Preliminary Appraisal Report, the final appraisal valued the conservation easement at $17,685,000.  (*Id.*)  On December 28, 2011, ACC prepared a BDR representing that the easement would satisfy the conservation purposes outlined in Section 170 of the Internal Revenue Code. (*Id.* ¶ 115.)  The Mossy Rock Syndicate formally conveyed a conservation easement to ACC on December 28, 2011.  (*Id.* ¶ 116.)  On that same date, ACC provided Mossy Rock with a letter confirming the conveyance of the easement and representing that the contribution was "fully tax deductible."  (*Id.* ¶ 117.)

On or around April 7, 2012, the Aprio Defendants prepared and signed the tax return for the Mossy Rock Syndicate.  (*Id.* ¶ 122.)  Defendant Greenberger

---

[9] The Court collectively refers to Keller and ACC as "the ACC Defendants."

signed the return as the tax preparer. (*Id.*) The return reported a charitable contribution deduction of $17,685,000, as reflected in the appraisal. (*Id.*) Copies of the appraisal, Form 8283, the BDR, and the letter from ACC were included with the return. (*Id.*) As it had done for the Maple Landing Syndicate, the Aprio Defendants prepared Form 8283 for the Mossy Rock Syndicate in collaboration with the Forever Forests Defendants. (*Id.* ¶ 120.) The Clower Defendants and Keller signed Form 8283 and verified that it was accurate.[10] (*Id.*) The Aprio Defendants also prepared K-1s for each member of the Mossy Rock Syndicate reporting the members' shares of the charitable contribution deduction. The K-1 that the Aprio Defendants prepared for the Thompson Plaintiffs reported a $92,835 deduction. (*Id.* ¶ 123.) The Aprio Defendants also provided the Thompson Plaintiffs with Form 8283 for use in their individual returns and advised them to report their charitable contribution deduction as it was reported on the K-1. (*Id.*) Following this advice, the Thompson Plaintiffs reported a $92,835 charitable deduction on their individual tax returns for 2011. (*Id.* ¶ 124.)

On or around April 9, 2014, the Mossy Rock Syndicate received notice that its 2011 tax return had been selected for an audit. (*Id.* ¶ 125.) The Syndicate's Sponsor hired Aprio and Sirote to represent the Syndicate in the audit and the subsequent Tax Court proceeding. (*Id.* ¶ 126.) On January 12, 2015, the Mossy Rock Syndicate's Tax Matters Partner, Mark Pickett, sent a letter to the Syndicate's

---

[10] The Aprio Defendants stated in the Form 8283 for Mossy Rock that the purpose of the easement was to protect wildlife habitats. (*Id.* ¶ 120.)

members notifying them that the IRS had issued an RAR on December 11, 2014, concluding that the entire deduction should be disallowed.  (*Id.* ¶ 127.)  The letter was "virtually identical" to the one the Maple Landing Syndicate had sent to its own members informing them of the Maple Landing RAR.  (*Id.* ¶ 127 n.25.)  The letter from the Mossy Rock Syndicate's Tax Matters Partner included the same language stating (1) that he "does not agree with any of the conclusions reached in the report" and "plan[s] to contest and appeal the findings as the Tax Matter Partner for the LLC"; and (2) "[i]t is important to remember that this report is issued in connection with the very first stage of the IRS process, and tax counsel [Sirote] has advised us that the report marks only the beginning of the proceedings."  (*Id.* ¶ 128.)

On or around October 10, 2017, the IRS issued an FPAA for the Mossy Rock Syndicate's 2011 tax return adopting the findings in the RAR.  (*Id.* ¶ 129.)  Like the Maple Landing Syndicate, the Mossy Rock Syndicate then filed a petition with the Tax Court.  In a letter to the Syndicate's members on August 23, 2019, Mossy Rock's Tax Matters Partner stated that the Judge in the Tax Court case "seemed skeptical about the value claimed for the conservation easement."[11]  (*Id.* ¶ 130.)

### 3.    The Oakhill Woods Transaction

Plaintiff Andrew Lechter invested in the Oakhill Woods Syndicate after receiving Promotional Materials for the Syndicate dated June 11, 2010.  (*Id.* ¶¶ 132,

---

[11]  The Court is not aware of the status of the Mossy Rock Tax Court case as of the date of this Order.

134, 138.)  The Promotional Materials stated that the Manager of the Syndicate would make the initial decision about whether to pursue a conservation easement and the members would have an opportunity to object.  (*Id.* ¶ 132.)  The materials were prepared jointly by the Managers of the Syndicate and Sirote and reviewed and approved by the Aprio Defendants.  (*Id.* ¶ 133.)  The Promotional Materials stated that the Syndicate had engaged an Appraiser — Tennille — and begun negotiations with a Land Trust — GALT — for the purpose of conveying a conservation easement.  (*Id.* ¶ 135(g).)

Lechter paid $141,312 into the Oakhill Woods Syndicate on August 3, 2010. (*Id.* ¶ 138.)  Prior to investing in the Syndicate, Lechter consulted with Defendants Nancy Zak and James Jowers of Forever Forests.  They advised him that the SCE Strategy complied with Section 170(h) of the Internal Revenue Code and that he could legally report his share of the charitable deduction for the Oakhill Woods easement.  (*Id.* ¶ 137.)

The Managers of the Oakhill Woods Syndicate subsequently elected to convey a conservation easement to GALT and that decision was ratified by the Syndicate's members.  (*Id.* ¶¶ 139–40.)  The Conservation Easement Deed was executed on December 7, 2010.  (*Id.* ¶ 141.)  It was verified and signed by both the Appraiser, David R. Roberts of Tennille, and the Deputy Director of GALT.  (*Id.*) The Deed was jointly prepared and approved by Sirote, the Aprio Defendants, the Managers of the Syndicate, the Sponsor (Effingham), and GALT.  (*Id.*)  The Oakhill Woods Syndicate formally conveyed a conservation easement to GALT on

December 7, 2010.  (*Id.* ¶ 143.)  On or around that date, GALT prepared a BDR for the Syndicate concluding that the easement satisfied the conservation purposes set out in Section 170 of the Internal Revenue Code.  (*Id.* ¶ 142.)  Around that time, GALT also provided the Syndicate with a letter confirming the conveyance of the easement and representing that it was "fully tax deductible."  (*Id.* ¶ 144.)  Shortly thereafter, Tennille submitted a final appraisal with an effective date of December 20, 2010, valuing the easement at $7,949,000.  (*Id.* ¶ 145.)

On or around April 28, 2011, the Aprio Defendants prepared Form 8283 for Oakhill Woods in collaboration with the Forever Forests Defendants, as it had done for the Maple Landing and Mossy Rock Syndicates.  (*Id.* ¶ 147.)  Roberts and the Deputy Director of GALT both signed and verified the form as accurate.  (*Id.*)  And on or around May 5, 2011, the Aprio Defendants prepared the Oakhill Woods Syndicate's tax return.  (*Id.* ¶ 149.)  The Aprio Defendants included a copy of the appraisal, Form 8283, the BDR, and the letter from GALT along with the return. (*Id.*)  The Aprio Defendants also prepared K-1s for each member of the Syndicate reporting their shares of the deduction.  (*Id.* ¶ 150.)  The K-1 that the Aprio Defendants prepared for Lechter reported a $635,920 deduction, which the Aprio Defendants advised Lechter to report on his individual tax return for 2010.  (*Id.*) The Aprio Defendants also provided Lechter with Form 8283 and advised him that it would substantiate the deduction and allow him to claim the deduction on his individual tax return.  (*Id.* ¶ 151.)  Following this advice, Lechter reported his

$635,920 share of the Syndicate's charitable deduction on his individual tax return for 2010. (*Id*. ¶ 152.)

Afterwards, the IRS notified the Oakhill Woods Syndicate that its 2010 partnership tax return had been selected for an audit. (*Id*. ¶ 153.) As it had done for the Maple Landing Syndicate, and as Evrgreen had done for the Mossy Rock Syndicate, Effingham hired Aprio and Sirote to represent the Oakhill Woods Syndicate in the audit and the subsequent Tax Court proceeding. (*Id*.) After the audit the IRS sent the Oakhill Woods Syndicate a letter notifying the Syndicate that the value of the deduction would be reduced from $7,949,000 to $40,473. (*Id*. ¶ 154.) The Syndicate received the letter on June 27, 2016. (*Id*.) A few weeks later, Effingham sent Lechter a letter notifying him that the deduction had been disallowed.[12] (*Id*. ¶ 153.) The Syndicate then filed a petition with the Tax Court challenging the disallowance of the deduction. (*Id*. ¶ 157.)

The Tax Court granted summary judgment for the United States on February 13, 2020. (*Id*.) In its memorandum opinion, the Tax Court found that the Oakhill Woods Syndicate had failed to properly complete Form 8283. More specifically, the court found that the Syndicate had intentionally submitted an incomplete form and "supplied the relevant information three years after its return was filed and only upon learning that the IRS examination might have an unhappy ending." (*Id*.) The court added that this was "not a case of inadvertent omission, but of a

---

[12] Though it is not clear from the face of the Amended Complaint, the Court interprets this to mean that the deduction had been disallowed in the amount that the Syndicate had claimed, and that it had been reduced; not that it had been disallowed in its entirety.

conscious election not to supply the required information." (*Id.* ¶ 159.)  The court also observed that the Syndicate had based the value of its originally claimed deduction on the dubious proposition that the 379 acres of land that was subject to the easement "had appreciated by more than 800% during the previous 3 ½ years amid the worst real estate crisis since the Great Depression." (*Id.* ¶ 158.)

### C.   The Present Lawsuit

Plaintiffs filed the present lawsuit on March 26, 2020 and amended their complaint on August 28 of that same year.  (Compl., Doc. 1); (Am. Compl., Doc. 155).  In their Amended Complaint, Plaintiffs allege that the SCE Strategy was deficient on the ground that the Conservation Easement Deeds, copies of Form 8283, and BDRs Defendants prepared in connection with the SCE Strategy did not comply with the IRS's requirements.  (Am. Compl., Doc. 155 ¶ 4.)  They allege that the appraisals performed for the easements in question "were a complete sham and contained grossly inflated valuations," and that all of the Defendants knew that the inflated appraisals would be used by Plaintiffs and the proposed class members to claim charitable contribution deductions that were legally unsupportable.  (*Id.* ¶ 5.)  They further allege that Defendants profited by convincing "hundreds, if not thousands" of clients to invest in the SCE Strategy for the purpose of claiming charitable tax deductions despite clear warnings from the IRS that the deductions were legally unsupportable.  (*Id.* ¶ 6.)  And they claim that unbeknownst to them Defendants had entered into undisclosed, improper business arrangements with each other, and that they were working to advance their own financial interests

instead of the interests of their clients.  (*Id.* ¶ 52.)  In other words, they claim Defendants were engaged in an illicit conspiracy.  Additionally, Plaintiffs claim that because Defendants developed and promoted this conspiracy through use of the mail and/or wires, Defendants were therefore taking part in a racketeering enterprise.  (*Id.* ¶ 7.)  As a consequence of their following Defendants' advice and recommendations in connection with the SCE strategy, Plaintiffs allege that the IRS disallowed their claimed charitable deductions "causing them to pay substantial fees and transaction costs, be exposed to interest and penalties from the IRS, and incur additional accounting and legal fees and expenses to deal with the IRS fallout."  (*Id.* ¶ 8.)

Plaintiffs raise claims against sixteen individuals and entities:  Aprio; Robert Greenberger; Sirote; Baker Donelson; David C. Smith; Smith, Lewis & Haley, LLP ("SLH"); Forever Forests; Nancy Zak; James Jowers; Large & Gilbert; Jim R. Clower; Clower Kirsch & Associates, LLC; Tennille; ACC; Robert D. Keller; and GALC.  They raise 12 counts, including violations of both the Racketeer Influenced and Corrupt Organizations Act ("Federal RICO"), 18 U.S.C. §§ 1961–1968, and the Georgia RICO Act ("Georgia RICO"), Ga. Code Ann. § 16-14-1, *et seq.* (Counts I and III); conspiracy to violate Federal RICO and Georgia RICO (Counts II and IV); fraud (Count IX); negligent misrepresentation, as an alternative to their fraud claims (Count VI); negligence/professional malpractice and breach of fiduciary duty by the Aprio Defendants (Counts V and VII), as well as a claim against the Aprio Defendants requesting disgorgement of profits (Count VIII);

negligence/professional malpractice by Sirote (Count XI); aiding and abetting the

Aprio Defendants' alleged breaches of fiduciary duty (Count X); and civil

conspiracy (Count XII).  *See* (*id.* ¶¶ 284–378).  In addition, Plaintiffs seek to

represent a nationwide class consisting of

> All Persons who, for any tax year from January 1, 2008 to the present,
> inclusive, have been assessed back-taxes, penalties, and/or interest by
> the Internal Revenue Service as a result of their involvement, either
> directly or indirectly through an ownership stake in another entity, in
> a Syndicated Conservation Easement designed, marketed, sold,
> implemented (including but not limited to preparing tax returns and
> K-1s for the participants) or managed by the Aprio Defendants and/or
> the Sponsors.[13]

(*Id.* ¶ 212.)  Defendants filed ten separate motions to dismiss.  *See* (Doc. 170) (the

Aprio Defendants); (Doc. 171) (the ACC Defendants); (Doc. 172) (Sirote); (Doc.

173) (Large & Gilbert); (Doc. 177) (Jowers); (Doc. 179) (Zak and Forever Forests);

(Doc. 180) (the SLH Defendants); (Doc. 181) (Baker Donelson); (Doc. 182)

(Tennille); (Doc. 183.) (GALT).[14]  Plaintiffs responded by filing a motion to strike

or, alternatively disregard evidence cited in Defendants' motions.  *See* (Doc. 187.)

---

[13] Plaintiffs add, "Excluded from the Class are: Defendants, Defendants' parents, subsidiaries, affiliates, partners, and employees; anyone receiving referral fees from the SCE Strategy transactions; federal governmental entities; the Sponsors; the Sponsors' parents, subsidiaries, affiliates, partners, and employees; the Other Participants; and the Other Participants' parents, subsidiaries, affiliates, partners, and employees." (*Id.* ¶ 212.)

[14] Each of these motions was fully briefed with a response, and most of the briefs included a reply as well.  As such, the briefing in this matter became voluminous, quickly.  The Court held a hearing with all parties to address this and identify a way forward that would allow the Court to realistically address all of the arguments presented in an efficient way.  *See* (Minute Entry, Docs. 200, 204.)  The parties agreed that any brief which required a page extension of five pages or more would be accompanied by an executive summary.  (*Id.*)  Defendants further agreed to provide the Court a consolidated executive summary regarding the arguments presented in their various motions to dismiss, and Plaintiffs agreed to also provide an Executive Summary of their arguments presented in response to those motions to dismiss.  *See* (Doc. 218.)  In addition to those consolidated executive summaries, any Defendant also had the option of filing a separate

### III.   Legal Standard

### A.   Rule 12(b)(2)

A plaintiff's complaint is subject to dismissal if there is a lack of personal jurisdiction over the defendant.  Fed. R. Civ. P. 12(b)(2).  Plaintiff bears the burden of establishing jurisdiction in this Court.  *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000); *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010).  "In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a *prima facie* case of jurisdiction over the movant, non-resident defendant."  *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988).  Plaintiff may establish a *prima facie* case by presenting sufficient evidence to withstand a motion for directed verdict.  *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990); *Allegiant Physicians Serv., Inc. v. Sturdy Memorial Hosp.*, 926 F. Supp. 1106, 1112 (N.D. Ga. 1996).  A party presents enough evidence to withstand a motion for directed verdict by putting forth "substantial evidence . . . of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions."  *Walker v. NationsBank of Fla.*, 53 F.3d 1548, 1554 (11th Cir. 1995); *see also Polskie Linie Oceaniczne v. Seasafe Transp. A/S*, 795 F.2d 968, 972 (11th Cir. 1986) (noting that, if the defendant makes a showing of the inapplicability of the long-arm statute,

---

executive summary of arguments and issues that were particular or specific to that Defendant, and Plaintiffs had the option as well to respond to those individual executive summaries.  (*Id.*)

"the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint."). The Court construes the allegations in the complaint as true to the extent that they are uncontroverted by defendant's evidence. *Morris*, 843 F.2d at 492; *Allegiant Physicians*, 926 F. Supp. at 1112; *Foxworthy v. Custom Tees, Inc.*, 879 F. Supp. 1200, 1207 n.10 (N.D. Ga. 1995).

### B.    Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). For the purposes of a motion to dismiss, the court must accept all factual allegations in the complaint as true; however, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, at 679. Although the plaintiff is not required to provide "detailed factual allegations" to survive dismissal, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678; *Twombly*, 550 U.S. at 555.

23

## IV.   Discussion

### A.      Plaintiffs' Motion to Strike

Before addressing Defendants' ten motions to dismiss, the Court first considers Plaintiffs' motion to strike or, alternatively, disregard various extrinsic evidence relied on in Defendants' motions to dismiss.

Ordinarily, the evidence the Court considers on a motion to dismiss should be limited to the four corners of the complaint because otherwise the motion would be converted to a motion for summary judgment. *See* 5C Charles Allen Wright et al., Federal Practice and Procedure § 1366 (3d ed. 1998) (noting that "whenever outside matters are presented to and not excluded by the court, the matter will be considered by the appellate court as one for summary judgment").   But the Eleventh Circuit has recognized an exception to this general rule for when "the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).   In such circumstances, "the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment." *Id.*

In their motion, Plaintiffs object to specific factual points raised in Defendants' motions to dismiss, as well as exhibits attached to Defendants' motions, that they claim do not fall within the Eleventh Circuit's exception.   They

argue that none of this information was included in the Amended Complaint and that it should not be considered at the pleading stage because it is not central to Plaintiffs' claims.  (Pls.' Mot. to Strike, Doc. 187. at 18.)  Plaintiffs' evidentiary objections are too numerous to list here, but the Court will address a few of the most salient examples.

For instance, Plaintiffs object to Defendants introducing copies of the Promotional Materials that Defendants allegedly sent Plaintiffs before Plaintiffs purchased their interests in the Syndicates.  Defendants primarily rely on the Promotional Materials for the purpose of showing that Plaintiffs received disclaimers and were warned not to rely on Defendants' representations about promised tax benefits.  Plaintiffs argue that these materials should be excluded on the ground that they are not "central" to Plaintiffs' claims, (Pls.' Mot. to Strike Reply, Doc. 221 at 17).  They argue that limited references to a document in a complaint do not make it a document on which the plaintiff relied in bringing the action, such that its introduction would be permissible for purposes of a motion to dismiss.  (*Id.*at 10.)

But Plaintiffs make more than a few limited references to the Promotional Materials in the Amended Complaint.  As Defendants note, the Promotional Materials are referenced in the Amended Complaint no less than forty times.  (Defs.' Opp'n to Mot. Strike, Doc. 213 at 13, 16.)  And these are not mere passing references.  Many of the alleged misrepresentations Plaintiffs rely on in support of their claims against Defendants were contained in these same Promotional

Materials.  As such, it appears that the Promotional Materials were one of the primary vehicles — if not the primary vehicle — through which Plaintiffs claim they were defrauded.  The Court will therefore consider these documents for purposes of Defendants' motions to dismiss on the ground that they are central to Plaintiffs' claims.  *Brooks*, 116 F.3d at 1369.

Plaintiffs also object to Defendants' inclusion of information from a Tax Court Order for the purpose of establishing the date when the deductions claimed by the members of the Oakhill Woods Syndicate were ultimately rejected. Defendants rely on the date referenced in the Tax Court Order for the limited purpose of "demonstrating Plaintiffs' notice of potential issues with their investment in the Oakhill Woods, LLC." (Defs.' Opp'n to Mot. Strike, Doc. 213 at 23.)  In that Order, the Tax Court stated, "In December 2014 the IRS issued petitioner a summary report proposing to disallow Oakhill's claimed deduction[.]" *Oakhill Woods, LLC v. Comm'r of Internal Revenue*, 119 T.C.M. (CCH) 1144 (2020).  Plaintiffs claim that it is improper for Defendants to offer this information for the purpose of showing "the purported date on which the claims against them could have been discovered by the Plaintiffs." (Pls.' Mot. to Strike Reply, Doc. 221 at 12.)  But when considering a motion to dismiss, a court can take judicial notice of facts that "are not subject to reasonable dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999) (citing Fed. R. Evid. 201(b)).  The December 2014 date of the

summary report referenced in the Tax Court opinion surely applies.  The Court will therefore take judicial notice of the quoted language in the Tax Court Order.

Finally, Plaintiffs object to the inclusion of a Declaration submitted by Defendant Nancy Zak from another matter.  Plaintiffs rely on the Declaration for the proposition that Defendants Baker Donelson and Large & Gilbert provided Zak with the advice related to Form 8283, which serves as the foundation for Plaintiffs' claims against the two firms in the Amended Complaint.  Defendants argue that the Declaration is "not just *a* central document, it is perhaps *the most* central document to the claims against Baker Donelson and L&G."  (Defs.' Opp'n to Mot. Strike, Doc. 213 at 25) (emphasis in original).  Defendants' point is well taken. Nevertheless, the Court need not consider the Declaration for purposes of Baker Donelson and Large & Gilbert's motions to dismiss because, as discussed below, Plaintiffs' claims against those two Defendants fail on independent grounds.

Ultimately, the Court **DENIES IN PART AND GRANTS IN PART** Plaintiffs' motion (Doc. 187.)  The Court **DENIES** Plaintiffs' motion insofar as it applies to the Promotional Materials referenced in the Amended Complaint and the information referenced in the Tax Court Order in the case involving Oakhill Woods.  The Court will not strike any of the additional extrinsic evidence contained in Defendants' motions to dismiss, but the Court will disregard that evidence to the extent it relies on information outside the four corners of the Amended Complaint.

**B.     Threshold Issues Pertaining to Defendants' Motions to Dismiss**

The Court now turns to three threshold issues pertaining to Defendants' motions to dismiss, which Defendants argue should preclude the Court from reaching the merits of Plaintiffs' claims.

### 1.     Statute of Limitations

First, Defendants argue that Plaintiffs' claims are time-barred under the applicable statutes of limitations.  Though the parties vigorously dispute whether each of the applicable statutes of limitations have actually run, they appear to agree what the statute of limitations should be for each claim, absent tolling:   five years for the Georgia RICO claims, Ga. Code Ann. § 16-14-8; four years for the federal RICO claims, *Rotella v. Wood*, 528 U.S. 549, 553 (2000); and four years for the state common law claims, Ga. Code Ann. § 9-3-31.

Plaintiffs all purchased their interests in the Syndicates in either 2010 or 2011 and did not file suit until 2020, which was well beyond the statute of limitations for each claim.  But that is not dispositive.  As the Eleventh Circuit has made clear, "a Rule 12(b)(6) dismissal on statute of limitations grounds is appropriate only if it is 'apparent from the face of the complaint' that the claim is time-barred," *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quoting *Omar v. Lindsey*, 334 F.3d 1246, 1251 (11th Cir. 20013)).  And in this case, the statute of limitations could be tolled for each of Plaintiffs' claims if Defendants prevented Plaintiffs from filing suit through an act of fraudulent

concealment.[15]  *Cf. Sec'y of Lab. v. Labbe*, 319 F. App'x 761, 764 (11th Cir. 2008) (declining to dismiss complaint on statute of limitations grounds because "as to those violations that may be time-barred" the court could not "conclude beyond a doubt that the Secretary can prove no set of facts that toll the statute").

For federal RICO claims, the statute of limitations begins to run "when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering." *Rowe v. Gary, Williams, Parenti, Watson & Gary, P.L.L.C.*, 181 F. Supp. 3d 1161, 1173 (N.D. Ga. 2016) (quoting *Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir. 2001)), *rev'd on alternative grounds*, 703 F. App'x 777 (11th Cir 2017).  This is "more restrictive" than the statute of limitations for a Georgia RICO claim.  *S. Intermodal Logistics, Inc. v. D.J. Powers Co.*, 555 S.E.2d 478, 481 (Ga. Ct. App. 2001).  Georgia RICO claims do not accrue until plaintiffs are both aware of the injury *and* aware that the injury was the result of a pattern of racketeering activity, or else could have discovered both of these things through reasonable diligence.[16]  *See id.*; *Peery v.*

---

[15]  Georgia law provides that when a plaintiff "has been debarred or deterred from bringing an action" through an act of fraud "the period of limitation shall run only from the time of the plaintiff's discovery of the fraud."  Ga. Code Ann. § 9-3-96.  Similarly, Federal RICO claims are "subject to equitable tolling," *Curtis Inv. Co. v. Bayerische Hypo-Und Vereinsbank*, No. 1:06-cv-2752, 2007 WL 4564133, at *9 (N.D. Ga. Dec. 20, 2007) (citing *Rotella*, 528 U.S. at 562), which "allows a plaintiff to sue after the expiration of the statute of limitations if the plaintiff has been prevented from filing suit due to fraudulent concealment or other inequitable circumstances," *Rowe v. Gary, Williams, Parenti, Watson & Gary, P.L.L.C.*, 181 F. Supp. 3d 1161, 1174 (N.D. Ga. 2016), *rev'd on alternative grounds*, 703 F. App'x 777 (11th Cir 2017).

[16]  For purposes of Plaintiffs' Federal RICO claims, however, it is irrelevant whether Plaintiffs knew that their injuries were the result of a pattern of racketeering activity; the statute of limitations begins to run for those claims once they know they were injured.  *See RLP Holdings, LP v. Bayerische Hypo-Und Vereinsbank*, No. 1:06-cv-3135, 2007 WL 9703154, at *6 (N.D. Ga. Nov. 27, 2007) ("Whether RLP knew of the defendants' intent regarding CARDS at that point is

*CSB Behavioral Health Sys.*, No. 106-172, 2008 WL 4425364, at *20 (S.D. Ga. Sept. 30 2008).  This is ultimately "a question of fact which must be resolved by a jury."[17]  *S. Intermodal Logistics*, 555 S.E.2d at 482.

As for Plaintiffs' state common law claims, the four-year statute of limitations for fraud claims begins to run "at the time the plaintiff sustains actual damages from the fraud."  *Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 494–95 (11th Cir. 2009) (citing *Green v. White*, 494 S.E.2d 681, 685 (Ga. Ct. App. 1997)).  The same is true for claims based on negligent misrepresentation.  *See Mbigi v. Wells Fargo Home Mortg.*, 785 S.E.2d 8, 18 (Ga. Ct. App. 2016) ("[I]n a claim for economic injury sustained due to reliance upon false information negligently provided by a defendant, the statute of limitation begins to run when the plaintiff suffers pecuniary loss with certainty, and not as a matter of pure speculation." (quoting *Hardaway Co. v. Parsons, Brinckerhoff, Quade & Douglas*, 479 S.E.2d 727, 730 (Ga. 1997))).  And for malpractice claims, the statute of limitations  does not begin to run until "the plaintiff could first have maintained the action against the defendant to a successful result."  *Gibson v. Casto*, 504 S.E.2d 705, 707 (Ga. Ct. App. 1998).

---

irrelevant; RLP knew from January 2, 2002, onward that it had suffered a financial injury at the hands of one or more of the defendants.").

[17]  Perhaps for this reason, some Defendants declined to move for dismissal of Plaintiffs' Georgia RICO claims on the ground that they were time-barred.  *See, e.g.*, (Sirote's MTD, Doc. 172-1 at 23 n.12) ("Sirote is not moving to dismiss Plaintiffs' Georgia RICO claims as time-barred on the face of the Amended Complaint. Sirote reserves the right to seek dismissal of these claims on statute of limitations grounds after conducting discovery if they are not dismissed for the other reasons identified below.").

Defendants argue that for each of Plaintiffs' claims the statute of limitations began to run, at the latest, when the IRS issued RARs indicating its intent to disallow the tax deductions.  This occurred on November 17, 2014 for Maple Landing; December 11, 2014 for Mossy Rock; and sometime before July 12, 2016 for Oakhill Woods.  (Sirote's MTD, Doc. 172-1 at 16.)  Defendants argue that the RARs effectively put Plaintiffs on notice of their injuries and triggered the statutes of limitations for their claims.  Plaintiffs contend that they were not on notice of their injuries until the IRS issued FPAAs adopting the RARs at the conclusion of the administrative review process.  Because the earliest FPAA was issued in 2017, Plaintiffs argue that they were not on notice of their injuries until less than four years before they filed suit, meaning that their claims are all timely.  (Pls.' Executive Summ., Doc. 229 at 10.)

Though Plaintiffs cite several cases in support of their theory that they were not put on notice of their injuries until the issuance of the FPAAs to the Syndicates, none of the cases they cite stand for that broad proposition.  Two of the cases Plaintiffs cite involved malpractice claims against attorneys in connection with their work lawsuits.  *See Jankowski v. Taylor, Bishop & Lee*, 273 S.E.2d 16 (Ga. 1980); *Mauldin v. Weinstock*, 411 S.E.2d 370 (Ga. Ct. App. 1991).  These cases stand for the narrower proposition that malpractice claims against attorneys based on conduct in particular lawsuits do not accrue until those particular lawsuits have

concluded.[18]   Another case Plaintiffs cite, *United States v. Clarke*, 86 F.3d 131,

(11th Cir. 2016), merely states that a specific type of statutory claim challenging

assessments on partnership returns — which is unrelated to the claims here — does

not accrue until an FPAA is used, *see id*. at 1317 n.6 ("The statute of limitation to

assess a partnership return is suspended during the period in which the taxpayer

may challenge the FPAA in court, or, until the court's decision becomes final, and

then for one year after. 26 U.S.C. § 6229(d) (2012).").   Defendants, on the other

hand, cite multiple cases that support the proposition that IRS audit notices —

which Plaintiffs admit they received — put plaintiffs on notice of their injuries.

Though some of these cases were decided on a motion for summary judgment,

others were decided on a motion to dismiss.[19]   *See, e.g.*, *Klopfenstein v. Deutsche

Bank Sec.*, 592 F. App'x 812 (11th Cir. 2014); *RLP Holdings, LP v. Bayerische

Hypo-Und Vereinsbank*, No. 1:06-cv-3135, 2007 WL 9703154 (N.D. Ga. Nov. 27,

2007).

   At first blush, the facts in one of the cases Defendants cite, *Klopfenstein v.

Deutsche Bank Securities*, appear to be on point.   Much like Plaintiffs here, the

plaintiff in *Klopfenstein* brought Georgia RICO, fraud, and breach of fiduciary duty

---

[18]  Although Plaintiffs do raise malpractice claims against the Aprio Defendants and Sirote, and
they allege that Aprio and Sirote both represented the Syndicates in the Tax Court proceedings,
Plaintiffs' malpractice claims against these Defendants stem from their provision of other services
that predated the Tax Court proceedings.

[19]  Relying on *Brumbaugh v. Princeton Partners*, 985 F.2d 157 (4th Cir. 1993), Defendants also
argue that the statutes of limitations should begin to run when Plaintiffs made their initial
investments in 2010 and 2011 because the Promotional Materials soliciting Plaintiffs to invest in
the Syndicates included disclaimers.   For the reasons discussed in connection with Plaintiffs'
Georgia RICO claims, it is currently premature for the Court to determine how these disclaimers
should affect Plaintiffs' claims.

claims against the defendants there alleging that they induced him to invest in a tax shelter scheme by representing to him that it was legal, and he claimed similar damages to the damages Plaintiffs claim in our case, including being subject to audits and various tax penalties. *Klopfenstein v. Deutsche Bank Sec.*, No. 1:14-cv-278, 2014 WL 12521383, at *1, *4 (N.D. Ga. May 13, 2014). As Defendants note, the district court held, and the Eleventh Circuit agreed, that the plaintiff there was on notice of his injuries at the time the IRS issued the audit notice — not, as the plaintiff argued, when the Tax Court proceedings concluded. *Klopfenstein*, 592 F. App'x at 813–14, 816; *Klopfenstein*, 2014 WL 12521383, at *4. In spite of these similarities, *Klopfenstein* is potentially distinguishable in several key respects.

For starters, the plaintiff in *Klopfenstein* was a tax advisor himself, 592 F. App'x at 813, so he should have known that the scheme he was investing in was unlawful. In contrast, Plaintiffs here claim to be lay people who were not experts in tax law and were instead relying on Defendants' advice. On top of that, in *Klopfenstein* it was the plaintiff who decided to challenge the IRS's disallowance on his own initiative, whereas here it was allegedly Defendants who decided to press the challenges to the IRS and represented to Plaintiffs that the IRS notices did not affect the legality of the easements, if the Complaint allegations are construed in the light most favorable to plaintiffs. Significantly, the district court in *Klopfenstein* emphasized that the plaintiff there did not allege that the defendants engaged in any fraudulent conduct after the plaintiff made his initial investment, nor did he allege that he relied on defendants' legal opinions in

deciding to challenge the IRS, or that defendants instructed him to proceed to court:

> Klopfenstein does not aver in his complaint or argue in his brief that Defendants engaged in further actual fraud after the transactions. Rather, he limits his fraud allegations to behavior surrounding the transactions. Nor does Klopfenstein aver or argue that Defendants' post-transaction conduct deterred him from bringing suit after his claims accrued or prevented him from discovering the alleged fraud after he was injured.
>
> Klopfenstein does aver that he relied on the opinion letters when arguing to the tax court that the transactions were legitimate, but he does not allege that Defendants instructed him to do this or that they continued to stand behind the letters in order to conceal their own fraud.

*Klopfenstein*, 2014 WL 12521383, at *5.  But that is exactly what Plaintiffs allege happened here.

Unlike the plaintiff in *Klopfenstein*, Plaintiffs' contend that until they filed the present lawsuit, Defendants "continued to advise them . . . that the SCE Strategy was lawful and that the Tax Matters Partner would prevail against the IRS on behalf of Plaintiffs and Class Members." (*Id.* ¶ 283.)  For example, with respect to the Maple Landing RAR, Plaintiffs allege:

> In the November 25, 2014 letter to all members of the Maple Landing Syndicate with which he enclosed the Maple Landing RAR, Derek Hutcheson continued to reassure the members that there was nothing to worry about. He stated that he "does not agree with any of the conclusions reached in the report" and that he "plan[s] to contest and appeal the findings as the Tax Matter Partner for the LLC." He further reassured the members of the Maple Landing Syndicate that "[i]t is important to remember that this report is issued in connection with the very first stage of the IRS process, and tax counsel [Sirote] has

> advised us that the report marks only the beginning of the
> proceedings."

(Am. Compl., Doc. 155 ¶ 99.)  Similarly, with respect to the Mossy Rock RAR,

Plaintiffs allege:

> In the January 12, 2015 letter to all members of the Mossy Rock
> Syndicate with which he enclosed the Mossy Rock RAR, the Tax
> Matters Partner continued to reassure the members that there was
> nothing to worry about. He stated that he "does not agree with any of
> the conclusions reached in the report" and that he "plan[s] to contest
> and appeal the findings as the Tax Matter Partner for the LLC." He
> further reassured the members of the Mossy Rock Syndicate that "[i]t
> is important to remember that this report is issued in connection with
> the very first stage of the IRS process, and tax counsel [Sirote] has
> advised us that the report marks only the beginning of the
> proceedings."

(*Id.* ¶ 128.)  And in connection with the Oakhill Woods transaction, Plaintiffs

point to a 2017 email that they describe as follows:

> April 6, 2017 email from Lisa Cantrell of Forever Forests to Andrew
> Lechter informing the members of Oakhill Woods of their duty to file
> a Form 8886 and that the status of Oakhill Woods as a listed
> transaction "in no way makes this transaction illegal" and that the
> filing of the 8886 "should not significantly change the risk profile of
> your investment" which was false when made because once a
> transaction is designated as a listed transaction by the IRS, an audit is
> sure to ensue.

(*Id.* ¶ 255 (v).)  Plaintiffs claim that these and similar representations by

Defendants "concealed material facts relating to Defendants' wrongdoing" and

deterred Plaintiffs from filing suit earlier.  (*Id.* ¶ 274.)

When plaintiffs invoke a fraudulent concealment exception, as Plaintiffs do

here, "the statute of limitation is tolled until such fraud is discovered, or could have

been discovered by the exercise of ordinary care and diligence." *Cochran Mill*

*Assocs. v. Stephens*, 648 S.E.2d 764, 769 (Ga. Ct. App. 2007).  In most cases "issues concerning a plaintiff's diligence in discovering fraud . . . must be resolved by the trier of fact."  *Id.*  However, in some situations, "[a] party may fail to exercise due diligence as a matter of law."  *Id.*

Defendants argue that Plaintiffs failed to exercise due diligence as a matter of law here by failing to file suit once they received audit notices from the IRS.  By analogy, Defendants argue that "finding out that a company you invested in is being audited by the IRS and being told you need to hire an accountant and lawyer . . . is quite analogous to seeing water leak into your home" because in both situations the plaintiff should know that "something is amiss."  (Aprio Defs.' MTD Reply, Doc. 206 at 18) (quoting *Bauer v. Weeks*, 600 S.E.2d 700, 703 (Ga. Ct. App. 2004)).   But Defendants cite no cases in which the plaintiff discovered that something was amiss but failed to act after the defendant had made "continued assertions" to the contrary, *cf. Hahne v. Wylly*, 406 S.E.2d 94, 96 (Ga. Ct. App. 1991), which is what Plaintiffs allege happened here.   Moreover, as the Eleventh Circuit has acknowledged, "even 'non-diligent' plaintiffs are protected if there is a 'veil of fraudulent concealment.'"[20] *Pac. Harbor Capital, Inc. v. Barnett Bank, N.A.*, 252 F.3d 1246, 1252 (11th Cir. 2001) (quoting *Morton's Market, Inc. v. Gustafon's Dairy, Inc.*, 198 F.3d 823, 832 (11th Cir. 1999)).   Although there are

---

[20]  Similarly, the Supreme Court of Georgia has recognized that a plaintiff's failure to exercise due diligence "may be excused" when the parties are in a confidential relationship.  *Shipman v. Horizon Corp.*, 267 S.E.2d 244, 246 (Ga. 1980).  The allegations in the Amended Complaint raise factual questions as to whether such a relationship existed here.

unresolved questions as to whether such a veil of fraudulent concealment was present in this case, including whether Plaintiffs reasonably relied on Defendants' alleged representations that nothing was amiss, it appears for the moment that "these inquiries are fact based and are not appropriately addressed on a motion to dismiss." *St. Paul Fire & Marine Ins. Co. v. Canal Wood, L.L.C.*, 4:10-cv-33, 2010 WL 11566319, at *4 (N.D. Ga. Nov. 12, 2010).

Therefore, at least on the current record, "[i]t cannot be said . . . that [Plaintiffs] could prove no set of facts in support of [their] pleadings which would toll the statute of limitation based upon a fraud which deterred [them] from bringing suit." *Goldston v. Bank of Am. Corp.*, 577 S.E.2d 684, 697 (Ga. Ct. App. 2003). Although, for now, the Court declines to hold that Plaintiffs' claims are time-barred, the Court takes no position on whether a tolling provision should ultimately apply. Whether a tolling provision should apply here is something best decided "in conjunction with the presentation of evidence," either at summary judgment or by a jury if this cannot be resolved at summary judgment. *State Farm Mut. Auto. Ins. Co. v. Proactive Spine & Relief Ctr.*, 1:19-cv-4866, 2020 WL 5951333, at *5 (N.D. Ga. Sept. 30, 2020).

### 2. Standing

As an additional threshold matter, Defendants argue that, at least for the Federal and Georgia RICO claims,[21] Plaintiffs lack standing to sue. The thrust of

---

[21] In their Joint Executive Summary, Defendants only challenge Plaintiffs' standing to bring Federal and Georgia RICO claims. *See* (Defs.' Executive Summ., Doc. 223 at 7.) In their briefs in support of their individual motions, some Defendants challenge only Plaintiffs' standing to pursue

37

Defendants' argument is that the proper plaintiffs in this matter are the Syndicates rather than the Syndicates' members — or, alternatively, the United States Government — and that plaintiffs lack standing to sue on behalf of any of these entities. *See, e.g.*, (Aprio Defs.' MTD, Doc. 170-1 at 47) (arguing that "a member lacks standing to prosecute civil RICO claims on behalf of the entity"); (ACC Defs.' MTD, Doc. 171-1 at 29) (arguing that Plaintiffs have "failed to allege an injury that was separate and distinct from the injury suffered by the LLC").

Plaintiffs counter that they are bringing claims on their own behalves rather than on behalf of the Syndicates. They claim that these injuries are personal in nature because they allege that they "paid fees and suffered personal tax losses" as a result of Defendants' wrongdoing. (Pls.' Opp'n to ACC Defs.' MTD, Doc. 197 at 39) (citing Am. Compl., Doc. 155 ¶ 355). They allege that these injuries include: (1) "pa[ying] substantial sums to participate in the SCE Strategy"; (2) "pa[ying] significant fees to the Defendants, the Sponsors, and the Other Participants"; (3) "hav[ing] been exposed to liability to the IRS for substantial back-taxes, interest, and/or penalties"; (4) "los[ing] the opportunity to avail themselves of other legitimate tax-savings opportunities'"; (5) "spen[ding] substantial funds in connection with the audits and in Tax Court proceedings"; and (6) "hav[ing] incurred] and . . . continu[ing] to incur substantial additional costs to rectify the situation." (Am. Compl., Doc. 155 ¶ 355). They argue that these injuries "have

---

RICO claims, *see, e.g.*, (Aprio Defs.' MTD, Doc. 170-1 at 45–48); (Sirote's MTD, Doc. 172-1 at 49–50), whereas others challenge Plaintiffs' standing to raise all of their claims, *see, e.g.*, (ACC Defs.' MTD, Doc. 171-1 at 28–30); (GALT's MTD, Doc. 183-1 at 8–12).

placed their claims outside the procedural framework applicable to derivative claims." (Pls.' Opp'n to ACC Defs.' MTD, Doc. 197 at 39.)  Plaintiffs also argue that they suffered a direct economic injury because "the LLCs passed through the purported tax savings to the individuals" and "it is the individual members (not the LLCs) who suffered the injury caused by the racketeering activity." (Pls.' Opp'n to Aprio Defs.' MTD, Doc. 188 at 38.)  Plaintiffs allege that this injury "qualifies as an injury-in-fact under federal standing jurisprudence." (*Id.*)

To start, the Supreme Court has addressed a plaintiff's standing to bring RICO claims on several occasions.[22]  For example, in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), the Court addressed a business's standing to bring RICO claims when it alleged that a competitor business had gained a competitive advantage through defrauding the State of New York.  The plaintiff alleged that the defendant had a practice of "failing to charge the requisite New York sales tax to cash-paying customers," which in turn allowed it to "reduce its prices without affecting its profit margin." *Id.* at 454.  As the Court explained, the plaintiff's theory was that by defrauding the New York tax authority the defendant was able to "us[e] the proceeds from the fraud to offer lower prices designed to attract more customers." *Id.* at 457–58.  The Court held that the "direct victim" of the fraud was the State of New York, not the plaintiff, because "[i]t was the State that was being

---

[22] Cases interpreting a plaintiff's standing to pursue Federal RICO are instructive for purposes of a plaintiff's standing to pursue Georgia RICO claims as well. *See Williams v. Mohawk Indus.*, 465 F.3d 1277, 1294 (11th Cir. 2006) ("'[B]ecause the state RICO act is modeled upon and closely analogous to the federal RICO statute,' Georgia courts 'look to federal authority' in determining RICO standing." (quoting *Maddox v. S. Eng'g Co.*, 500 S.E.2d 591, 594 (Ga. Ct. App. 1998))).

defrauded and the State that lost tax revenue as a result." *Id.* at 458.  Moreover, the Court observed that the alleged harm stemmed from the defendant's subsequent act of lowering its prices, which was conduct "entirely distinct" from the alleged fraudulent conduct directed at the State.  *Id.*  The Court also noted that the defendant could have lowered its prices for any number of reasons, and that because the loss and gain of customers depends on multiple factors "it would require a complex assessment to establish what portion of [the plaintiff's] lost sales were the product of [the defendant's] decreased prices." *Id.* at 459.  It emphasized that the proximate cause requirement for civil RICO claims "is meant to prevent these types of intricate, uncertain inquiries" into how much of the harm was attributable to defendants.  *Id.* at 460.  Finally, the Court added that the State of New York was the more appropriate plaintiff because the State was the direct target of the fraud, and it would be "considerably easier" to determine how much of the State's injuries were attributable to the defendant — *i.e.*, how much tax revenue the defendant had withheld from the State.  *Id.*  Based on all of these factors, the Court concluded that the plaintiff's civil RICO claim must fail.  *Id.* at 461.

A few years later, the Supreme Court addressed Federal RICO standing again in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010).  There, the City of New York claimed that the defendant had defrauded the State of New York by selling cigarettes to New York City residents and failing to submit the required customer information to the State.  *Id.* at 9.  As a consequence, the State could not pass the customer information along to the City and the City was deprived of sales

tax revenue that the defendant's customers were legally obligated to pay. *Id.* The Court held that the City could not bring a RICO claim under these circumstances because the City's injuries were caused by the defendant's customers rather than by the defendant, and the State was the better-situated party to seek recovery for the injuries that were directly caused by the defendant rather than by the defendant's customers. *Id.* at 11–12.

Defendants cite both of these cases, as well as an unpublished decision from the Eleventh Circuit and a decision from the Ninth Circuit. In the Eleventh Circuit decision, *Harris v. Orange, S.A.*, 636 F. App'x 476 (11th Cir. 2015), the plaintiff raised a civil RICO claim on the theory that the defendant committed fraudulent conduct that deprived her of "the value of her shares," in a company in which she was a shareholder, *id.* at 479. In analyzing the plaintiff's standing to bring a RICO claim, the court opined, "The critical question in determining whether a shareholder has standing to file a RICO action is whether or not the plaintiff suffered a harm that stands separate and distinct from the harm suffered by the corporation." *Id.* at 481. The court found that the plaintiff could not satisfy this test because each of the injuries she claimed merely "flowed from her status as a shareholder and the diminution in the value of her shares." *Id.* The court found that the plaintiff's injuries were "indistinguishable" from the injuries to the corporation and that absent the injury to the corporation she "would not have been harmed." *Id.* at 481–82. Because the plaintiff owned 19% of the shares in the corporation, her injury was simply a 19% share of that same harm. *Id.* at 482.

The court also found the case distinguishable from cases concerning "injuries inflicted directly on the plaintiff shareholder" where courts have recognized that the plaintiff shareholder had standing to sue. *Id.* In evaluating whether a plaintiff has satisfied this direct injury requirement the court found that relevant factors to consider include: (1) "the difficulty in ascertaining the amount of damages attributable to the RICO violation as distinct from other independent factors," and (2) whether there would be a "risk of duplicative recoveries" if the plaintiff had standing to sue. *Id.* at 483. As to the first factor, the court found that "it would be difficult, if not impossible" to determine how much of the proportionate reduction in the value of the shares was attributable to the defendants' conduct as opposed to other factors such as "market conditions, poor business practices, or failure to anticipate developments in the financial markets." *Id.* As to the second factor, the court found that the company could be counted on to vindicate its interests and that if the plaintiff could sue too it would "only increase the risk of duplicative recovery"; especially considering that plaintiff had not proposed a method of apportioning possible recovery between herself and the corporation of which she was a member. *Id.*

In the Ninth Circuit case, *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866 (9th Cir. 2010), the plaintiff brought a RICO claim against the organizers of a tax shelter scheme designed to allow the plaintiff to claim losses on his tax returns after the IRS denied the plaintiff's claimed losses and ordered him to pay back taxes and interest, *id.* at 868–69. The court held that the plaintiff

lacked standing to bring a RICO claim when the defendant's fraudulent conduct was directed at the United States and the plaintiff was only indirectly injured by the transaction.  *Id.* at 873.  Moreover, the court found that the United States was the "better suited plaintiff" for purposes of recovering from the defendant because as the direct victim of the fraud it had an incentive to sue, and it "did in fact sue" by entering a deferred prosecution agreement with the defendant.  *Id.* at 873–74.

To be sure, there are some factual similarities between this case and *Rezner*, but, it is not binding on his Court.  And in *Bivens Gardens Office Building, Inc. v. Barnett Banks of Florida, Inc.*, 140 F.3d 898 (11th Cir. 1998), which *is* binding on this Court, the Eleventh Circuit acknowledged that its prior holding that a plaintiff "had standing to bring a RICO claim because, as a target of the defendant's alleged scheme, his injury would have been a direct result of the defendant's substantive RICO violation, " *id.* at 906 (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1500 (11th Cir. 1991), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)).  The court added that in that circumstance "[b]ecause injury to the solicited investors was the direct result of the alleged activity, such an injury would have been sufficient to confer RICO standing." *Id.*  Likewise, in *Beck v. Prupis*, 162 F.3d 1090 (11th Cir. 1998), the Eleventh Circuit acknowledged that "[a] plaintiff's status as a creditor or stockholder . . . does not preclude standing for RICO violations if the plaintiff has alleged an injury proximately caused by the defendants' acts of racketeering *that target the plaintiff*," *id.* at 1096 n.10 (emphasis added).  The court in *Beck* found that because the plaintiff there had

"properly set forth claims of injury proximately caused by racketeering activity that targeted him" he therefore had standing to pursue a RICO claim.[23]  *Id.*

In the Amended Complaint, plaintiffs allege that they — the "solicited investors" — not the Syndicates, were the targets of the alleged fraud.  Specifically, they allege that in furtherance of their fraudulent scheme Defendants sought to induce them, the investors, to invest in the Syndicates as a means of generating profits.  And, as a consequence, they suffered injuries in the form of both "paid fees" and "personal tax losses."[24]  Though more information may be needed to ascertain the precise nature of Plaintiffs' damages, including whether these damages simply flowed from Plaintiffs' status as shareholders, it seems unlikely that the Court would have to engage in a "complex assessment" to determine how much of Plaintiffs' damages were attributable to defendants as opposed to other factors.  The damages Plaintiffs seek here may be more analogous to the tax revenue the defendants in *Anza* owed to the State of New York than the damages from lost profits that the plaintiff sought in that case or the damages the plaintiff

---

[23] A similar standard applies to Georgia RICO claims.  *See Wylie v. Denton*, 746 S.E.2d 689, 694 (Ga. Ct. App. 2013) (holding that to satisfy Georgia RICO's proximate causation requirement the plaintiff "must show that her injury was the direct result of a predicate act targeted toward her, such that she was the intended victim").

[24] In support of their argument that Defendants proximately caused their injuries, Plaintiffs assert that they would have acted differently if Defendants had not (1) "promoted the SCE Strategy to them," (2) "organized and operated the LLC entities necessary to implement the SCE Strategy," (3) "improperly advised Plaintiffs and members of the class on the steps necessary to implement the SCE Strategy," (4) "improperly advised Plaintiffs and members of the class on the tax treatment and purported tax benefits of the SCE Strategy," (5) "obtained inaccurate appraisals for the property interests donated as part of the SCE Strategy," (6) "inaccurately filled out tax forms for the SCE Strategy," and (7) "improperly advised Plaintiffs and members of the class on how to respond to IRS scrutiny of the SCE Strategy."  (Am. Compl., Doc. 155 ¶ 292.)

in *Harris* sought for the portion of the diminution in the value of her shares that was attributable to the defendant there, both of which may have been attributable to other factors unrelated to the defendants' conduct.  And though the United States has filed other lawsuits over Syndicated Conservation Easement transactions, including before this Court and in the United States Tax Court, it is unclear whether the United States sought to vindicate the same interests in those cases that Plaintiffs invoke here.  Ultimately, further factual development may be needed to determine whether this is a situation in which the plaintiff shareholders were injured by "acts of racketeering activity that target the plaintiff," *Harris*, 636 F. App'x at 481 (quoting *Beck*, 162 F.3d at 1096 n.10), or whether it is one in which the plaintiff shareholders suffered injuries "only as a result of harm to the corporation," *id.* (quoting *Bivens*, 140 F.3d at 908).  For purposes of the pleading stage, however, Plaintiffs have plausibly alleged injuries distinct from the injuries to the Syndicates under the standard adopted by the Supreme Court and by the Eleventh Circuit, assuming that they actually can also prove their substantive claims of fraud or misrepresentation.

As such, the Court finds that Plaintiffs have adequately plead a direct injury that was proximately caused by Defendants.  On the current record, it also appears to the Court that these injuries are concrete and particularized, actual or imminent, fairly traceable to Defendants, and redressable by court order.  Plaintiffs therefore satisfy the pleading requirements for both Article III and RICO standing.  *See Friend of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–

81 (2000) ("[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992))); *Anza*, 547 U.S. at 453 ("[A] plaintiff may sue under § 1964(c) only if the alleged RICO violation was the proximate cause of the plaintiff's injury.").

### 3.   Personal Jurisdiction

Separately, two of the out-of-state Defendants move to dismiss the Amended Complaint for lack of personal jurisdiction — Sirote and Baker Donelson.  The Court will first consider the exercise of personal jurisdiction over Sirote.

In the Amended Complaint, Plaintiffs allege that Sirote "has done and is doing business in the State of Georgia, maintains a regular place of business, and maintains a designated agent upon whom service may be made in this civil action." (Am. Compl., Doc. 155 ¶ 21.)  Plaintiffs also allege that it has committed tortious acts directed at Georgia residents.  (*Id.*)  And in their Opposition to Sirote's motion to dismiss, Plaintiffs argue that Sirote's letters and emails sent to Georgia in connection with properties at issue in this lawsuit — primarily Maple Landing — qualify as purposeful contacts with Georgia for purposes of conferring personal jurisdiction.  (Pls.' Opp'n to Sirote's MTD, Doc. 189 at 54.)

Nevertheless, Sirote argues that the Court lacks personal jurisdiction over it because it only had passing contacts with Georgia.  It contends that "exercising personal jurisdiction over Sirote, a nonresident law firm with only incidental connections to Georgia, would violate due process."  (Sirote's MTD, Doc. 172-1 at 52.)  It contends that "the mere preparation of documents for Sirote's clients (who are not Plaintiffs) does not establish personal jurisdiction." (*Id*. at 54.)  And though Sirote acknowledges that it prepared documents —  including a Legal Opinion — in connection with the Maple Landing property, which is located in Georgia, it contends that "the mere fact that these documents addressed certain transactions involving real property in Georgia does not give rise to personal jurisdiction." (*Id*.) (citing *Duncan v. O'Shea*, 376 F. Supp. 3d 115, 123 (D. Me. 2019)).

In support of this argument, Sirote relies on a single out-of-circuit district court case — *Duncan v. O'Shea*.  In *Duncan*, the court held that it lacked personal jurisdiction over a Texas-based law firm based on the law firm's work related to the conveyance of a property located in Maine to an LLC located in Texas.  376 F. Supp. 3d at 121, 125.  The transfer of the property occurred in Texas, where the deed of conveyance was executed, and the documents related to the deed of conveyance were all prepared in Texas.  *Id.* at 120.  The firm's only contact with Maine was mailing the deed from Texas to Maine for recording.  *Id.*  The court found that the firm's sole contact with Maine — the mailing of the deed — was "ancillary to the wrongful acts alleged to have occurred in Texas," and this single contact with Maine did not mean that the firm could reasonably anticipate being

haled into court in that forum.  *id.* at 123.  Here, however, Sirote's alleged contacts with Georgia are more than just "ancillary" to the alleged wrongful acts; indeed, the alleged wrongful acts all pertain to a transaction that took place in Georgia that was purposefully directed to Plaintiffs located in Georgia, not some other state outside of the forum.  And at least for purposes of the pleading stage, it appears to the Court that Plaintiffs have plead sufficient facts to support the exercise of personal jurisdiction over Sirote.

To start, the Georgia long-arm statute[25] authorizes jurisdiction over an out-of-state Defendant who (1) "[t]ransacts any business within this state,"  Ga. Code Ann. § 9-10-91(1); (2) "[c]ommits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act,"  *id.* § 9-10-91(2); or (3) "[c]ommits a tortious injury in this state caused by an act or omission outside this state" if the Defendant "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state,"  *id.* § 9-10-91(3). Plaintiffs allege that Sirote transacts business in the State of Georgia and that it has committed tortious acts within the State of Georgia in connection with the

---

[25]  As the Eleventh Circuit has acknowledged, "[T]he Georgia long-arm statute does not grant courts in Georgia personal jurisdiction that is coextensive with procedural due process." *Diamond Crystal*, 593 F.3d at 1259.  Rather, the long-arm statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Id.*  Thus, "the exercise of personal jurisdiction in Georgia requires a court to find that at least one prong of the long-arm statute is satisfied." *Id.* at 1260.  And because the reach of the long-arm statute is a state law, federal courts are required to interpret the long-arm statute "as would the state's supreme court." *Lockard v. Equifax, Inc.*, 163 F.3d 1259, 1265 (11th Cir. 1998).

conveyance of the conservation easement from the Maple Landing Syndicate to GALT.  Even if the tortious acts occurred out of state, Sirote does not dispute that it was transacting business with a Syndicate that was based in Georgia.  Therefore, in the Court's view, personal jurisdiction over Sirote is authorized by subsection (1) of the Georgia long-arm statute because Sirote is an entity that "[t]ransacts any business within this state."  Ga. Code Ann. § 9-10-91(1).

Next, to determine whether the exercise of specific jurisdiction over a nonresident defendant comports with the Due Process Clause, the Eleventh Circuit applies a three-prong test that looks to (1) "whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws"; (2) "whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum";  and (3) "whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'"  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73, 474–75 (1985)).  The plaintiff bears the burden of satisfying the first two prongs, and "if the plaintiff does so," the burden then shifts to the defendant to show that the exercise of jurisdiction in the forum state would violate traditional notions of fair play and substantial justice.  *Id*.

For due process purposes, "the constitutional touchstone remains whether the defendant purposefully established 'minimum contacts' in the forum."  *Burger*

*King*, 471 U.S. at 474 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  And for plaintiffs to meet their initial burden under the first two prongs, they must show that the defendant's "suit-related conduct" created "a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014); *see Diamond Crystal*, 593 F.3d at 1267 ("Put differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation.").  In this case, Sirote's "suit-related conduct" in connection with its role in the Maple Landing transaction establishes the requisite "substantial connection with the forum state" for the Court to exercise personal jurisdiction over Sirote consistent with the Due Process Clause.

Finally, the Court considers whether the exercise of personal jurisdiction over Sirote would comport with traditional notions of fair play and substantial justice.  In evaluating this element, the Court considers (1) "the burden on the defendant"; (2) "the forum's interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; and (4) "the judicial system's interest in resolving the dispute." *Louis Vuitton*, 736 F.3d at 1358 (quoting *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008)).  Here, the burden that would be imposed on Sirote to litigate the case in Georgia is fairly minimal, especially considering that "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State

where he engages in economic activity." *Burger King*, 471 U.S. at 474 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).  "When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 114 (1987) (plurality opinion).  But here, the burden on Defendant is minimal, and the remaining factors all weigh in favor of litigating the case in Georgia:  the named Plaintiffs are all located in Georgia, the properties at issue are all located in Georgia, and most of the relevant evidence is likely to be located in Georgia.  Thus, the interests of Plaintiffs, the forum state, and the judicial system all cut in favor of litigating the case in Georgia as opposed to somewhere else.  As such, this is not "one of those rare cases in which 'minimum requirements inherent in the concept of "fair play and substantial justice" . . . defeat the reasonableness of jurisdiction even [though] the defendant has purposefully engaged in forum activities.'" *Id.* at 116 (quoting *Burger King*, 471 U.S. at 477–78).  Accordingly, the Court finds that the exercise of personal jurisdiction over Sirote would not offend traditional notions of fair play and substantial justice.

As explained in more detail below, the Court finds that Plaintiffs fail to state a claim against Baker Donelson on the merits.  Therefore, in the interest of judicial economy, the Court declines to consider whether Plaintiffs claims against Baker Donelson should also be dismissed for lack of personal jurisdiction.

### C.     The Merits of Plaintiffs' Claims

Having concluded that none of the threshold issues raised by Defendants preclude the Court from addressing the merits of Plaintiffs' claims, the Court now turns to the merits.

### 1.     Federal RICO (Count I)

The Court first addresses Plaintiffs' Federal RICO claim.  To properly state a Federal RICO claim, Plaintiffs must allege facts showing "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985); *Carter v. MGA, Inc.*, 189 F. App'x 893, 894 (11th Cir. 2006).

Under Federal RICO, an "enterprise" is "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  "Racketeering activity" includes such predicate acts as mail or wire fraud, *see* 18 U.S.C. § 1961(1), which "occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Pelletier*, F.2d at 1498).  A "pattern of racketeering activity" under RICO "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5).  "[W]hile two acts are necessary [for a Federal RICO claim], they may not be sufficient. Indeed, . . . two of anything do not generally form a 'pattern.'" *Sedima*, 473 U.S. at 496 n.14.  RICO's legislative history thus "supports the view that two isolated acts

of racketeering activity do not constitute a pattern." *Id.* "In order to prove a pattern of racketeering in a civil or criminal RICO case, a plaintiff must show at least two racketeering predicates that are related, and that they amount to or pose a threat of continued criminal activity." *Am. Dental Ass'n*, 605 F.3d at 1290–91.

In addition to satisfying these first four elements, when a plaintiff brings a civil action for damages under Federal RICO, as Plaintiffs do here, the plaintiff must also show "(1) that an injury occurred to business or property and (2) 'that such injury was "by reason of" the substantive RICO violation.'" *Lawrie v. Ginn Dev. Co.*, 656 F. App'x 464, 467 (11th Cir. 2016) (quoting 18 U.S.C. § 1964(c) and *Williams*, 465 F.3d at 1283).

The Court begins with the "enterprise" element. Despite the lack of a formal structure behind the alleged enterprise, Plaintiffs argue that Defendants constitute an "association-in-fact enterprise." The Supreme Court has defined an association-in-fact enterprise as "a group of persons associated together for a common purpose of engaging in a course of conduct." *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). Plaintiffs contend that Defendants qualify as an association-in-fact enterprise because (1) they shared a common purpose of making money; (2) there was a "relationship among those associated with the enterprise"; and (3) the enterprise had "longevity sufficient to permit associates to pursue the enterprise's purpose." (Pls.' Opp'n to Aprio Defs.' MTD, Doc. 188 at 21) (quoting *Boyle*, 556 U.S. at 946).

By means of this purported association-in-fact enterprise, Plaintiffs allege that Defendants "conspired with one another to design, promote, sell, and implement the SCE Strategy for the purpose of receiving and splitting substantial fees." (Am. Compl., Doc. 155 ¶ 200.)  Toward that end, Plaintiffs allege that Defendants "unlawfully agreed to provide a veneer of legitimacy to each other's opinions on the lawfulness and tax consequences of the SCE Strategy." (*Id.*)  In so doing, Plaintiffs allege that Defendants "agreed and had a meeting of the minds that they would work together as a team - with each team member assigned certain roles and responsibilities - to develop, market, sell, and implement the SCE Strategy," (*id.* ¶ 202), and that each Co-Conspirator "authorized, ratified and/or affirmed the fraudulent misrepresentations and/or omissions made by each of the Co-Conspirators," (*id.* ¶ 203).

However, as Defendants point out, despite the length of the Amended Complaint and the detail of these allegations, Plaintiffs have not explained "how a diverse collection of accountants, lawyers, LLC managers, appraisers, and conservation organizations in multiple states agreed to create and undertake this alleged fraudulent scheme." (Aprio Defs.' MTD, Doc. 170-1 at 23.)  In other words, "Plaintiffs do not allege how Defendants *agreed* to employ any of these procedures as part of a long-term criminal enterprise predicated on acts of mail and wire fraud." *Am. Dental Ass'n*, 605 F.3d at 1292 (emphasis added).  That is fatal to Plaintiffs' Federal RICO claim.

Although the existence of a conspiracy "may be inferred from the conduct of the participants," *id.* at 1293 (quoting *Republic of Panama v. BCCI Holdings (Lux.) S.A.*, 119 F.3d 935, 950 (11th Cir. 1997)), Plaintiffs offer only "conclusory statements" and "formulaic recitations" that such an agreement existed, *id.* at 1293–94. Plaintiffs also do not address the "obvious alternative explanation" that instead of them each agreeing to perpetuate an elaborate conspiracy Defendants were each independently pursuing their own economic self-interest by providing financial services. *Id.* at 1295 (quoting *Twombly*, 550 U.S. at 568). The allegations in the Amended Complaint are just as consistent with each of the Defendants "going about its own business." *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 855 (7th Cir. 2013); *cf. Am. Dental Ass'n*, 605 F.3d at 1295 (finding that the plaintiffs' allegations were "equally indicative of rational independent action"). As the Supreme Court and the Eleventh Circuit have emphasized, "[w]ithout more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556–57; *see Am. Dental Ass'n*, 605 F.3d at 1294 (holding that "allegations of parallel conduct, accompanied by nothing more than a bare assertion of a conspiracy, do not plausibly suggest a conspiracy"); *see also Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068 (11th Cir. 2017) (holding that "parallel conduct alone cannot support a plausible inference of an agreement"). This is true both in situations of unknowing parallel conduct and in

situations of parallel conduct that was "consciously undertaken." *Twombly*, 550 U.S. at 557; *accord Almanza*, 851 F.3d at 1069.

Granted, the factual situation Plaintiffs present does not "entirely rule out" the possibility that Defendants all agreed to carry out a fraudulent scheme, but "there is ultimately not enough in this complaint to elevate that inference from a 'sheer possibility' to something that is 'plausible on its face.'" *Walgreen Co.*, 719 F.3d at 855 (quoting *Iqbal*, 556 U.S. at 678). The Eleventh Circuit has been clear that "[t]o cross the line from a possible to a plausible existence of an agreement, plaintiffs must allege a 'further circumstance pointing toward a meeting of the minds.'" *Almanza*, 851 F.3d at 1068 (quoting *Twombly*, 550 U.S. at 557). To provide this further factual enhancement, "the plaintiffs had to assert allegations explaining how exactly the defendants went about entering into an agreement with each other." *Id.* "It wasn't enough that the defendants all ended up doing the same fraudulent thing." *Id.* at 1068–69. Though Plaintiffs describe what they believe to be the fraudulent purpose of the alleged enterprise, they offer "no factual allegations from which [the Court] could infer" that Defendants "decided on this purpose together." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020). For example, Plaintiffs include "no allegations about specific interactions" between Defendants from which the Court could infer the existence of a RICO agreement, or "allegations regarding the origins or scope of the alleged scheme." *Id.* Plaintiffs simply ask the Court to speculate that Defendants all "decided at some point to pursue fraud" and decided that together. *Id.*

Even if some of the Defendants individually committed fraud, to proceed with a Federal RICO claim Plaintiffs must plausibly allege that the individuals who allegedly made up the association-in-fact enterprise "shared a common purpose to do so." *Id.* at 1214 (citing *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1352–53 (11th Cir. 2016)).  Absent this showing, Plaintiffs cannot state a Federal RICO claim.  *Id.* at 1215.   Accordingly, the Court **GRANTS** Defendants' motions to dismiss Plaintiffs' Federal RICO claims.[26]

### 2.    Georgia RICO (Count III)

In addition to their Federal RICO claims, Plaintiffs raise claims against each Defendant under Georgia RICO.  Federal RICO and Georgia RICO have many similarities, but as explained below, they also have "a number of significant differences." *Chesapeake Emp'rs Ins. Co. v. Eaves*, 77 F. Supp. 3d 1241, 1256 (N.D. Ga. 2015) (quoting *Dover v. State*, 385 S.E.2d 417, 419 (Ga. Ct. App. 1989)).

Plaintiffs raise claims under two separate provisions of Georgia RICO.  *See* (Am. Compl., Doc. 155 ¶ 305) (citing Ga. Code Ann. §§ 16-14-4(a), (b)).  One of these provisions, Ga. Code Ann. § 16-14-4(a) ("subsection(a)"), provides,

> It shall be unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money.

The other provision, Ga. Code Ann. § 16-14-4(b) ("subsection(b)"), states,

---

[26]  Because the Court concludes that Plaintiffs fail to state a Federal RICO claim, the Court need not address Defendants' argument that Plaintiffs' Federal RICO claims would be barred by the Private Securities Litigation Reform Act.

> It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

To the extent Plaintiffs rely on subsection (b), Plaintiffs claims fail for the same reason as their Federal RICO claims — Plaintiffs cannot establish that the alleged pattern of racketeering activity was carried out as part of an "enterprise." However, the enterprise element is not required under subsection (a); *see Burgess v. Religious Tech. Ctr., Inc.*, 600 F. App'x 657 663 (11th Cir. 2015); *J & D Int'l Trading ( H.K.) Ltd. v. MTD Equip., LLC*, 1:13-cv-2526, 2014 WL 1683375, at *13 (N.D. Ga. Apr. 28, 2014).   This is a significant difference from Federal RICO because "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle*, 556 U.S. at 947 (quoting *Turkette*, 452 U.S. at 583).  To establish a violation under subsection (a), unlike a Federal RICO claim or a Georgia RICO claim under subsection (b), all Plaintiffs have to show is "proof that the defendant committed predicate offenses . . . at least twice."  *Cobb Cnty. v. Jones Grp., P.L.C.* , 460 S.E.2d 516, 521 (Ga. Ct. App. 1995); *accord Williams v. Mohawk Indus.*, 568 F.3d 1350, 1356 (11th Cir. 2009).

Under Georgia RICO, the same acts of mail and wire fraud that qualify as predicate acts under Federal RICO also qualify as predicate acts under Georgia RICO. *See* Ga. Code Ann. § 16-14-3(5)(C). And a "pattern of racketeering activity" for purposes of subsection (a) means the commission of at least two of these predicate acts, provided that they "are interrelated" and "were done 'in furtherance

of one or more incidents, schemes, or transactions.'" *Wylie v. Denton*, 746 S.E.2d 689, 693 (Ga. Ct. App. 2013) (quoting Ga. Code Ann. § 16–14–3(4)(A)) (footnote omitted).   Importantly, unlike for Federal RICO claims, plaintiffs do not have to show continuity to establish a pattern of racketeering activity under Georgia RICO. *See Chesapeake Emp'rs Ins. Co.*, 77 F. Supp. 3d at 1256; *See also* 4 Ga. Jur. § 7:23 ("Georgia RICO plaintiffs need not show that the conduct will continue or that the defendants have been guilty of like conduct in the past.").   Finally, as is the case under Federal RICO, a plaintiff raising a civil claim for damages under Georgia RICO must also show that the defendant's violation of the statute proximately caused the plaintiff's injury.   *Wylie*, 746 S.E.2d at 693.

### a.   Pattern of Racketeering Activity

In support of their Georgia RICO claims, Plaintiffs rely on the predicate acts of mail and wire fraud. *See* (Am. Compl., Doc. 155 ¶ 250.)   Specifically, Plaintiffs allege that Defendants utilized the mail and wires to send "contracts, instructions, correspondence, and other transmittals" in connection with each of the transactions at issue.   (*Id.* ¶ 254.)   Plaintiffs allege that Defendants sent these communications "[f]or the purpose of executing and/or attempting to execute their transaction to defraud and to obtain money by means of false pretenses, representations or promises."   (*Id.*)   Through these communications, Plaintiffs allege that Defendants made fraudulent statements and omissions, including

- "[f]ailing to advise Plaintiffs and members of the Class that the SCE Strategy was an illegal and abusive tax shelter," (*id.* ¶ 258(4));

- "[a]dvising Plaintiffs and members of the Class that the SCE Strategy complied with the applicable tax laws, rules, regulations, common law doctrines, and published court decisions," (*id.* ¶ 258(6));

- "[f]ailing to advise Plaintiffs and members of the Class that the tax benefits of the SCE Strategy would be disallowed, if audited," (*id.* ¶ 258(25)); and

- "[f]ailing to advise Plaintiffs and members of the Class that each of the Defendants, the Sponsors, and the Other Participants were not 'independent' of one another and in fact were involved in a conspiracy to design, market, sell, and implement the SCE Strategy," (*id.* ¶ 258(27)).

Plaintiffs allege that Defendants' commission of these predicate acts constituted a "pattern of racketeering activity" as defined by Ga. Stat. Ann. § 16-14-3(4) because Defendants each committed at least two related acts of mail or wire fraud within the past ten years to advance the SCE Strategy. (*Id.* ¶ 266.) Plaintiffs claim, in essence, that the predicate acts of mail and wire fraud are related because they were all committed for the similar purpose of defrauding Plaintiffs to generate fees. (*Id.* ¶ 267); *see* (*id.* ¶ 308) ("Through the fraudulent and wrongful conduct described in this Complaint, Defendants sought to obtain financial gain by depriving Plaintiffs and the Class of money and property rights."). Plaintiffs further allege that they have been "injured in their business or property" as a result of this conduct. (*Id.* ¶ 312.)

In this case, Plaintiffs' mail and wire allegations also form the basis of their common-law fraud claims. *Cf. Curtis Inv. Co.*, 341 F. App'x at 497 (noting that the plaintiff's allegations of mail and wire fraud "formed the basis for the mail and wire fraud allegations underlying the Georgia RICO claim and for the common law fraud claim"). Like any fraud allegations, Plaintiffs' allegations of mail and wire

fraud must comply with the heightened pleading standard set forth in Fed. R. Civ. P. 9(b). *Am. Dental Ass'n*, 605 F.3d at 1291; *see Burgess*, 600 F. App'x at 663 (noting that "like any other fraud action, a [Georgia] RICO claim based on fraud must be pleaded with specificity"). Thus, Plaintiffs must "state with particularity the circumstances constituting" the mail and wire fraud. *Am. Dental Ass'n*, 605 F.3d at 1291 (quoting Fed. R. Civ. P 9(b)).

To satisfy Rule 9(b)'s particularity requirement "a plaintiff must allege: '(1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud.'" *Id.* (quoting *Brooks*, 116 F.3d at 1380–81). In short, Plaintiffs must set forth "the who, what, when[,] where, and how" circumstances of the fraud. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (citation omitted). The Eleventh Circuit has acknowledged that this requirement "may be relaxed for allegations of 'prolonged multi-act schemes.'" *Burgess*, 600 F. App'x at 662–63 (quoting *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1314 n.25 (11th Cir. 2002)). Under this relaxed standard, plaintiffs can satisfy Rule 9(b)'s particularity requirement by simply pleading "one or more illustrative instances of the fraud." *Id.* at 663. However, plaintiffs still must provide "some measure of substantiation" to their allegations of fraud. *Rowe*, 181 F. Supp. 3d at 1186 (quoting *Antilles Trading Co., S.A. v. Sci.-Atlanta, Inc.*, 117 F.R.D. 447, 450 (N.D. Ga. 1986)).

Importantly, "[a]n essential element of any fraud claim is that defendant knew his representation was false." *First Fin. Sav. & Loan Ass'n v. Title Ins. Co. of Minn.*, 557 F. Supp. 654, 661 (N.D. Ga. 1982). This is equally true for the predicate acts of mail or wire fraud. *See Rowe*, 181 F. Supp. 3d at 1190 ("An allegation that a defendant committed mail or wire fraud in furtherance of a RICO scheme requires a showing 'that the defendant held the requisite *mens rea* . . . a "conscious knowing intent to defraud."'") (quoting *Pelletier*, 921 F.2d at 1499 (quoting *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir.1980)))). In this case, whether the Defendants knew that the representations they made were false largely depends on whether each Defendant knew that the appraisals of the properties were inflated — assuming for purposes of the pending motions to dismiss that the appraisals were in fact inflated. Plaintiffs do not have to provide direct evidence that Defendants knew that the appraisals were inflated and, consequently, that Defendants' representations were fraudulent. But Plaintiffs' allegations regarding Defendants' knowledge of the fraud "cannot be merely conclusory and unsupported by any factual allegations." *Id.* (internal quotation marks omitted).

Now, before discussing the predicate acts allegedly committed by each Defendant, the Court first addresses a few of the arguments Defendants raise collectively, which they claim preclude Plaintiffs' Georgia RICO and other fraud-based claims more generally.

First, Defendants contend that the Amended Complaint is an impermissible shotgun pleading. *See, e.g.*, (ACC Defs.' MTD, Doc. 171-1 at 15) (arguing that the

Amended Complaint "is replete with improper group pleading, often referred to as shotgun pleading, where plaintiffs make allegations collectively against all the 'Defendants' generally instead of specifically against each particular defendant"); (GALT's MTD, Doc. 183-1 at 2) (arguing that "Plaintiffs did nothing to resolve the pleading defects that are fatal to their claims against GALT" and instead merely "expanded their shotgun pleading to nearly 200 pages and 400 paragraphs").  A shotgun pleading is one where the plaintiff has failed "to identify his claims with sufficient clarity to enable the defendant to frame a responsible pleading." *Holtz v. Harpagon Co., LLC*, No. 1:09-cv-03085, 2010 WL 2595075, at *4 (N.D. Ga. June 25, 2010) (quoting *Sledge v. Goodyear Dunlop Tires North Am., Ltd.*, 275 F.3d 1014, 1018 n.8 (11th Cir. 2001)).  When a plaintiff presents a shotgun pleading, "it is virtually impossible to know which allegations of fact are intended to support which claim(s) for relief." *Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th Cir. 1996).   And as Defendants note, "Eleventh Circuit authority requires that shotgun pleadings be dismissed and authorizes dismissal with prejudice where it is the plaintiff's second effort at the pleading." (Baker Donelson's MTD, Doc. 181-1 at 24) (citing *Hirsch v. Ensurety Ventures, LLC*, 805 F. App'x 987, 991–92 (11th Cir. 2020)).  The scheme that Plaintiffs describe in the Amended Complaint is a complex one; it involves multiple actors and significant description.  However, even in complex cases involving multiple defendants, "the complaint must not lump together all of the defendants, as 'the complaint should inform each defendant of the nature of his alleged participation in the fraud.'"

*Kivisto v. Miller, Canfield, Paddock & Stone, PLC*, 413 F. App'x 136, 139 (11th Cir. 2011) (quoting *Ambrosia Coal & Constr. Co. v. Morales*, 482 F.3d 1309, 1317 (11th Cir. 2007)).

The Amended Complaint is lengthy, and includes 379 paragraphs spanning more than 190 pages.  At times the Amended Complaint speaks in generalities, but by and large, it clearly identifies the Defendant(s) each count is asserted against. Aside from a few examples discussed below, each Count is plead with sufficient clarity and is directed at particular Defendants such that the Defendants would be able to file a responsive pleading.  These allegations succeed in identifying the facts relevant to each charge.  Because the overall complaint identifies the facts and parties relevant to each charge, it does not warrant dismissal as a shotgun pleading.

Second, the Court addresses Defendants' argument that their representations about Plaintiffs' entitlement to charitable deductions were simply opinions and predictions about future events, which generally cannot serve as the bases for fraud claims.  *See, e.g.*, *Gignilliat v. Borg*, 205 S.E.2d 479, 480 (Ga. Ct. App. 1974) ("A misrepresentation as to the status of the law, or as a matter of law, or as to its effect upon the subject matter of a contract is a statement of opinion only and can not afford a basis for a charge of fraud or deceit in the making of the contract."); *Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1364 (N.D. Ga. 2006) ("Fraud cannot consist of mere broken promises, unfulfilled predictions or erroneous conjecture as to future events.") (quoting *Next Century Commc'ns Corp. v. Ellis*, 318 F.3d 1023, 1027 (11th Cir. 2003)).  More

specifically, Defendants argue that Plaintiffs cannot establish fraud simply because their predictions or opinions about Plaintiffs' entitlement to charitable deductions turned out to be incorrect. *See, e.g.*, (Defs.' Executive Summ., Doc. 223 at 3) (arguing that most of the specific statements identified in the Amended Complaint are "not actionable" because they are "legal opinions" or "pertain to future events"); (ACC Defs.' MTD, Doc. 171-1 at 31) (arguing that "a representation as to the future cannot state a claim for fraud"); (Sirote's MTD, Doc. 172-1 at 32) (arguing that "neither opinions nor statements concerning future events can support a claim for fraud or negligent misrepresentation").

Though it is "generally" true that statements of legal opinion cannot serve as the basis for a fraud claim, there is an exception to this general rule for when a confidential relationship exist between the parties. *Douglas v. Bigley*, 628 S.E.2d 199, 206 (Ga. Ct. App. 2006); *see Clinton v. State Farm Mut. Auto. Ins. Co.*, 138 S.E.2d 687, 691 (Ga. Ct. App. 1964) (stating that "a representation or expression of opinion as to a matter of law . . . is not actionable *unless there is a fiduciary relationship between the parties*") (emphasis added).  As Plaintiffs note, Georgia law broadly defines a "confidential relationship" as

> Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.

(Pls.' Opp'n to ACC Defs.' MTD, Doc. 197 at 42) (quoting Ga. Code Ann. § 23-2-58).  Plaintiffs argue that this exception applies here.  *See* (*id.* at 43); (Pls.' Opp'n to Sirote's MTD, Doc. 189 at 29).  As Plaintiffs also note, (Pls.' Opp'n to Sirote's MTD, Doc. 189 at 30), Georgia law also authorizes actions in fraud when the defendant knew that its prediction would not come true.  *See, e.g.*, *Williams v. Crispaire Corp.*, 483 S.E.2d 653, 656 (Ga. Ct. App. 1997) (recognizing a "well known exception[ ]" to general rule that representations about future events are not actionable in fraud for when the defendant made representations that were "either known at the time to be false, or recklessly made with intent of deceiving the opposite party"); *Mallayev v. Cohen*, No. 1:07-cv-94, 2009 WL 10697493, at *7 (N.D. Ga. Mar. 27, 2009) (recognizing an exception to the general rule that representations about future events are not actionable in fraud for when the defendant "knew the projected event would not occur").  At this stage, the determination of whether Plaintiffs had confidential relationships with each of the Defendants or whether each of the Defendants knew that Plaintiffs' charitable deductions would ultimately be disallowed raises factual issues that are inappropriate for resolution at the pleading stage.[27]

---

[27] For similar reasons, it is also premature for the Court to accept Defendants' argument that their alleged fraudulent omissions are not actionable on the theory that they did not owe Plaintiffs any fiduciary duties.  To be sure, Georgia courts have held that "[s]uppression of a material fact is fraud only if there is a duty to disclose arising from a fiduciary relationship or the particular circumstances of the case." *Ledford v. Smith*, 618 S.E.2d 627, 634 (Ga. Ct. App. 2005) (citation and omitted).  But assessing "the particular circumstances of the case" inherently depends on factual questions.

Third, though some Defendants argue that they cannot be liable in fraud because they only made representations to Plaintiffs indirectly through third parties, "[i]ndirect representations may nevertheless be a ground of liability in fraud, so long as it was intended or expected that they would be communicated to and acted upon by the complaining party." *First Fin. Sav. & Loan Ass'n*, 557 F. Supp. at 661.   Defendants may dispute whether they intended for their representations to ultimately reach Plaintiffs; however, at the very least, that argument raises factual issues that are better suited for resolution at summary judgment.

Finally, Defendants argue that Plaintiffs' fraud claims fail because Plaintiffs received multiple warnings that the deductions could be disallowed, including through disclaimers contained in the Promotional Materials for the Syndicates.[28] (Defs.' Executive Summ., Doc. 223 at 9.)  By way of example, Defendants cite the Promotional Materials from Maple Landing, which included the following language

> PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH AND RELY ONLY UPON THE ADVICE OF THEIR OWN TAX ADVISORS WITH REGARD TO ALL TAX ASPECTS OF INVESTMENT IN THE COMPANY WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATIONS.

(Aprio Defs.' MTD, Doc. 170-1 at 52) (quoting (Doc. 135-3 at 21)).  The Promotional Materials also stated,

---

[28] As the Court already discussed in resolving Plaintiffs' motion to strike, the Court may consider the Promotional Materials for purposes of resolving Defendants' motions to dismiss even though they appear outside the four corners of the Amended Complaint.

> YOU SHOULD REVIEW CAREFULLY THE TAX RISKS DESCRIBED
> IN THIS OFFERING SUMMARY AND YOU ARE URGED TO
> CONSULT WITH AND RELY UPON YOUR OWN PERSONAL TAX
> ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES
> ARISING FROM THE PURCHASE OF THE UNITS BEFORE
> MAKING A DECISION TO INVEST IN THE COMPANY.

(*Id.* at 53 n.44) (quoting (Doc. 135-3 at 37)).

Defendants also reference the Promotional Materials from Mossy Rock, which stated

> YOU SHOULD ASSUME THAT THE INTERNAL REVENUE
> SERVICE (THE "IRS") WILL AUDIT THE COMPANY'S TAX
> RETURNS, AND THAT SUCH AN AUDIT COULD RESULT IN THE
> LOSS OF SOME OR ALL OF THE TAX BENEFITS ANTICIPATED TO
> BE DERIVED FROM AN INVESTMENT IN THE COMPANY.

(ACC Defs.' MTD, Doc. 171-1 7–8) (quoting (Doc. 171-3 at 24)).  Much like the Promotional Materials for Maple Landing, the Promotional Materials for Mossy Rock added

> YOU ARE URGED TO CONSULT WITH YOUR OWN TAX ADVISOR
> WITH RESPECT TO AN INVESTMENT IN THE UNITS AND
> VARIOUS RISK FACTORS ASSOCIATED THEREWITH.

(*Id.* at 8) (quoting (Doc. 171-3 at 33)).

Even though under Georgia law "the mere presence of a disclaimer" can render reliance unreasonable, *Middleton v. Int'l Bus. Machs. Corp.*, 787 F. App'x 619, 622 (11th Cir. 2019), factual issues may prevent a court from determining at the pleading stage that the disclaimers would "preclude any reasonable reliance as a matter of law," *Raysoni v. Payless Auto Deals, LLC*, 766 S.E.2d 24, 26 (Ga. 2014). In this case, there are factual questions as to whether Plaintiffs viewed any of

Defendants as their own tax advisors.  Notably, Plaintiffs allege that they decided to invest in the Syndicates based not only on the written representations contained in the Promotional Materials, but also based on the advice and representations they separately received from Defendants.  *See* (Am. Compl., Doc. 155 ¶¶ 79, 110, 138.)   For instance, Plaintiffs allege that the Dalba Plaintiffs consulted with Defendant Greenberger before deciding to invest in the Maple Landing Syndicate, and that Greenberger advised them "the SCE Strategy complied with the requirements of Code Section 170(h) and, as a result, they could legally report this allocated charitable contribution deduction provided by the SCE Strategy." (*Id.* ¶ 79.) Similarly, Plaintiffs allege that Lechter consulted with both Defendant Jowers and Defendant Zak before deciding to invest in the Oakhill Woods Syndicate, and that these Defendants "advised Lechter that the SCE Strategy complied with the requirements of Code Section 170(h) and, as a result, he could legally report this allocated charitable contribution deductions provided by the SCE Strategy." (*Id.* ¶ 138.)  Plaintiffs also allege that, as a result of Defendants' misrepresentations and omissions, they had to hire "*new* tax and legal advisors to rectify the situation." (*Id.* ¶ 340) (emphasis added).  These allegations raise a plausible inference that Plaintiffs viewed Defendants as their own tax advisors.  Whether that was actually the case or whether there was actually a reasonable objective basis for the Plaintiffs' view or not is a question best resolved at summary judgment or if necessary, at trial.

In light of these lingering factual questions, it would be premature to determine how the disclaimers should be read in conjunction with any additional written or oral misrepresentations Defendants have made, and whether Plaintiffs should have understood these disclaimers as qualifying any other written or oral misrepresentations Defendants may have made. *Raysoni*, 766 S.E.2d at 27. As the Supreme Court has acknowledged, "[w]hen an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice" because "[m]ost taxpayers are not competent to discern error in the substantive advice of an accountant or attorney." *United States v. Boyle*, 469 U.S. 241, 251 (1985) (emphasis in original). At least insofar as Defendants were allegedly acting as Plaintiffs' own tax advisors, "[t]o require the taxpayer to challenge the attorney, to seek a 'second opinion,' or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place." *Id.* There is at least a question of fact as to whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations and omissions, notwithstanding the presence of disclaimers in the Promotional Materials.

That said, the Court recognizes that the broader question of whether Plaintiffs reasonably relied on Defendants' representations will depend on what the facts reveal in discovery. And for Plaintiffs to succeed on their fraud-based claims they would have to show that they actually relied on Defendants' alleged misrepresentations; not simply that they indirectly relied on them and that the

70

injuries would not have occurred but for the existence of those misrepresentations. *See White v. BDO Seidman, LLP*, 549 S.E.2d 490, 492–93 (Ga. Ct. App. 2001) (holding that plaintiffs failed to satisfy reliance element when they claimed that they "indirectly relied upon BDO's audits because the audits were necessary to make the securities available to them" but not that they "actually relied upon any representation in BDO's audit opinions in making their decision to invest in the securities"). Of course, the facts may also show that Defendants were not acting as Plaintiffs' tax advisors.  However, given Plaintiffs' allegations that they were not tax experts, and were instead relying on the representations of Defendants in their capacities as purported tax experts, coupled with Plaintiffs' contention that "the purpose for which the . . . representation[s] [were] made" was to induce Plaintiffs to buy into a fraudulent scheme, *Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 300 S.E.2d 503, 504 (Ga. 1983), the Court finds that Plaintiffs have satisfied this element for purposes of the pleading stage.  Under these circumstances, there is at least a question of fact as to whether Plaintiffs reasonably relied on each Defendant's representations.

The Court also recognizes that Plaintiffs will ultimately have to prove their damages.  But for purposes of the pending motions to dismiss, the Court finds that Plaintiffs have plausibly alleged that they suffered damages in the form of the money they paid into the Syndicates and the personal tax liability they subsequently incurred as a result of Defendants' conduct.

Having addressed Defendants' arguments that apply to Plaintiffs' fraud-based claims more generally, the Court now addresses the predicate acts of racketeering activity that Plaintiffs allege were committed by each of the Defendants specifically.

### i.   The Aprio Defendants

Plaintiffs claim that the Aprio Defendants were the key organizers of the SCE Strategy, and effectively treat the Aprio Defendants as the focal point of their claims.  They allege that the Aprio Defendants were involved in nearly all steps of the transactions at issue, including soliciting potential investors, preparing the tax returns for each of the Syndicates, and representing the Syndicates in the IRS audits and Tax Court proceedings.  Not surprisingly, the predicate acts of mail and wire fraud Plaintiffs attribute to the Aprio Defendants occurred at multiple points in these transactions.

For instance, Plaintiffs point to an email that Defendant Robert Greenberger sent to Plaintiff Russell Dalba on November 16, 2010 soliciting Dalba's participation in the Maple Landing transaction.  (Am. Compl., Doc. 155 ¶ 255(a).)  As a part of that same transaction, Plaintiffs reference the Aprio Defendants' delivery of Form 8283 and an appraisal performed by Tennille to members of the Maple Landing Syndicate by U.S. mail on or around March 9, 2011, following the conveyance of the Syndicate's conservation easement to GALT.  (*Id.* ¶ 255(k).)  Plaintiffs allege that these documents both "misstated the value of the conservation easement" and "intentionally concealed the cost basis of the donated property."

(*Id.*)  In connection with the Mossy Rock transaction, Plaintiffs allege that on or around April 7, 2012, the Aprio Defendants sent Plaintiff Sylvia Thompson the following items via U.S. mail:  a K-1 with her share of the Mossy Rock conservation easement, a Form 8283, and an appraisal performed by the Clower Defendants. (*Id.* ¶ 255(n).)  Plaintiffs contend that each of these documents constitute mail fraud because the K-1 reflected "bogus tax deductions," the Form 8283 intentionally omitted the cost basis for the deduction, and the appraisal "deviated from applicable appraisal standards" and "substantially overvalued the property." (*Id.*)

Granted, it may turn out that, through these communications, the Aprio Defendants were merely performing ordinary professional services for their clients, unaware that they were making misrepresentations or omissions — or, alternatively, that the Aprio Defendants were not making misrepresentations or omissions at all.  But based on the allegations in the Amended Complaint, the Court could plausibly infer both that the Aprio Defendants' representations were fraudulent and that the Aprio Defendants were well aware of this fact.

For one thing, Plaintiffs allege that each of the charitable deductions at issue was ultimately disallowed by the IRS based primarily on inflated appraisals. Assuming that this was the case, the Aprio Defendants would have had good reason to know that given their intimate involvement in each of the transactions. Plaintiffs also allege that the Aprio Defendants "hand-picked" the Appraisers for each of the transactions.  *See* (Am. Compl., Doc. 155 ¶¶ 77, 109, 136.)  If true, this

could be significant.  By way of analogy, in *Cisneros v. Petland, Inc.*, 972 F.3d 1204, (11th Cir. 2020), the Eleventh Circuit denied the plaintiff's RICO claims when the plaintiff alleged that the defendant was selling puppies at inflated prices based on certification from veterinarians that the puppies were healthy.  Notably, one of the deficiencies the court identified in the complaint was that the plaintiff did not allege that the defendant had "directed the selection of any preferred veterinarians" who falsely certified that the puppies were healthy.  *Id.* at 1212.  But here, Plaintiffs allege that the Aprio Defendants *did* direct the selection of the individuals performing the underlying misconduct — the Appraisers who allegedly committed the inflated appraisals.  And the Court could plausibly infer, based on the facts alleged, that the Aprio Defendants selected these Appraisers knowing that they would overstate the value of the easements.  If that were so, that would mean the Aprio Defendants may likely have known that the representations they made to Plaintiffs were fraudulent, and the communications Plaintiffs identified would qualify as predicate acts of mail or wire fraud.

Because the alleged communications Plaintiffs reference were both interrelated and performed in connection with multiple transactions, for purposes of the pleading stage, the Court finds that they satisfy the "relatedness" requirement for a pattern of racketeering under Georgia RICO.  As a caveat though, the Court recognizes that to show that the Aprio Defendants acquired an interest in "personal property of any nature, including money," as required by subsection (a) of Georgia RICO, Plaintiffs may have to show that the Aprio Defendants

generated additional business that they would not have otherwise received but for the alleged pattern of racketeering activity.[29]  For purposes of the pleading stage, however, Plaintiffs have plausibly alleged that, as a result of a pattern of racketeering activity, the Aprio Defendants received accounting fees and other professional fees from "additional potential participants" who were not already their clients.[30]  (Am. Compl., Doc. 155 ¶ 55.)

### i.    The Land Trust Defendants

The Court next addresses the predicate acts Plaintiffs attribute to the Land Trust Defendants — the ACC Defendants and GALT.

### *The ACC Defendants*

Beginning with the ACC Defendants, Plaintiffs do not allege that these Defendants were involved in any of the transactions at issue other than Mossy Rock.    However, Plaintiffs identify several representations that the ACC Defendants allegedly made in connection with the Mossy Rock transaction that Plaintiffs claim could qualify as predicate acts of mail or wire fraud.  For example, Plaintiffs point to the preliminary study the ACC Defendants prepared stating that

---

[29] Unlike for a Federal RICO claim or a Georgia RICO claim under subsection (b), Plaintiffs would not have to establish that the Aprio Defendants engaged in the operation or management of an enterprise to state a claim under subsection (a).  As the Aprio Defendants argue in their motion to dismiss, performing ordinary professional services such as preparing financial documents would not qualify as operation or management of a RICO enterprise.  *See* (Aprio Defs.' MTD, Doc. 170-1 at 37) (citing *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993)).  Performing such services could give rise to a Georgia RICO claim under subsection (a) if it led the defendant to acquire an interest in money or other personal property, but the plaintiff would still have to show that this conduct did in fact lead the defendant to acquire an interest in money or other personal property.
[30] Of course, the Court also recognizes that the Aprio Defendants may have sought to attract additional clients for other neutral reasons unconnected to any fraudulent conduct.

the easement would satisfy one or more conservation purposes and the letter they provided to the Mossy Rock Syndicate on December 28, 2011 confirming the conveyance of the conservation easement and representing that it was "fully tax deductible." (Pls.' Opp'n to ACC Defs.' MTD, Doc. 197 at 24–25.)

As an initial matter, it does not appear to the Court that any of the representations ACC made about the easement's purported conservation purposes rise to the level of fraud. Although Plaintiffs allege that a Judge on the Tax Court "seemed skeptical about the value claimed for the easement" on the Mossy Rock property, that comment was based on the *value* of the easement, not the *bona fides* of the easement's purported conservation purposes. Plaintiffs do allege that the ACC Defendants represented to Plaintiffs that the easement was "fully tax deductible," but nothing in the Amended Complaint suggests that the ACC Defendants had any reason to know whether the appraisals supporting Plaintiffs' claimed tax deductions had been performed accurately. As the ACC Defendants argue in their motion to dismiss, to the extent they made representations to Plaintiffs about the easement through their communications with the Mossy Rock Syndicate, Plaintiffs do not allege that they made any representations as to the value of the easement or any potential tax benefits that Plaintiffs could derive therefrom. (ACC Defs.' MTD, Doc. 171-1 at 11.)

Accordingly, the Court cannot plausibly infer that the ACC Defendants *knew* that the appraisals supporting the Thompson Plaintiffs' claimed tax deductions were inflated or that the deductions could not withstand IRS scrutiny because they

were overvalued.  Plaintiffs therefore fail to state a Georgia RICO claim against the ACC Defendants.

### GALT

The Court reaches the same conclusion as to GALT, which accepted the conservation easement donations from the other two Syndicates — Maple Landing and Oakhill Woods.  Plaintiffs make similar allegations against GALT with respect to their involvement in those two transactions.  For example, Plaintiffs allege that GALT helped prepare the BDRs, Conservation Easement Deeds, and Form 8283s for these transactions, and that it sent letters to the members of the Syndicates stating that the donations of the easements were "fully tax deductible."  But as was the case with their allegations against the ACC Defendants, Plaintiffs' allegations against GALT are slim.  Furthermore, these allegations are insufficient for the Court to plausibly conclude that GALT knew that any of these representations were fraudulent, assuming that they were fraudulent at all.  Plaintiffs therefore fail to state a Georgia RICO claim against GALT as well.

### iii.    The Law Firm Defendants

Plaintiffs refer to four sets of Defendants as "the Law Firm Defendants": Baker Donelson, Large & Gilbert, the SLH Defendants, and Sirote.  The Court addresses the predicate acts Plaintiffs attribute to these Defendants in turn.

### Baker Donelson and Large & Gilbert

To start, Plaintiffs raise essentially the same allegations against both Baker Donelson and Large & Gilbert.  The crux of Plaintiffs' Georgia RICO claim against

these Defendants is that Baker Donelson — jointly with Large & Gilbert — gave Defendant Nancy Zak advice about how to fill out Form 8283.  Though that advice was in connection with a prior transaction not at issue here, Plaintiffs allege that Zak subsequently used that advice to prepare Form 8283s in "every SCE Strategy transaction," including the three transactions at issue here.  (Am. Compl., Doc. 155 ¶ 177.)

Baker Donelson argues that Plaintiffs have failed to plead these allegations with the requisite particularity because Plaintiffs omit key information such as "what exactly was the advice," "how the advice was delivered," "when was the advice given," and "under what circumstances." (Baker Donelson's MTD, Doc. 181-1 at 12.)  In their opposition to Baker Donelson's motion to dismiss, Plaintiffs assert that the purpose of the advice was to assist Zak in "conceal[ing] the inflated nature of the Appraisals." (Pls.' Opp'n to Baker Donelson's MTD, Doc. 193 at 17) (quoting Am. Compl., Doc. 155 ¶ 181).  But even if the Court were to credit that argument, Plaintiffs do not explain how Baker Donelson advised Zak how to accomplish that task or what Baker Donelson and Large & Gilbert's roles were in providing that advice.  As Large & Gilbert states in its own motion to dismiss, "all of Plaintiffs' claims against L&G boil down to the single amended allegation that L&G (together with the Baker Donelson law firm) provided advice and services to the Forever Forests Defendants regarding the preparation of a template Appraisal Form that was then allegedly used by the other Defendants to prepare the Appraisal Form for each Syndicate." (Large & Gilbert's MTD, Doc. 173-1 at 2.)

At bottom, "lumping multiple defendants together in such generalities is insufficient under Rule 9(b)." *Burgess*, 600 F. App'x at 663.  The Court therefore finds that Plaintiffs fail to state a Georgia RICO claim against either Baker Donelson or Large & Gilbert.

### *The SLH Defendants*

Next, the Court addresses the predicate acts allegedly committed by the SLH Defendants.  Plaintiffs' allegations against these Defendants principally rely on group pleadings.  *See, e.g.*, (Am. Compl., Doc. 155 ¶ 207) ("The SLH Defendants and Sirote were key components of the Co-Conspirators' Arrangement.").  For example, Plaintiffs allege that the SLH Defendants formed the Syndicates jointly with the Aprio Defendants, Sirote, and the Sponsors of the Syndicates.  (*Id.* ¶ 39.)  Yet Plaintiffs do not explain what the SLH Defendants' role was in forming the Syndicates or how the SLH Defendants assisted these other Defendants with that process.  Plaintiffs also vaguely assert that the SLH Defendants helped prepare Conservation Easement Deeds, BDRs, and appraisals, (*id.* ¶ 57 (c)), but again, Plaintiffs do not explain exactly *how* the SLH Defendants assisted with the preparation of these documents or what they did to assist with them.  Though Plaintiffs attempt to attribute the alleged misrepresentations contained in the Mossy Rock Promotional Materials to the SLH Defendants on the theory that the SLH Defendants assisted with the preparation of those materials, (Pls.' Opp'n to SLH Defs.' MTD, Doc. 190 at 9-10), it does not appear to the Court that the SLH Defendants were the ones who actually made any of these representations.

Plaintiffs do not allege that the SLH Defendants prepared a Legal Opinion for Mossy Rock stating, among other things, that the deductions complied with all relevant regulations and would more likely than not withstand IRS scrutiny, like Sirote did for Maple Landing.

As the SLH Defendants argue in their motion to dismiss, the Amended Complaint does not plead with particularity "the precise misrepresentations or omissions" that they actually made.   (SLH Defs.' MTD, Doc. 180-1 at 11.) Accordingly, Plaintiffs' allegations against the SLH Defendants do not satisfy Rule 9(b)'s particularity requirement, and Plaintiffs fail to state a claim against these Defendants under Georgia RICO.

### *Sirote*

In support of their Georgia RICO claim against Sirote, Plaintiffs mainly rely on a December 18, 2010 Legal Opinion that Sirote prepared for the Maple Landing Syndicate.  Plaintiffs allege that the Legal Opinion was transmitted to potential investors and members of the Maple Landing Syndicate via email.  (Am. Compl., Doc. 15 ¶ 255(ll).)

Plaintiffs claim that in that Legal Opinion Sirote made the following misrepresentations:

- "The Conservation Easement Deed supports the assumption that the conservation easements were contributed "exclusively for conservation purposes,"

- "[t]he Appraisal constitutes a Qualified Appraisal under Treas. Reg. § 1.170A-13(c),"

- "[t]he Syndicate will file an accurate and complete Appraisal Summary (Form 8283),"

- "the conservation easement satisfies the conservation purpose requirement of Section 170(h)(1)(C) of the Code,"

- "the conservation easement donation will meet the IRS's perpetuity requirement,"

- "[t]he Baseline Documentation Reports meet the IRS's substantiation requirements,"

- "[i[t is more likely than not that an accuracy-related penalty shall not apply under Section 6662 or 6662A of the Code," and

- "[i]f the Conservation Easement is contributed to GLT, each Member [of the Maple Landing Syndicate] will be entitled to a charitable contribution deduction based upon their allocable share of the 'fair market value' of the Conservation Easement."

(Pls.' Opp'n to Sirote's MTD, Doc. 189 at 25–26.)  Plaintiffs claim that these representations were fraudulent because, in reality, "Sirote knew that the appraiser had falsely and fraudulently inflated the appraisal value." (*Id.* at 26.)

But these allegations are merely conclusory.  Plaintiffs provide no facts to substantiate their conclusion that Sirote knew for a fact that the Appraiser's valuation of the conservation easement was fraudulent.  Thus, the Legal Opinion does not qualify as a predicate act of mail or wire fraud.

Plaintiffs also allege that Sirote made misrepresentations "<u>outside</u> of Its Opinion Letter." (*Id.* at 27) (emphasis in original).  Specifically Plaintiffs point to (1) representations in the Promotional Materials for Oakhill Woods, which Plaintiffs claim Sirote "jointly" prepared with other Defendants; (2) an email sent to members of the Maple Landing Syndicate on February 16, 2017 providing an

update of the IRS appeals conference, which Sirote described as "productive"; and (3) a letter sent to the members of Mossy Rock Syndicate on August 23, 2019 stating that the Tax Court "seemed skeptical about the value claimed for the conservation easement."

For starters, Plaintiffs do not explain what Sirote's role was in the Promotional Materials for Oakhill Woods or precisely what Sirote represented to potential investors of that Syndicate. Plaintiffs' allegations with respect to Sirote's preparation of these Promotional Materials therefore fail to satisfy Rule 9(b)'s particularity requirement. As for the email to the members of the Maple Landing Syndicate and the letter to the members of the Mossy Rock Syndicate, it does not appear to the Court that those communications contain any misstatements or omissions that rise to the level of fraud. The Court thus cannot conclude that communications expressing the view that a conference was "productive" or conveying a court's view of a case to a client could constitute mail or wire fraud under these circumstances. And even if these allegations could qualify as independent acts of mail or wire fraud, they do not appear to be sufficiently interrelated for the Court to conclude that they constitute a pattern of racketeering activity. Sirote's representation of the Syndicates in the audits and Tax Court proceedings occurred several years after it issued the Legal Opinion for Maple Landing, and the email and the letter referenced above in connection to these two proceedings do not strike the Court as interrelated communications; they were about two independent legal matters. As such, Plaintiffs cannot show that any

predicate acts of mail or wire fraud committed by Sirote could establish the requisite "pattern" of racketeering activity necessary for liability under Georgia RICO.  Plaintiffs therefore fail to state a Georgia RICO claim against Sirote.

### iv.    The Appraisers

As for the Appraiser Defendants, the Court begins by noting that only one of these Defendants — Tennille — filed a motion to dismiss.  Though Plaintiffs often refer to the Appraiser Defendants collectively, as the Court reads the Amended Complaint, Plaintiffs are alleging that the Appraiser Defendants engaged in essentially identical conduct in different transactions.  The Amended Complaint makes clear that Tennille engaged in this conduct with respect to Maple Landing and Oakhill Woods and that the Clower Defendants did so with respect to Mossy Rock.  Each of the Appraiser Defendants are therefore sufficiently apprised of the allegations against them and the allegations do not fail as impermissible group pleadings.

As previously stated, Tennille performed the appraisals for the Maple Landing and Oakhill Woods transactions.  In the Amended Complaint, Plaintiffs allege that Tennille was aware that these appraisals would be used "in the promotion, sale, and implementation of the SCE Strategy."  (Am. Compl., Doc. 155 ¶ 204.)  Plaintiffs further allege that Tennille "allowed the Aprio Defendants, the Law Firm Defendants and the Sponsors to control, direct, and/or affect the conclusions reached and the methodologies used in each of the Appraisals."  (*Id.*)  Additionally, Plaintiffs allege that Tennille "prepared the Appraisals that

purported to support the conservation purpose of the conservation easement donation, as well as the value of the donation" and did so "with full knowledge and the intent that the valuations contained in the appraisals would be used by the Plaintiffs to claim charitable contribution deductions on their tax returns." (*Id.* ¶ 242(c).) Most importantly, Plaintiffs allege that Tennille "knew that the Appraisals were flawed and the valuations contained therein were grossly inflated." (*Id.*)

Assuming for purposes of Tennille's motion to dismiss that the Appraisals Tennille performed for both Maple Landing and Oakhill Woods were transmitted via mail or email, (*id.* ¶ 255 (kk),) and that the appraisals fraudulently overstated the value of the easements, these acts would suffice as two or more related predicate acts of mail or wire fraud for purposes of a Georgia RICO claim. If the appraisals were in fact inflated, Tennille almost certainly would have been aware of this — after all, it performed the appraisals. Though Tennille argues that, for a variety of reasons, the Dalba Plaintiffs and Lechter could not have reasonably relied on the appraisals, those are factual questions that are better suited for resolution at summary judgment. For purposes of the pleading stage, the Court finds that Plaintiffs have adequately alleged a pattern of racketeering activity committed by Tennille.

### v.    The Forever Forests Defendants

Plaintiffs refer to Defendants James Jowers, Nancy Zak, and Forever Forests collectively as "the Forever Forests Defendants." Plaintiffs allege that these Defendants "directly promoted the SCE Strategy to potential participants" and

"made numerous misrepresentations . . . including that the SCE Strategy was designed and would be implemented in a manner that complied with all applicable Code provisions and regulations and would generate a legal and legitimate charitable contribution deduction." (Am. Compl., Doc. 155, ¶ 208.) Because the Forever Forest Defendants filed two separate motions to dismiss — one by Jowers and the other by Zak and Forever Forests — the Court will separately address the predicate acts Plaintiffs attribute to Jowers and to Zak and Forever Forests.

### *Jowers*

In support of their Georgia RICO claim against Defendant James Jowers, Plaintiffs reference the following emails, which they claim qualify as predicate acts of wire fraud:

- A December 20, 2010 email from Jowers to all members of the Maple Landing Syndicate in which he stated "that the release of the transaction documents was forthcoming." (Am. Compl., Doc. 155 ¶ 255(b)).

- A December 21, email from Jowers to Plaintiff Russell Dalba in which he "promised tax deductions of approximately $67,910 per unit and Georgia tax credits of $10,000 per unit" in connection with the Maple Landing transaction. (*Id.* ¶ 255(c).)

- An email Jowers sent Dalba on December 21, 2010 requesting that Dalba sign a "Consent to Conserve" document and warning Dalba that he would risk losing his spot as a participant in the Maple Landing transaction "if we do not hear from you in a timely fashion." (*Id.* ¶ 255(d).)

- An email that Jowers sent Dalba on December 22, 2010 notifying him that he needed to update his documents and wire additional funds to receive his 2.4 shares in the Syndicate, and promising "federal deductions and Georgia tax credits that will be realized upon his purchase of the 2.4 Units." (*Id.* ¶ 255(e).)

- An email Jowers sent to Dalba on December 22, 2010 "containing wire instructions for payment to Maple Landing Syndicate" (*Id.* ¶ 255(g).)

- An email Jowers sent to all members of the Effingham-sponsored Syndicates — Maple Landing and Oakhill Woods — on February 1, 2011, notifying them that Forever Forests and the attorneys and accountants working on the transactions were "working diligently to be sure that you receive the K-1 and all pertinent documents in a timely manner." (*Id.* ¶ 255(j).)

Plaintiffs claim that by sending these emails Jowers used the mail and wires to recruit clients to participate in the SCE Strategy and that by doing so he also "helped implement the Strategy, including by helping prepare the fraudulent Forms 8283 that were central to the scheme." (Pls.' Opp'n to Jowers's MTD, Doc. 194 at 14.)   In addition, Plaintiffs claim that Jowers advised Plaintiff Andrew Lechter that the SCE Strategy complied with Section 170(h) of the Internal Revenue Code before Lechter invested in the Oakhill Woods Syndicate.   (Am. Compl., Doc. 155 ¶ 137.)

What all of this shows is that Jowers was involved in the transactions at issue; what it does not show is that Jowers actually knew the representations that he made were in any way false.  Thus, the Court cannot plausibly infer that Jowers committed the predicate acts of mail or wire fraud.  Plaintiffs therefore fail to state a Georgia RICO claim against Jowers.

### *Zak and Forever Forests*

Plaintiffs' primary allegation against Defendant Nancy Zak is that she sought advice from Baker Donelson and Large & Gilbert "for the specific purpose of circumventing the reporting of the cost basis in line 5 of page 2 of the Form 8283,

while at the same time making it appear this was a permissible deviation from reporting the basis and fair market value in a transparent manner (as required by the applicable Code sections and related regulations)." (*Id.* ¶ 209.) Plaintiffs claim that Zak caused these forms to be sent through the mail or wires despite knowing that they fraudulently omitted the cost basis for the appraisals, thereby establishing multiple related acts of mail or wire fraud.

In support of their claims against Forever Forests, Plaintiffs evidently rely on these transmissions and the emails sent by Jowers referenced above.  In addition, Plaintiffs rely on an email from Forever Forests employee Lisa Cantrell to Plaintiff Lechter on April 6, 2017, informing Lechter that the Oakhill Woods transaction's status as a listed transaction "in no way makes this transaction illegal," advising him to file a Form 8886 and stating that doing so "should not significantly change the risk profile of your investment."

Assuming for purposes of the Forever Forest Defendants' motion to dismiss that Defendant Zak sought to hide the cost basis of the appraisals for the transactions at issue when she assisted in the preparation of the Form 8283s, the Court can plausibly infer that she and Forever Forests were aware that the appraisals underlying these transactions were inflated.  If that were the case, the Form 8283s sent through the mail and wires would contain fraudulent statements and omissions that could constitute a pattern of racketeering activity under Georgia RICO.  From this information, the Court can also plausibly infer that Forever Forests was aware that (1) contrary to Jowers's statement to Dalba via

email, Dalba was not entitled to claim a charitable deduction; and (2) contrary to Cantrell's statement to Lechter via email, his claimed deduction could not be legally supported. Assuming that these were in fact fraudulent misrepresentations, the Court can plausibly infer that Forever Forests was aware that they were fraudulent even if Jowers and Cantrell were not.

Even if the Court credits the Forever Forest Defendants' argument that their role as project managers materially ended once the transactions were completed, that makes no material difference given that Plaintiffs have plausibly alleged predicate acts of mail or wire fraud. And though Zak and Forever Forests argue that Plaintiffs' injuries were self-inflicted because they were sophisticated investors who assumed the risk of their investments, it is premature for the Court to make that determination at the pleading stage. Thus, the Court finds that Plaintiffs state a Georgia RICO claim against Zak and Forever Forests.

### b. Causation

As stated above, the Court finds that Plaintiffs adequately alleged that the following Defendants committed the pattern of racketeering activity necessary to state a Georgia RICO claim: the Aprio Defendants, Tennille, Zak, and Forever Forests. For essentially the same reasons the Court found that Plaintiffs had standing to pursue Georgia RICO claims, the Court also finds that Plaintiffs have satisfied the proximate causation requirement for their Georgia RICO claims against each of these Defendants. Plaintiffs have plausibly alleged that they would have acted differently but for the alleged pattern of racketeering activity on the part

of each of these Defendants.  And because, if true, Plaintiffs could potentially show that these actions proximately led to Plaintiffs' loss of "personal property of any nature, including money," Ga. Code Ann. § 16-14-4(a), Plaintiffs therefore state a Georgia RICO claim against each of these Defendants.  Plaintiffs' Georgia RICO claims against the remaining Defendants are **DISMISSED**.

### 3.   Conspiracy to Violate Federal RICO and Georgia RICO (Counts II and IV)

Under Federal RICO, it is also unlawful to "conspire" to violate that statute's substantive provisions.  18 U.S.C. § 1962(d).  Plaintiffs allege that in addition to violating Federal RICO's substantive provisions, Defendants have also violated 18 U.S.C. § 1962(d) by conspiring to "conduct or participate in, directly or indirectly, the conduct of the affairs" of the RICO enterprise.  (Am. Compl., Doc. 155 ¶ 298.)

A plaintiff can establish a conspiracy to violate Federal RICO claim by showing either (1) **"**that the defendant agreed to the overall objective of the conspiracy" or (2) "that the defendant agreed to commit two predicate acts."  *Am. Dental Ass'n*, 605 F.3d at 1293 (quoting *Republic of Panama*, 119 F.3d at 950).  For the reasons stated above, Plaintiffs have not plausibly alleged that Defendants "agreed to the overall objective of the conspiracy."  Plaintiffs' first option therefore fails at the outset.  *Cf. Walgreen Co.*, 719 F.3d at 856 ("Just as the complaint fails to allege that Walgreens and Par acted on behalf of the Hrp enterprise, it equally fails to allege that Walgreens and Par *agreed* to act on behalf of the enterprise.") (emphasis in original).  So, as an alternative, Plaintiffs "must allege facts to support

an agreement to violate a substantive provision of the RICO statute." *Carter v. MGA, Inc.*, 189 F. App'x 893, 895 (11th Cir. 2006).

Defendants could still be liable for conspiring to commit two predicate acts even if there was no RICO enterprise and even if those predicate acts were never actually carried out.  But for that to happen Plaintiffs would first have to plausibly allege that Defendants made "an illegal agreement to violate a substantive provision of the RICO statute." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269 (11th Cir. 2004).  In this case, Plaintiffs have not plausibly alleged that any of the Defendants "*agreed* to violate any of the substantive provisions of the RICO laws." *Id.* (emphasis added).  Though it is possible that some Defendants committed predicate acts of mail or wire fraud, Plaintiffs have not plausibly alleged that any of these Defendants *made an agreement* with any of the other Defendants that they would commit these predicate acts.[31]  And even if a smaller group of the Defendants agreed to commit these predicate acts, Plaintiffs have not explained which Defendants were a part of that agreement or how that agreement ultimately came about.  Plaintiffs' argument that Defendants "conspired with each other" for the purpose of committing these predicate acts is at best conclusory.  *Carter*, 189 F. App'x at 895.  Plaintiffs' conspiracy to violate Federal RICO claim therefore fails.

---

[31] Naturally, one cannot conspire with oneself because a conspiracy requires an agreement of "two or more persons." *See Conspiracy*, Black's Law Dictionary (11th ed. 2019) (defining conspiracy as "[a]n agreement by two or more persons to commit an unlawful act, coupled with an intent to achieve the agreement's objective, and (in most states) action or conduct that furthers the agreement").

Much like Federal RICO, Georgia RICO makes it unlawful for any person to "conspire or endeavor to violate" Georgia RICO. Ga. Code Ann. § 16-14-4(c). There is no apparent substantive difference between the requirements for establishing a conspiracy to violate Federal RICO claim and a conspiracy to violate Georgia RICO claim. So even though the Court reaches different results with respect to Plaintiffs' claims of substantive violations of Federal RICO and Georgia RICO, the result is the same for Plaintiffs' claims of conspiracy to violate these two statutes. Plaintiffs fail to state a claim on either of these Counts.[32]

### 4.    Fraud (Count IX)

In support of their common-law fraud claims, Plaintiffs rely on the same alleged acts of mail and wire fraud as they did for the predicate acts of mail and wire fraud for their RICO claims. *See, e.g.*, (Pls.' Opp'n to Aprio Defs.' MTD, Doc. 188 at 23) (arguing that "[t]he same detailed allegations . . . concerning the RICO predicate acts . . . sufficiently support Plaintiffs' other fraud-based claims"). The Court has already found that Plaintiffs plausibly alleged that the Aprio Defendants, Tennille, Zak, and Forever Forests committed the predicate acts of mail or wire

---

[32] The Court recognizes that, having dismissed Plaintiffs' two federal statutory claims, Plaintiffs can no longer rely on 28 U.S.C. § 1331 as the basis for the Court's jurisdiction. For now, the Court retains subject matter jurisdiction over Plaintiffs' remaining claims under 28 U.S.C. § 1332(d) based on Plaintiff' allegations that the Class Action Fairness Act vests the Court with diversity jurisdiction over those claims. (Am. Compl., Doc. 155 ¶ 10); *see Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1220 (11th Cir. 2020). However, the Court advises the parties that it may be required to decline jurisdiction in the event that the amount in controversy does not exceed $5,000,00, or if two thirds or more of the proposed class members are Georgia residents. *See* 28 U.S.C. § 1332(d)(2), (4).

fraud.  Having reached this conclusion, the Court necessarily finds that Plaintiffs have also plausibly alleged common-law fraud claims against these Defendants.

On the other hand, this also means that Plaintiffs have failed to state fraud claims against the remaining Defendants for the same reasons Plaintiffs failed to plausibly allege that these Defendants had committed the predicate acts of mail or wire fraud.  Plaintiffs' common-law fraud claims against the remaining Defendants are therefore **DISMISSED**.

### 5.   Negligent Misrepresentation (Count VI)

Plaintiffs also raise negligent misrepresentation claims as an alternative to their fraud claims.  A negligent misrepresentation claim is similar to a fraud claim and requires "the same elements of proof"; "the only difference being whether the defendant knowingly or negligently made the misrepresentations." *Am. Casual Dining*, 426 F. Supp. 2d at 1365.  To establish a negligent misrepresentation claim, a plaintiff must show "(1) the defendant negligently supplied false information to foreseeable persons, known or unknown; (2) such persons reasonably relied upon that information; and (3) economic injury proximately resulted from that reliance." *Id.* at 1365–66.  "Liability for a negligent representation attaches when a defendant makes a false representation upon which the plaintiff relies," *Global Payments, Inc. v. Incomm Fin. Servs., Inc.*, 843 S.E.2d 821, 824 (Ga. 2020), even if the defendant did not know that the representation was false.  As was the case for Plaintiffs' fraud and RICO claims, Rule 9(b)'s particularity requirement also applies to Plaintiffs' negligent misrepresentation claims. *See Jackson Inv. Grp.,*

*LLC v. Thomas*, 325 F. Supp. 3d 1334, 1354 (N.D. Ga. 2017) ("For the claims alleging fraudulent conduct—i.e., the claims for fraud, collusion, and negligent misrepresentation—[plaintiff must] plead with particularity the actions of [defendant] that form the basis of those claims as required by Rule 9(b)." (alterations in original) (quoting *Smith v. Ocwen Fin.*, 488 F. App'x 426, 428 (11th Cir. 2012))).

In this case, some Defendants could be liable on a negligent misrepresentation theory even if they did not know that the appraisals were inflated and — consequently — that the charitable deductions Plaintiffs claimed were overvalued and their representations to Plaintiffs were false. As they state in the Amended Complaint, Plaintiffs can establish liability on a negligence theory if they have plausibly alleged that Defendants "reasonably *should have known* that their representations, recommendations, advice and instructions were improper, inaccurate, or wrong," (Am. Compl., Doc. 155 ¶ 336) (emphasis added), and that Plaintiffs reasonably relied on these representations and suffered damages as a consequence.

Instead of plausibly alleging that Defendants *knew* that the representations they made were false, to establish negligent misrepresentation claims against Defendants here Plaintiffs would simply have to show that Defendants negligently "represented that the false information was legitimate, accurate, or trustworthy." *Global Payments, Inc.*, 843 S.E.2d at 824. And as was the case with Plaintiffs' fraud and Georgia RICO claims, even if Defendants only made these

representations to Plaintiffs' indirectly through third parties, liability may still attach for representations made indirectly to "a foreseeable person or limited class of persons for whom the information was intended." *Robert & Co. Assocs. v. Rhodes-Haverty P'ship*, 300 S.E.2d 503, 504 (Ga. 1983).

As an initial matter, by implication, the Court's conclusion that Plaintiffs have stated common-law fraud claims against the Aprio Defendants, Tennille, Zak, and Forever Forests necessarily means that Plaintiffs have stated negligent misrepresentation claims against these Defendants as well. In this context, liability for the greater offense of fraud necessarily entails liability for the lesser offense of negligence; for if Defendants' representations were fraudulent then they were, by definition, at least negligent. On the other end of the spectrum, for the same reasons Plaintiffs failed to state fraud claims against Baker Donelson, Large & Gilbert, and the SLH Defendants, Plaintiffs also fail to state negligent misrepresentation claims against these Defendants. As noted above, Plaintiffs failed to plead their fraud claims against these Defendants with the requisite particularity under Rule 9(b). Because Rule 9(b)'s particularity requirement applies to negligent misrepresentation claims as well as fraud claims, Plaintiffs therefore fail to state negligent misrepresentation claims against these Defendants as well. As a consequence, Plaintiffs' negligent misrepresentation claims against Baker Donelson, Large & Gilbert, and the SLH Defendants are **DISMISSED**.

That leaves the Land Trusts, Sirote, and Jowers. Assuming for purposes of the pleading stage that Plaintiffs have adequately alleged that the representations

these Defendants made were false, that Plaintiffs reasonably relied on those representations, and that Plaintiffs suffered damages as a consequence, the Court finds that Plaintiffs have plausibly alleged negligent misrepresentation claims against each of these Defendants except for the Land Trusts.

Beginning with Sirote, the Court finds that Sirote's representations to Plaintiffs in the Maple Landing Legal Opinion that, among other things, it was more likely than not that the deductions would withstand IRS scrutiny, could plausibly support a negligent misrepresentation claim. Even if Sirote did not actually know that the appraisals were inflated, the Amended Complaint at least creates a plausible inference that Sirote should have discovered this in the process of preparing the Legal Opinion. The Court therefore finds that Plaintiffs state a negligent misrepresentation claim against Sirote, though the claim may stand on a thin factual reed.

In support of their claim against Jowers, Plaintiffs cite emails Jowers sent to members of the Syndicates and potential investors. Among these were emails Jowers sent to Plaintiff Russell Dalba in which Jowers "promised" Dalba that he would be entitled to charitable deductions in exchange for his investment in the Maple Landing Syndicate. Even though Plaintiffs do not provide sufficient facts to substantiate their allegation that Jowers knew for a fact that these deductions would never be realized, the Court could plausibly infer that Jowers was at least negligent in making that promise. It is not clear whether Jowers's role in the transactions at issue was purely administrative in nature or whether he was more

deeply involved.  Construing the facts in the light most favorable to the Plaintiffs, however, the Court could plausibly infer that Jowers's role in the transactions was more than just clerical in nature, and that he was intimately familiar with the details of the transactions.  If that were the case, Plaintiffs could plausibly show that Jowers at least *should have known* that the promises he was making about the transactions could never be realized even if he did not actually know this for a fact. And if he were advising potential investors such as Lechter that the SCE Strategy was lawful, as Plaintiffs allege, the Court could plausibly conclude that providing that advice was at least negligent.  Whether that was really so is a question that should be resolved on a fully developed factual record.  But for now, the Court concludes that Plaintiffs state a negligent misrepresentation claim against Jowers.

Lastly, regarding the Land Trusts, as noted above, the Land Trusts did not comment on the value of the easements that they received from the Syndicates. Although Plaintiffs allege that the Land Trusts represented that the conveyances of the easements were "fully tax deductible," at most, these were representations that the conveyances were fully tax deductible from a conservation purposes perspective, not that  the conveyances were fully tax deductible in any particular amount.  The Land Trusts had no apparent involvement in the appraisals and did not make any representations as to their validity.   Accordingly, Plaintiffs could not have reasonably relied on any representations by the Land Trusts when they reported charitable deductions based on the values of the underlying appraisals.

Plaintiffs' negligent misrepresentation claims against the ACC Defendants and GALT are therefore **DISMISSED**.

### 6.    Negligence/Professional Malpractice Against the Aprio Defendants (Count V)

Professional malpractice claims arise when a professional negligently fails to exercise "ordinary care, skill and diligence" and "such negligence was the proximate cause of damages to the plaintiff." *Leibel v. Johnson*, 728 S.E.2d 554, 555 (Ga. 2012).   In support of their malpractice claim against the Aprio Defendants, Plaintiffs allege that in providing professional services for Plaintiffs, the Aprio Defendants owed Plaintiffs a duty of care in providing those services, including a duty to comply with "the applicable provisions of their codes of professional responsibility." (Am. Compl., Doc. 155 ¶ 325.) Plaintiffs further allege that the Aprio Defendants breached that duty of care and that, by doing so, they proximately caused Plaintiffs' injuries, including money Plaintiffs paid to participate in the SCE Strategy transactions and fees associated with their subsequent personal tax liability. (*Id.* ¶¶ 326, 329.)

For example, Plaintiffs allege that Defendant Robert Greenberger advised the Dalba Plaintiffs that the SCE Strategy complied with Section 170(h) of the Internal Revenue Code. (*Id.* ¶ 78.) Plaintiffs also allege that the Aprio Defendants advised them to report their shares of the charitable contribution deductions as they were reflected in  the K-1s, which were prepared by the Aprio Defendants, and to include copies of the Form 8283s, which were also prepared by the Aprio

Defendants, with their individual tax returns to substantiate their deductions.  (*Id.* ¶ 92–93.)

In their motion to dismiss, the Aprio Defendants argue that they cannot be liable for professional malpractice because there was no accountant-client relationship between themselves and Plaintiffs.  (Aprio Defs.' MTD, Doc. 170-1 at 50.)  In response, Plaintiffs argue that they did in fact have an accountant-client relationship based on the Aprio Defendants' provision of advice and preparation of documents that Plaintiffs relied on in reporting charitable deductions on their individual tax returns.   (Pls.' Opp'n to Aprio Defs.' MTD, Doc. 188 at 42.)  Alternatively, Plaintiffs argue that even if they were not the Aprio Defendants' clients, they could still state a claim for professional malpractice based on the Aprio Defendants' negligent provision of services to the Syndicates.  On this theory, Plaintiffs argue, the Aprio Defendants could still be liable to Plaintiffs for professional malpractice if the Aprio Defendants intended for Plaintiffs to rely on the advice and representations that the Aprio Defendants made to their actual clients — the Syndicates.

Ultimately, Plaintiffs' malpractice claim against the Aprio Defendants can only succeed if Plaintiffs will be able to prove that they were the Aprio Defendants' clients.  As the Aprio Defendants note, "Georgia law, . . . provides only one cause of action to persons who are not clients of an accounting firm but who wish to sue the firm and any of its accountants for professional malpractice: an action for negligent misrepresentation."  *White*, 549 S.E.2d at 492.  Plaintiffs cite *Badische*

*Corp. v. Caylor*, 356 S.E.2d 198 (Ga. 1987), for the proposition that liability for professional malpractice may nevertheless extend to "those persons, or the limited class of persons who the professional is actually aware will rely upon the information he prepared," *id.* at 200.  However, the plaintiffs in *Badische* did not attempt to raise both claims of negligent misrepresentation and claims of professional malpractice, as Plaintiffs do here.  The negligence claim raised by the plaintiffs in *Badische* could be construed as a single negligent misrepresentation claim instead of a malpractice claim, which is how the Court construes the negligence claim against the Aprio Defendants here to the extent Plaintiffs were not the Aprio Defendants' clients.  Thus, to the extent Plaintiffs are not the Aprio Defendants' clients, their professional malpractice claim cannot succeed.

That being said, the Court finds that, based on the extent of work the Aprio Defendants performed for Plaintiffs in preparing their tax returns or alternatively, documents to be attached to their returns there is at least a question of fact as to whether Plaintiffs were the Aprio Defendants' clients.  And assuming for purposes of the pleading stage that Plaintiffs were the Aprio Defendants' clients, the same allegations that establish fraudulent and negligent misrepresentation claims against the Aprio Defendants would also establish that the Aprio Defendants negligently provided the services through which they allegedly made these same representations.  At least for now, Plaintiffs therefore state a claim against the Aprio Defendants for professional malpractice.

### 7.  Negligence/Professional Malpractice Against Sirote (Count XI)

Plaintiffs also raise a professional malpractice claim against Sirote based on its preparation of the Legal Opinion for Maple Landing.  The gravamen of this claim is that Sirote negligently breached its duty of care in providing the Legal Opinion by recommending that the Dalba Plaintiffs and other potential investors invest in the Maple Landing Syndicate and that, relying on this advice, these individuals invested in the Syndicate and suffered damages.  (Am. Compl., Doc. 155 ¶ 363–68.)

Like the Aprio Defendants, Sirote argues that it cannot be liable to the Dalba Plaintiffs for professional malpractice because the Dalba Plaintiffs were not its clients.  (Sirote's MTD, Doc. 172-1 at 14.)  In their opposition, Plaintiffs argue that the Dalba Plaintiffs and other investors in the Maple Landing Syndicate were Sirote's clients on the theory that the Maple Landing Legal Opinion was addressed to both the Syndicate and its members.  (Pls.' Opp'n to Sirote's MTD, Doc. 189 at 21–22.)  But even if both the Maple Landing Syndicate itself and the members of the Maple Landing Syndicate were Sirote's clients, Plaintiffs' argument attempts to stretch the scope of the potential attorney-client relationship a step further; their argument presumes that, in addition to the Syndicate and the Syndicate's existing members, prospective investors in the Syndicates who were not yet members of the Syndicate could somehow qualify as Sirote's clients too.  It may well be that Sirote intended for individuals who were not its clients to rely on the

representations contained in its Legal Opinion, and if so, that could potentially serve as grounds for a negligent misrepresentation claim against Sirote by individuals who were not Sirote's clients. But the legal malpractice claim Plaintiffs attempt to assert here can only be raised by Sirote's clients. And the Court cannot plausibly conclude that, in addition to having an attorney-client relationship with the Syndicate *and* its existing members, Sirote also had an attorney-client relationship with any potential future members of the Maple Landing Syndicate who might read its Legal Opinion. Because an attorney-client relationship must exist for Plaintiffs' professional malpractice claim to succeed against Sirote, the Court therefore **DISMISSES** this claim.

### 8.   Breach of Fiduciary Duty Against the Aprio Defendants (Count VII)

In addition to their fraud- and negligence-based claims, Plaintiffs separately claim that the Aprio Defendants breached their fiduciary duties to Plaintiffs. To state a claim for a breach of fiduciary duty, a plaintiff must show (1) "the existence of a fiduciary duty"; (2) "breach of that duty"; and (3) "damage proximately caused by the breach." *Burds v. Hipes*, 763 S.E.2d 887, 890 (Ga. Ct. App. 2014) (quoting *Bedsole v. Action Outdoor Advertising JV*, 750 S.E.2d 445, 452 (Ga. Ct. App. 2013)).

Plaintiffs' breach of fiduciary duty claim is premised on their allegations that the Aprio Defendants failed to disclose conflicts of interest. (Am. Compl., Doc. 155 ¶ 344.) They argue that these conflicts of interest arose both in the context of the

conservation easement transactions in which Plaintiffs took part and in the subsequent audits and Tax Court proceedings in which the Aprio Defendants were representing the Syndicates.  Plaintiffs claim that the Aprio Defendants owed fiduciary duties to them because Plaintiffs placed their "trust and confidence" in them for purposes of providing Plaintiffs with tax advice and defending Plaintiffs' claimed deductions before the IRS and the Tax Court.  (*Id.*)  Plaintiffs claim, effectively, that the Aprio Defendants breached their duties of "honesty, loyalty, care, and adherence to the applicable codes of professional responsibility" because they were working to advance the SCE Strategy that defrauded Plaintiffs instead of serving Plaintiffs' best interests.  (*Id.*)  Plaintiffs also claim that during the audits the Aprio Defendants failed to disclose that Greenberger himself was under investigation by the IRS.  (*Id.* ¶ 195.)  They ostensibly argue that the Aprio Defendants' failure to disclose this fact to Plaintiffs constituted a breach of fiduciary duty as well.  (Pls.' Opp'n to Aprio Defs.' MTD, Doc. 188 at 31.)

The Aprio Defendants argue that Plaintiffs' breach of fiduciary duty claim should be dismissed as duplicative of Plaintiffs' malpractice claim.  (Aprio Defs.' MTD, Doc. 170-1 at 50 n.43).  But as Plaintiffs point out, (Pls.' Opp'n to Aprio Defs.' MTD, Doc. 188 at 45), their allegations in support of their breach of fiduciary duty claim stem from the Aprio Defendants' alleged failures to disclose conflicts of interest rather than their alleged negligence in providing professional services.  If true, these conflict of interest allegations could constitute an independent tort.

In some respects, resolution of this claim would depend on the resolution of Plaintiffs' fraud-based claims insofar as it depends on Plaintiffs proving that the Aprio Defendants had a conflict of interest because they were engaging in a fraudulent scheme. If the Aprio Defendants were not actually engaging in a fraudulent scheme, it would be difficult for Plaintiffs to show that the Aprio Defendants had any conflicts of interest. On the other hand, Plaintiffs also claim that the Aprio Defendants failed to disclose relevant information that Plaintiffs should have known during the audits — that the Aprio Defendants themselves allegedly were involved in legal disputes with the IRS. Plaintiffs also allege in the Amended Complaint that one of the Appraisers had been suspended "for preparing sham appraisals" in connection with the SCE Strategy, and that the other Appraiser was involved in an IRS enforcement proceeding, (Am .Compl., Doc. 155 ¶ 195), yet the Aprio Defendants apparently did not disclose these facts to Plaintiffs either. Had Plaintiffs been aware of any of these alleged facts, they may have been less inclined to place their trust in the Aprio Defendants to challenge the IRS's decision to disallow Plaintiffs' claimed tax deductions.

The Court would require a more fully developed factual record to conclusively resolve this claim. At present, it is not clear whether the Aprio Defendants actually had any conflicts of interest that they failed to disclose, and the Court is unaware of the details of the legal matters Plaintiffs referenced involving Greenberger and the Appraisers. But at least for now, acknowledging that it must construe the allegations in the Amended Complaint in the light most

favorable to Plaintiffs, the Court will allow Plaintiffs' breach of fiduciary duty claim to proceed.

### 9.   Disgorgement Against the Aprio Defendants (Count VIII)

Relatedly, Plaintiffs raise an additional claim against the Aprio Defendants arguing "they should be required to disgorge all payments received by them from any party including Plaintiffs . . . for work performed in connection with the SCE Strategy." (*Id.* ¶ 348.)  This claim is simply a remedy dressed up as a substantive count.  Plaintiffs are welcome to request disgorgement as a possible remedy in the event that they are successful on the merits, but for now this claim is **DISMISSED** as a substantive Count.

### 10.   Aiding and Abetting Against Everyone Except for the Aprio Defendants (Count X)

As another tack on to their breach of fiduciary duty claim against the Aprio Defendants, Plaintiffs raise a separate claim against all Defendants except for the Aprio Defendants alleging that each of these Defendants aided and abetted the Aprio Defendants' breaches of fiduciary duty.  (*Id.* ¶ 359.)  Unlike claims of aiding and abetting acts of fraud, which are not recognized as independent torts under Georgia law and are instead treated as substantive fraud claims, *Siavage v. Gandy*, 829 S.E.2d 787, 790 (Ga. Ct. App. 2019), Georgia law recognizes claims of aiding or abetting a breach of fiduciary duty as a distinct tort separate from the underlying breach of fiduciary duty.  To establish a claim of aiding and abetting a breach of fiduciary duty, a plaintiff must prove the following elements:

(1) "through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff";

(2) "with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure";

(3) "the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty";

(4) "the defendant's tortious conduct proximately caused damage to the plaintiff."

*White v. Shamrock Bldg. Sys., Inc.*, 669 S.E.2d 168, 172 (Ga. Ct. App. 2008).

Plaintiffs' allegations in support of their aiding and abetting a breach of fiduciary duty claim largely rely on formulaic recitations of the elements of the claim.  In an effort to establish the first element, Plaintiffs allege that  "[e]ach of the Defendants' wrongful conduct procured the breach of the primary wrongdoer's fiduciary duty." (Am. Compl., Doc. 155 ¶  359.)  But Plaintiffs do not explain *how* any of the Defendants "procured the breach" of any of the Aprio Defendants' fiduciary duties.

Plaintiffs provide some further explanation of their theory in their opposition to GALT's motion to dismiss.  In that brief Plaintiffs state that GALT "verif[ied] as accurate" the Aprio Defendants' representations in the Form 8283s, and represented that the donations of the easements GALT received from the Maple Landing and Oakhill Woods Syndicates were "fully tax deductible."  (Pls.' Opp'n to GALT's MTD, Doc. 191 at 42.)  Plaintiffs argue that this enabled the Aprio Defendants to misrepresent to Plaintiffs that those transactions "complied with all

applicable tax laws." (*Id.* at 42–43.) Although these allegations could conceivably support a claim of aiding and abetting fraudulent representations or omissions on the part of the Aprio Defendants, if such a claim were cognizable under Georgia law, they bear no relation to the Aprio Defendants' alleged breaches of fiduciary duty. Unlike Plaintiffs' fraud- and negligence-based claims against the Aprio Defendants, Plaintiffs' breach of fiduciary duty claim against the Aprio Defendants is premised on the Aprio Defendants' alleged failure to disclose conflicts of interest. Yet Plaintiffs do not explain how GALT or any other Defendant "acted to procure" the Aprio Defendants' failure to disclose the alleged conflicts. The other Defendants in this case may have assisted the Aprio Defendants in other ways, but Plaintiffs do not allege that any Defendant induced the Aprio Defendants' nondisclosure of their purported conflicts of interest. Accordingly, Plaintiffs' aiding and abetting claim fails. *See Curry v. TD Ameritrade, Inc.*, No. 1:14-cv-1361, 2015 WL 1125449, at *15 (N.D. Ga. June 30, 2015) (dismissing aiding and abetting breach of fiduciary duty claim because the complaint was "devoid of any evidence or allegation that Defendants *induced* Alleca to breach his duties to Plaintiffs" (emphasis in original)).

### 11.   Civil Conspiracy (Count XII)

At last, the Court reaches Plaintiffs' final claim — civil conspiracy. Under Georgia law, civil conspiracy is "a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Mustaqeem-Graydon v. SunTrust Bank*, 573 S.E.2d 455, 461 (Ga. Ct.

App. 2002) (citation omitted).  In their Amended Complaint, Plaintiffs allege that each Defendant is liable for civil conspiracy for conspiring to commit acts of fraud and breaches of fiduciary duty.  (Am. Compl., Doc. 155 ¶ 373.)  This claim fails for essentially the same reason as Plaintiffs' conspiracy to violate Federal and Georgia RICO claims:  Plaintiffs offer only conclusory assertions that Defendants had a "meeting of the minds" through which they mutually agreed to engage in tortious conduct.  (*Id.* ¶ 376.)

Although Plaintiffs have plausibly alleged that some Defendants have committed unlawful acts individually, as Defendants note, "there are no factual allegations setting forth any basis for a mutual understanding" among the Defendants "to accomplish an unlawful end or to accomplish a lawful end by unlawful means."  (ACC Defs.' MTD, Doc. 171-1 at 46.)  To be sure, the existence of a conspiracy agreement may be inferred from the circumstances, but "the law does not authorize a finding that conspiracy exists merely because of some speculative suspicion."  *First Fed. Fin. Sav. Bank v. Haty*, 363 S.E.2d 832, 833 (Ga. Ct. App. 1987).  Without further factual support for the existence of a conspiracy, Plaintiffs' civil conspiracy claim cannot succeed.  *See id.* ("[T]he mere fact that conspiracy has been alleged does not require submission of the question to a jury where there is no evidence of record that the alleged conspirators either positively or tacitly came to a mutual understanding to accomplish an unlawful end or to accomplish a lawful end by an unlawful means.").  Because Plaintiffs have failed to provide that further factual support, Plaintiffs' civil conspiracy claim is **DISMISSED**.

## V.    Conclusion

To recap, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Strike or Disregard Extrinsic Evidence [Doc. 187].  The Court **DENIES** Plaintiffs' motion insofar as it applies to the Promotional Materials referenced in the Amended Complaint and the language Defendants quoted from a Tax Court Order in a matter involving Oakhill Woods.  The Court will not strike any of the extrinsic evidence referenced in Defendants' motions to dismiss, but the Court disregards that evidence for purpose of resolving Defendants' motions.  The Court also declines to dismiss Plaintiffs' claims at this stage on the theories that Plaintiffs' claims are time-barred, that Plaintiffs lack standing to pursue their claims, or that the Court lacks personal jurisdiction over Sirote.

As for the merits of Defendants' motions dismiss, the Court **GRANTS** Defendants' motions to dismiss Plaintiffs' Federal RICO claims on the ground that Plaintiffs cannot establish the "enterprise" element of a Federal RICO claim.

The Court also **GRANTS** Defendants' motions to dismiss Plaintiffs' conspiracy to violate Federal RICO and conspiracy to violate Georgia RICO claims because Plaintiffs have not plausibly alleged that any Defendant made an agreement with any other Defendant to violate the substantive provisions of either of those statutes.

The Court **DENIES** Defendants' motions to dismiss Plaintiffs' Georgia RICO claims against Defendants Aprio, Greenberger, Tennille, Zak, and Forever Forests because Plaintiffs have plausibly alleged that each of these Defendants

committed a pattern of racketeering activity under that statute that proximately caused Plaintiffs' losses of money or personal property; however, the Court **GRANTS** Defendants' motions to dismiss Plaintiffs Georgia RICO claims as to the remaining Defendants.

The Court **DENIES** Defendants' motions to dismiss Plaintiffs' fraud claims against Defendants Aprio, Greenberger, Tennille, Zak, and Forever Forests based on the same allegations of mail and wire fraud that form the basis of Plaintiffs' Georgia RICO claims against these Defendants, but the Court **GRANTS** Defendants' motions to dismiss Plaintiffs' fraud claims as to the remaining Defendants.

The Court **DENIES** Defendants' motions to dismiss Plaintiffs' negligent misrepresentation claims against Defendants Aprio, Greenberger, Tennille, Zak, and Forever Forests because the same allegations that lead the Court to conclude that Plaintiffs have stated fraud claims against these Defendants necessarily lead the Court to conclude that Plaintiffs have stated negligence claims against these Defendants. Additionally, the Court **DENIES** Defendants' motions to dismiss Plaintiffs' negligent misrepresentation claims against Sirote and Jowers. Although Plaintiffs have not plausibly alleged that these Defendants committed fraudulent misrepresentations on the theory that they knew that the representations they made were false, Plaintiffs have plausibly alleged that they *should have known* that these representations were false. The Court **GRANTS** Defendants' motions to

dismiss Plaintiffs' negligent misrepresentation claims as to the remaining Defendants.

The Court **DENIES** Aprio and Greenberger's motion to dismiss Plaintiffs' professional malpractice claim because Plaintiffs have plausibly alleged that they were the Aprio Defendants' clients and that these Defendants negligently provided professional services in connection with the transactions in which Plaintiffs took part and proximately caused injuries to Plaintiffs.  But the Court **GRANTS** Sirote's motion to dismiss Plaintiffs' professional malpractice claim because Plaintiffs have not plausibly alleged that they were Sirote's clients.

The Court **DENIES** Aprio and Greenberger's motion to dismiss Plaintiffs' breach of fiduciary duty claim based on the Aprio Defendants' alleged failure to disclose conflicts of interest.   However, the Court **GRANTS** Aprio and Greenberger's motion to dismiss Plaintiffs' disgorgement claim because it is a remedy rather than a substantive Count.

Finally, the Court **DENIES** Defendants' motions to dismiss Plaintiffs' claims of aiding and abetting and civil conspiracy because Plaintiffs have not plausibly alleged that any Defendants acted to procure the Aprio Defendants' alleged breaches of fiduciary duty or that any Defendants agreed with one another to commit tortious conduct.

A summary of the Court's rulings on Defendants' motions to dismiss is included in the table below:

| Doc. No. | Motion | Ruling |
|---|---|---|
| 170 | Aprio and Greenberger's Motion to Dismiss | **GRANTED** with respect to Federal RICO (Count I), conspiracy to violate Federal RICO (Count II), conspiracy to violate Georgia RICO (Count IV), Disgorgement (Count VIII), and civil conspiracy (Count XII) claims; **DENIED** with respect to remaining claims |
| 171 | ACC and Keller's Motion to Dismiss | **GRANTED** in full |
| 172 | Sirote's Motion to Dismiss | **GRANTED** with respect to Federal RICO (Count I), conspiracy to violate Federal RICO (Count II), Georgia RICO (Count III), conspiracy to violate Georgia RICO (Count IV), fraud (Count IX), aiding and abetting (Count X), negligence/professional malpractice (Count XI), and civil conspiracy (Count XII) claims; **DENIED** with respect to remaining claims |
| 173 | Large & Gilbert's Motion to Dismiss | **GRANTED** in full |
| 177 | Jowers's Motion to Dismiss | **GRANTED** with respect to Federal RICO (Count I), conspiracy to violate Federal RICO (Count II), Georgia RICO (Count III), conspiracy to violate Georgia RICO (Count IV), fraud (Count IX), aiding and abetting (Count X), and civil conspiracy (Count XII) claims; **DENIED** with respect to remaining claims |
| 179 | Zak and Forever Forests' Motion to Dismiss | **GRANTED** with respect to Federal RICO (Count I), conspiracy to violate Federal RICO (Count II), conspiracy to violate Georgia RICO (Count IV), aiding and abetting (Count X), and civil conspiracy (Count XII) claims; **DENIED** with respect to remaining claims |
| 180 | Smith and SLH's Motion to Dismiss | **GRANTED** in full |

| 181 | Baker Donelson's Motion to Dismiss | **GRANTED** in full |
|---|---|---|
| 182 | Tennille's Motion to Dismiss | **GRANTED** with respect to Federal RICO (Count I), conspiracy to violate Federal RICO (Count II), conspiracy to violate Georgia RICO (Count IV), aiding and abetting (Count X), and civil conspiracy (Count XII) claims; **DENIED** with respect to remaining claims |
| 183 | GALT's Motion to Dismiss | **GRANTED** in full |

Accordingly, Defendants Atlantic Coast Conservancy, Inc.; Robert D. Keller; Large & Gilbert, Inc.; David C. Smith; Smith, Lewis & Haley, LLP; Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.; and Georgia Alabama Land Trust, Inc. are **DISMISSED** from this case.

Aside from Plaintiffs' claims against the Clower Defendants, who have yet to respond to the Amended Complaint, the following claims remain:

| Count III | Georgia RICO against Aprio, Greenberger, Tennille, Zak, and Forever Forests |
|---|---|
| Count V | Negligence/professional malpractice against Aprio and Greenberger |
| Count VI | Negligent misrepresentation against Aprio, Greenberger, Tennille, Zak, Forever Forests, Sirote, and Jowers |
| Count VII | Breach of fiduciary duty against Aprio and Greenberger |
| Count IX | Fraud against Aprio, Greenberger, Tennille, Zak, and Forever Forests |

As a final note, the Court acknowledges that Plaintiffs have requested leave to file a Second Amended Complaint in the event that the Court denied any of their claims. Given that Plaintiffs have already amended their complaint once, and the

parties have had a full opportunity to brief the issues involved, the Court believes that the wiser course is to proceed with discovery on Plaintiffs' remaining claims.

The Court strongly encourages the parties to perform targeted discovery on the issues that could potentially resolve or streamline this case — such as whether Plaintiffs have standing, whether Plaintiffs' claims are time-barred, and whether Plaintiffs reasonably relied on Defendants' alleged misrepresentations and omissions[33] — instead of endeavoring to perform discovery on all issues at the same time.  With that in mind, the Court **ORDERS** the parties to meet and confer to discuss a plan for approaching discovery, and ultimately summary judgment, on a narrower set of issues.  The parties are further **ORDERED** to appear for a Status Conference on **November 4, 2021 at 10:30 A.M.** via video conference to discuss their plans for proceeding with discovery and summary judgment and to file any preliminary agreements the parties have reached regarding case management by **October 26, 2021**.  In the meantime, Defendants are directed to promptly file Answers to the Amended Complaint.

**IT IS SO ORDERED** this 30th day of September, 2021.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**

---

[33] The Court believes that these issues should be conclusively resolved before the parties proceed with class certification, as they may lead to a full resolution of the case on the merits.  But for purposes of the November 4, 2021 hearing, Plaintiffs should be prepared to provide the Court with an updated estimate of their claimed damages, the number of proposed class members, and the percentage of those proposed class members who are Georgia residents.