# EXHIBIT B

Summary No. _____          Name of Offeree: _____

## CONFIDENTIAL PRIVATE OFFERING SUMMARY

# MAPLE LANDING, LLC

---

**95 Units ($1,995,000)**
**$21,000 per Unit**
**This is an All or None Offering.**

### Minimum Subscription Per Investor:  1 Unit ($21,000)

Maple Landing, LLC, a Georgia limited liability company (the "Company" "we" or "us"), is offering units of membership interest in the Company (the "Units") to **Accredited Investors Only** at an offering price of $21,000 per Unit (the "Offering Price"). Each Unit represents a pro rata ownership interest in the assets, profits, losses and distributions of the Company.  A total of 95 Units (the "Offered Units") are being offered (the "Offering") pursuant to this Confidential Private Offering Summary (this "Offering Summary"), representing an aggregate 95% ownership interest in the Company. No public market currently exists for our Units, and no such market will develop as a result of this Offering.

The Company was formed for the purpose of acquiring and owning approximately 283.42 acres of unimproved real estate currently owned by it located in Effingham County, Georgia, as further identified on the survey attached hereto as Exhibit D (the "Property").

The purpose of this Offering is to raise money from investors (the "Investors") to permit the Company to redeem on a pro rata basis an equal number of Units sold in this Offering (the "Redeemed Units") from the following Members of the Company: WDHL Investments, LLC, a Georgia limited liability company ("WDHL"), LDHL Investments LLC, a Georgia limited liability company ("LDHL"), and Julienton Investments LLC, a Georgia limited liability company ("Julienton", and together with WDHL and LDHL, the "Sellers"), each of which currently owns 33 Units, or 33% of the issued and outstanding Units in the Company.  The remaining 1 Unit, or 1% of the issued and outstanding Units in the Company, is owned by Effingham Managers LLC, a Georgia limited liability company ("Effingham Managers"). Effingham Managers currently serves as the manager of the Company (the "Manager"), and is owned by the Sellers.

The redemption price for a Redeemed Unit (the "Redemption Price") will be $18,421.53. The remaining $2,578.47 per Unit, approximately $244,955 in the aggregate, raised in the Offering will be used by the Company to fund its operating costs, pay the expenses of the Offering, and establish certain reserves as described in this Offering Summary.  The redemption of the Redeemed Units shall occur immediately following the closing of this Offering (the "Closing").

The minimum investment amount per investor is $21,000, or one Unit, which we may waive in our sole discretion.  This is an "All or None" Offering, and we must receive and accept subscriptions for all of the Offered Units by December 27, 2010 for this Offering to close. If subscriptions for fewer than all of the Offered Units are received and accepted and the conditions set forth in this Offering Summary are not satisfied by December 24, 2010 (the "Termination Date"), the Offering will be terminated and all payments will be returned to the subscribers without interest or deduction.  If subscriptions for all of the Offered Units are received and accepted and the conditions set forth in this Offering Summary are satisfied by the Termination Date, the Company will close the Offering and accept subscription funds for use in accordance with the terms of this Offering Summary.

**NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THESE SECURITIES OR PASSED UPON THE ADEQUACY OR ACCURACY OF THIS OFFERING SUMMARY OR ANY OF THE OTHER INFORMATION AND MATERIALS PROVIDED TO PROSPECTIVE INVESTORS IN CONNECTION WITH THIS OFFERING. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

---

**The date of this Offering Summary is December 18, 2010.**



EXHIBIT
8

THIS IS A SPECULATIVE OFFERING

DOCSBHM\1753430\4

We determined the offering price of the Units in our sole discretion, and it is not necessarily indicative of the actual fair market value of the Units, our assets, earnings, book value, or other recognized criteria of value. **AN INVESTMENT IN THE UNITS OR IN OUR COMPANY IS SPECULATIVE, INVOLVES A HIGH DEGREE OF RISK, AND SHOULD BE CONSIDERED ONLY BY INVESTORS WHO CAN BEAR THE ECONOMIC RISKS OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD AND THAT CAN AFFORD TO SUSTAIN A TOTAL LOSS OF THEIR INVESTMENT.** Prospective investors should carefully consider all of the information set forth in this Offering Summary and, in particular, under the heading "Risk Factors" beginning on page 8 of this Offering Summary. In making an investment decision, investors must rely on their own examination of our Company and the terms of this Offering, including the merits and risks involved.

| | Price to Offerees [1][3][5] | Selling Commissions [4] | Redemption Price [6] | Net proceeds to Company [6] |
|---|---|---|---|---|
| **Per Minimum Subscription of $21,000** | $ 21,000 | $0 | $ 18,421 | $ 2,578 |
| **Total Offering** | $ 1,995,000 | $0 | $ 1,750,045 | $ 244,955 |

(1) The offering price per Unit is not been based on any objective valuation criteria, such as book value or earnings per share, but instead has been set at the discretion of the Manager of the Company and not as a result of arm's length negotiations. No representation is made that a Unit has a market value of $21,000.00 or could be sold at that price. There is no established market for the Units, and no affirmation is made that there ever will be an established market. (See "RISK FACTORS" beginning on page 8).

(2) The Offering will end on December 27, 2010. All proceeds from the sale of the Units (the "Subscription Funds") will be held pursuant to the terms of the Escrow Agreement, the form of which is attached hereto as Exhibit G, by Oakworth Capital Bank in Birmingham, Alabama ("Escrow Agent"), until the earlier of the Termination Date or the receipt of subscriptions for all Offered Units. Upon the sale of all of the Offered Units prior to the Termination Date, all Subscription Funds will be delivered to the Company and deposited in the Company's bank account and used for the purposes discussed in this Offering Summary. If subscriptions for less than all Offered Units have been received by the Termination Date, then the Company shall terminate the Offering and refund the Subscription Funds to Investors without interest or deduction.

(3) 95 Units are being offered for sale in this Offering. The purchase price for the Units is payable in full at the time of subscription. To purchase a Unit an Investor must complete and execute the Subscription Documents accompanying this Offering Summary, including the Subscription and Suitability Agreement and Confidential Investor Questionnaire. (See "HOW TO INVEST" beginning on page 5).

(4) The Company will not pay commissions upon the sale of the Units. The Company intends to sell the Units acting in its capacity as the issuer.

(5) There are currently 100 Units issued and outstanding that are collectively held by the Sellers and the Manager, 95 of which are held by the Sellers are subject to redemption for the Redemption Price, immediately after the Closing.

(6) Net proceeds to the Company are calculated before deducting the expenses incurred in connection with this Offering to be paid by the Company, such as legal, accounting, reproduction, filing fees, appraisal fees, site preparation work, project management fees, and other miscellaneous items, which are estimated to be $108,305. (See "SOURCE AND USE OF FUNDS" at page 17).

## CONFIDENTIAL INFORMATION

This Offering Summary and any other information or documents delivered in connection with this Offering Summary are being furnished on a confidential basis solely for use by potential Investors in considering whether or not to purchase a Unit in this Offering. By accepting delivery of the Offering Summary and related documents and information you acknowledge and agree that (a) all of the information contained in this Offering Summary and any related documents and information is confidential and proprietary to us, (b) you will not reproduce this Offering Summary or any related documents or information, in whole or in part, (c) if you do not wish to participate in the Offering, you will return this Offering Summary to us as soon as practicable, together with any other material relating to the Company that you may have received, and (d) you will obtain our prior written consent before taking any proposed actions that are inconsistent in any manner with the foregoing statements.

P0000025

## GENERAL DISCLAIMERS ABOUT THIS OFFERING SUMMARY

This Offering Summary and the other information and materials provided in connection with this Offering constitute an offer only to the person whose name appears in the log we maintain in connection with the distribution of such materials and who has represented to us in writing that he, she or it is an Accredited Investor, as defined in Regulation D as promulgated by the United States Securities and Exchange Commission. Delivery of such materials to anyone other than the person named or such person's designated representative is unauthorized, and any reproduction of such materials, in whole or in part, without our prior written consent is prohibited.

We are not giving legal, business or tax advice, and prospective Investors are not to construe the contents of this Offering Summary and the other information and materials provided in connection with this Offering as such. You should consult your attorney or business advisor as to the legal, business, tax, and related matters concerning your investment. You are urged to request any additional information that you may consider necessary in making an informed investment decision. If you have questions concerning the terms and conditions of the Offering or to obtain additional relevant information, we will provide the answers to the extent we possess such information or can acquire it without unreasonable effort or expense. All such additional information shall only be in writing and identified as such by us. Inquiries concerning such additional information should be directed to the Manager as set forth in this Offering Summary.

We are not making any representation to you regarding the legality of an investment in the Units under any applicable laws. No person has been authorized to give any information or to make any representations in connection with this Offering unless preceded or accompanied by this Offering Summary and the other information and materials provided and made available to you herewith, nor has any person been authorized to give any information or to make any representation other than that contained in this Offering Summary and the other information and materials provided and made available to you herewith and, if given or made, such information or representations must not be relied upon. This Offering Summary and the other information and materials provided in connection with this Offering do not constitute an offer or solicitation in any jurisdiction in which it is unlawful to make such offer or solicitation or to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction. Neither the delivery of this Offering Summary and the other information and materials provided in connection with this Offering nor any sale made hereunder shall, under any circumstances, create an implication that there has been no change in the affairs of the Company since the date hereof.

## GENERAL SECURITIES LEGEND

**THE UNITS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT") OR THE SECURITIES LAWS OF ANY OTHER STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON THE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS PROVIDED BY THOSE ACTS. THE UNITS MAY NOT BE RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, OR PURSUANT TO REGISTRATION OR AN EXEMPTION THEREFROM. PROSPECTIVE INVESTORS SHOULD PROCEED ON THE ASSUMPTION THAT THEY MUST BEAR THE ECONOMIC RISK ASSOCIATED WITH PURCHASING THE UNITS FOR AN INDEFINITE PERIOD OF TIME.**

**THE U.S. SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING CIRCULAR OR SELLING LITERATURE. THESE SECURITIES ARE OFFERED UNDER AN EXEMPTION FROM REGISTRATION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THESE SECURITIES ARE EXEMPT FROM REGISTRATION.**

P0000026

## NASAA UNIFORM LEGEND

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY.  FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.  INVESTORS SHOULD BE MADE AWARE THAT THEY WILL BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

NO REGISTRATION STATEMENT HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION WITH RESPECT TO THIS OFFERING, AND THE UNITS BEING OFFERED HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT. THE UNITS ARE BEING OFFERED AND SOLD IN RELIANCE ON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, AND THE UNITS MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT.  THE UNITS BEING OFFERED HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THIS OFFERING SUMMARY.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS OFFERING SUMMARY DOES NOT CONSTITUTE AN OFFER OR A SOLICITATION OF AN OFFER TO ACCEPT AND/OR MAKE SUBSCRIPTIONS FOR THE UNITS OR TO SELL AND/OR BUY THE UNITS.  ACCEPTANCE OF A RECIPIENT'S SUBSCRIPTION FOR THE UNITS SHALL BE MADE ONLY AFTER IT HAS BEEN DETERMINED THAT SUCH RECIPIENT SATISFIES THE REQUIREMENTS FOR AN EXEMPTION FROM REGISTRATION AND THE FACTORS SET FORTH IN THE SECTION ENTITLED INVESTOR SUITABILITY. DELIVERY OF THIS OFFERING SUMMARY FOR INFORMATIONAL PURPOSES SHALL NOT CONSTITUTE AN OFFER TO SELL OR SOLICITATION OF AN OFFER TO BUY SECURITIES.  THIS OFFERING SUMMARY DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE TO ANY PERSON TO WHOM SUCH OFFER OR SOLICITATION WOULD BE UNLAWFUL.

INVESTMENT IN THE UNITS IS SPECULATIVE AND INVOLVES A RISK OF LOSS.  THE UNITS WILL NOT BE FREELY TRANSFERABLE AFTER THE OFFERING AND ANY TRANSFER OF SUCH SECURITIES WILL BE SUBJECT TO COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS.  THE UNITS SHOULD BE PURCHASED ONLY BY PERSONS OF SUBSTANTIAL MEANS WHO HAVE NO NEED FOR LIQUIDITY WITH RESPECT TO THIS INVESTMENT AND WHO CAN BEAR THE ECONOMIC RISK OF A TOTAL LOSS OF THEIR INVESTMENT.   EACH OFFEREE SHOULD CAREFULLY CONSIDER THE INFORMATION UNDER "RISK FACTORS" AND "INVESTOR SUITABILITY."

THE COMPANY RESERVES THE RIGHT IN ITS SOLE DISCRETION AND FOR ANY REASON WHATSOEVER TO MODIFY, AMEND OR WITHDRAW THIS OFFERING, TO ACCEPT OR REJECT IN WHOLE OR IN PART ANY SUBSCRIPTION FOR THE UNITS OFFERED HEREBY, OR TO ALLOT TO AN INVESTOR FEWER THAN THE NUMBER OF UNITS DESIRED TO BE

P0000027

PURCHASED. NEITHER THE COMPANY NOR THE MANAGER SHALL HAVE ANY LIABILITY WHATSOEVER TO YOU IN THE EVENT THAT ANY OF THE FOREGOING OCCURS.

---

ALL DOCUMENTS REFERRED TO IN THIS OFFERING SUMMARY BUT NOT ATTACHED AS EXHIBITS ARE AVAILABLE FOR INSPECTION BY A PROSPECTIVE INVESTOR OR HIS REPRESENTATIVE AT THE OFFICE OF THE COMPANY. THE OBLIGATIONS OF THE PARTIES TO THE TRANSACTIONS CONTEMPLATED BY THIS OFFERING SUMMARY ARE DESCRIBED IN AND WILL BE GOVERNED BY THE DOCUMENTS ATTACHED AS EXHIBITS AND/OR REFERRED TO HEREIN.  ALL STATEMENTS AND INFORMATION CONTAINED IN THIS OFFERING SUMMARY ARE QUALIFIED IN THEIR ENTIRETY BY THOSE DOCUMENTS. CONSEQUENTLY, PROSPECTIVE INVESTORS ARE URGED TO READ CAREFULLY THE DOCUMENTS ATTACHED TO AND/OR REFERENCED IN THIS OFFERING SUMMARY.

---

RECIPIENTS ARE NOT TO CONSTRUE THE CONTENTS OF THIS OFFERING SUMMARY OR ANY PRIOR OR SUBSEQUENT COMMUNICATIONS, WHETHER WRITTEN OR ORAL, FROM THE COMPANY OR ANY PERSON ASSOCIATED WITH THIS OFFERING AS LEGAL, TAX OR INVESTMENT ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT HIS OWN PERSONAL LEGAL COUNSEL, TAX ADVISOR, BUSINESS ADVISOR AND "PURCHASER REPRESENTATIVE" (AS SUCH TERM IS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT) AS TO LEGAL, TAX, ECONOMIC AND RELATED MATTERS CONCERNING THIS INVESTMENT AND ITS SUITABILITY.

---

IN THE EVENT A PROSPECTIVE INVESTOR SUBSCRIBES FOR ANY UNITS, HE ACKNOWLEDGES THAT HE DOES NOT ANTICIPATE THAT HE WILL BE REQUIRED TO LIQUIDATE ANY PORTION OF SUCH INVESTMENT IN THE FORESEEABLE FUTURE AND THAT HE UNDERSTANDS OR HAS BEEN ADVISED WITH RESPECT TO THE RISK FACTORS ASSOCIATED WITH SUCH INVESTMENT.  EACH INVESTOR WILL BE REQUIRED TO REPRESENT TO THE COMPANY IN WRITING IN THE SUBSCRIPTION AND SUITABILITY AGREEMENT AND INVESTOR REPRESENTATION AGREEMENT (FORMS OF WHICH ARE ATTACHED HERETO AS EXHIBITS E AND F) THAT (i) HE IS AN ACCREDITED INVESTOR, (ii) CERTAIN FACTS AND CIRCUMSTANCES REGARDING HIS FINANCIAL CONDITION AND RESOURCES ARE TRUE, AND (iii) HE IS PURCHASING THE UNITS FOR INVESTMENT PURPOSES ONLY AND NOT WITH A VIEW TOWARD RESALE.

---

NO GENERAL SOLICITATION OR ADVERTISING WHATSOEVER WILL BE EMPLOYED IN THE OFFERING OF UNITS DESCRIBED IN THIS OFFERING SUMMARY.  NO PERSON HAS BEEN AUTHORIZED BY THE COMPANY TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS CONCERNING THE COMPANY OR THIS OFFERING OTHER THAN THE REPRESENTATIONS CONTAINED IN AND INFORMATION PROVIDED IN OR WITH THIS OFFERING SUMMARY, AND, IF GIVEN OR MADE, SUCH OTHER REPRESENTATIONS OR INFORMATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE COMPANY. NEITHER THE DELIVERY OF THIS OFFERING SUMMARY NOR ANY SALES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, IMPLY THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE COMPANY DESCRIBED HEREIN SINCE THE DATE HEREOF, OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY TIME AFTER THE DATE OF THIS OFFERING SUMMARY.

---

P0000028

## FORWARD LOOKING STATEMENTS

This Offering Summary contains, in addition to historical information, forward-looking statements. Forward-looking statements made in this Offering Summary are subject to risks and uncertainties. Forward-looking statements include statements that are predictive in nature, which depend upon or refer to future events or conditions, which include words such as "believes," "plans," "anticipates," "estimates," "expects", "intends", "seeks" or similar expressions. In addition, any statements we may provide concerning future financial performance, ongoing business strategies or prospects, and possible future actions, including with respect to our strategy following completion of the Offering and our plans with respect to the Company, are also forward-looking statements. Forward-looking statements are based on current expectations and projections about future events and are subject to risks, uncertainties and assumptions about the Company, the Property, and the transactions contemplated by this Offering Summary, economic and market factors and the industry in which the Company does business, among other things. You should not place undue reliance on forward-looking statements, which are based on current expectations, since, while we believe the assumptions on which the forward-looking statements are based are reasonable, there can be no assurance that these forward-looking statements will prove accurate. This cautionary statement is applicable to all forward-looking statements contained in this Offering Summary and the material accompanying this Offering Summary. These statements are not guarantees of future performance. All forward-looking statements included in this Offering Summary are made as of the date on the front cover of this Offering Summary and, unless otherwise required by applicable law, we undertake no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise. Actual events and results may differ materially from those expressed or forecasted in forward-looking statements due to a number of factors.

———————————————

P0000029

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ............................................................................................................. 1
    General ............................................................................................................................. 1
    The Offering ..................................................................................................................... 1
    Primary Purpose of the Offering ..................................................................................... 1
    Risk Factors ..................................................................................................................... 1
    The Property ..................................................................................................................... 1
    General Information Regarding Holding the Property for Investment .............................. 2
    What is a Conservation Easement? ................................................................................. 2
    Operating Agreement ....................................................................................................... 2
    Cash Distributions ........................................................................................................... 3

THE OFFERING ....................................................................................................................... 4
    Primary Purpose Of The Offering ................................................................................... 4
    Determination Of Offering Price ...................................................................................... 4
    Terms Of Purchase .......................................................................................................... 4
    Offering Period ................................................................................................................. 4
    Escrow Of Subscription Funds ........................................................................................ 4
    How to Invest ................................................................................................................... 5

WHO MAY INVEST .................................................................................................................. 6
    Suitability Standards ........................................................................................................ 6
    Investor Qualifications ..................................................................................................... 6
    Exemptions From Registration ........................................................................................ 7
    Restriction On Transfer ................................................................................................... 7

RISK FACTORS ....................................................................................................................... 8
    Investment and Operating Risks ...................................................................................... 8
    Tax Risks ......................................................................................................................... 12

SOURCE AND USE OF FUNDS .............................................................................................. 17

DESCRIPTION OF THE COMPANY ....................................................................................... 19
    General Overview ............................................................................................................ 19
    Objects and Purposes ....................................................................................................... 19
    Summary Of The Operating Agreement ........................................................................... 19

DESCRIPTION OF THE PROPERTY ...................................................................................... 23
    General Description .......................................................................................................... 23
    Potential Uses of the Property ......................................................................................... 25
    Conservation Purposes .................................................................................................... 25
    Title Encumbrances ......................................................................................................... 26
    The Appraisal ................................................................................................................... 26

OTHER SIMILAR PROJECTS UNDERTAKEN BY THE MANAGER ..................................... 27

FEDERAL INCOME TAX CONSIDERATIONS ....................................................................... 28
    General ............................................................................................................................. 28
    Taxation as a Partnership ................................................................................................. 28
    Member's Basis in Units .................................................................................................. 29
    Allocation of Company Profits and Losses ...................................................................... 29
    Limitations on Losses ...................................................................................................... 29
    Cash Distributions ........................................................................................................... 29
    Sale or Disposition of Units ............................................................................................ 29
    Dissolution or Liquidation of the Company ..................................................................... 30
    Tax Shelter Disclosure .................................................................................................... 30
    The Conservation Easement ............................................................................................ 30
    Current Intention .............................................................................................................. 30

P0000030

Specific Requirements Under Code and Regulations........................................................30
Nature of Restrictions........................................................................................................31
Qualified Organization......................................................................................................31
Conservation Purposes.......................................................................................................31
Treatment of Charitable Contributions..............................................................................32
The Contribution Deduction..............................................................................................32
Substantiation of Value of Conservation Easement ..........................................................32
Enhancement Issues...........................................................................................................34
The Company's Holding Period.........................................................................................34
Charitable Contributions by Partnerships..........................................................................35
Ordinary Income Property..................................................................................................35
Basis Reduction..................................................................................................................36
IRS Scrutiny and Criticism of Conservation Easements ...................................................36
Potential Legislative Changes ...........................................................................................37
The Glass Case...................................................................................................................39
The June 8, 2005 Hearings ................................................................................................39
Recent Legislative Changes...............................................................................................40
State and Local Taxes.........................................................................................................40
Professional Advice............................................................................................................41

**CONFLICTS OF INTEREST** .................................................................................................42

**ERISA** ......................................................................................................................................42

**WHERE YOU CAN OBTAIN MORE INFORMATION**........................................................43

_____

**EXHIBITS:**

| | |
|---|---|
| Exhibit A: | Articles of Organization of Maple Landing, LLC |
| Exhibit B: | Operating Agreement of Maple Landing, LLC |
| Exhibit C: | Redemption Agreement |
| Exhibit D: | Survey of Property |
| Exhibit E | Subscription and Suitability Agreement |
| Exhibit F | Confidential Investor Questionnaire |
| Exhibit G | Escrow Agreement |
| Exhibit H | Tax Opinion |

_____

P0000031

## EXECUTIVE SUMMARY

### General

Maple Landing, LLC (the "Company" "we" or "us"), a Georgia limited liability company, was formed on April 23, 2008. The Company's governing document, an operating agreement, is attached hereto as Exhibit B (the "Operating Agreement"), and divides the equity interests of the Company into Units that represent a pro rata ownership interest in the assets, profits, losses and distributions of the Company. There are currently 200 Units authorized for issuance by the Company, 100 of which are issued and outstanding and owned of record by four entities: (1) WDHL Investments, LLC, a Georgia limited liability company ("WDHL"), which currently owns 33 Units, (2) LDHL Investments LLC, a Georgia limited liability company ("LDHL"), which currently owns 33 Units, (3) Julienton Investments LLC, a Georgia limited liability company ("Julienton", and together with WDHL and LDHL, the "Sellers"), which currently owns 33 Units, and (4) Effingham Managers LLC, a Georgia limited liability company ("Effingham Managers"), which currently owns 1 Unit. Effingham Managers currently serves as the Manager of the Company and is owned by the Sellers.

### The Offering

A total of 95 Units are being offered for sale in this Offering at an Offering Price of $21,000.00 per Unit. This is an "All or None Offering," and all Subscription Funds will be held pursuant to the terms of the Escrow Agreement, the form of which is attached hereto as Exhibit G, by the Escrow Agent, until the earlier of the Termination Date or the receipt of subscriptions for all Offered Units. Upon the sale of all Offered Units, all Subscription Funds will be delivered to the Company and deposited in the Company's bank account and used for the purposes discussed in this Offering Summary. If subscriptions for less than all Offered Units have been received by the Termination Date, then the Company shall terminate the Offering and refund the Subscription Funds to Investors without interest or deduction.

Persons wishing to purchase Units must subscribe for Units by fully completing the Subscription Documents that accompany this Offering Summary.

THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND AN INVESTOR SHOULD NOT INVEST IN THE UNITS IF THE INVESTOR IS NOT FINANCIALLY CAPABLE OF TAKING THE RISK OF LOSING THE INVESTOR'S ENTIRE INVESTMENT (SEE "RISK FACTORS" BEGINNING ON PAGE 8).

### Primary Purpose of the Offering

The primary purpose of the Offering is to raise funds to redeem 95 Units held by the current Members pursuant to the Redemption Agreement that has been entered into by the Sellers and the Company, a copy of which is attached hereto as Exhibit C (the "Redemption Agreement"). The Redemption Agreement provides for the redemption by the Company on a pro rata basis of an aggregate of 95 Units owned by the Sellers (the "Redeemed Units"), which number of Redeemed Units corresponds to the number of Units sold by the Company pursuant to the Offering such that upon the completion of the Offering and the closing of the Redemption Agreement there will be 100 Units issued and outstanding in the Company.

### Risk Factors

The Units being offered hereby involve a high degree of risk, including risks associated with the ownership of real estate, as well as tax and financial risks associated with the transaction and the general economy. Investors should carefully review the information in the "Risk Factors" section of this Offering Summary starting on page 8 before purchasing Units.

### The Property

The Company's principal asset is approximately 283.42 acres of unimproved real estate (the "Property") located in Effingham County, Georgia, as further identified on the survey attached hereto as

P0000032

Exhibit C. The Property is not encumbered by any debt. The Property was originally purchased by an affiliate of the Company and the Sellers, HRH Investments, LLC, a Georgia limited liability company ("HRH"), on August 1, 2007, as part of the purchase by it of an approximately 1,490 acre parcel of land (the "Initial Parcel"). The Initial Parcel was subsequently divided into 10 separate parcels, each of which was transferred to an affiliate of HRH for separate ownership in exchange for membership interests in such affiliate. The Company acquired the Property in that manner on December 17, 2008.

The Company has investigated the following possible uses for the Property, the selection of which, if any, would be made by a vote of a majority in interest of the holders of the Units following the Closing (the "Majority"): (1) Continuing to hold the Property for investment, which may involve the development of the Property into as many as one hundred eighty-nine (189) residential lots for sale to the public either by itself or in conjunction with others or selling the Property in the future; or (2) Granting a conservation easement (the "Conservation Easement") on the Property to achieve certain business and tax objectives.

A proposed Deed of Conservation Easement (the "DCE") has been prepared for the Company and reviewed by the Manager, which DCE is preliminary and has not been adopted or approved by the Company or the Members. A copy of such proposed DCE is available from the Manager upon request. Neither the Company nor the Members are under any obligation to adopt the proposed DCE or any DCE at all. No DCE can be adopted by the Company unless recommended by the Manager and approved by the Majority. See "Summary of the Operating Agreement" beginning on page 19 and the Operating Agreement, attached to this Offering Summary as Exhibit B).

The Company is under no obligation to do any of the foregoing. A Majority of the Members of the Company following the Closing is required to approve any significant plans for the Company other than continuing to hold the Property for investment, such as granting a conservation easement on the Property or pursuing any future development of the Property.

**General Information Regarding Holding the Property for Investment**

The Company acquired the Property for investment and continues to hold it for investment. The Manager has investigated the potential future development of the Property and believes that the Property could support the development of the Property into as many as one hundred eighty-nine (189) residential lots for sale to the public either by itself or in conjunction with others. Any future development of the Property by the Company would likely require significant additional investment or borrowings by the Company. Any decision to develop the Property either by the Company or in conjunction with others would require a vote of the Majority.

**What is a Conservation Easement?**

A conservation easement is a perpetual, bilateral contract between a land owner and a non-profit conservation organization (often called a "land trust" or "conservancy") or governmental agency regarding a distinct tract of real property in which the land owner agrees to restrict the development activity on the property as well as other activity on the property that might interfere with its scenic, environmental or other value as open space (including agricultural value where applicable). The restrictions of a conservation easement are enforceable by the conservation organization or governmental agency perpetually, are recorded in the deed records of the county court house and are considered to "run with the land." A conservation easement also gives the conservation organization or governmental agency a right of access for inspection and enforcement purposes. If the conservation easement complies with the requirements of Section 170(h) of the Internal Revenue Code ("Code") and Treasury Regulations, including the requirement that the restrictions accomplish one or more several specific "conservation purposes," the owner who donated the conservation easement will receive a federal income tax deduction. See "The Conservation Easement" at Page 30.

**Operating Agreement**

Each Investor should read the Operating Agreement of the Company attached hereto as Exhibit B. The management of the Company is to be conducted by a person appointed or elected as "Manager" in accordance with

P0000033

the Operating Agreement. The current Manager is Effingham Managers. The Manager exercises all management authority and responsibility for the Company and the operation of the Business. The Manager can only be removed for "Cause" as such term is defined in the Operating Agreement prior to December 17, 2015. Thereafter, a Majority has the authority to remove the Manager and to appoint any other person deemed appropriate by them to serve as the Manager for any reason whatsoever.

The Manager is granted broad authority in the Operating Agreement to manage the Company. Certain actions, such as entering into a contract or loan agreement that would commit or obligate the Company to expend more than $50,000.00 of Company funds, selling substantially all of the assets of the Company, except in compliance with Article XIII of the Operating Agreement, filing bankruptcy for the Company, settling or compromising any claim of the Company in excess of $10,000.00, or confessing a judgment against the Company, require the consent of a Majority of the Members. Should the Manager desire to take any of such restricted actions, the Manager is required to notify each of the Members of such fact, and if any Member so notified fails to respond either affirmatively or negatively in writing to the Manager within three (3) days of the effective date of such notice, such Member shall be deemed to have consented to the action proposed by the Manager.

Within two years of the adoption of the Operating Agreement, the Manager is required to make a proposal to the Members to pursue either an investment proposal (a "Investment Proposal") or a conservation easement proposal (a "Conservation Proposal") with respect to the Property and notify the Members of such proposal deemed by the Manager to be the best course of action with respect to the Property. Each of the Members then has the right and option (unless such right and option is waived by a Member in writing), at his or her election, immediately or at any time during the three (3) calendar days after the deemed receipt of such notice, in which he or she may reject the Investment Proposal or the Conservation Proposal, as appropriate. In the event that a Majority has provided such a timely notice of rejection, the Company shall not pursue the rejected proposal, and shall pursue the other proposal. See "Summary of the Operating Agreement" beginning on page 19 and the Operating Agreement, attached to this Offering Summary as Exhibit B).

**Cash Distributions**

Any cash available for distribution to the Members will be paid on a pro rata basis to each Member in accordance with the Member's respective ownership of Units. Distributions, if any, will be made at the discretion of the Manager. (See the Operating Agreement, attached to this Offering Summary as Exhibit B.)

P0000034

## THE OFFERING

### Primary Purpose Of The Offering

This Offering is being made for the primary purpose of providing funds required to redeem from the Sellers the Redeemed Units on a pro rata basis at the Redemption Price per Redeemed Unit of $18,421.53. The remaining $2,578.47 per Unit raised in the Offering will be used by the Company to pay the expenses of the Offering, fund its operating costs, and establish certain reserves as described in this Offering Summary. (See "SOURCE AND USE OF FUNDS" at page 17).

Following the redemption of the Redeemed Units, the Sellers and the Manager will continue to own an aggregate of five (5) Units, or 5% of the issued and outstanding Units.

### Determination Of Offering Price

The Offering Price of $21,000 for each Unit has been arbitrarily determined by the Manager in its sole discretion and is not a result of arm's length negotiations. The Offering Price is not based upon any direct relationship to asset value, net worth, earnings, cash flow, or any other established or measurable criteria of value. No outside party has established that the Offering Price is fair, or that the Company has used an accurate means to value the Units. The largest factor that the Manager of the Company considered in determining the Offering Price was the Redemption Price desired by the Sellers for their Redeemed Units. We make no representations, whether express or implied, as to the value of the Units offered hereby. No assurances can be given that the Units could be resold for the Offering Price or for any amount.

### Terms Of Purchase

The Units will be sold only for cash and no deferred payment will be accepted. Payment must be made by wire transfer in the full amount of the Offering Price for the Units being purchased. If you desire to purchase a Unit, then you must purchase a whole Unit. No fractional Units will be sold to any of the Investors unless the Manager, in its sole discretion, waives this restriction.

### Offering Period

This Offering commences on the date hereof and terminates on the earlier of the Termination Date or the date on which Subscription Funds for the sale of all 95 Offered Units have been received and accepted by the Manager (the "Offering Period").

### Escrow Of Subscription Funds

This is an "All or None Offering," meaning that all 95 Units being offered must be sold during the Offering Period. All Subscription Funds will be held pursuant to the terms of the Escrow Agreement, the form of which is attached hereto as Exhibit G, by the Escrow Agent, until the earlier of the expiration of the Offering Period or the receipt of subscriptions for all Offered Units. Upon the sale of all Offered Units, all Subscription Funds will be delivered to the Company and deposited in the Company's bank account and used for the purposes discussed in this Offering Summary. If subscriptions for less than all Offered Units have been received and accepted prior to the expiration of the Offering Period, then the Company shall terminate the Offering and refund the Subscription Funds to Investors without interest and without deduction. The Escrow Agent shall have no liability to any potential Investor.

P0000035

**How to Invest**

For a subscription to be accepted by the Company, the potential investor must do all of the following prior to the Termination Date of the Offering Period:

1.   **COMPLETE AND SIGN** all documents in this Execution Documents Package.

2.   **E-MAIL OR FAX** this completed Execution Documents Package to the Company, in care of James Jowers, to: E-Mail: jjowers@foreverforests.net or Fax: (888) 506-2732 (a return fax cover sheet is included in this package).

3.   **OVERNIGHT MAIL** the original, completed and signed Execution Documents Package to James Jowers as follows:

> Mr. James Jowers
> Forever Forests
> SVP Business Development
> 1039 Dornell Road
> Ball Ground, Georgia 30107

4.   **WIRE** the Subscription Funds payable to "Oakworth Capital Bank FBO Maples Landing, LLC" pursuant to the following wiring instructions:

| | |
|---|---|
| Receiving Bank: | The Independent Bankers Bank |
| ABA Number: | 111010170 |
| Beneficiary Bank: | Oakworth Capital Bank |
| DDA Account #: | 1021807 or  062006709 |
| Address: | 2100A Southbridge Parkway Ste 445 |
| | Birmingham, AL  35209 |
| Beneficiary Name: | River's Edge Landing, LLC |
| | OCB Wealth Mgmt as Escrow Agent |
| Beneficiary Acct #: | 2007399 |
| For Wire Assistance: | Please contact Janet Ball at (205) 263-4717 or |
| | Lindsay Ethridge at (205) 263-4714. |

5.   **FAX OR E-MAIL** the Fed Reference Number from your bank for the above wire to James Jowers as set forth above to confirm you investment.

---

The Subscription Fund amount is determined by multiplying the number of Units desired to be purchased by the Offering Price of $21,000.00 per Unit. The minimum number of Units that may be purchased by an individual investor is 1 Unit (or $21,000), unless the Manager waives this requirement in his sole discretion. An Investor is permitted to purchase more than one Unit.

Subscriptions may be rejected for failure to conform to the requirements of this Offering or for any other reason, in the sole discretion of the Manager of the Company.

For questions further regarding on how to invest or to confirm any receipt, please contact James Jowers: By Phone: (678) 648-8315   By E-Mail: jjowers@foreverforests.net or By FAX: (888) 506-2732.

P0000036

## WHO MAY INVEST

**Suitability Standards**

THE PURCHASE OF THESE SECURITIES INVOLVES INVESTMENT RISKS. INVESTMENT IN THESE SECURITIES IS SUITABLE ONLY FOR PERSONS WHO HAVE NO NEED FOR AN IMMEDIATE CASH RETURN OR LIQUIDITY WITH RESPECT TO THEIR INVESTMENT. This is a private placement offering to certain **ACCREDITED INVESTORS ONLY.** No public market for the Units is expected and the sale or transfer of the Units may not be possible. The Company will sell the Units only to a person who either alone or with his Purchaser Representative, if any, has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of purchasing the Units. Each Subscriber will be required to certify to the Company that he or she meets the foregoing requirements (see the Subscription and Suitability Agreement attached as Exhibit E).

Each Investor must be able to demonstrate that the Investor has the capacity to protect his or her own interests in evaluating the merits and risks of an investment in the Company by reason of the Investor's business or financial experience. An Investor who does not have sufficient knowledge and experience in financial and business matters to be capable of evaluating the merits and risks of purchasing the Units must, regardless of his or her net worth, retain a "Purchaser Representative" (as defined in Rule 501(h) of SEC Regulation D) who has that knowledge and experience either alone, together with other purchaser representatives, or together with the Investor. A person who wishes to use and rely upon a Purchaser Representative in connection with making an investment in the Units should be aware that a Purchaser Representative (1) must meet certain statutory or regulatory requirements; (2) must be acknowledged by the Investor in writing to be his Purchaser Representative in connection with evaluating the merits and risks of purchasing the Units; (3) may not be affiliated with the Company or any of its affiliates; and (4) may not receive compensation from any of those persons or entities.

**Investor Qualifications**

Each Investor must agree to abide by all applicable provisions of the Articles of Organization, the Operating Agreement, rules and regulations and any other governing documents of the Company. The Company has further adopted, as a general suitability standard, the requirement that each Investor represent in writing in the Subscription and Suitability Agreement, among other things, that:

(a)   the Investor is acquiring the Units for investment only, and not with a view toward the resale or other distribution of the Units;

(b)   the Investor can bear the economic risk of losing the Investor's entire investment;

(c)   the Investor has adequate means of providing for the Investor's current needs and personal contingencies and has no need for liquidity of the Investor's investment in the Units; and

(d)   the Investor has substantial experience in making investment decisions of this type, or the Investor is relying on the Investor's own Purchaser Representative in making this investment decision.

These suitability standards represent minimum requirements for Investors, and the satisfaction of such standards does not necessarily mean that the Units are a suitable investment for such persons. The Company reserves the right, in its sole discretion, to reject any subscription even though the Investor may otherwise satisfy the above-described criteria.

Potential purchasers of the Units should complete the Subscription Documents. After receipt of the Subscription Documents, the Company will determine, in its sole discretion, whether to accept the subscription. All potential purchasers must meet the minimum suitability requirements set forth above. The Manager has the option, in his sole discretion, after review of a potential purchaser's Subscription Documents, to reject a proposed investor by returning to him his payment for the Units, without interest. Subscriptions may be rejected for failure to conform to the requirements of this Offering or for any other reason, in the sole discretion of the Manager of the Company.

P0000037

**Exemptions From Registration**

The Units will not be registered for sale under the Securities Act or under the securities laws of any state. The Units will be offered for sale in reliance on an exemption from registration under Federal law pursuant to Rule 506 of Regulation D. The Units are being offered in certain states in reliance on exemption from registration under the securities laws of such states.

**Restriction On Transfer**

The transferability of a Unit is severely limited by the Operating Agreement and by federal and state securities laws.

Additionally, the Units offered pursuant to this Offering have not been registered under Federal or state securities laws and, consequently, Units purchased pursuant to this Offering may not be transferred or sold by the purchaser without the approval of the Company and an opinion of counsel for the Company that such transfer or sale will not contravene applicable federal and state securities laws. Therefore, all certificates, if any, evidencing the Units purchased by an investor will bear the following language:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE (THE "SECURITIES") HAVE BEEN (I) ACQUIRED FOR INVESTMENT; (II) ISSUED AND SOLD IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES LAWS OF VARIOUS STATES; AND (III) ISSUED AND SOLD IN RELIANCE UPON THE EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 (THE "ACT") PROVIDED BY SECTION 4(2) OF THE ACT. THE SECURITIES CANNOT BE OFFERED FOR SALE, SOLD OR TRANSFERRED OTHER THAN PURSUANT TO (A) AN EFFECTIVE REGISTRATION UNDER THE ACT OR ANY TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH THE ACT; AND (B) EVIDENCE SATISFACTORY TO THE COMPANY OF COMPLIANCE WITH THE APPLICABLE SECURITIES LAWS OF ANY OTHER JURISDICTION. THE COMPANY SHALL BE ENTITLED TO RELY UPON AN OPINION OF COUNSEL SATISFACTORY TO IT WITH RESPECT TO COMPLIANCE WITH THE ABOVE LAWS.

THE SALE OR TRANSFER OF THE MEMBERSHIP UNITS IN THE COMPANY IS SUBJECT TO THE TERMS AND CONDITIONS CONTAINED IN THE OPERATING AGREEMENT OF THE COMPANY, AS MAY BE AMENDED FROM TIME TO TIME, A COPY OF WHICH IS ON FILE WITH THE MANAGER OF THE COMPANY AND MAY BE REVIEWED UPON REQUEST. BY ACCEPTANCE OF THIS CERTIFICATE, THE HOLDER HEREOF AGREES TO BE BOUND BY THE TERMS OF THE OPERATING AGREEMENT.

P0000038

## RISK FACTORS

*An investment in the Units is highly speculative, involves a high degree of risk and is suitable only for Accredited Investors, who understand and have financial resources sufficient to enable them to bear a number of risks, including but not necessarily limited to those described below. In addition to the other information contained in this Offering Summary, you should carefully consider the following risk factors in evaluating an investment in the Units and in the Company and its business plans. If any of the following risks actually occur, the business, financial condition, and operating results of the Company may be materially and adversely affected. Prospective Investors should not consider an investment in the Units unless they are willing and able to sustain a complete loss on their investment. The foregoing Risk Factors reflect many, but perhaps not all, of the risks incident to a purchase of the Units. Each potential Investor must make an independent evaluation of the risks associated with a purchase of the Units.*

### Investment and Operating Risks

1.      *Lack of Operating History.* The Company is a Georgia limited liability company formed on April 23, 2008, to hold real estate for investment. The Company has engaged in minimal activities since that time and has no operating history. The Manager currently plans to continue to hold the Property for investment absent the vote of a Majority to take any other action with respect to the Property. If a Majority votes to cause the Company to grant a Conservation Easement on the Property, the Manager does not expect the Company to have any material operations in the foreseeable future other than causing the grant of such Conservation Easement. If a Majority decides that the Property should be developed, the Manager would need to develop a business plan for the Company's use and disposition of the Property, the implementation of which would require significant capital, which the Company does not have. The Company would have to raise additional capital or partner with another party to develop the Property, and such activities would be subject to all of the risks inherent in a business enterprise that is commencing operations. It is impossible to predict whether the Company will be successful, and there can be no assurance that the Company will operate profitably.

2.      *Primary Purpose May Not Be to Maximize Profits for Members.* One of the business plans that the Manager will propose to the Members for consideration following the completion of the Offering will be the granting of the Conservation Easement of the Property. Any such decision would be made by the Majority, which may not agree with your desires. Assuming a Majority approves the granting of the Conservation Easement, the principal asset of the Company, the Property, would be encumbered and its future development would be restricted, which would diminish the value of the Property and severely hinder the ability of the Company to maximize profits with respect to the Property. While the Conservation Easement may create a charitable tax deduction for the Members, the Company would not be in a position to maximize the profits that could be generated and distributions that could be made to the Members. If the Company's goal was to maximize profits and distributions, it could choose to develop the Property or hold it for investment. Because of the possibility of the Company granting the Conservation Easement on the Property, only Investors who are not focused on maximizing the potential cash return from an investment in the Units should consider purchasing the Units.

3.      *Conservation Easement Deductions.* If approved by a Majority, a significant component of the Company's business plan would involve the granting of a Conservation Easement to a Qualified Organization during calendar year 2010. The potential benefits to you arising from any such Conservation Easement will be dependent upon the valuation of such Conservation Easement and the potential application of provisions in the Code and Regulations which lack a substantial body of interpretive case law. There is no assurance that the Company will be able to achieve its business and tax objectives in connection with any Conservation Easement which may be granted to a Qualified Organization.

4.      *Need for Additional Capital.* If a Conversation Easement is not granted and the Manager proposes to develop the Property, the Company will need additional resources in the future to continue to operate. The proceeds of the Offering are estimated to be sufficient to hold the Property for long term investment but would most likely not be sufficient to permit the Company to attempt to develop the Property. Furthermore, the Company may be unable to sell the Property for an amount deemed reasonable to the Manager, or for an amount in excess of the aggregate amount of the Offering, or at all. Accordingly, if a Conservation Easement is not granted on the

P0000039

Property, the Company may need additional capital to permit it to continue to operate. The Company does not have any current commitments for additional financing. And the Manager has no current plans to pursue any other opportunities for additional financing. There can be no assurance that additional financing will be available in the future on acceptable terms or at all. If the Company raises additional funds by issuing equity securities, the percentage ownership of the Company's owners will be diluted. Additional securities issued by the Company in the future could have rights, preferences and privileges senior to those of the Units.

5.     *Determination of Offering Price.* The Offering Price of $21,000 per Unit has been determined solely by the Manager based on (1) the Redemption Price the Sellers are willing to accept for the Redeemed Units, (2) the anticipated payment of certain fees and expenses associated with the Offering and the granting of the Conservation Easement, if proposed by the Manager and approved by a Majority, and (3) certain limited anticipated capital needs of the Company in the near future. (See "SOURCE AND USE OF FUNDS" at page 17). Such Offering Price is not an indication of the value of a Unit or the pro rata portion of the Company or the Property, and no assurance is given that any of the Units could be resold for the Offering Price or for any other amount.

6.     *Redemption Units.* You should not construe the willingness of the Sellers to have their Redeemed Units redeemed by the Company for the Redemption Price as an indication that the Offering Price is objectively determined or that your investment decision is shared by persons unaffiliated with the Company as the Sellers are directly interested in the receipt of funds from the Offering. You should not make your investment decision solely based upon your own evaluation of the merits and risk of the investment.

7.     *Cash Distributions.* Assuming a Majority approve the granting of the Conservation Easement on the Property, the Company is unlikely to engage in business operations, and the Company would therefore not expect to realize any profits that would be realized by the Members. If we do in fact encumber the Property with the proposed Conservation Easement, the terms of such easement will materially limit our permitted uses of the Property and our prospects for future income and profits. We do not expect to make any cash distributions to you, and if you require a cash return from the Company on your investment, you are advised against this investment.

8.     *Illiquidity of Investment.* The Units have not been registered under any federal or state securities laws and therefore cannot be resold or otherwise transferred unless they are subsequently registered under such laws, or unless an exemption from such registration is available. We do not intend to register the Units with the Commission, the Georgia Securities Commission or any other state securities commissions, and you will have no right to require the Company or the Manager to register the Units. There is presently no public or other market for the Units, and it is highly unlikely that such a market will develop in the future. In addition, certain restrictions on transfer of the Units are contained in the Operating Agreement, and if we encumber the Property with a Conservation Easement, such encumbrance will affect the value of the Property, the Company and the Units in a materially adverse manner. Under the circumstances, you should consider the purchase of Units to be an investment lacking liquidity and involving substantial risk, and that, in the event the Property is ultimately encumbered by a Conservation Easement, you will be unable to recoup any amount of your original investment from the sale of a Unit, the Company's disposition of the Property, or the liquidation of the Company.

9.     *Absence of Securities Registration and Review.* The Units have not been nor will they be registered under the Securities Act or any applicable state securities laws, and no federal, state or other agency has reviewed the terms of this Offering, recommended or endorsed the purchase of the Units or passed upon the adequacy or accuracy of any information disclosed to prospective Investors. Accordingly, prospective Investors must assess the fairness of the terms of this Offering on their own, or with aid of their advisors or representatives, and without the benefit of any prior review by any regulatory agency.

10.    *Manager's Involvement in Other Business Activities.* The Manager will not devote its full time to the business and affairs of the Company, and is involved in other business activities, including activities which may be competitive with the Company. The Manager is currently the manager of nine (9) other limited liability companies that also own real estate in and around the Property. A conservation easement has previously been granted with respect to certain of such other real estate, while certain of such remaining other real estate remains held for investment. Under the circumstances, the interests of the Manager may conflict with the interests of the Company in various ways. The Manager can only be removed for "Cause" as such term is defined in the Operating

P0000040

Agreement prior to December 17, 2015. Thereafter, a Majority has the authority to remove the Manager and to appoint any other person deemed appropriate by them to serve as the Manager for any reason whatsoever. Prior to that time, the Investors will have to rely upon the Manager for almost all decisions relating to the operation of the Company.

*11.    Limitations on Manager's Liability.* The Operating Agreement contains certain limitations of liability for the benefit of the Manager which are intended to have the effect of reducing the liability and obligations of the Manager to the Company. The Operating Agreement also contains a provision for binding arbitration in the event of a dispute, controversy or claim asserted by a Member arising out of or relating to the Operating Agreement or to its alleged breach by the Manager. In addition, the Company is required under the Operating Agreement to indemnify and hold the Manager and its affiliates harmless from and against certain liabilities or damages incurred by them. (See "DESCRIPTION OF THE COMPANY" beginning on page 19). Accordingly, your rights and remedies as a Member of the Company in connection with the actions or omissions of the Manager or its affiliates may be more limited than would otherwise be the case absent such provisions in the Operating Agreement.

*12.    The Redemption Agreement is Not a Negotiated Agreement.* Neither the Redemption Agreement nor the Redemption Amount was arrived at by a process of negotiation. There can be no assurance that the Redemption Amount is an appropriate amount for the redemption of the Redeemed Units. Similarly, there can be no assurance that the covenants, representations and warranties given by the Sellers in the Redemption Agreement are sufficient to protect the Investors from all loss in connection with the redemption of the Redeemed Units ancillary to the Investor's purchase of the Units. Each Investor is advised to read the Redemption Agreement carefully to make his or her own determination as to the sufficiency of the Redemption Agreement for his or her own purposes.

*13.    Limitation on Operating Expense Obligation.* The obligation of the Manager and the Members under the Operating Agreement to bear operating expenses of the Company is limited to the amount of their respective contributions to the Company in the Offering. In the event that the Company incurs financial obligations in excess of such amounts reserved in the Offering, there can be no assurance that the Company will have funds to meet any such excess.

*14.    Lack of Investor Control.* Unless the approval of the Members is expressly required under the Operating Agreement or the Georgia Limited Liability Company Act, the Manager has full and complete authority, power and discretion to manage and control the business and operations of the Company. The rights of the Members to participate in the management and control of the Company are restricted to a limited number of specific circumstances, and the Members have no right or authority to act for or bind the Company. Under the Operating Agreement, certain significant decisions may require the approval of a Majority of the Members, notwithstanding the fact that one or more prospective Investors may object thereto. Moreover, a Member may be deemed to have approved certain actions following notice from the Manager of the need to act with respect thereto if such notified Member fails to respond either affirmatively or negatively in writing to the Manager within three (3) days of the effective date of such notice. With regard to any strategic proposal made by the Manager for use of the Property for which notice is provided to the Members (e.g., a proposal to the Members to pursue an investment proposal or a conservation easement proposal with respect to the Property), a Member is required to reject the Manager's recommended proposal within three (3) calendar days after the deemed receipt of such notice or else such proposal would be deemed accepted by such Member. Accordingly, a prospective Investor should purchase Units only if such prospective Investor is willing to entrust all aspects of Company management to the Manager, or to a Majority of the Members which may or may not include such Investor. (See "DESCRIPTION OF THE COMPANY" beginning on page 19).

*15.    Authority of Manager to Sell or Dispose of Property.* In the event that a Conservation Easement is granted with respect to the Property and has been recorded for at least four (4) years, the Manager has been granted the authority pursuant to Section 13.9 of the Operating Agreement to sell or otherwise dispose of the Property, in the Manager's sole discretion, and such disposition may include, but is not limited to, donating the Property to charity.

P0000041

16.    *Investment in Real Estate.*  An investment in real estate is inherently speculative. Over the course of the life of the Company, the Company will experience certain transactional and carrying costs incident to the ownership of the Property. There is no assurance that the Property will operate with positive cash flow or appreciate sufficiently, if at all. The risks inherent in the ownership of real estate which may cause the Property to operate profitably or either to appreciate or depreciate are, in large part, beyond the control of the Company or the Manager. If the Company has insufficient funds to pay expenses such as property taxes, then the Members would have to contribute additional capital, which would require unanimous consent of the Members pursuant to the Operating Agreement to require the contribution of additional capital, and/or the Company may have to borrow additional funds, or risk foreclosure of the Property resulting in a loss of the Company's investment, an event which would trigger undesirable tax consequences for the Investors. In addition, certain operating expenses of the Property (e.g., real estate taxes, labor costs, and insurance, maintenance and repair expenditures) may increase as a result of inflation or other factors. Thus, the cost of owning the Property may exceed the amount of the Company's available funds and additional funds may have to be borrowed or invested in order to protect the Company's investment.

No representation or warranty is made as to future operations of the Property or as to the amount of profit, loss or cash flow from the operation of the Company business. Although the Manager will endeavor to protect the interests of the Members, a prospective Investor should not view the Manager as a guarantor of the financial success of the Property. The value of the Property is speculative and the offering price is not based in any way upon any appraised value of the Property. Pursuant to the offering, Investors are subscribing to interests in the Company and not the Property. The Purchase Price of the Units being offered herein is not based upon the value of the Property.

17.    *Uninsured Losses.*  While the Company may carry liability insurance for the Property, there are certain other types of catastrophic losses, which are either uninsurable or not economically insurable.

18.    *Hazardous Waste and Environmental Concerns.*  Federal and state statutes impose liability on property owners or operators for the cleanup of or removal of hazardous substances found on their property regardless of whether they had any involvement in placing the substance on the property. Additionally, such statutes allow the government to place liens for such liabilities against affected properties which liens will be senior in priority to other liens. State and federal laws in this area are constantly evolving, and the Company intends to monitor such laws and take commercially reasonably steps to protect itself from the impact thereof. However, there can be no assurance that the Company will be fully protected from the impact of such laws. While there has been no Phase I or other environmental study conducted on the Property, neither the Company, the Manager, nor the Sellers are aware of any adverse environmental condition on the Property.

19.    *Taking of Property by Eminent Domain.*  It is possible that portions of the Property could be taken by governmental authority. Such a taking would result in a forced sale that could have adverse consequences on your investment. Even though condemning authorities must offer fair market value for property to be condemned, such a taking could materially and adversely effect an investment in the Company if the amount the Company receives as compensation for taking is less than the perceived value of the condemned property.

20.    *Adverse General Economic Conditions.*  The value of real property often depends on the general state of the economy, and economic recessions can materially and adversely affect the viability of investments in real estate. Governmental, economic and tax policies may also render an additional element of uncertainty and risk in this as well as other investments.

21.    *Lack of Independent Legal Counsel.*  Sirote & Permutt, P.C., is legal counsel for the Offering and is expected to be legal counsel for the Manager at the Closing, and is not acting as counsel for any of the prospective Investors. The use of the same legal counsel may, at times, result in a lack of independent review. Thus, prospective Investors should not rely on such legal counsel to represent and protect their respective interests. Prospective Investors are accordingly urged to consult with their own advisors before investing in the Units.

P0000042

**Tax Risks**

*1.      General Considerations.* There are significant federal and state income tax risks associated with the purchase and ownership of Units. The tax aspects of owning Units are complex, and are not free from doubt. NEITHER THE MANAGER NOR THE COMPANY IS OFFERING ANY PROSPECTIVE INVESTOR TAX ADVICE. TAX CONSEQUENCES ASSOCIATED WITH AN INVESTMENT IN THE UNITS WILL VARY WITH YOUR INDIVIDUAL CIRCUMSTANCES, AND YOU ARE URGED TO CONSULT WITH YOUR OWN TAX ADVISOR WITH RESPECT TO AN INVESTMENT IN THE UNITS AND VARIOUS RISK FACTORS ASSOCIATED THEREWITH.

*2.      No Ruling Requests.* Neither the Manager nor the Company has requested nor do they intend to request any ruling or other guidance from the Internal Revenue Service with respect to any federal income tax consequences of an investment in the Units, or in connection with the Company's business and tax objectives.

*3.      Potential Changes in Law.* There can be no assurance that the <u>Code</u> or existing Treasury regulations thereunder (the "<u>Regulations</u>") will not be amended in such a manner as to alter the present form of computing the federal income tax liability of Investors, or to otherwise change in a materially adverse way the potential tax consequences from an investment in the Units.

*4.      Risks of Conservation Easements.*  A significant component of one of the Company's contemplated business plans, which if approved by a Majority, involves the encumbrance of the Property with the Conservation Easement to a Qualified Organization in 2010. **You should be aware that Conservation Easements, the appraisal methodologies and techniques used in establishing the value thereof, and the tax law applicable thereto, have come under significant scrutiny and criticism by Treasury officials in recent years, and proposed legislative changes have been identified as a means of increasing the treasury revenues which, if enacted, would have a material adverse effect on the tax benefits which might otherwise arise from an investment in the Units.** The granting of a conservation easement can have a significant federal and state income tax impact on the Members if granted. Nevertheless, this impact can vary substantially from Investor to Investor depending upon the Investor's particular tax circumstances. In addition, there are substantial risks associated with the granting of conversation easements, including but not limited to: (1) the valuation of the conservation easement itself; (2) whether the conservation easement satisfies a valid conservation purpose; (3) whether the donee of the conservation easement is a qualified donee under the Code, some of which are factual issues for which there can be no assurances of certainty. Prospective investors are advised that the Company is under no contractual obligation to grant a conversation easement. A conservation easement can only be granted upon a determination of the Manager and the approval of a Majority. Consequently, there can be no assurances that a conservation easement will be granted or that one will not be granted. Moreover, there is no assurance of the potential tax impact on a particular Investor in the event that such an easement is granted.

The Company has obtained a Tax Opinion from counsel for the Company addressing certain tax issues with respect to the proposed grant of the Conservation Easement, a copy of which Tax Opinion is attached hereto as <u>Exhibit H</u>. Investors are encouraged to read the Tax Opinion, including the limitations described therein, for an explanation and appreciation of issues involved. Factual matters, such as those discussed above, are generally beyond the scope of any tax opinion and are generally addressed in the Tax Opinion as assumptions that are relied upon. While neither the Manager nor the Company's counsel has reason to believe that any such factual issues would be resolved against the Company if challenged, there can be no assurances all such factual issues would be fully resolved in the Company's favor. It is also important to note that the Tax Opinion has been issued to the Company only and has not been issued to any Investor, and no Investor may rely upon such Tax Opinion for any purpose whatsoever without the prior written consent of the opinion giver. It is also important to note that the Tax Opinion is not a guaranty that the tax treatment will be sustained if challenged. Rather, it only represents counsel's opinion that it is more likely than not (i.e., a greater than 50% likelihood) that one or more significant federal tax issues would be resolved in the taxpayer's favor. PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH AND RELY ONLY UPON THE ADVICE OF THEIR OWN TAX ADVISORS WITH REGARD TO ALL TAX ASPECTS OF INVESTMENT IN THE COMPANY WITH SPECIFIC REFERENCE TO THEIR OWN TAX SITUATIONS.

P0000043

5.      *Charitable Contribution Limits.* Current tax law limits the available charitable contribution deduction for calendar year 2010 relating to conservation easements to 50% of an individual's contribution base or 10% of a corporation's taxable income (subject to certain adjustments) for such year. Such limitation will be applied to an Investor's aggregate charitable contributions, including an Investor's allocable share of any Contribution Deduction claimed by the Company. Accordingly, your ability to utilize the potential Contribution Deduction will depend on your individual income, other charitable contributions, and other particular circumstances. Current tax law during 2010 allows any unused charitable contribution deduction relating to conservation easements to be carried forward for up to fifteen (15) years. If you are unable to fully utilize your allocable share of any Contribution Deduction for the year in which the Company claims such deduction, you should consider the possibility that future tax law changes may limit or otherwise affect your ability to carry forward and utilize any unused portion of such deduction in future years. Current tax law stems from the fact that Congress has just approved legislation to allow up to 50% of the contribution base to be used in 2010, similar to the rule in 2009. In addition, Congress has just approved legislation to provide for a 15 year carryover, instead of the 5 year carryover, for 2010, similar to the rule in 2009. This legislation to reinstate the 2009 rules was signed into law by the President on December 17, 2010. Tax law limits for charitable contributions could change further.

6.      *Risk of Audit.* An audit of the Company's income tax returns, or your individual returns, may result in an audit of the individual tax returns of some or all of the Investors. The Internal Revenue Service (the "IRS") has established detailed procedures for identifying tax returns for examination based on various parameters and criteria, including parameters and criteria which are not publicly disclosed. One or more of the criteria and parameters established for the IRS for selection of returns to be audited may be present in the Company. In the event of such adjustments, a Member might incur attorney's fees, court costs, and other expenses in connection with contesting a proposed deficiency asserted by the IRS. Adjustment to or audits of a Member's federal income tax return may lead to adjustment to or audits by state tax officials of a Member's state tax return. Recent scrutiny of Conservation Easement transactions, as well as recent and proposed changes to IRS forms and reporting requirements for such transactions, discussed beginning at Page 30 of this Offering Summary, may increase the likelihood that the Company's return might be reviewed for possible audit.

Additionally, each Member is required to treat the Company's items on his individual return in a manner consistent with the treatment of such items on the Company's return. In the event any Member treats an item on his individual return inconsistently with the treatment of that item on the Company's return, then the IRS has the authority to assess a deficiency against the individual Member without conducting an administrative proceeding at the Company level, unless the Member files a statement with the IRS identifying the inconsistency. Although administrative proceedings are now conducted at the Company level, every Member is entitled to participate in such proceedings.

The Company is required to designate a Member as the "tax matters partner," and the Manager has been so designated in the Operating Agreement. When a final administrative adjustment is made, the IRS must initially send notice of such adjustment to this tax matters partner. Notice to the other Members of such an adjustment must be mailed by the IRS within sixty days after the mailing of the notice to the tax matters partner.

Moreover, the Property was originally acquired by an affiliate of the Company and the Sellers, HRH Investments, LLC, a Georgia limited liability company ("HRH"), on August 1, 2007, as part of the purchase by it of an approximately 1,490 acre parcel of land (the "Initial Parcel"). The Initial Parcel was subsequently divided into 10 separate parcels, each of which was transferred to one of 10 separate limited liability company affiliates of HRH (each, an "Affiliate LLC") in exchange for membership interests in each such Affiliate LLC. The Company in one such Affiliate LLC and acquired the Property in such manner on December 17, 2008. One of the Affiliate LLCs was subsequently merged with another Affiliate LLC. The Manager is the manager of all nine Affiliate LLCs that received a portion of the Initial Parcel. Six of the other Affiliates LLCs have implemented an offering of units in such Affiliate LLC and subsequently granted a conservation easement on substantially all of the real property owned by such Affiliate LLC. The audit of any of the Affiliate LLCs could subject the Company to an increased risk of audit as well. Certain of the Sellers are also members and / or managers of other entities that own real estate which are either conducting or contemplating conducting similar offerings to investors following which conservation easements may be imposed on all or substantially all of the real estate owned by such entities. The audit of any one or more of these other entities could subject the Company to an increased risk of audit as well. See "OTHER SIMILAR PROJECTS UNDERTAKEN BY THE MANAGER" at Page 27.

P0000044

YOU SHOULD CONSULT WITH YOUR OWN TAX ADVISOR CONCERNING WHETHER THE POTENTIAL CONTRIBUTION DEDUCTION, THE POTENTIAL TAX SHELTER REGISTRATION WITH RESPECT TO THE COMPANY, OR OTHER FEATURES OF THE COMPANY'S BUSINESS PLAN AND TAX OBJECTIVES MAY INVOLVE AN UNACCEPTABLE RISK OF AUDIT OR MAY OTHERWISE CAUSE AN INVESTMENT IN THE COMPANY TO BE INAPPROPRIATE GIVEN A PARTICULAR PROSPECTIVE INVESTOR'S INDIVIDUAL CIRCUMSTANCES.

7.      *Potential Limitation of the Charitable Deduction if the Property Does not Constitute Long-Term Capital Gain Property.*  In general, if a taxpayer makes a charitable contribution of property (including a conservation easement), the amount of the charitable deduction is the fair market value of the contributed property. However, if the property being contributed constitutes property held primarily for sale to customers in the course of a taxpayer's business (i.e., dealer or inventory property) or has a holding period of less than one year, the charitable deduction generally will be limited to the lesser of the value of the property or the taxpayer's adjusted basis of the property. The Company believes that the Property constitutes long-term capital gain property, has been owned by the Company for more than three years, and has not been associated with any development activities. Although the Manager believes that the Property constitutes long-term capital gain property, there is a risk that the IRS could take a contrary position, even though such a position by the IRS would be inconsistent with the intent of the Company in acquiring the Property and other relevant evidence relating thereto which the Company believes supports capital gain treatment.

8.      *Disguised Sale of Units for Tax and Securities Law Purposes.*  The sale of the Units in this Offering by the Company is intended to qualify as a disguised sale of Units by the current Members pursuant to Section 707 of the Code for the purposes of complying with an applicable exemption from registration under the Securities Act of 1933 provided by Section 4(2) of such Act and the regulations promulgated thereunder. The Manager believes that the tax and securities law treatment of the Offering in this manner is consistent with applicable law for both of these purposes. However, there can be no assurance that the IRS will agree with this tax treatment. To the extent that the IRS challenges such sale as not being a disguised sale Section 707 of the Code and subsequently prevails in such argument, such challenge could result in the possible reallocation of some or all of the charitable deductions taken by the Company among the Members of the Company, with the result that the Members could owe additional tax and interest and possibly a penalty.

9.      *Georgia Tax Credits.*  In 2006, the Georgia legislature passed House Bill 1107, which provides for income tax credits with respect to qualified donations of real property for conservation purposes that are available with respect to taxes owing to the state of Georgia. The Georgia Code and regulations set forth the types of donations that qualify for the credit, the types of organizations that are allowed to accept the donations, and the procedures that must be complied with in order to obtain the credit. The Manager believes that the Conservation Easement donation will qualify for the Georgia income tax credit entitling certain Investors to a portion of the Georgia tax credit. However, there are several limitations with respect to the Georgia tax credit, and many prerequisites that must be met before a credit is allowable under the Georgia Code. For example, the Georgia Department of Revenue could rule that the Conservation Easement does not qualify for the Georgia income tax credit. The Georgia Department of Revenue could also rule that the Georgia Land Trust, the proposed qualified organization for the Conservation Easement, does not qualify as a "qualified organization" for purposes of obtaining the Georgia income tax credit. While the Company does not believe that these situations will occur, there can be no assurances that the Georgia Department of Revenue will not make any of these potential arguments, and if made, there can be no assurance that the Georgia Department of Revenue will not prevail.

Furthermore, there are limitations on the amount of the Georgia credit that can be obtained, and the limitations vary depending on the person or entity making the donation. For instance, each partnership (or entity treated as a partnership for federal tax purposes) is limited to an aggregate amount of credit of for all pass-through partners of $1,000,000. Furthermore, each individual partner is limited to a credit not to exceed $250,000. Each individual Investor should consult with his or her tax advisor as to how these limitations could apply to them. In addition to these limitations, a conservation easement will only entitle a qualified taxpayer to a Georgia tax credit in an amount equal to, at most, 25% of the value of the property donated. Moreover, the Georgia rules limit the ability of a partnership or individual to contribute multiple conservation easements on the same parcel of property, or to obtain multiple conservation easement credits in a single tax year. If any Investor has previously claimed, or intends to claim, either individually or as a member of another entity, an additional Georgia tax credit with respect

P0000045

to a qualified donation of real property for conservation purpose, such Investor should consult with his or her tax advisor about how these provisions could affect his or her ability to claim the Georgia income tax credit described herein.

    *10.    Partnership Anti-Abuse Rule and Common Law Tax Doctrines.* The IRS is authorized pursuant to regulations promulgated by the U.S. Department of Treasury ("Anti-Abuse Regs") to recast a partnership transaction, or one or more aspects of a partnership transaction, if the transaction has a principal purpose of substantially reducing the partners' federal income tax liability in a manner inconsistent with the intent of subchapter K. The Anti-Abuse Regs are very broad and provide little guidance about determining whether a transaction violates them. They do provide, however, that a substantial reduction in partners' federal income tax liability, standing alone, will not trigger application of the regulations. The IRS may only recast a transaction if the substantial reduction in tax liability is also contrary to the intent of subchapter K. The Anti-Abuse Regs also authorize the IRS to recast the form of a partnership transaction if the transaction is part of a larger series of transactions in order for the larger series of transactions to be recast in accordance with their substance. In addition, the IRS may utilize common law tax doctrines such as the substance-over form doctrine, the step transaction doctrine, the economic substance doctrine, and other similar principles to recharacterize the form of a transaction for federal income tax purposes ("Common Law Tax Doctrines"). The Manager, based upon the Tax Opinion, does not believe that the application of the Anti-Abuse Regs or the Common Law Tax Doctrines is appropriate in this situation, and the Manager is unaware of any circumstances where the IRS has made this argument in a similar fact situation. There can be no assurance, however, that the IRS will not make any of these potential arguments, and if made, there can be no assurance that the IRS will not prevail.

    *11.    Codified Economic Substance Doctrine.* In 2010 Congress enacted Section 7701(o) of the Code codifying the economic substance doctrine (the "Statutory Economic Substance Doctrine"). The IRS could attempt to use the Statutory Economic Substance Doctrine to recast the purchase of the Units as a direct purchase of the Property, which, if the IRS was successful, would substantially reduce the amount of Conservation Easement deduction if the Conservation Easement is granted prior to one year and one day after the Closing. While counsel for the Company does not believe such a position by the IRS would succeed, if the IRS does take this position and prevails, the amount of the Conservation Easement deduction will be limited at most to the lesser of the value of the property or the purchase price paid for the Units.

Under Code Section 7701(o), "certain transactions to which the doctrine applies" must satisfy both an objective and subjective test in order for the transactions to be respected for tax purposes. Under Code Sections 6662(b)(6) and 6662(i) a strict liability penalty equal to 20-percent of the amount of understated tax will be applied to a transaction which is found to lack economic substance. The penalty is increased to 40-percent of the underpayment if there is a nondisclosure of a noneconomic substance transaction. There is no reasonable cause exception to the penalties imposed under Code Sections 6662(b)(6) and 6662(i), so reliance on a tax opinion will not provide a taxpayer with a defense to the penalties imposed by the statutes.

In order for a transaction to be subject to the requirements of Section 7701(o), the transaction must be the type of "transaction to which the economic substance doctrine applies." In the case of an individual, this means the transaction must be entered into in connection with a "trade or business or an activity engaged in for the production of income." However, when making the determination as to whether a transaction is subject to Section 7701, the term "transaction" includes a series of transactions.

If a transaction is subject to the economic substance analysis, the transaction will only be deemed to have economic substance if the transaction (or series of transactions when viewed together) satisfy a two-prong test: (1) the transaction changes the taxpayer's economic position in a meaningful way (apart from federal income tax effects) and (2) the taxpayer has a substantial purpose (apart from federal income tax effects) for entering into the transaction. For purposes of the Code, the term "economic substance doctrine" means the common law economic substance doctrine, and prior common law guidance is controlling.

The Manager, based upon the Tax Opinion, does not believe that the Statutory Economic Substance Doctrine is appropriate in this situation because the Manager does not believe the situation is a "transaction to which the doctrine applies" and the Manager believes that, should the transaction constitute a transaction to which the doctrine applies, the transaction would satisfy the two part test set forth in Section 7701(o). However, there is

P0000046

very little guidance as to the application of Section 7701(o), and there can be no assurance that the IRS will not make any of these potential arguments, and if made, there can be no assurance that the IRS will not prevail. (See "FEDERAL INCOME TAX CONSIDERATIONS – The Conservation Easement - The Company's Holding Period" beginning on page 34).

*12.   Substantial Valuation Misstatement Penalty.*  Section 6662 of the Code provides generally for a penalty of 20% of an underpayment of tax attributable to a substantial valuation misstatement, where such underpayment of tax exceeds $5,000 for individual taxpayers. A substantial valuation misstatement exists where the reported value is 200% or more of the amount determined to be the correct amount. A 40% penalty applies where the reported value is 400% or more of the amount determined to be the correct amount. If all or a portion of the charitable deduction for the Conservation Easement is disallowed based on an overstatement of the value of the Conservation Easement, this penalty may be applicable.

There can be no assurance that the IRS will recognize the Conservation Easement as qualified real property interests or, if it does, that it will accept the amount of the claimed charitable deductions. The Company has not obtained (and does not plan to obtain) a letter ruling from the IRS that it will recognize the Conservation Easement for purposes of charitable deduction. It is highly unlikely that a letter ruling would be issued even if the Company were to seek one. Given the magnitude of the charitable contribution that the Company would likely claim, there is a risk that the IRS could audit the Company's information return on which such contribution deduction is claimed. A successful challenge by the IRS could result in the disallowance of some or all of the charitable deductions taken by the Company, with the result that the Members could owe additional tax and interest and possibly a penalty. In addition, there are significant changes in the federal tax laws governing conservation easements that in recent years have been under discussion in Congress that, if enacted, could significantly reduce or eliminate the expected tax benefit of a conservation easement. In the event that the Conservation Easement is granted, there can be no assurance that such new tax laws adversely affecting the Company will not be enacted with an effective date prior to the date of such grants.

Because the Company cannot verify that the Conservation Easement will be determined by a court to have the value set forth in the Appraisal, there can be no assurance that the value of the Conservation Easement will be determined by a court not to result in valuation penalties. Although Section 6664(c) provides a reasonable cause exception for the penalties imposed under Section 6662, in the case of a valuation penalty, the reasonable cause exception will only apply if the court finds that (1) the value of the claimed deduction for the Conservation Easement was based on qualified appraisal made by a qualified appraiser, and (2) the Company made a good faith investigation of the value of the Conservation Easement. The determination of whether an appraisal or an appraiser are "qualified" for purposes of the Code and whether the Company made a good faith investigation of the value of the Conservation Easement involve subjective determinations which pose risks to the Company and the ability of the Company to avoid the potential application of valuation penalties; accordingly, there can be no assurances that a valuation penalty will not be applied to an investor in connection with any valuation adjustment that may be made by the IRS against the Company.

(See "FEDERAL INCOME TAX CONSIDERATIONS" beginning on page 28)

P0000047

## SOURCE AND USE OF FUNDS

This is an "All or None Offering." Therefore, we must sell all 95 of the Offered Units before we can close the Offering and accept any subscriptions from Investors. We estimate that the net proceeds to the Company from the sale of all Offered Units will be approximately $136,350, after deducting the total Redemption Price of $1,750,045, the estimated Offering expenses and other amounts to be paid at Closing out of the offering proceeds of approximately $108,305. Following the Closing, the remaining portion of the Offering Amount will be used for working capital, to establish reserves to cover the expected operating expenses of the Company for at least one year and to fund the costs of granting the Conservation Easement if approved by a Majority.

The following table illustrates our estimated use of proceeds from this Offering. It is emphasized that such estimated use of proceeds is subject to change based on actual costs and expenses incurred, changes in the plans of the Company for the Property, and other factors.

| Proceeds Used For | Offering Amount[1] |
|---|---|
| Redemption Price[2] | $1,750,045 |
| Estimated Offering expenses[3] | 38,500 |
| Georgia Land Trust[4] | 5,000 |
| Project Management[5] | 50,000 |
| Appraisal[6] | 4,000 |
| Survey[7] | 615 |
| 2010 Property Taxes[8] | 3,503 |
| Site Work[9] | 5,437 |
| Escrow Agent[10] | 1,250 |
| Reimbursement to the Sellers[11] | 9,437 |
| Working Capital[12] | 136,350 |
| TOTAL | $ 1,995,000 |

[1]    Assumes the sale of all 95 Offered Units for a purchase price of $21,000 per Unit for aggregate gross proceeds to the Company from the Offering of $1,995,000.

[2]    The aggregate Redemption Price is based upon the redemption of all 95 Redeemed Units multiplied by Redemption Price of $18,421.53 per Redeemed Unit.

[3]    The Offering expenses are being paid as follows: (i) approximately $35,000 to Sirote & Permutt, P.C. for the costs of preparing the Redemption Agreement for the purchase of the Redeemed Units, drafting the Operating Agreement, issuing a legal opinion with respect to the Conservation Easement, and the estimated legal costs of exploring the feasibility of, negotiating the terms of and implementing the Conservation Easement; and (ii) approximately $3,500 to Henderson & Harris, LLC, attorney for the Sellers and the Manager for the costs of representing the Sellers in connection with the Redemption Agreement and performing the title review on the Property.

[4]    The total cost to grant the Conservation Easement to Georgia Land Trust is approximately $20,150, of which the Company has obligated itself to pay and the Manager has already paid on behalf of the Company $5,000, which amount is due to be reimbursed by the Company out of the proceeds from the Offering at the Closing. The remaining amount of $15,150 includes a stewardship donation amount and other related fees that would only be payable by the Company in the event that a Majority elects to pursue a Conservation Easement and is budgeted for in the Working Capital. If the Majority does not elect to pursue a Conservation Easement, the Company would not pay the budgeted amount of $15,150 for the Conservation Easement.

[5]    The total cost for the project management associated with the investigation of the Conservation Easement is $100,000 that is payable to Forever Forests, LLC, of which $50,000 is past due or due at Closing. The remaining $50,000 covers final project management fees that would only be due and payable by the Company in the event that a

P0000048

Majority elects to pursue a Conservation Easement. Such remaining amount is budgeted for by the Company in the Working Capital.

[6] The Company has obtained an initial appraisal from Tennille & Associates, Inc., which has been paid by the Manager on behalf of the Company and is due to be reimbursed at Closing out of the proceeds of the Offering. The Company expects to pay an additional $11,000 to Tennille & Associates, Inc. for all remaining appraisals necessary to complete the Conservation Easement, if elected by the Majority, which remaining appraisal cost is budgeted for by the Company in the Working Capital.

[7] The total cost for the survey is $615, which is payable to Poythress Land Surveying, Inc..

[8] The 2010 property taxes for the Property is approximately $ 3,502.79 and is due and payable to the Effingham County.

[9] The Company has incurred site related work in the aggregate amount of $5,437.08 as follows: (i) $277.08 to Wastewater & Sewer Consultants for sewage treatment proposal services, which has been paid by the Manager on behalf of the Company and is due to be reimbursed at Closing out of the proceeds of the Offering; (ii) $160.00 to Kendall & Associates for soil testing services, which has been paid by the Manager on behalf of the Company and is due to be reimbursed at Closing out of the proceeds of the Offering; and (iii) $5,000.00 to K&H Farms for site cleanup and tractor services.

[10] Oakworth Capital Bank, Birmingham, Alabama is expected to be paid a total of approximately $1,250 for serving as the Escrow Agent for the Company in connection with the Offering.

[11] The Manager has paid approximately $9,437 of the expenses of the Offering prior to the date hereof that are due to be reimbursed from the Company out of the proceeds of the Offering at the Closing. In particular, the Manager has paid: (i) $4,000 to Tennille & Associates, Inc. for appraisal services; (ii) $277 to Wastewater & Sewer Consultants for site work related to the Property; (iii) $160 to Kendall & Associates for site work related to the Property; and (iv) $5,000 to Georgia Land Trust for conservation easement investigative work. This amount is included for clarity in the above expense amounts but such amount is not included in the Total of all expenses paid as a result of the previous inclusion of such total in other categories of expenses. The Manager may advance for convenience after the date hereof other expenses outlined above for which it would be due to be reimbursed from the Company out of the proceeds of the Offering at the Closing.

[12] Following the payment by the Company of the other expenses stated above, the Company will retain approximately $136,350 out of the proceeds of the Offering at the Closing that the Company has budgeted for use as follows, assuming that a Majority approves the grant of a Conservation Easement after Closing: (i) $15,150 to Georgia Land Trust for Stewardship Donation & Fees; (ii) $11,000 to Tennille & Associates, Inc. for remaining final appraisal costs and expenses; (iii) $50,000 to Forever Forests, LLC for final project management costs and expenses; (iv) $25,000 for an audit reserve; (v) $30,000 for project accounting services; and (vi) $500 for future expected insurance coverage, which is currently maintained with the Jack Sherrill Insurance Agency.

---

P0000049

## DESCRIPTION OF THE COMPANY

### General Overview

The Company is a Manager-managed limited liability company that was organized on April 23, 2008, in the state of Georgia to hold the Property for investment. A copy of the Articles of Organization is attached as Exhibit A to this Offering Summary. On December 18, 2010, the current operating agreement of the Company was adopted by all of the then current Members and Manager of the Company, a copy of which is attached hereto as Exhibit B. The Company's principal asset is the Property, approximately 283.42 acres of unimproved real estate located in Effingham County, Georgia as further described on the Survey attached hereto as Exhibit D. The Company does not have any other material asset or interest in any other property or business interest.

The current owners of the Company are: WDHL, LDHL, Julienton, and Effingham Managers, which collectively owns 100 of the 200 total authorized Units in the Company. WDHL, LDHL, and Julienton have entered into the Redemption Agreement attached hereto as Exhibit C pursuant to which they have agreed to the redemption by the Company of an aggregate of 95 Units owned by them on a pro rata basis corresponding to the number of Units sold by the Company pursuant to this Offering. The Redemption Price for a Redeemed Unit pursuant to the Redemption Agreement is $18,421.53. The closing of the Redemption Agreement will be completed simultaneously with the Closing of the Offering. Following the Closing, the Sellers and the Manager will own an aggregate of five Units, representing 5% of the issued and outstanding Units in the Company, with the remaining 95 issued and outstanding Units being owned by the Investors. The Sellers and the Manager may elect to consolidate their ownership in the Company with the Manager remaining as the sole owner of an aggregate of five Units owned by them at some point in the future.

The principal office of the Company is currently 405 Main Street, Eastman, Georgia 31023. The telephone number of the Company is currently (478) 231-9163.

### Objects and Purposes

The principal object and purpose of the Company is to hold the Property for investment. The Majority may elect to continue to hold the Property for investment or vote to take any other action with respect to the Property, including, without limitation, seeking to preserve the Property in its natural state and promoting the conservation of the Property through a grant of the Conservation Easement to a Qualified Organization or developing the Property. Under the Operating Agreement the Company is authorized to engage in any lawful act or activity which the Manager shall deem appropriate, subject to the restrictions set forth in the Operating Agreement. (See "Summary of the Operating Agreement" beginning on page 19 and the Operating Agreement, attached to this Offering Summary as Exhibit B)).

**WHILE THE MANAGER ANTICIPATES THAT THE MAJORITY WILL WANT TO ENCUMBER THE PROPERTY WITH THE CONSERVATION EASEMENT AT SOME POINT IN THE FUTURE, IT IS IMPORTANT TO NOTE THAT NEITHER THE MEMBERS NOR THE COMPANY ARE UNDER ANY LEGAL OBLIGATION TO SO ENCUMBER THE PROPERTY, AND MAY HOLD THE PROPERTY FOR LONG TERM INVESTMENT, DEVELOP (OR MAKE ARRANGEMENTS FOR) THE DEVELOPMENT OF THE PROPERTY, OR TAKE ANY OTHER LEGALLY PERMITTED ACTIONS AS DEEMED APPROPRIATE BY THE MANAGER IN THE EVENT THAT A MAJORITY OF THE MEMBERS DO NOT ELECT TO SO GRANT THE CONSERVATION EASEMENT. (SEE "RISK FACTORS" BEGINNING ON PAGE 8).**

### Summary Of The Operating Agreement

*1.    Importance of Operating Agreement.* The Company is governed by the Georgia Limited Liability Company Act, Georgia Code Section 14-11-100, et seq. (the "LLC Act"), and all amendments to the LLC Act, and by provisions contained in its Operating Agreement (the "Operating Agreement"), a copy of which is attached hereto as Exhibit B, including provisions dealing with capital contributions, management, allocation of profits and losses, distributions, transfers of Units, dissolution and other matters. Each Investor will be required to execute the

P0000050

Subscription and Suitability Agreement in the form attached hereto as <u>Exhibit E</u> as a condition of investment, which Subscription and Suitability Agreement contains the agreement of the Investor to be bound by the terms and conditions of the Operating Agreement as a Member of the Company. The following is a summary of certain provisions of the Operating Agreement. *This summary does not purport to be a complete description of the terms and conditions of the Operating Agreement and is qualified in its entirety by express reference to the Operating Agreement included in the Exhibits to this Offering Summary. You should carefully review the entire Operating Agreement, and consult your advisor as to its terms and provisions, before deciding to invest in the Company.*

2.    *Member's Units.* The owners of the Company are called Members. The equity interests in the Company are divided into and represented by Units. All Units are of one class and, except as otherwise provided in the Operating Agreement, have identical voting and economic rights. A Member's interest in voting and in the profits, losses, gains, deductions, distributions and other attributes of ownership of the Company will be determined by the number of Units owned by such Member divided by the total number of issued and outstanding Units (the Member's "<u>Ownership Interest</u>"). There are a total of 200 Units authorized for issuance to Members but only 100 expected to be outstanding, 95 of which will be allocated to the Investors in proportion to their participation in the Offering. The 95 Redeemed Units currently held by the Sellers would thus be redeemed and cancelled and no longer issued and outstanding such that only five of the current Units outstanding would remain unredeemed in addition to the 95 Units issued in the Offering. Upon completion of the Offering and redemption of the Redeemed Units, there will still only be 100 Units issued and outstanding in the Offering, but an aggregate of five of such Units, or 5%, would be held by the Sellers and the Manager.

3.    *Term.* The term of the Company is perpetual.

4.    *Management.* The Operating Agreement provides for centralized management, in the form of one or more Managers. As of the date hereof, there is currently one Manager, Effingham Managers. Unless the approval of the Members is expressly required by the Operating Agreement or the LLC Act, the Manager has full and complete authority, power and discretion to manage and control the business operations of the Company, to make all decisions regarding those matters and to perform any and all other acts and activities customary or incident to the management of the Company's business operations. The Manager can only be removed for "Cause" as such term is defined in the Operating Agreement prior to December 17, 2015. Thereafter, a Majority has the authority to remove the Manager and to appoint any other person deemed appropriate by them to serve as the Manager for any reason whatsoever.

5.    *Member Participation in Management.* The right of the Members to participate in the management and control of the Company's business operations is restricted to a very limited number of significant restrictions upon the ability of the Manager to take certain actions without the consent of a Majority, such as

(i)    Enter into a contract or loan agreement which would commit or obligate the Company to expend more than $50,000.00 of Company funds;

(ii)    The sale of substantially all of the assets of the Company, except in compliance with Article XIII hereof;

(iii)    File bankruptcy for the Company, settle or compromise any claim of the Company in excess of $10,000.00, or confess a judgment against the Company;

(iv)    Make any loans of Company funds;

(v)    Cause the Company to be a party to a merger, or an exchange or acquisition of the type described in section § 14-11-901 of the Georgia Act;

(vi)    Take any action which would be likely to have an adverse effect on the Property or any other property of the Company;

P0000051

(vii)    Sell, assign, convey, exchange, dispose, grant or otherwise transfer the Property or any other property of the Company, except in compliance with Article XIII of the Operating Agreement;

(viii)    Mortgage, pledge, encumber, grant a security interest in, lease or sell the Real Property or any other Property of the Company, except in compliance with Article XIII of the Operating Agreement;

(ix)    Cause the Company to engage in any business activities or lines of business other than pursuant to its purpose described in Section 3.01 of the Operating Agreement;

(x)    Take any action in derogation of the decision of the Members under Article XIII of the Operating Agreement; or

(xi)    The undertaking, generally, to do any act which is in contravention of this Operating Agreement or which would make it impossible to carry on the ordinary business of the Company.

Should the Manager desire to take any of such restricted actions, the Manager is required to notify each of the Members of such fact, and if any Member so notified fails to respond either affirmatively or negatively in writing to the Manager within three (3) days of the effective date of such notice, such Member shall be deemed to have consented to the action proposed by the Manager. A Member has no right or authority to act as an agent for or to bind the Company, unless that Member is also a Manager. Accordingly, a prospective Investor should purchase Units in the Company only if such prospective Investor is willing to relinquish control over the management of the Company.

6.    *Investment or Conservation Proposal.* The Manager is required to make a proposal to the Members to pursue an investment proposal (a "Investment Proposal") or a conservation easement proposal (a "Conservation Proposal") with respect to the Property and notify the Members of such proposal deemed by the Manager to be the best course of action with respect to the Property. Each of the Members then has the right and option (unless such right and option is waived by a Member in writing), at his or her election, immediately or at any time during the three (3) calendar days after the deemed receipt of such notice, in which he or she may reject the Investment Proposal or the Conservation Proposal, as appropriate. In the event that a Majority has provided such a timely notice of rejection, the Company shall not pursue the rejected proposal, and shall pursue the other proposal.

7.    *Managers Fees and Obligations.* The Manager is not entitled to any management fee generally. However, upon any winding up, liquidation or distribution of assets of the Company, the Manager is entitled to receive any funds remaining in the Operating Reserve of the Company, if any, as a "guaranteed payment" for services rendered as the manager. Such Operating Reserve is expected to contain a maximum of $40,000. The Manager is also entitled to be reimbursed for all reasonable expenses incurred in managing the Company and carrying out its duties as manager.

8.    *Additional Capital Contributions.* No Member will be obligated to make any Capital Contributions to the Company other than as initially made in this Offering.

9.    *Allocation Among Members.* Any profits and losses of the Company will be allocated among the Members based upon their relative Unit ownership. Any Contribution Deduction will be allocated to the Members in accordance with their relative Unit ownership, as separately stated items under Section 702 of the Internal Revenue Code. The Manager may make distributions in the amounts and at the times he determines. After repayment of any loans advanced by the Manager, any net cash flow (minus a reserve) will be distributed to the Members so as to discharge positive capital accounts, and then in accordance with their relative Unit ownership. Because the Company will be taxed as a partnership for federal and state tax purposes, profits and losses will be allocated to the Members regardless of whether any distributions are made.

10.    *Admission of Additional Members.* The consent of a Majority of the Members is required to admit an additional Member into the Company.

P0000052

11.    *Permitted Transfers.* A Member is generally permitted, subject to compliance with applicable securities laws, to transfer a Unit to: (i) a revocable trust of which the transferring Member is the grantor, trustee and primary beneficiary, (ii) the estate of a Member who is a natural person upon such Member's death, or (iii) an entity wholly-owned by the Member (each, a "Permitted Transfer"). Provided, however, that upon the transfer of said Membership Units, said the assignee of such Units shall continue to be bound by all of the terms and conditions of this Operating Agreement as it applied to the transferring Member and the assignee of such Membership Units shall execute such documents as are deemed reasonably necessary by the attorneys for the Company to bind said assignee to the provisions of the Operating Agreement.

12.    *Transfer of Units.* Other than a Permitted Transfer, a Member may not voluntarily sell, assign, transfer, gift, pledge or otherwise dispose of such Member's Units without the consent of a Majority of the Members.

13.    *Withdrawal from Company.* A member may not voluntarily withdraw from the Company without the consent of the Manager or without the occurrence of certain specified events such as death of an individual Member, dissolution of an entity Member, or a bankruptcy event. A Member is not entitled to a return of such Member's capital.

14.    *Books and Records.* The Manager is required to keep the books and records of account of the Company, which books and records shall be available for inspection by the Members.

15.    *Dissolution.* The Company is to be dissolved upon the first to occur of (i) the unanimous written agreement of all of the Members to dissolve the Company; (ii) there is an administrative or judicial decree of dissolution; (iii) the sale of all of the assets of the Company; or (iv) the disposition of all of the Property. Upon dissolution of the Company in accordance with the Operating Agreement, or by law, the Managers shall undertake to liquidate the Company's assets as promptly as practicable. After satisfaction of the claims of third parties, if any, the proceeds from such liquidation, together with the assets distributed in kind, shall be distributed to the members as provided in the Operating Agreement.

16.    *Waiver of Trial by Jury.* All Members will have waived their right to a trial by jury with respect to any disputes under the Operating Agreement.

---

P0000053

## DESCRIPTION OF THE PROPERTY

### General Description

The Company's principal asset is approximately 283.42 acres of unimproved real estate (the "Property") located in Effingham County, Georgia, as shown on the Survey attached hereto as Exhibit D. The Property is not encumbered by any debt. The Property surrounds two separate five (5) acre parcels as shown on such Survey (the "Distributed Parcels") that were distributed to Pine Creek Management, LLC, a Georgia limited liability company and an affiliate of the current Members and Manager ("Pine Creek") prior to the date hereon in December of 2010.

The Property is located in the Sea Island Flatwoods region of the Southern Coastal Plain Ecoregion of Georgia in the Lower Ogeechee River watershed. The Ogeechee River originates in the lower Georgia Piedmont and flows 245 miles to the Atlantic Ocean at Ossabaw Sound. The Ogeechee River watershed has been identified as a high priority watershed for protection by the Georgia Department of Natural Resources in its Georgia Comprehensive Wildlife Conservation Strategy (herein "GCWCS"). Wetlands exist on the Property as shown on the Survey. The Property adjoins other properties protected with conservation easements.

The Property is presently zoned AR-1 Agricultural Residential by Effingham County, Georgia. This requires minimum site sizes for residential properties of five acres. However, if the site has sewer treatment available, which many similar neighborhoods built in Effingham County in the same zoning have utilized, sites can be as small as ¼ acre with county approval. An agreement has been reached with a sewer company to provide sewer services if the property were developed. Thus, applicable zoning ordinances would restrict development of the Property to no more than four units per acre, which equates to a maximum permissible density of approximately one hundred eighty-nine (189) units under applicable zoning.

Mineral rights are attached to the Property and owned by the Company, and the Company is not aware of any active drilling or other mining activities under the subsurface.

No hazardous materials or environmental problems are known to exist on or about the Property. The Company has not commissioned or obtained any environmental site assessment or other third party report with respect to such matters.

The Property is comprised of 2 separate parcels for tax purposes consisting of an aggregate of approximately 283.42 acres. The 2010 ad valorem taxes for the entire 288.42 acres that existed prior to the distribution of the Distributed Parcels to Pine Creek, during December 2010 are assessed at approximately $3,502.79 in the aggregate.

### Access and Use Easements

The Company entered into that certain Declaration and Grant of Access and Use Easements with Pine Creek on December 18, 2010 (the "Pine Creek Easement"), for the benefit of the Distributed Parcels. The Pine Creek Easement creates, establishes, grants and conveys to Pine Creek, as owner of the Distributed Parcels, a non-exclusive easement over and across a separately designed easement parcel on the Property for each such Distributed Parcel for the purposes of (i) vehicular and pedestrian ingress and egress, and for the purpose of constructing, repairing, connecting to and/or maintaining a road, paved or unpaved, between Old Louisville County Road and such Distributed Parcel, and (ii) installation, construction and maintenance, repair, operation and extension of utility lines, poles, wires, pipes, transformers and other facilities necessary or appropriate to the transmission, distribution, flow and delivery of electric current, water, telephone communications, cable television, gas, storm sewage and sanitary sewage serving such Distributed Parcel. Moreover, the Pine Creek Easement grants to Pine Creek, as owner of the Distributed Parcels, a perpetual non-exclusive easement and right to access and use of the entire Property for recreational purposes and hunting, as well as the use of any amenities constructed upon the Property, as well as an easement for reasonable ingress and egress over the entire Property for the purpose of exercising such recreational and hunting rights and accessing and using said amenities. The Company is permitted to charge a reasonable fee for the use of said amenities.

P0000054

While the Pine Creek Easement is clear that the Company is under no obligation to grant any conservation easement on all or any portion of the Property, the Pine Creek Easement does grants to Pine Creek all rights to exercise any rights that may be reserved to the Company in any conservation easement pertaining to the Property that may be subsequently imposed by the Company.

**Timber Rights**

When the Property was originally acquired by HRH on August 1, 2007, there was retained in such limited warranty deed a right of first offer for the benefit of International Paper Company ("IP") that is deemed to run with the land until December 31, 2026, pursuant to which in the event that the owner of the Property desires to sell timber from any portion of the Property (other than as a part of the sale of such lands themselves or any party thereof), such owner is required to provide notice of such sale to IP at least 45 days before advertising such timber for sale or offering such timber for sale to any other person or entity to give IP time to make a written offer (the "IP Offer") to acquire such timber. In the event the IP Offer is accepted, IP will then have no less than 12 nor more than 18 months to harvest such timber. In the event the IP Offer is rejected by the owner of the Property or otherwise not accepted, the owner of the Property is permitted to sell such timber to another third party within a period of 60 days following such rejection or deemed non-acceptance of the IP Offer on terms no more favorable to such other third party than the terms set out in the IP Offer, provided that the harvesting terms are the same as in the IP Offer, the method of payment is the same as in the IP Offer, and the price offered by such third party exceeds by 4% or more the price set forth in the IP Offer.

The Company has entered into a Timber Lease dated as of December 18, 2010 (the "Timber Lease"), with Pine Creek, pursuant to which Pine Creek was granted the right to use and occupy the Property for timber management and harvesting and for incidental purposes related thereto, and for no other purpose. The Company has retained the rights to use and enjoy the Property for such purposes as the Company deems appropriate, so long as such use and enjoyment does not result in a substantial interference with Pine Creek's timber harvesting rights contained in the Timber Lease. The Timber Lease is specifically subject to the IP right of first offer and to any subsequent conservation easement that may be imposed upon the Property by the Company.

The Timber Lease expires on December 16, 2030 and provides for an annual payment to the Company of $3,600.00, with such annual lease payments to be increased each year by the increase in the Consumer Price Index, as published by the United States Bureau of Labor Statistics from the date of the prior Lease Payment until the date of the following Lease Payment. The first such increase will be effective November 23 2011. Should Pine Creek directly harvest timber from the Property, Pine Creek is required to pay to the Company additional rent, for the timber harvested and removed from the Property, at the rate of 10% of the Gross Delivered Price of Timber (as such terms are defined in the Timber Lease). Alternatively, should Pine Creek engage an independent contractor to harvest timber from the Property, Pine Creek is required to pay to the Company additional rent, for the timber harvested and removed from the Property, at the rate of 10% of the payments received by Pine Creek under the agreement with such independent contractor.

The Company has the right to terminate the Timber Lease as to all or any portion of the Property (a "Lease Termination") upon no less than 30 days written notice to Pine Creek ("Timber Notice"), provided that the Company transfers title of that portion of the Property (the "Terminated Portion") which is the subject of the Lease Termination to an unrelated third party in a bona fide sale for adequate consideration within thirty (30) days of the effective date of the Lease Termination. The Company is permitted to make multiple Terminations of the Timber Lease should the prior Lease Termination(s) not terminate the Timber Lease as to the entire Property. In the event of any such Lease Termination by the Company, Pine Creek has the option either: (i) to then harvest the timber on the Terminated Portion of the Property within ninety (90) days of said termination, or (ii) to require the Company to pay Pine Creek the prorated value of the remaining term of the Timber Lease as to the Terminated Portion of the Property as determined pursuant to the Timber Lease.

P0000055

**Potential Uses of the Property**

The Company has investigated several possibilities for the Property, including all of the following, the selection of which, if any other than continuing to hold the Property for investment, would require the vote of a majority in interest of the holders of the Units following the Closing (the "Majority"):

(1)  Continuing to Hold the Property For Investment.  The Company could continue to hold the Property for investment purposes.  If a majority of the Members of the Company following the Closing do not vote to cause the Company to grant a conservation easement on the Property, pursue the future development of the Property, or take some other significant action with respect to the Property requiring the vote of the Members, the Company would continue to hold the Property for investment

Residential development has occurred in proximity to the Property. The Company has investigated the feasibility of the future development of the Property into as many as one hundred eighty-nine (189) residential lots for sale to the public either by itself or in conjunction with others.  The Property is located in Effingham County, Georgia, with a significant portion of the surrounding real property perpetually preserved in its natural state pursuant to conservation easements that have previously been granted with respect thereto by affiliates of the Manager and the Sellers.  The Manager believes that the proximity of the Property to the preserved natural habitats surrounding the Property as well as its proximity to the economic generators located in Savannah, Georgia, could support the development and sale of the Property in this fashion.  However, the development of the Property in this fashion would likely require the Company to incur significant indebtedness that would likely need to be guaranteed by some or all of the members or the members to make significant additional capital contributions to the Company.  The Company does not intend to pursue the future development of the Property without the approval of a majority of the Members of the Company following the Closing.  No Member is required to guarantee any indebtedness of the Company or otherwise make any additional capital contributions to the Company.

(2)  Granting a Conservation Easement on a Portion of the Property.  The Company has investigated the feasibility of granting a conservation easement (the "Conservation Easement") on the Property to achieve certain business and tax objectives.  While the Company is under no legal obligation to pursue the Conservation Easement, the Company has preliminarily negotiated with Georgia Land Trust ("GLT"), a qualified organization as defined under Section 170(h)(3) of the Code (a "Qualified Organization"), to accept the Conservation Easement in accordance with applicable law to permit the Company to receive a charitable contribution deduction pursuant to Section 170(h) of the Internal Revenue Code as described in this Offering Summary.

Based upon the preliminary appraisal received by the Company, the Manager expects that the grant of the Conservation Easement would generate a charitable contribution easement deduction in the approximate amount of Six Million Seven Hundred Ninety-one Thousand and 00/100 Dollars ($6,791,000), which would inure to the Members based upon their relative ownership percentage in the Company.  However, there can be no assurance that this or any amount will ultimately be available to the Members as a charitable contribution easement deduction. (See "RISK FACTORS" beginning on page 8 and "THE PROPOSED CONSERVATION EASEMENT" beginning on page 30).

Under the Operating Agreement, a vote of the Majority of the Members is required to cause the Company to grant any conservation easement on the Property.

**Conservation Purposes**

Preliminary studies have been undertaken by GLT to indicate that the Property will satisfy one or more of the "conservation purposes" defined under Treasury Regulations Section 1.170A-14(d).  A copy of such baseline study is available for inspection from the Manager upon request.  Among other things, the Property is located in the Sea Island Flatwoods region of the Southern Coastal Plain Ecoregion of Georgia in the Lower Ogeechee River watershed.  The Ogeechee River originates in the lower Georgia Piedmont and flows 245 miles to the Atlantic Ocean at Ossabaw Sound.  The Ogeechee River watershed has been identified as a high priority watershed for protection by the Georgia Department of Natural Resources in its GCWCS.  Moreover, the baseline study indicates

P0000056

that the Property provides food, water, and shelter for large numbers of mammals, such as raccoon, deer, otter, beaver, and mink. Trees found in the wetter areas include tupelo and cypress, and the bottomlands support water oak, laurel oak, red maple, swamp blackgum, and sweet gum. The river has a namesake tree, the Ogeechee lime (Nyssa ogeche), whose bright red fruits are found floating in quiet eddies of the river during the fall. Several rare plants are also found near the river, including pitcher plants, witch-alder, needle palm, spider lily, and others. Blooming in the spring is wild azalea. The secluded river swamps are a haven to a wide variety of birds that use the river as a protected greenway, including woodpeckers, ducks, songbirds, and wading birds. Osprey and Mississippi and swallowtail kites are seen cruising the river, and a variety of owls and hawks feeds on the small mammals found in the bottomland forests. Water snakes and alligators are common in the Ogeechee River. In the lower reaches, wood 'storks and southern bald eagles use the river as a feeding ground, and West Indian manatees occasionally visit the river near the coast. The fish fauna of the Ogeechee, much sought after by fishermen, includes American shad, redbreast, crappie, striped bass, shellcracker, and catfish. The endangered shortnose sturgeon (Acipenser brevirostrum) breeds here as well. Additionally, the Property adjoins other properties protected by conservation easement, which would extend the habitat by adding contiguous protected lands, and the preservation of the Property would preserve natural views from Old Louisville Road and preserve timberland.

**Title Encumbrances**

The Company is in possession of a recent title review performed by Henderson & Harris, LLC, legal counsel for the Sellers. This review discloses that the Property is subject to certain recorded instruments that should not materially affect or impair the value of the Property or its potential development.

**The Appraisal**

The Company has reviewed a copy of a preliminary summary appraisal report for the Property prepared by Tennille & Associates, Inc. for the Company estimating the "as is" market value of the Property as of October 22, 2010, at $6,791,000, which appraisal is preliminary and stated as being subject to all of the assumptions, limitations, qualifications and other terms and provisions set forth therein. A copy of such appraisal report is available from the Manager upon request. The Manager has not reviewed or commissioned any other appraisal of the Property and does not intend to do so prior to Closing.

The Manager has reviewed such summary appraisal in connection with the Company's investigation of the feasibility of pursuing a Conservation Easement on the Property. HOWEVER, NEITHER THE COMPANY NOR THE COMPANY'S COUNSEL EXPRESS ANY OPINION WHATSOEVER CONCERNING THE VALUE OF THE PROPERTY FOR ANY PURPOSE, INCLUDING, WITHOUT LIMITATION, THE VALUE OF THE PROPERTY FOR PURPOSES OF COMPUTING ANY CONTRIBUTION DEDUCTION WHICH MAY BE AVAILABLE TO THE COMPANY IN THE EVENT THAT IT ENCUMBERS THE PROPERTY WITH A CONSERVATION EASEMENT TO A QUALIFIED ORGANIZATION.

P0000057

## OTHER SIMILAR PROJECTS UNDERTAKEN BY THE MANAGER

(1) _Affiliated LLC Projects._ The Property was originally acquired by an affiliate of the Company and the Sellers, HRH Investments, LLC, a Georgia limited liability company ("HRH"), on August 1, 2007, as part of the purchase by it of an approximately 1,490 acre parcel of land (the "Initial Parcel"). The Initial Parcel was subsequently divided into 10 separate parcels, each of which was transferred to one of 10 separate limited liability company affiliates of HRH (each, an "Affiliate LLC") in exchange for membership interests in each such Affiliate LLC. The Company is an Affiliate LLC and acquired the Property in such manner on December 17, 2008. The Manager is the manager of all ten Affiliate LLCs that received a portion of the Initial Parcel. One of the Affiliate LLCs was subsequently merged with another Affiliate LLC. The Manager is the manager of all nine Affiliate LLCs that received a portion of the Initial Parcel.

Six of the Affiliate LLCs, (i) Bald Eagle Estates, LLC, a Georgia limited liability company ("Bald Eagle"); (ii) Conifer Estates, LLC, a Georgia limited liability company ("Conifer"); (iii) Belair Woods, LLC, a Georgia limited liability company ("Belair"); (iv) Cottonwood Place, LLC, a Georgia limited liability company ("Cottonwood"); (v) Red Oak Estates, LLC, a Georgia limited liability company ("Red Oak"); and (vi) Riverside Place, LLC, a Georgia limited liability company ("Riverside"), have all conducted an offering of units in such limited liability company to third party investors. Moreover, the members of the first six of such Affiliate LLC have elected to impose a conservation easement on substantially all of the real estate owned by such entity. Two other related Affiliate LLCs, Oakhill Estates, LLC, a Georgia limited liability company ("Oakhill") and Village at Effingham, a Georgia limited liability company ("Village"), have recently closed an offering of their units to third party investors as well. Both Oakhill and Village are expected to impose a conservation easement on substantially all of the real estate owned by it as well. The last Affiliate LLC, Effingham Place, LLC, will likely commence an offering of its units to third party investors during calendar year 2010 in a manner similar to the Offering of the Company.

The conservation easements imposed by Bald Eagle and Conifer were recorded on the last day of December 2008. The conservation easements imposed by Belair, Cottonwood, Red Oak and Riverside were recorded on the last day of December 2009. Neither Oakhill nor Village have yet recorded a conservation easement on any real property owned by them, but each is expected to do so during 2010. None of the conservation easements imposed by any of the other Affiliate LLCs have been challenged by the Internal Revenue Service or any other governmental taxing authority.

(2) _Other Projects._ Certain of the Sellers are also members and / or managers of other entities that own real estate which are either conducting or contemplating conducting similar offerings to investors following which conservation easements may be imposed on all or substantially all of the real estate owned by such entities. The audit of any one or more of these other entities could subject the Company to an increased risk of audit as well.

P0000058

## FEDERAL INCOME TAX CONSIDERATIONS

*You are urged to consult with your personal tax advisor regarding the federal, state and local tax considerations and reporting consequences of the purchase of a Unit.*

This section is provided for general information only and is a summary of certain federal income tax considerations of an investment in the Company and is based upon the Code and the Regulations, published rulings and practices of the IRS and court decisions. This summary is based upon current authorities, and there can be no assurance that future legislative or administrative changes or court decisions will not significantly modify the law regarding the matters described herein. Further amendments to the Code are likely in the future. Prospective Members should recognize that it is possible that the present federal income tax treatment of investments in limited liability companies may be modified by legislative, judicial or administrative action at any time, and such action may be applied retroactively or prospectively or otherwise in a manner which may adversely affect investments and commitments previously made.

In addition to the federal income tax considerations discussed below, ownership of Units may subject a Member to state, local, estate, inheritance or intangibles taxes that may be imposed by various jurisdictions. Except as specifically indicated below, the following discussion does not address the various tax implications of an investment in the Company by any corporations, partnerships, tax-exempt entities, trusts, and other non-individual taxpayers.

**THE COMPANY HAS SOUGHT AN OPINION OF COUNSEL ON FEDERAL INCOME TAX CONSEQUENCES OF AN INVESTMENT IN THE COMPANY WHICH IS ATTACHED HERETO AS EXHIBIT H (the "Tax Opinion").** However, this tax opinion is not a guaranty of any particular tax treatment. Accordingly, you may wish to seek and rely on your own professional tax advisor in evaluating the tax consequences of an investment in the Company.

The Company will make a number of decisions with respect to the tax treatment of particular transactions on the Company's tax return. There can be no assurance that all of the positions taken by the Company will be accepted by the IRS. Such non-acceptance could adversely affect the Members.

**YOU SHOULD ASSUME THAT THE IRS WILL AUDIT THE COMPANY'S TAX RETURN, AND THAT SUCH AN AUDIT COULD RESULT IN THE LOSS OF SOME OR ALL OF THE TAX BENEFITS ANTICIPATED TO BE DERIVED FROM AN INVESTMENT IN THE COMPANY. MOREOVER, THE POTENTIAL TAX BENEFITS TO YOU ARISING OUT OF ANY CONTRIBUTION DEDUCTION WILL DEPEND UPON YOUR INDIVIDUAL TAX CIRCUMSTANCES, INCLUDING YOUR EFFECTIVE MARGINAL TAX BRACKET AND OTHER CHARITABLE CONTRIBUTIONS MADE BY YOU OR AVAILABLE TO BE CARRIED FORWARD FROM PRIOR YEARS. ACCORDINGLY, YOU SHOULD REVIEW CAREFULLY THE TAX RISKS DESCRIBED IN THIS OFFERING SUMMARY AND YOU ARE URGED TO CONSULT WITH AND RELY UPON YOUR OWN PERSONAL TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES ARISING FROM THE PURCHASE OF THE UNITS BEFORE MAKING A DECISION TO INVEST IN THE COMPANY.**

### General

Taxation as a Partnership

The Members will realize certain tax advantages from owning Units only if the Company is treated as a partnership for federal income tax purposes, and is not treated as an association which is taxable as a corporation. So long as the Company does not affirmatively elect to be taxed as a corporation, the Company will be considered a partnership for federal income tax purposes. As a partnership for federal income tax purposes, the Company will not be subject to any federal income tax, and each Member will be required to take into account his allocable share of the Company's taxable income, gains, losses and deductions in computing his federal income tax liability.

P0000059

Member's Basis in Units

Your basis in your Unit is determined initially by the adjusted basis of property and the amount of cash you have contributed to the Company. This basis will be increased by (i) additional capital contributions; (ii) your allocable share of the Company's liabilities; and (iii) your distributive share of the Company's taxable income. Your basis in Units is decreased by (a) the amount of cash or the basis of any property distributed to you and (b) your allocable share of the Company's taxable losses and nondeductible expenditures.

The Company does not presently intend to incur significant indebtedness. However, if the Company does incur significant indebtedness later, such indebtedness could have an effect on a Member's basis in his or her Units. Different rules apply depending upon whether such indebtedness will be considered recourse or nonrecourse indebtedness.

Allocation of Company Profits and Losses

Your distributive share of the Company's income, gain, loss and deduction will be determined by the Operating Agreement, unless an allocation is determined not to have "substantial economic effect" or is not in accordance with the "partners' interests in the partnership," both of which are determined under Section 704(b) of the Code and the Regulations thereunder (the "Allocation Regulations"). The Allocation Regulations contain complex provisions which deal with numerous issues that should not be a problem for the Company. All items of income, gain, loss and deduction will be allocated among the Members in accordance with their participation in the Offering Price. In addition, charitable deductions allowed to the Company will be allocated among the Members in accordance with their ownership interest in the Company.

Limitations on Losses

Your ability to claim any losses attributable to the Company is subject to various limitations relating to your adjusted basis in the Company, passive activity losses, and at-risk limitation in the Company. If your distributive share of Company losses is greater than your available adjusted basis, the excess loss can't be claimed in that year but must instead be carried forward until you once again have adjusted basis available to offset the loss.

The Company does not expect to generate any significant losses. The Contribution Deduction, discussed below, is a separately stated item, which is passed through to you as a Member and is not considered an expense at the Company level for purposes of calculating the Company's income or loss.

Cash Distributions

Cash distributions by the Company and amounts received upon the complete redemption of a Member's Units will be taxable to Members only to the extent such distributions exceed a Member's adjusted tax basis in his Units. Similarly, in the case of distributions other than pursuant to a complete liquidation of a Member's Units, the Member's adjusted tax basis in his Units will be reduced by the amount of the cash distribution.

Sale or Disposition of Units

Upon a sale of Units, the gain or loss recognized for federal income tax purposes by the selling Member will be, in general, equal to the difference between the adjusted tax basis in such Member's Units and the amount realized by him on such sale. For purposes of computing such gain or loss, the amount realized on the sale includes not only the cash and the value of any other property received but also the selling Member's share (if any) of Company liabilities included in the basis of his Units. If a Member's basis in his Units has been reduced below his share of Company liabilities (by, for example, the allocation of losses), the amount of his taxable gain (and possibly even tax liability) on the disposition may exceed the amount of cash that is received. In addition to the recognition of gain or loss from the disposition, any Company losses of the selling Member that had been suspended pursuant to the limitations on "passive losses" may also be used upon certain dispositions of Units.

There are special rules with respect to a Member's share of the potential "depreciation recapture", "unrealized receivables" or "substantially appreciated inventory items" of the Company, as defined in section 751(c)

P0000060

and (d) of the Code. A Member will realize ordinary income as a result of the deemed disposition of such items. In the case of the Company, however, substantially all assets of the Company are expected to consist of real property, which is not depreciable. Accordingly, depreciation recapture is not likely to occur as a result of the sale or exchange of the Company's assets.

### Dissolution or Liquidation of the Company

Upon the dissolution and liquidation of the Company, a Member will recognize gain only to the extent that a liquidating distribution of money exceeds his adjusted tax basis in his Units immediately before the distribution. Section 731(a) of the Code. No gain will be recognized to a recipient Member as a result of a distribution of property other than money, and the Member's basis for the distributed property will be the same as his basis in his Units, reduced by the amount of any money distributed to him in liquidation. Section 732(b) of the Code. Furthermore, gain will be recognized to a recipient Member only to the extent that any money distributed exceeds the adjusted basis of such Member's interest in the Company immediately before the distribution and loss will be recognized in a liquidating distribution only if such distribution is limited to money, unrealized receivables and substantially appreciated inventory items, and the amount of money plus the Member's basis in the unrealized receivables and substantially appreciated inventory items is less than his adjusted tax basis for his Units. Section 731(a)(2) of the Code. Such gain or loss will be considered gain or loss arising from the sale or exchange of Units. Section 731(a) of the Code.

### Tax Shelter Disclosure

Treasury Regulations promulgated under Section 6011 of the Code require every taxpayer (defined to include any corporation, partnership, individual or trust) that has participated in a "reportable transaction" and who is required to file a tax return, to file with its tax return a disclosure on From 8886. A "reportable transaction" is any transaction described in any one of six categories set forth in the Treasury Regulations.

At the present time, we do not believe that any of the transactions contemplated involving the Company constitute reportable transactions under existing Treasury Regulations and administrative rulings. However, we cannot predict with certainty whether any such transaction will constitute a reportable transaction in the future as a result of (i) published guidance designating the same or similar transaction as a listed transaction, (ii) satisfaction of the thresholds for a loss transaction, or (iii) new legislation or differing interpretations of existing law resulting in the classification of any transaction as a reportable transaction. Each prospective Member should consult with his or her own tax advisor regarding the disclosure requirements resulting from an investment in the Company.

Investors are urged to consult with their tax advisors regarding the tax consequences of purchasing Units prior to making an investment

## The Conservation Easement

### Current Intention

The Manager intends to propose to the Members that they consider encumbering the Property by a Conservation Easement to a Qualified Organization at some point in the future. However, the Company is under no legal obligation to encumber the Property with a Conservation Easement and the Members are under no legal obligation to vote to approve the encumbrance of the Property with a Conservation Easement.

### Specific Requirements Under Code and Regulations

The charitable contribution deduction allowed under Section 170(h) of the Code represents a particular and specific type of the charitable contributions for which deductions are more generally allowed. In the case of a Conservation Easement, the Company, as the grantor, is permitted to retain and reserve certain rights that are not inconsistent with the conservation purposes which such a Conservation Easement is intended to serve. As such, the federal tax deduction for a qualified conservation easement constitutes a limited exception to the more general rule restricting charitable contributions of partial interests in property. It is important for prospective Members to be aware that the Company's proposed Conservation Easement with respect to the Property must meet the specific

P0000061

requirements outlined in the Code and Regulations in order for the Company to successfully claim and sustain any Contribution Deduction.

Nature of Restrictions

Any Conservation Easement would impose substantial restrictions granted in perpetuity on the uses which may be made of the Property. Such restrictions would be enforceable under the terms of the Georgia Uniform Conservation Easement Act, OCGA §§ 44-10-1 *et seq*.

The following covenants and restrictions are among the limitations which likely would be applicable to the Property in perpetuity in the event that the Company encumbers it with a Conservation Easement: (1) the Property could not be used for any residence or for any commercial, institutional, or industrial purpose or purposes (2) the nature of any structures which may be built on the Property would be severely limited (3) the cutting, removal or destruction of living trees would be restricted but not prohibited (4) signage, billboards or outdoor advertising structures would be limited (5) filling, excavation, surface mining, drilling, dumping and material changes in the topography would be precluded (6) generally no livestock grazing on the Property would be allowed, but some small scale agricultural use would be permitted, and (7) any other use or activity, not expressly reserved under the Conservation Easement, which would be inconsistent with or materially threaten the conservation purposes would be prohibited. While certain rights would be reserved to the Company under the Conservation Easement which are considered to be consistent with the conservation purposes, the Company, or future owners of the Property, would be required to notify the Qualified Organization as defined below in writing before exercising any such rights, and the Qualified Organization must be satisfied that the proposed use or activity will have no material adverse effect on the conservation purposes or on the significant environmental features of the Property established under the reports, plans, photographs, documentation and exhibits assembled by the Qualified Organization which describe the Property's present significant ecological and scenic features.

Qualified Organization

The likely Qualified Organization under any Conservation Easement with respect to the Property would be the Georgia Land Trust ("GLT"), a Georgia non-profit corporation. GLT was established as a public charity for purposes of preserving and conserving natural habitats and environmentally sensitive areas and for other charitable scientific and educational purposes. The Company is aware that GLT has received a determination from the IRS of its status as a publicly supported organization under Code § 501(c)(3) as described in Sections 509(a)(1) and 170(b)(1)(A)(vi) of the Code. GLT will be required to represent to the Company in any such Conservation Easement, if and when it is executed, delivered and filed, that GLT constitutes a "qualified organization" under Section 170(h)(3) of the Code, which is one of the Company's prerequisites to claim and maintain any Contribution Deduction.

Conservation Purposes

Any qualified conservation contribution must be exclusively for conservation purposes. The recognized conservation purposes are limited to the following: (1) preservation of land areas for outdoor recreation by, or the education of, the general public (2) protection of a relatively natural habitat of fish, wildlife, or plants, or similar ecosystem (3) the preservation of open space for the scenic enjoyment of the general public or pursuant to a clearly delineated federal, state or local governmental conservation policy, yielding a significant public benefit or (4) the preservation of an historically important land area or a certified historical structure.

The conservation purposes which are expected to be served if a Conservation Easement is granted with respect to the Property would include (1) preservation of the Property's relatively natural habitat of fish, wildlife, or plants, or similar ecosystem, and (2) preservation of the Property as open space (including farmland and forest land) which provides scenic enjoyment to the general public and yields a significant public benefit, and preservation of the Property as open space which, if preserved, will advance a clearly delineated governmental conservation policy and will yield a significant public benefit.

Because each tract of land possesses a unique mix of conservation values, the determination of whether a particular contribution satisfies a specific conservation purpose can be subject to some uncertainty. Therefore, it

P0000062

would be important that the Company attempt to ensure that the Property and any such proposed Conservation Easement will satisfy one or more of the required conservation purposes.

Treatment of Charitable Contributions

Section 170(a)(1) of the Code allows a deduction with respect to a contribution or gift to or for the use of a corporation, trust, community chest, fund or foundation organized and operated exclusively for charitable or educational purposes. For individual taxpayers, charitable deductions are limited under §170(b)(1) to certain percentages of the contribution base (defined to mean adjusted gross income computed without regard to any net operating loss carry back). Such percentages vary depending upon the type of charitable organization to which the gift or contribution is made and the type of property which is the subject of the gift or contribution.

A charitable contribution of property generally entitles a donor to a deduction in an amount equal to the fair market value of the property contributed. If the contributed property is not a capital asset held for more than one year by the donor, then the amount of the deduction is limited to the lesser of the value of the property or the adjusted basis in the property contributed. The Manager believes that the Property constitutes a capital asset held for more than one year in the hands of the Company.

Current tax law limits the available charitable contribution deduction for calendar year 2010 relating to conservation easements to 50% of an individual's contribution base or 10% of a corporation's taxable income (subject to certain adjustments) for such year. Such limitation will be applied to an Investor's aggregate charitable contributions, including an Investor's allocable share of any Contribution Deduction claimed by the Company. Accordingly, your ability to utilize the potential Contribution Deduction will depend on your individual income, other charitable contributions, and other particular circumstances. Current tax law during 2010 allows any unused charitable contribution deduction relating to conservation easements to be carried forward for up to fifteen (15) years. If you are unable to fully utilize your allocable share of any Contribution Deduction for the year in which the Company claims such deduction, you should consider the possibility that future tax law changes may limit or otherwise affect your ability to carry forward and utilize any unused portion of such deduction in future years. Current tax law stems from the fact that Congress has just approved legislation to allow up to 50% of the contribution base to be used in 2010, similar to the rule in 2009. In addition, Congress has just approved legislation to provide for a 15 year carryover, instead of the 5 year carryover, for 2010, similar to the rule in 2009. This legislation to reinstate the 2009 rules was signed into law by the President on December 17, 2010. Tax law limits for charitable contributions could change further.

Under Code §170(f)(3)(A), a donor may take a charitable deduction for a contribution of land only if the donor conveys the entire interest in the land to a qualified organization. However, a deduction is permitted in the case of a contribution of a "partial" interest in very limited circumstances; namely, (i) a remainder interest in a personal residence or farm; (ii) an undivided portion of the taxpayer's entire interest in the property; (iii) a partial interest transferred to certain trusts; and (iv) a qualified conservation easement.

The Contribution Deduction

In the event that the Company does in fact encumber some or all of the Property with a Conservation Easement, the Company will claim a Conservation Deduction on account thereof on its federal tax return for the year in which such Conservation Easement is granted. Under Section 702(a)(4) of the Code, each Member will take into account separately his, her or its distributive share (determined in accordance with their percentage interests) of the Company's Contribution Deduction. The amount of the Contribution Deduction will be determined in accordance with an appraisal that would be obtained by the Company valuing the Property for these purposes.

Substantiation of Value of Conservation Easement

Under Section 1.170A-14(h) of the Regulations, where no substantial record of marketplace sales of comparable easement rights is available, the fair market value of a perpetual conservation restriction (i.e., the allowable amount of the Contribution Deduction) is equal to the difference between the fair market value of the property it encumbers before the granting of the restriction the "Before Value") and the fair market value of the encumbered property after the granting of the restriction (the "After Value"). Under Section 1.170A-14(h)(3)(ii)

P0000063