EXHIBIT

3

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                      ATLANTA DIVISION

4

5    ANDREW LECHTER; SYLVIA THOMPSON;   ) CIVIL ACTION NO.
     LAWSON F. THOMPSON; RUSSELL DALBA; ) 20-CV-01325-AT
6    AND KATHRYN DALBA, ON BEHALF OF    )
     THEMSELVES AND ALL OTHERS          )
7    SIMILARLY SITUATED,                )
                                        )
8              PLAINTIFFS,              )
                                        )
9         v.                           )
                                        )
10   APRIO, LLP, F/K/A HABIF, AROGETI   )
     & WYNNE, LLP, ET AL.,              )
11                                      )
               DEFENDANTS,              )
12   _____   )

13

14

15

16          VIDEOTAPED DEPOSITION OF ANDREW LECHTER

17                 TUESDAY, JULY 26, 2022

18

19

20

21

22

23

     FILE NO.  CS 5318210
24

     REPORTED BY  MARK McCLURE, CRR
25                CAL CSR 12203

1    A.   They are not my employees.

2    Q.   Fair enough.

3    A.   I engage.

4    Q.   You engage an accounting firm.

5    A.   And I do pay them.

6    Q.   Who are your current accountants for purposes

7    of your personal income taxes?

8    A.   The company is called PeachCap.

9    Q.   How long have you engaged PeachCap?

10   A.   PeachCap used to be known as

11   Harless & Associates.   Early 2000s.

12   Q.   Before you engaged or worked with

13   Harless & Associates, did you have accountants who

14   prepared your personal tax returns?

15   A.   Yes.

16   Q.   Who were those accountants?

17   A.   Before Harless, I can't remember the name of

18   the firm.   My contact was a woman named Angela Maxwell.

19   They were in Dunwoody.   I just can't remember -- she

20   left to go into, like, in-house.

21   Q.   With PeachCap and before that

22   Harless & Associates, did you sign engagement letters

23   for the services of those accounting firms?

24   A.   No, I don't believe I ever have.

25   Q.   How did you go about retaining them or

1    tax advice.

2         Q.   Does Mr. Dearth still represent you?

3         A.   Yes.

4         Q.   For how long has he represented you?

5         A.   I've known Mark since the time of that

6    personal audit, so call it 10, 12 years.

7         Q.   How did you come to meet him?

8         A.   I'm not quite sure.  My best guess is he was

9    probably introduced to me by Harless.

10        Q.   By the principal accountant that you worked

11   with?

12        A.   Yes.

13        Q.   Have you ever been a client of Aprio, LLP,

14   which was formerly known as Habif, Arogeti & Wynne?

15        A.   I was a client of Habif, Arogeti & Wynne, yes.

16        Q.   Do you recall when that was?

17        A.   I would say mid-80s to probably -- maybe a

18   ten-year period, mid-80s to mid-90s.

19        Q.   Why did you cease to be a client of Habif,

20   Arogeti & Wynne?

21        A.   I thought I was sort of small potatoes for

22   them and was not getting the level of attention or

23   responsiveness that I felt I needed.

24        Q.   Who were the accountants you worked with when

25   you were a client at Habif, Arogeti & Wynne?

1     Q.   When do you first recall speaking to

2  Mr. Greenberger?

3     A.   In connection with the Forever Forests

4  investments.

5     Q.   Approximately when was that?

6     A.   2008, 2009, I think.

7     Q.   How did you speak with him?  Were these

8  in-person meetings?  Telephone conferences?  What do you

9  recall?

10     A.   Telephone.

11     Q.   Do you know how many times you spoke with him

12  on the telephone back in 2008-2009?

13     A.   I would say three or four.

14     Q.   Do you recall how long those telephone

15  conferences lasted?

16     A.   Not more than ten minutes.

17     Q.   Were there any other participants besides you

18  and Mr. Greenberger?

19     A.   I don't believe so.  Not on my end.

20     Q.   What do you recall discussing during those

21  telephone conferences?

22     A.   Well, the first time I spoke with him was

23  after I'd been solicited by James Jowers, and Jowers had

24  indicated that Habif, Arogeti, as they were known at the

25  time, was part of the team, and either he gave me

1    Greenberger's name or I did my own investigation and

2    found out that Mr. Greenberger was the point of contact,

3    and so I called him.

4         I was -- one of the things that gave me --

5    even though I didn't know Mr. Jowers, I believe he

6    reached out to me just on a cold call, but when they

7    told me that Habif, Arogeti was part of the team, so to

8    speak, that gave me a level of confidence that this

9    wasn't just, you know, some guy hanging out a shingle

10   selling an investment.

11        And I guess, ultimately, got to

12   Mr. Greenberger again.  I don't remember whether Jowers

13   gave me the name or I did it on my own research, and

14   called him and said, you know, this sounds like a good

15   deal, what -- tell me what I'm missing.

16   Q.   And what do you recall Mr. Greenberger saying?

17   A.   It's a good deal, you save money, it's

18   completely supported by the tax code, and we're doing

19   the audit work or the accounting work, essentially

20   assuring me that everything was going to be done on

21   the -- you know, done on the up and up, done accurately

22   and completely.

23        Because if I'm engaging a lawyer, I rely on

24   the lawyer to use good words; if I'm engaging an

25   accountant, I figure they are going to run the numbers

1       Which I thought was a very flippant response

2   to a client calling about a concern -- with concern

3   because of a letter from the IRS.  But just the

4   general -- I don't remember anything else specific

5   verbatim, but the general tone was, don't worry about

6   it, this happens all the time, we expected it, and we'll

7   successfully push back.

8   BY MR. RAINS:

9       Q.   Other than what you have now testified to

10  today, you don't recall anything else specific

11  Mr. Greenberger said to you?

12      A.   Correct.

13      Q.   Have you ever paid a fee directly to Habif,

14  Arogeti & Wynne or Aprio since you stopped using them as

15  your accountant in the 90s?

16      A.   I paid a fee because I'm -- because I'm

17  assuming they got something from the investment

18  proceeds, but have I ever written a check made out to

19  them?  No.

20      Q.   When you say "investment proceeds," you're

21  referring to what you purchased, a particular membership

22  interest in a conservation easement project?

23      A.   Correct.

24      Q.   You didn't receive bills from Aprio?

25      A.   Correct.

1    Q.   And you never had an engagement letter with

2    Aprio concerning anything relating to conservation

3    easements?

4    A.   Correct.  Unless it was buried in the

5    subscription, but I don't remember even seeing their

6    name in the subscription agreements.

7    Q.   You referred to yourself as a client of

8    Aprio's a moment ago.

9         What's your basis for referring to yourself

10   that way.

11   A.   Well, they did my tax work for several years,

12   so I was a client then.  And I put myself in the client

13   position because, as a member of the partnership to

14   which I think the partnership was a client, and I'm a

15   member of that partnership.  I would hope that they were

16   there to defend the interests of each -- of the

17   partnership as a whole and, by extension, each

18   individual.

19   Q.   Do you recall any conversations or discussions

20   with Mr. Greenberger in which you referred to yourself

21   as a client?

22   A.   I may have used that term.

23   Q.   But you don't recall specifically?

24   A.   No.  But I think it's somewhat implied.  I

25   don't know that I -- I don't know that I -- I wouldn't

1  have gone to the yellow pages and looked up CPAs and

2  said, hey, tell me about this letter.

3      Q.   How many conservation easement contracts have

4  you participated in as an investor?

5      A.   In addition to the two with Forever Forests, I

6  believe I've made four other investments.

7      Q.   Do you recall what the final tax year was

8  where you made a conservation easement investment?

9      A.   You mean the most recent?

10     Q.   Yes.

11     A.   2018 or '19, I think.

12     Q.   At the time you made that investment decision,

13  were all of your prior conservation easement investments

14  being audited?

15     A.   No.

16     Q.   Which ones were?

17     A.   I believe just these two.

18     Q.   When you say "these two," which are you

19  referring to?

20     A.   The Forever Forests -- Oakhill and Cottonwood.

21     Q.   You mentioned receiving a solicitation from

22  Mr. Jowers a few moments ago.

23          What do you recall about that?

24     A.   I'm sitting at my office and I answer every

25  call I get, or return every call I get, and he

1    introduced himself.  He sounded a little goofy to me,

2    but he said he worked with other people in my industry

3    and that they have a program to conserve land and

4    conserve money by reducing one's tax bill legally.

5        Q.   You referred earlier to Mr. Jowers saying

6    something about who the team was.

7             Did that happen during this solicitation call?

8        A.   Yes.

9        Q.   And what did he say?

10       A.   He said, we have a top -- we have the top CPA

11   firm, or the top local CPA firm in Atlanta, Habif,

12   Arogeti & Wynne, who is doing the accounting work.

13       Q.   Did he say who else was part of the team?

14       A.   I don't recall.  The gist of his pitch was how

15   much money you could save, and he followed up that --

16   followed up that phone conversation with a chart

17   showing -- you know, for every dollar or every $50,000

18   or whatever one invests, this is the amount of

19   deduction, this is the amount of tax credit based on an

20   income level -- or a tax bracket, rather.

21       Q.   How soon after that solicitation call with

22   Mr. Jowers did you speak with Mr. Greenberger?

23       A.   A matter of days.

24       Q.   You mentioned some subscription materials

25   earlier.

1    invested was under audit.

2         Q.   And the salesperson you've been referring to

3    or the person selling, that was Mr. Jowers?

4         A.   Correct.

5         Q.   Have you ever spoken with anybody else at

6    Forever Forests besides Mr. Jowers?

7         A.   I believe Nancy Zak may have been on a call

8    that included all the investors within the last few

9    years.

10        Q.   But nothing a decade ago?

11        A.   I believe so.

12        Q.   Other than the two telephone calls you've

13   testified about today, do you recall any other

14   discussions with Mr. Greenberger about conservation

15   easements?

16        A.   No.

17        Q.   Do you recall ever exchanging emails with

18   Mr. Greenberger about conservation easements

19   transactions?

20        A.   No.

21        Q.   Do you recall emailing with anybody else at

22   Habif, Arogeti & Wynne or Aprio about conservation

23   easement transactions?

24        A.   No.

25        Q.   When you received the subscription materials

1    fees.

2    BY MR. RAINS:

3        Q.   Do you recall what the settlement agreement

4    payments you made personally were in connection with

5    Cottonwood Place and Oakhill Woods?

6        A.   One was in the neighborhood of $220,000, and

7    one was in the neighborhood of just over $100,000.

8        Q.   Do you recall what your share of the legal

9    fees for the partnership's attorneys were for those

10   transactions?

11       A.   Less than that.  Probably in the -- I would

12   say probably in the total $5,000 range.

13       Q.   Per transaction?

14       A.   No, I think that's total.  I could be wrong,

15   but it's a de minimus amount compared to the

16   300,000-plus.

17       Q.   That $300,000-plus includes taxes, penalties

18   and interest?

19       A.   That's correct.

20       Q.   Do you know which penalties it includes?

21       A.   I think, as part of the settlement, the 40

22   percent penalty was reduced to 10 or 20, but no, I don't

23   remember the components.  I remember the big component,

24   which is how much the check was.

25       Q.   You testified that the investors in Cottonwood

1    believe you paid as part of the Cottonwood Place
2    settlement with the IRS?
3           A.   I suppose it is, yeah.
4                (Exhibit 57 marked for identification.)
5    BY MR. RAINS:
6           Q.   I've handed you a document marked as Exhibit
7    57.
8                What is Exhibit 57?
9           A.   Describes the penalty -- the penalty to settle
10   and the wire that was sent to the tax counsel.
11          Q.   If you look at the second page of the exhibit
12   there's an email from Mr. Haupt, at PeachCap, to Gilbert
13   Carey, at the Asbury Law firm.
14               Do you see that email?
15          A.   Uh-huh.
16          Q.   He writes:  "This is somewhat tricky for us to
17   calculate.  These returns were done by a prior firm and
18   Andy has requested copies from the IRS that have yet to
19   arrive."
20               Did I read that correctly?
21          A.   Yes, you did.
22          Q.   Did you not have a copy of your tax return in
23   2020 for the 2009 year?
24          A.   I did not.
25          Q.   Why is that?