IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREW LECHTER, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:20-cv-1325-AT |
| APRIO, LLP, *et al.*, | : | |
| Defendants. | : | |

# **ORDER**

As a follow-up to the Court's February 23, 2023 hearing on Plaintiffs' Motion for Class Certification (Doc. 326), the Court **DIRECTS** counsel to appear for a video conference on **Thursday, March 9, 2023 at 2:30 p.m.**[1] Counsel should contact the Court's Courtroom Deputy, Mr. Harry Martin, if they have any conflicts with that time. Counsel should be prepared to address the following questions at the conference:

1. In their opening brief, Plaintiffs represent that additional discovery is required to confirm the extent of the Aprio Defendants' role in the transactions at issue and that "Plaintiffs expect that discovery will further confirm the common ways Aprio directed or participated in nearly every aspect of the SCE Strategy." (Doc. 326-1 at ECF 12.) If Plaintiffs currently lack the evidence necessary to confirm the extent of Aprio's role absent additional discovery, does that mean that it would be premature to certify a class to the extent the class claims depend on the Aprio Defendants' knowledge of and extent of involvement in the alleged scheme? If that is the case, could a smaller subset of Plaintiffs' claims still proceed absent additional evidence (e.g., Plaintiffs' negligent misrepresentation claims)?

---

[1] Join ZoomGov Meeting https://ganduscourts.zoomgov.com/j/1600143530. Meeting ID: 160 014 3530. Passcode: 510519. Audio Only 1-669-254-5252.

2.     Plaintiffs rely on *Fox v. Ritz-Carlton Hotel Co., L.L.C.*, 977 F.3d 1039 (11th Cir. 2020) for the proposition that the named Plaintiffs should have standing to bring claims related to all 53 transactions at issue even though they only personally invested in 9 of them collectively.  The plaintiff in *Fox* did not personally visit all 49 of Ritz-Carlton's restaurants in which it implemented its automatic gratuity policy.  However, the Eleventh Circuit found that he had standing to bring claims related to each of those restaurants because all of the putative class members "ha[d] the same interest and suffer[ed] the 'same injury.'" *Fox*, 977 F.3d at 1047 (quoting *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000)).  Plaintiffs argue that the same theory should apply in this case, and Plaintiffs here should be able to bring claims related to every single transaction in which the Aprio Defendants implemented their common policy of issuing defective K-1s even though the named Plaintiffs did not personally invest in all 53 of those transactions.  Putting aside the 9 land projects in which at least one named plaintiff invested, do all of the putative class members in this case "have the same interest and suffer the 'same injury'" in the remaining 46 projects given that their claims rely on claimed tax deductions that were supported by different appraisals associated with different properties?  Aside from *Fox*, can Plaintiffs identify any other authority that could potentially establish that they have standing to bring claims related to transactions in which the named Plaintiffs did not personally invest?

3.     If the Court were to certify a class involving all 53 transactions, how many different sponsors would be involved in the full universe of transactions compared to the number of sponsors that would be involved if the Court were to certify a class involving only the 9 transactions in which the named Plaintiffs personally invested?

4.     Plaintiffs describe the Aprio Defendants' alleged practice of preparing defective K-1s as a "corporate policy" like the corporate policy in *Rivera v. Equifax Information Services, LLC*, 341 F.R.D. 328 (N.D. Ga. 2022) of issuing identical form responses to hard inquiry dispute letters and the corporate policy of systemically underpaying physicians in *Klay v. Humana, Inc.*, 382 F.3d 1241 (11th Cir. 2004).  Why should the Court consider the Aprio Defendants' alleged misrepresentations and omissions in preparing the LLCs' partnership tax returns to be a "corporate policy" rather than simply repeat acts of negligence or fraud?  In Plaintiffs' and Defendants' views, what distinguishes a corporate policy from a mere common course of conduct?

5.     In their Reply brief, Plaintiffs minimize the significance of any potential individualized issues related to the putative class members' decision to invest in the transactions at issue and argue that the Court should instead focus on common issues related to the post-investment phase of the transactions.  How do Plaintiffs

separate the pre-investment component of their claims from the post-investment component given that, on Plaintiffs' theory, the whole purpose of investing in the LLCs was to claim a tax deduction?  Is this approach consistent with Plaintiffs' arguments in the opening brief that this case presents common questions of law and fact because the Aprio Defendants "induced members of the Class *both to invest in LLCs that owned these real estate parcels and to take deductions* for donated conservation easements on their individual tax returns" and that one of the common questions in this case is "[d]id the Aprio Defendants use a common course of conduct to market the SCE Strategy?"  (Doc. 326-1 at ECF 24–25) (emphasis added).  How do Plaintiffs square the approach they have taken in the Reply brief with their allegations in the Amended Complaint that Defendants made fraudulent representations "[i]n order to induce Plaintiffs and members of the Class to participate in the SCE Strategy and pay substantial fees and other monies to the Defendants"? (Am. Compl., Doc. 155 ¶ 351); (*see also id.* ¶ 352) (stating that the 77 alleged misrepresentations and omissions listed in paragraph 351 of the Amended Complaint "were committed knowingly by the Defendants *with the intent to induce Plaintiffs and members of the Class to enter into the SCE Strategy . . .*") (emphasis added).

6.   If Plaintiffs are only intending to bring claims on a class-wide basis related to the Aprio Defendants' alleged *post*-investment representations and omissions, do the named Plaintiffs still intend to bring claims related to the Aprio Defendants' alleged *pre*-investment representations and omissions on an individual basis?

7.   If Plaintiffs abandon the pre-investment component of their claims, would that transform this case into a derivative case in which Plaintiffs were allegedly injured only indirectly by errors that the Aprio Defendants made in the LLCs' partnership tax returns?  (*See* MTD Order, Doc. 248 at 45) (noting that "further factual development may be needed to determine whether this is a situation in which the plaintiff shareholders were injured by 'acts of racketeering activity that target the plaintiff,' *Harris*, 636 F. App'x at 481 (quoting *Beck*, 162 F.3d at 1096 n.10), or whether it is one in which the plaintiff shareholders suffered injuries 'only as a result of harm to the corporation,' *id*. (quoting *Bivens*, 140 F.3d at 908).").

8.   If Plaintiffs abandon the pre-investment component of their claims but contend that the evidence indicates simple malpractice and/or reckless or intentional failure on Aprio's part to address inflated values of the properties facially evident from the leap in assessed values resulting from the new appraisals, would that:  (a) still only transform this case into a derivative case on behalf of the LLC and its investors?  Or, (b) permit Plaintiffs' class and/or individual tort claims against the Aprio defendants to proceed?  Explain why or why not.

9. Plaintiffs' counsel have proposed grouping Plaintiffs into different subclasses to account for variations among the different promotional materials that Plaintiffs received from different sponsors. Why would those variations matter if the Court were to accept Plaintiffs' theory that pre-investment representations are irrelevant to their Motion?

10. Plaintiffs argue that the common questions in this case parallel the common questions in *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, (S.D.N.Y. 2005). Are the K-1s and associated oral representation that were provided to Plaintiffs in this case analogous to the legal opinion letters and associated oral representations that were provided to the plaintiffs in *Denney*? Why or why not?

11. How does the Aprio Defendants' completion of the K-1s as a component of the partnership tax returns qualify as a "representation" on Plaintiffs' theory? Or how does such a representation on the K-1 cause Plaintiffs, who had already entered into the LLC, to rely on it without consulting their own tax accountant(s)? *See Representation*, Black's Law Dictionary (11th ed. 2019) (defining "representation" as "[a] presentation of fact — either by words or by conduct — made to induce someone to act, esp. to enter a contract; esp., the manifestation to another that a fact, including a state of mind, exists"); *Fraudulent Misrepresentation*, Black's Law Dictionary (11th ed. 2019) (defining "fraudulent misrepresentation" as "[a] false statement that is known to be false or is made recklessly — without knowing or caring whether it is true or false — and that is intended to induce a party to detrimentally rely on it").

12. Even if the Court accepts Plaintiffs' theory that the Aprio Defendants' alleged pre-investment representations were designed to induce Plaintiffs to enter into transactions that would generate additional fees for Aprio, and that those pre-investment representations could potentially support a Georgia RICO claim, how would that be the case for any of the Aprio Defendants' alleged post-investments representations? It appears that by the time the Aprio Defendants finished preparing the partnership tax returns (which included the K-1s) there would have been no additional work left for the Aprio Defendants to perform. Additionally, it does not appear that whether or not each Plaintiff chose to claim deductions based on the specific values reflected in the K-1s would have had any effect on the Aprio Defendants' ability to generate additional fees. Do Plaintiffs have any evidence that the Aprio Defendants sought to "induce" Plaintiffs to claim deductions based on the values reflected in the K-1s, or that the Aprio Defendants did so for the purpose of generating additional fees (or for some other purpose that could potentially support a Georgia RICO claim)?

13. What evidence do Plaintiffs have that Defendants "advised Plaintiffs to take the deductions reported on the K-1s on their personal tax returns" (Doc. 326-1 at ECF 28)?

14. With respect to Plaintiffs' breach of fiduciary duty claims, how can Plaintiffs show that the Aprio Defendants had a controlling influence over each individual Plaintiff without relying on individualized evidence?

15. Similarly, with respect to Plaintiffs' malpractice claims, how can Plaintiffs rebut the evidence the Aprio Defendants have provided that none of the named Plaintiffs were their clients without relying on individualized evidence?

16. Can Plaintiffs' malpractice claims proceed on a class-wide basis given that Plaintiffs have failed to include a supporting affidavit consistent with O.C.G.A § 9-11-9.1, which states, "the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which affidavit shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim"?

17. To the extent the Aprio Defendants have obligations to investors who were not their clients that could potentially support Plaintiffs' negligent misrepresentation claims, what were the Aprio Defendants' obligations to Plaintiffs in their capacity as the tax return preparers for the partnerships and how did those obligations compare to the obligations that the Tax Matters Partners for the partnerships had to the Plaintiffs?

18. In Defendants' view, what were the primary material variances in the named Plaintiffs' individual conversations with Mr. Greenberger?

19. Defendants argue that there are significant variations among the different sample appraisals in this case that will have to be addressed on an individualized basis. As long as the appraisals and Forms 8283 for the transactions have at least one potential deficiency in common, such as omission of the purchase price for the land, why would it be inappropriate for the Court to address that common issue on a class-wide basis?

**IT IS SO ORDERED** this 6th day of March, 2023.

_____
**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**