IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ANDREW LECHTER, SYLVIA THOMPSON, LAWSON THOMPSON, RUSSELL DALBA, and KATHRYN DALBA, *on behalf of themselves and all others similarly situated*, | : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION NO. 1:20-cv-1325-AT |
| v. | : : | |
| APRIO LLP (f/k/a HABIF, AROGETI & WYNNE LLP) and ROBERT GREENBERGER | : : : : | |
| Defendants. | : : | |

**ORDER**

Before the Court is Plaintiffs' Motion for Class Certification. [Doc. 326].
After due consideration, the Court enters the following Order.

**I.    BACKGROUND**

This putative class action suit arises out of a land conservation and tax-
saving effort. Plaintiffs Andrew Lechter, Sylvia Thompson, Lawson Thompson,
Russell Dalba, and Kathryn Dalba allege that they, along with a class of investors
they seek to represent, were fraudulently induced to buy into a flawed tax-saving
strategy known as the "Syndicated Conservation Easement Strategy" ("SCE
Strategy"). (*See* Am. Compl., Doc. 155). Through this strategy – that was facilitated
in relevant part by the prominent accounting firm, Aprio LLP, and one of its

partners, Robert Greenberger ("Defendants," or "Aprio Defendants") – putative class members were persuaded to invest in limited liability corporations (which Plaintiffs refer to as "Syndicates") that conveyed conservation easements to land trusts. Conservation easements are encumbrances placed on real estate to preserve property for conservation purposes. (Am. Compl., Doc. 155 ¶ 36). An entity or person that owns property subject to a conservation easement can claim a charitable contribution tax deduction in an amount equal to "the value by which the easement impairs the fair market value of the property." (*Id.* ¶ 2). Here, the Syndicates purchased or already owned land tracts subject to conservation easements, donated that land to a land trust, then claimed a charitable tax deduction. (*Id.* ¶ 43). When properly valued and implemented in compliance with Section 170(h) of the Internal Revenue Code, conservation easements can and do confer legitimate tax advantages to the donor in addition to environmental benefits for the public.

There are three primary tax forms that must be filed with the Internal Revenue Service ("IRS") as part of this process. First, multi-member LLCs are required to file IRS Form 1065  tax returns annually with the IRS. Forms 1065 report the partnership's annual income, deductions, gains, and losses. (*Id.* ¶ 41). Here, Aprio allegedly prepared the annual Forms 1065 on behalf of the Syndicates. (*Id.* ¶ 42). Second, Aprio distributed to its clients Form 8283 Appraisal Summaries. These are forms used to substantiate the value of charitable tax deductions. (*Id.* ¶ 50). Along with each Form 1065, Aprio allegedly attached a Form 8283 Appraisal

Summary that stated the appraised fair market value of the conservation easements. (*See id.* ¶ 440; Doc. 327 at 8). While Aprio *reviewed* the Forms 8283 in preparing the Syndicates' tax returns and the investors' Schedule K-1 Forms, Aprio did not, itself, *prepare* the Forms 8283. (*See* Greenberger Dep., Doc. 383-1 at 34-36). Finally, Schedule K-1 Forms were also filed with the IRS as part of the alleged scheme. K-1 Forms are statements that LLCs are required to furnish to its members and to the IRS that report each individual LLC member's distributive share of partnership income or loss. (*Id.* ¶ 41). Plaintiffs allege that Aprio prepared and issued Schedule K-1 Forms to each individual investor. (*Id.* ¶ 42). Here, the K-1s allegedly also included the charitable tax deduction amount Aprio calculated and presented to the investors as appropriate to claim on their individual tax returns. (*Id.*).

To summarize, Plaintiffs claim that by virtue of their investments, the putative class members became members of Syndicates and claimed deductions on their tax returns in proportion to their partnership interests. Based on Defendants' representations, the putative class was under the impression that by investing in these Syndicates, their money would go towards conserving valuable environmentally vulnerable tracts of land, and simultaneously, they could claim legitimate charitable tax deductions for their donation(s) on their annual tax returns – a win-win situation.

In reality, the investment opportunity was not quite so lucrative. Plaintiffs allege that Aprio's tax deduction calculations were actually based on land value

appraisals that were artificially inflated to a substantial degree, and that Aprio and Mr. Greenberger knew or should have known about the inflation and resulting inaccuracies. (Am. Compl., Doc. 155 ¶ 4). The IRS ultimately flagged the charitable tax deductions as fraudulent and disallowed the deductions. (*Id.* ¶ 49). The putative class members were allegedly left to deal with the fallout – IRS investigations, fees, transaction costs, tax assessments and penalties, as well as other losses. (*Id.* ¶ 8).

Plaintiffs first filed this suit in March 2020, asserting twelve claims against sixteen defendants. (Compl., Doc. 1). The initial sixteen defendants included other accounting firms, law firms, consulting firms, sponsors, promoters, land trusts, and individual representatives from those entities – all of whom Plaintiffs alleged were a part of the SCE Strategy. (*See* Am. Compl., Doc. 155 ¶¶ 55-59). Now, only Aprio and Mr. Greenberger remain as Defendants.[1] Plaintiffs have asserted five remaining claims against Aprio and Mr. Greenberger: malpractice, breach of fiduciary duty, common law fraud, negligent misrepresentation, and violations of Georgia's Racketeering Influenced and Corrupt Organizations Act ("Georgia RICO"), O.C.G.A. § 16-14-4.

---

[1] A number of the other Defendants were dismissed as a result of the Court's Motion to Dismiss Order (Doc. 248), and the rest were voluntarily dismissed by Plaintiffs in advance of their class certification motion. (Docs. 311, 312, 315, 316, 325). The Court notes that, perhaps as a result of these dismissals and because only Aprio and Mr. Greenberger remain as Defendants, Plaintiffs' theory of the case has fundamentally shifted over time and at the class certification stage. The Court discusses this shift and its implications on the class certification analysis in a later section of this Order.

Plaintiffs seek to certify a class of investors who participated in one or more of approximately fifty-three "cookie cutter" SCE transactions. These include transactions involving the following salient elements and associated audits: (1) Aprio prepared the donation-year partnership tax return for the Syndicate and the Form K-1s for the participants; (2) the IRS audited the charitable contribution tax deduction claimed on the partnership's tax return; and (3) the IRS audit ended with proposed penalties, interest, or disallowance of the Syndicate's conservation easement and associated charitable deduction. (*See* Pls.' Mtn. for Class Cert., Doc. 327 at 16–17). The named Plaintiffs seek to be appointed as the class representatives and for their counsel to be named as class counsel. (*Id.* at 40). Plaintiffs seek class certification under Federal Rule of Civil Procedure 23(b)(3).[2] (Doc. 327 at 5, 21, 22, 42).

Plaintiffs' efforts to certify this class have spanned several years, dating back to when they initially filed their Motion for Class Certification in August 2022. (Doc. 327). Defendants have objected to class certification on several grounds. Defendants maintain that that the named Plaintiffs themselves do not have standing to represent the putative class, that Plaintiffs failed to prove that the putative class members have standing, and that overwhelmingly, individualized

---

[2] Although Plaintiffs' Amended Complaint asserts that they seek certification "pursuant to Rule 23(b)(1)(A), (b)(2), and/or (b)(3)," (Am. Compl., Doc. 155 ¶ 212), their Motion for Class Certification only requests certification under Rule 23(b)(3). (*See* Doc. 327 at 5, 21, 22, 42). Therefore, in assessing whether Plaintiffs have adequately established that their case meets one of the three types of cases under Rule 23(b), the Court will only do so relative to Rule 23(b)(3).

inquiries would need to be undertaken in order for Plaintiffs to establish their claims – all of which makes class certification arguably inappropriate. (*See* Defs.' Resp. in Opp. to Mtn. for Class Cert., Doc. 332; *see also* Defs.' Sur-Reply, Doc. 341). Initial briefing and oral argument on this Motion left the Court with more questions than answers though, leading the Court to stay the action pending a limited deposition of Mr. Greenberger.[3] (*See* March 24, 2023 Order Staying Action, Doc. 362). Mr. Greenberger was deposed in November 2023. (Greenberger Dep., Doc. 383-1). After carefully reviewing his deposition and associated exhibits, along with the many supplementary briefings and notices filed by the parties, the Court issues this ruling on Plaintiffs' Motion for Class Certification.

## II.    LEGAL STANDARD

"A class action may be maintained only when it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule 23(b)." *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir. 1997) (footnotes omitted). The party seeking class certification (here, Plaintiffs) bears the burden of showing that the Rule 23 requirements are met. *Valley Drug Co. v.*

---

[3] Plaintiffs' opening brief stated that "discovery will further confirm the common ways Aprio directed or participated in nearly every aspect of the SCE Strategy." (Doc. 327-1 at 12). Troubled by the fact that Plaintiffs, at the time of filing their Motion for Class Certification, lacked the evidence necessary to confirm the extent of Aprio's role absent additional discovery, the Court decided it would be premature to certify a class without deposition testimony from Mr. Greenberger. (Doc. 362). Mr. Greenberger's deposition was to be limited to issues surrounding the assessment of the IRS promoter penalty lodged against Mr. Greenberger, the "Oakhill Woods declaration," and Mr. Greenberger's involvement in the review and preparation of the Forms 8283 for the transactions at issue in this case. (*See id.*; *see also* Greenberger Dep., Doc. 383-1).

*Geneva Pharms., Inc.,* 350 F.3d 1181, 1187 (11th Cir. 2003); *see also Thompson v. Jackson,* No. 1:16-cv-4217, 2018 WL 5993867, at * 2 (N.D. Ga. Nov. 15, 2018) (citing *Brown v. Electrolux Home Prods., Inc.,* 817 F.3d 1225, 1233 (11th Cir. 2016)) ("The party seeking class certification bears the burden of showing by a preponderance of the evidence that the proposed class meets Rule 23's requirements.").

Rule 23(a) requires a plaintiff seeking class certification to show that:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as 'the prerequisites of numerosity, commonality, typicality, and adequacy of representation,' and they are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341, 1346 (11th Cir. 2001) (quoting *Gen. Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 156 (1982)).

If Rule 23(a) is satisfied, Rule 23(b) further provides that a class action may be maintained only where one of the three following requirements is met:

(1)    prosecuting separate actions by or against individual members of the class would create a risk of prejudice to the party opposing the class or to those members of the class not parties to the subject litigation, *see* Fed. R. Civ. P. 23(b)(1);

(2)    the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is appropriate respecting the class as a whole, *see* Fed. R. Civ. P. 23(b)(2); or

(3)    the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy, *see* Fed. R. Civ. P. 23(b)(3).

Here, Plaintiffs seek class certification under Rule 23(b)(3). In a Rule 23(b)(3) putative class action suit, the required "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016) (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)).

In conducting the class certification inquiry, a court should "give careful scrutiny to the relation between common and individual questions in a case." *Id.* "An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Id.* (internal quotations omitted). The crux of the analysis is "whether the common,

aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Id.*

Where, "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims," certification is not appropriate. *Sellers v. Rushmore Loan Mgmt. Servs., LLC,* 941 F.3d 1031, 1040 (11th Cir. 2019) (quoting *Klay v. Humana, Inc.,* 382 F.3d 1241, 1255 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phx. Bond & Indem. Co.,* 553 U.S. 639 (2008)). On the other hand, when one or more central issues are "common to the class and can be said to predominate," certification is proper under Rule 23(b)(3), even where "other important matters" such as "damages or some affirmative defenses peculiar to some individual class members" will have to be tried separately. *Bouaphakeo,* 577 U.S. at 453.

Importantly, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Since class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," the party seeking to certify a class action bears the burden to prove their compliance with Rule 23's requirements through "evidentiary proof." *See Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (cleaned up); *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 888 (11th Cir. 2023); *see also Halliburton Co. v. Erica P. John Fund, Inc.,* 573 U.S. 258, 275 (2014)

("[P]laintiffs wishing to proceed through a class action must actually prove—not simply plead—that their proposed class satisfies each requirement of Rule 23").

The district court must therefore "conduct a 'rigorous analysis' to determine whether the movant carried his burden," *Brown*, 817 F.3d at 1234 (citation omitted). Although courts do not determine the merits of plaintiffs' claims at the class certification stage, they "can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1266 (11th Cir. 2009) (quoting *Valley Drug Co. v. Geneva Pharms., Inc.,* 350 F.3d 1181, 1188 n. 15 (11th Cir. 2003)).

Rule 23(c)(1) grants the district court "broad discretion in the initial certification and subsequent amendment of a class." *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 877 (11th Cir. 1986). Ultimately, "[a] district court that has doubts about whether the requirements of Rule 23 have been met should refuse certification until they have been met." *Brown,* 817 F.3d at 1233-34 (quoting Fed. R. Civ. P. 23).

## III.   DISCUSSION

### A.   Framing of Harm

At the outset, the Court finds it prudent to acknowledge anew a slight, but ultimately significant, change Plaintiffs have attempted to make in the framing of

10

their claims.[4] In their First Amended Complaint, Plaintiffs explained in detail that the putative class members' injuries arose when the sixteen original defendants made misrepresentations and omissions, which caused putative class members to make faulty investments and claim defective tax deductions on their federal and state tax returns. (Am. Compl., Doc. 155 ¶¶ 8, 338, 345). Plaintiffs long maintained this theory of harm — that their injury resulted from their decision to invest in the Syndicates and thereafter claim tax deductions. Their Motion for Class Certification similarly alleges that the misrepresentations made by former defendants and non-parties "traveled from the promotional materials, into SCE Strategy appraisals, and then into tax positions taken on IRS partnership returns, which flow to the Class members' individual tax returns as the end point." (Doc. 327 at 4-5).

In their Reply to Defendants' Response to the Motion for Class Certification, however, Plaintiffs fundamentally altered the framing of their claims. Instead of arguing that the putative class was harmed by the Defendants' scheme to fraudulently induce them into investing in Syndicates, they argued that the putative class was harmed when they decided to claim the tax deduction on their tax returns, *after* investing in the Syndicates. (*See generally* Doc. 340). In other words, Plaintiffs argued in their Reply that the Court could certify a class based

---

[4] The Court initially discussed its preliminary thoughts regarding the significance of this change in its March 24, 2023 Order Staying Plaintiffs' Motion for Class Certification. (Doc. 362 at 4).

solely on the representations the Aprio Defendants made in the IRS Schedule K-1 Forms contained within the LLCs' partnership tax returns, and that the Court should ignore any pre-investment representations for the purposes of class certification. Plaintiffs appeared to double down on this change in their claims after conducting the Court-ordered deposition of Mr. Greenberger. (*See* Pls.' Supp. Brief in Support of Mtn for Class Cert., Doc. 385). Plaintiffs have since clarified that they are not abandoning the *pre-investment* component of their claims. (*See* Nov. 1, 2024 Tr. of Oral Arg. on Class Cert., Doc. 411).  Rather, they now argue that one of Defendants' main contentions that Plaintiffs cannot show reliance on a class-wide basis should be rejected as to the *post-investment* component of their claims.

Given that Plaintiffs have since clarified that the pre-investment component of their claims remains in play, the Court will analyze class certification in this Order based upon Plaintiffs' original theory — that their injury occurred when they invested in the Syndicates and additionally, when they claimed the associated charitable tax deduction that the IRS rejected in part or whole. The Plaintiffs' claims now are solely focused on the financial losses they suffered as a result of the advice they received from Aprio and Mr. Greenberger.

## B.  Standing

The Court now turns to the issue of standing, which every analysis of class certification must begin with. *Griffin v. Dugger,* 823 F.2d 1476, 1482 (11th Cir. 1987). Article III of the U.S. Constitution requires a plaintiff to allege that they

12

suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent." *Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 560-61 (1992). That injury must be "fairly traceable to the challenged action of the defendant," and it must be "likely ... that the injury will be redressed by a favorable decision." *Id.*

Defendants challenge Plaintiffs' standing for the purpose of class certification, arguing that Plaintiffs have not met "their burden of proving that all putative class members have standing," and that the record does not show that "every putative class member" has suffered the injury that the named Plaintiffs allege. (Doc. 332 at 19). Defendants misconstrue the standing requirement at this stage. On a motion for class certification, a plaintiff is not required to show that every putative class member has standing. *Griffin,* 823 F.2d at 1483. Rather, at the class certification stage, only *named* plaintiffs must show that they have personally suffered an injury — not that that injury has been suffered by other, unidentified members of the class to which they belong. *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, n. 20 (1976) (quoting *Warth v. Seldin,* 422 U.S. 490, 502 (1975)) (*see also Cordoba v. DIRECTV, LLC,* 942 F.3d 1259, 1273 (11th Cir. 2019) ("[F]or a class action to be justiciable, all that the law requires is that a named plaintiff have standing.") (emphasis added)). Therefore, at this stage, Plaintiffs do not bear the burden of proving that *all* putative class members have standing, as Defendants suggest. Plaintiffs simply must show that "at least one named class representative has Article III standing to raise each subclaim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

13

Given that distinction, the more compelling standing challenge that Defendants raise is that Plaintiffs have not proven the traceability element required for standing. More specifically, Defendants argue that the named Plaintiffs lack standing to assert claims based on Syndicates in which they did not invest, or for which they did not claim a charitable tax deduction, because their injuries are not traceable to the Defendants' conduct related to those specific Syndicates. (*See* Defs.' Resp. in Opp., Doc. 332 at 19; *see also* Defs.' Supp. Brief in Opp. to Class Cert., Doc. 403 at 1). Here, Plaintiffs seek to certify a class of investors who invested in fifty-three total Syndicates that they assert were a part of the SCE Strategy. (Doc. 410 at 2-8). In each of the fifty-three Syndicates, Aprio allegedly prepared Forms 1065 for the partnerships, prepared Schedule K-1 Forms for the investors, and underwent an audit by the IRS. (*Id.; see also* Nov. 1, 2024 Tr. of Oral Arg. on Class Cert., Doc. 411 at 103:16-20). The named Plaintiffs participated in ten of those fifty-three transactions.[5] (Doc. 409 at 2-3). Defendants argue that the named Plaintiffs cannot demonstrate that they suffered an injury traceable to

---

[5] Notably, Plaintiffs initially stated that the named Plaintiffs invested in nine of the fifty-three Syndicates at issue (Doc. 327 at 11-12), but corrected themselves in a hearing held on November 1, 2024 and in a supplementary filing, clarifying that the named Plaintiffs had in fact been a part of *ten* of the fifty-three Syndicates at issue (*see* Nov. 1, 2024 Tr. of Oral Arg. on Class Cert., Doc. 411 at 102, 103:21-22): Big K, LLC / Big-K Farms, LLC n/k/a Buckelew Farm, LLC (Lechter) in 2013; Bogan Holdings, LLC / King's Hollow Partners, LLC (Dalba, Thompson) in 2012 (added in Doc. 409 at 2-3); Cottonwood Place, LLC (Lechter) in 2009; I-20 Oconee Limited, LLC / I-20 Oconee, LLC (Dalba) in 2014; Lontrac Investors, LLC / Lontrac Enterprises, LLC (Lechter) in 2014; Maple Landing, LLC (Dalba) in 2010; Mossy Rock, LLC (Thompson) in 2011; Oakhill Woods, LLC (Lechter) in 2010; Sky View Holdings, LLC / Cold Valley, LLC (Dalba, Thompson) in 2013; and Wildwood, LLC (Dalba) in 2011. (Doc. 409 at 2-3; Doc. 327 at 8–9).

14

Aprio or Mr. Greenberger's conduct related to the forty-three other Syndicates that the named Plaintiffs did not invest in. (Defs.' Resp. in Opp., Doc. 332 at 23-24).

In asserting their standing to represent a class that includes all fifty-three Syndicates, Plaintiffs rely primarily on *Fox v. Ritz-Carlton Hotel Co.,* 977 F.3d 1039 (11th Cir. 2020). In *Fox,* the Eleventh Circuit reviewed a district court's finding that a named plaintiff did not have standing to represent a class. The putative class action involved forty-nine Ritz-Carlton restaurants in the state of Florida where each restaurant had an allegedly unlawful "common business practice" of automatically charging gratuities and sales tax on gratuities without notifying patrons. *Id.* at 1046. The Eleventh Circuit found that the named plaintiff, an individual who dined at only three of those restaurants, had standing to sue on behalf of a class of individuals who dined at any of those forty-nine restaurants. The Eleventh Circuit reasoned that the named plaintiff sufficiently alleged that all forty-nine restaurants across the state had the same common business practice. In other words, the automatic gratuity policy without adequate notice existed at all forty-nine restaurants, and therefore, the putative class members' alleged injuries were "identical" to that of the named plaintiff. *Id.* at 1047.

Here, Plaintiffs analogize the current case with *Fox,* asserting that the named Plaintiffs have standing to sue on behalf of investors for all fifty-three Syndicates — even though the named Plaintiffs collectively invested in only ten of them. Plaintiffs rely on the theory that Defendants had a common business practice of hand-picking appraisers, instructing them to inflate the appraisals, then

15

preparing tax documents based on those deficient appraisals in all fifty-three Syndicates. (Doc. 340 at 4; *see also* Feb. 23, 2023 Tr. of Motion Hearing, Doc. 352 at 41-42). Thus, Plaintiffs argue that the named Plaintiffs' and the putative class members' injuries were identical such that the named Plaintiffs have standing to represent the class because their injuries were caused by the same common business practice employed by Defendants across all fifty-three Syndicates. (Feb. 23, 2023 Tr. of Motion Hearing, Doc. 352 at 41-42).

*Fox* was decided at a different procedural stage – on a motion to dismiss – than the class certification stage at which this case currently sits. "The proof required for a plaintiff to establish standing varies depending on the stage of litigation." *Green-Cooper v. Brinker Int'l, Inc.,* 73 F.4th 883, 891 (11th Cir. 2023), cert. denied sub nom. *Brinker Int'l, Inc. v. Steinmetz,* 144 S. Ct 1357 (2024). At the pleading stage, the plaintiff must simply "allege facts demonstrating each element of standing." *Fox*, 977 F.3d at 1046 (quoting *Spokeo Inc. v. Robins,* 578 U.S. 330, 338 (2016)) (internal formatting omitted). The evidentiary burden for standing at the class certification stage, however, is much higher. *Green-Cooper,* 73 F.4th at 891 (citing *Lujan,* 504 U.S. at 561 ("Since [the standing elements] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.")). When assessing standing for purposes of class certification, the Court cannot solely rely on allegations made in

a complaint. Rather, at this stage in the proceeding, the circumstances may be such that a district court should "probe behind the pleadings" to determine whether the named plaintiffs have standing to represent a class. *Id. (*quoting *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160 (1982) (internal quotations omitted)). Thus, here, the Court cannot rely solely on Plaintiffs' allegations that Defendants employed a standard business practice across all fifty-three Syndicates that may be traced to the putative class members' injuries. Rather, the Court must determine whether the record evidence actually reflects the allegation that Defendants employed the same common business practice across all fifty-three Syndicates.

Defendants' standard business practice, as Plaintiffs allege, was as follows. First, Defendants would "hand-pick[] the appraisers to be used for the SCE Strategy and instruct[] them to reach predetermined valuations." (Doc. 327 at 31; *see also* Am. Compl., Doc. 155 ¶ 5). Then, knowing that the appraisal values contained in the Forms 8283 were "defective and not independent," Defendants would allegedly use these artificially inflated appraisals to convince potential investors that investing in these Syndicates would result in tax benefits. (Doc. 327 at 32; *see also* Am. Compl., Doc. 155 ¶ 43). After the putative class members invested in the Syndicates, Defendants would prepare Forms 1065 for the Syndicates and Schedule K-1 Forms for the investors based on the artificially inflated appraisals. (Doc. 327 at 32; Am. Compl., Doc. 155 ¶ 56). Despite Defendants' alleged knowledge that the IRS would reject these appraisals, Plaintiffs submit that Defendants nevertheless represented to the putative class

17

that the tax deductions contained in the Schedule K-1 Forms were legitimate. (Doc. 327 at 32).

In support of their allegations of this common business practice, Plaintiffs present an expert report prepared by Mr. Gerald Barber, an experienced conservation easement appraiser. (Barber Report, Doc. 327-1). The Barber Report contains an assessment of a sample of twenty of the allegedly inflated conservation easement appraisals that formed the basis of the Defendants' tax-saving recommendations to Plaintiffs. As part of his assessment, Mr. Barber reviewed the following nine documents for each of the twenty tracts of land: (1) the appraisal that the Syndicate relied on when claiming the tax deduction; (2) the conservation easement deed; (3) a "private placement memorandum" describing an offer to sell ownership interests to investors; (4) the partnership tax return filed by the Syndicate; (5) the IRS Form 8283 filed by the Syndicate; (6) an IRS revenue agent report regarding the transaction; (7) any opinions or orders issued by the tax court that were referenced in the appraisal; (8) deeds of record from the counties in which the properties were located; and (9) websites that provided Georgia transfer tax rates. (*Id.* at 6-7).

After reviewing these documents, Mr. Barber grouped the twenty tracts of land in the sample into three groups based on certain commonalities the properties shared. In each group, Mr. Barber found that the appraiser "significantly inflated the 'before value' of the subject property which led to a significant inflation of the

value of the conservation easement."[6] (*Id.* at 8). For example, in Group 1, made up of three conservation easements in Effingham County, Georgia, the "before" easement values the appraiser assigned to the properties were 11.4 times more than the original purchase price. (*Id.* at 13). In Group 2, made up of seven conservation easements in Effingham County, Georgia, the "before" easement values ranged from 9.8 to 14.4 times more than the original purchase price. (*Id.* at 15). In Group 3, made up of ten conservation easements in eight Georgia counties and two Tennessee counties, the "before" easement values ranged from 9.6 to 23.5 times more than the original purchase price. (*Id.* at 16). Finally, the Barber Report also concluded that across all twenty conservation easements, "[t]he promoters provided hypothetical concept plans to the appraisers, and the appraisers failed to analyze the concept plans. Thus, the promoter, not the independent appraiser, determined the [highest best use of the land]." (Barber Report, Doc. 327-1 at 17, 25, 32, 39, 47, 54, 61, 68, 75, 82, 89, 97, 104, 111, 118, 125, 132, 139, 146, 153, 160).

---

[6] Mr. Barber came to this conclusion using the "before and after" method of valuing the fair market value of the properties at issue, which is a method governed by Treasury Regulation § 1.170A-14(h)(3). (Barber Report, Doc. 327-1 at n. 7). Deduction amounts are limited based on the difference between the fair market value of the land before the conservation easement encumbers the land, and the fair market value of the land after the conservation easement encumbers the land. 26 C.F.R. § 1.170A-14(h)(3)(i). Inflating the "before value" leads to a larger difference between the two fair market values, resulting in a larger potential deduction. For example, say the fair market value of a tract of land was originally $100,000 before the conservation easement encumbered it, and after the conservation easement encumbered it, the fair market value decreased to $75,000. The charitable tax deduction would be limited by the difference between the two values, or $25,000. On the other hand, if the "before value" of that tract of land was inflated (as Plaintiffs allege happened here) to $150,000, for example, then the resulting difference between the "before" and "after" fair market values would increase to $75,000, thereby also increasing the resulting allowable charitable tax deduction.

Plaintiffs also present an expert report prepared by Nancy A. McLaughlin, a professor of law[7] and a faculty member at the University of Utah. (McLaughlin Report, Doc. 327-2). The McLaughlin Report primarily provides a summary and history of how syndicated conservation easements have been used in abusive tax schemes. (*Id.* 9-30). Beyond that, the McLaughlin Report's findings largely echo those of the Barber Report: for each of the twenty conservation easements in the sampling that the Syndicates donated, the appraisal value was artificially inflated. (*See id.* ¶¶ 120, 122-23, 125, 126, 128). The McLaughlin Report also echoes the assertion in the Barber Report that "the appraiser accepted a hypothetical development plan provided by the promoter and failed to objectively assess how immediate or remote the likelihood was that the property would in fact be developed . . . and this led to significantly inflated 'before' values for the subject properties and, in turn, significantly inflated values for the conservation easements." (*Id.* ¶ 128 (internal formatting omitted)).

The Barber and McLaughlin expert reports identify certain commonalities across the Syndicates. First, they proffer that the appraisals that Defendants' tax forms were based on were inflated – often at hugely significant and unsupportable rates. Next, they submit that syndicated conservation easements have repeatedly been used as part of illegal tax-saving strategies in the past. But what the expert reports do not address, which is crucial at this stage for a finding of standing, is

---

[7] Professor McLaughlin teaches a course on conservation easements at the University of Utah's College of Law. (Doc. 327-2 at 4).

that the Aprio Defendants actually had a common policy or standard business practice in place that they employed across all fifty-three Syndicates that led to Plaintiffs' alleged injury. The Barber Report does not provide any basis for its conclusory assertion that the Aprio Defendants played a role in determining or inflating the value of the land. There is simply no way for the Court to ascertain, from the expert reports alone, the nature of Aprio or Mr. Greenberger's involvement or interference with the inflated land appraisals.

The Court turns to other evidence in the record that might establish the Aprio Defendants' common business practice that the putative class members' injuries can be traced to, namely, the deposition of Mr. Greenberger. After reviewing Plaintiffs' Motion for Class Certification, the Court was concerned that the record remained too thin as to Mr. Greenberger's involvement in the alleged SCE Strategy. Thus, the Court directed Plaintiffs to depose Mr. Greenberger after all other depositions had been conducted, and Mr. Greenberger's deposition elicited some important information. (*See* March 24, 2023 Order Staying Action, Doc. 362). For example, Mr. Greenberger testified that he "employed the same standardized practice when preparing conservation easement partnership returns as he does in preparing all returns." (Greenberger Dep., Doc. 383-1 at 66:11-16). He also testified that he "always relied on the partnership's appraiser for the contemporaneous valuation" stated on the partnership returns. (*Id.* at 66:17-20). He further testified that Aprio had an unwritten "standardized [tax] return preparation process." (*Id.* at 67:23-25). These statements support Plaintiffs'

allegations that Defendants employed standardized procedures in preparing the tax returns for all fifty-three Syndicates.

The most pertinent part of Mr. Greenberger's deposition, however, is related to the IRS promoter penalty that was lodged against him in relation to his role in forty-six out of the fifty-three Syndicates at issue here. IRS regulations allow the imposition of a penalty on any person who: (1) aids or assists in, procures, or advises with respect to, the preparation or presentation of any portion of a return, affidavit, claim, or other document; (2) knows (or has reason to believe) that such portion will be used in connection with any material matter arising under the internal review laws, and (3) knows that such portion (if so used) would result in an understatement of the liability for tax of another person. 26 U.S.C. § 6701(a). The IRS, after conducting an investigation into forty-six Syndicates, found that all of these elements had been met as to Mr. Greenberger's handling of the returns at issue. (*See generally,* IRS Promoter Penalty Report, Doc. 385-2). In its Promoter Penalty Report, the IRS characterizes Mr. Greenberger as "fully immersed in the scheme," and finds that he "consistently and repeatedly assisted in the preparation of documents, and tax returns claiming unallowable and grossly overvalued conservation easements deductions relied upon by taxpayers that resulted or would have resulted in an understatement of tax." (*Id.* at 27-26). As to Aprio and Mr. Greenberger's common business practices across all the Syndicates, the IRS promoter penalty report states:

> Greenberger is signing as a tax return preparer and **he or other partners in his firm have prepared at least 46 known partnership returns** claiming charitable contributions of $576,861,810 for conservation easement deductions. **He knew or reasonably should have known that the charitable contributions were not allowable and were overvalued**. Furthermore, the evidence demonstrates his return preparation was reckless and intentionally disregarded the rules and regulations and he may have willfully attempted to understate over 1200 partnership investor's [sic] tax liabilities.

(*Id.* at 27 (emphasis added)).

The IRS Promoter Penalty Report paints a picture of a common business practice employed by Defendants Aprio and Mr. Greenberger that may have led to the putative class members' injuries. Importantly, however, there is no explicit evidence in the record that Aprio or Mr. Greenberger "hand-picked" appraisers and instructed them to inflate the appraisals – which appears to be a key part of Plaintiffs' proposed SCE Strategy. (*See* Doc. 327 at 31). Plaintiffs themselves only cite to the allegations in their own Amended Complaint – not to any record evidence – when making the assertion that Defendants hand-picked appraisers in their Motion for Class Certification. (Doc. 327 at 31 (citing only to "FAC ¶¶ 5, 43, 53, 160-69")). Mr. Greenberger also testified that Aprio never hired or evaluated the appraisers – rather, appraisers were "hired by either the law firm or the conservation easement firm, so [Aprio] had nothing to do with the hiring of any of the appraisers." (Greenberger Dep., Doc. 383-1 at 45:17-25, 46:1-15). The only evidence in the record that supports Plaintiffs' assertion that Defendants hand-picked appraisers appears in a general statement in the IRS Promoter Penalty

Report that is not specific to the appraisals at issue here: "Even though there was an abundance of potentially 'qualified appraisers' located within the state or county where the property was located, promoters elected to 'shop' for appraisers who would provide the necessary valuations to support the partnership contribution arrangement." (IRS Promoter Penalty Report, Doc. 385-2 at 19). As this statement was made in the context of describing how syndicated conservation tax schemes in general were handled, it does not explicitly show or prove Plaintiffs' allegation that Defendants' "hand-picked" the appraisers here.

But there is record evidence that indicates, at the very least, that Aprio and Mr. Greenberger may have improperly engaged at some point in the SCE strategy (potentially at the appraisal stage) before assisting with tax return preparation. For example, the IRS Promoter Penalty Report states:

> Substantial services were performed by accountants ***prior*** to the Private Offerings to investors. There are strong indications that Greenberger and his firm [Aprio] provided accounting services including calculation of the offering price, calculation of the Return on Investment and calculation of redemption price to the land owners. The offerings identify payments in the amount of $368,500 for project accounting services with a total of $161,000 specifically paid to [Aprio]. **The amount paid is inconsistent with the normal fees charged for tax return preparation only.**

(IRS Promoter Penalty Report, Doc. 385-2 at 21 (emphasis added)). Ultimately, after reviewing certain email correspondence, the IRS made a finding that Greenberger's position that "he rarely participated with the partnerships in the Conservation Easement transactions prior to preparation of the tax returns" was "not a true statement." (*Id.* at 22).

Based primarily on the IRS Promoter Penalty Report's findings and Mr. Greenberger's deposition testimony, the Court finds that Plaintiffs have adequately shown, for the purposes of standing to represent the putative class, that Defendants employed a common business practice that the putative class members' injuries may be traced to. The Court's finding that the record indicates that Defendants had such a common business practice, however, is limited solely to the Court's inquiry into the named Plaintiffs' standing to represent a class of investors, based on the burden Plaintiffs must meet to prove standing at the class certification stage. It is unrelated to the merits of Plaintiffs' claims and to the propriety of certifying a class of investors for Plaintiffs' claims pursuant to Federal Rule of Procedure 23 – which are two distinct inquiries. The Court now turns to the class certification inquiry.

### C.    Rule 23 Requirements

Plaintiffs seek certification of the following class, pursuant to Federal Rule of Civil Procedure 23, for each of their remaining claims:

> All persons who, for any tax year from January 1, 2008 to the present, inclusive, were members either directly or indirectly through an ownership stake in another entity, in a Syndicated Conservation Easement which claimed a pass-through tax deduction based upon a charitable contribution of a conservation easement, where Aprio prepared the donation-year partnership return for the limited liability company and K-1s for the participants, and where the donation year limited liability company tax return has been audited (examined) by the IRS with regard to the charitable deduction arising from the conservation easement, unless such audit ended with no proposed penalties, interest, or disallowance of the limited liability company's conservation easement pass-through deduction.

(Doc. 327 at 19-20). The Court now assesses whether it would be appropriate to certify such a class for each of the remaining claims under the requirements enumerated in Rule 23.

### 1.    Ascertainability

Before analyzing the enumerated requirements in Rule 23, the Court must first decide that a proposed class is "adequately defined and clearly ascertainable." *Little*, 691 F.3d at 1304. A class is "clearly ascertainable" if its membership is capable of being determined by "objective criteria." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1301 (11th Cir. 2021). Ascertainability does not require proof of administrative feasibility. *See id.* at 1304.

Here, the Court finds that the proposed class is adequately defined and clearly ascertainable through objective criteria. Aprio's records should contain information regarding whether Aprio prepared the donation-year partnership return for the fifty-three Syndicates. Similarly, Aprio's records will show which of the Schedule K-1 Forms prepared by Aprio for investors have been audited by the IRS, and which of those audits resulted in penalties. *See Owens v. Metro. Life Ins. Co.,* 323 F.R.D. 411, 416 (N.D. Ga. 2017) ("A plaintiff may rely on a defendant's business records in identifying class membership.") (citing *Bussey v. Macon Cty. Greyhound Park, Inc.,* 562 Fed. App'x. 782, 788 (11th Cir. 2014)).

### 2.    Numerosity

Rule 23(a) requires the named Plaintiffs to show that the proposed class "is so numerous that joinder of all members is impracticable." *Vega,* 564 F.3d at 1266.

26

As a general rule, fewer than twenty-one proposed class members is inadequate for a finding of numerosity, more than forty is adequate, and any number between "is open to judgment based on other factors." *Id.* (citation omitted). Although mere allegations of numerosity are insufficient, plaintiffs need not show the exact number of class members. *Id.*

Plaintiffs estimate that their proposed class of individuals who invested in any of the fifty-three Syndicates would contain between 750-1,500 investors.[8] (Doc. 327 at 23, n. 9). Defendants do not dispute this estimate. (*See generally* Doc. 332). Thus, the Court finds that the number of investors in the proposed class satisfies Rule 23(a)'s numerosity requirement.

### 3.    Commonality & Predominance

The Court now turns to Rule 23's commonality and predominance standards. "Because there is considerable overlap between Rule 23(a)'s commonality requirement and Rule 23(b)(3)'s predominance requirement, courts often address them together." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enters., Inc.,* 481 F. Supp. 3d 1258 (S.D. Fla. 2020) (quoting *Justice v. Rheem Mfg. Co.,* 318 F.R.D. 687, 695 n. 4 (S.D. Fla. 2016)).

The "commonality" requirement in Rule 23(a) and the "predominance" requirement in Rule 23(b)(3) overlap, but the predominance requirement is a

---

[8] In their proposed class definition, Plaintiffs included a list of entities that would be excluded from the class. (*See* Doc. 327 at 17). Plaintiffs indicated that the proposed class would have included around 1,500 individuals, but the exclusions would likely result in a class of 750 members.

more taxing standard. *See Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1268 (11th Cir. 2009) (noting that Rule 23(a)(2)'s commonality requirement imposes a "relatively light burden" on the plaintiff). While the commonality element requires that questions of law or fact common to the class exist, the predominance element requires that those common questions of law or fact *predominate* over any questions affecting only individual members. *Id.* at 1268-69.

"The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v. Bouaphakeo,* 577 U.S. 442, 453 (2016) (cleaned up). "To determine whether common issues predominate, a district court first must "identify the parties' claims and defenses and their elements" and "then classify these issues as common questions or individual questions by predicting how the parties will prove them at trial." *Brown v. Electrolux Home Prods., Inc.,* 817 F.3d 1225, 1234 (11th Cir. 2016).

"An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc.,* 577 U.S. at 453 (citation and internal formatting omitted). Ultimately, in determining whether the predominance requirement is satisfied, the court should assess how the parties will prove their claims at trial. *Brown,* 817 F.3d at 1235. When "one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule

28

23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc.*, 577 U.S. at 453. But if in order to establish the elements of their claims, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal issues or facts at trial, the claim is not suitable for class certification. *Klay v. Humana,* 382 F.3d 1241, 1255 (11th Cir. 2004).

The Court will assess whether common questions both exist and predominate over each claim Plaintiffs assert against Defendants, beginning with fraud.

### a.      Common Law Fraud (Count IX)

In Georgia, the tort of fraud consists of five elements: (1) a false representation by a defendant; (2) scienter; (3) intention to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff. *Bowden v. Med. Ctr., Inc.*, 309 Ga. 188, 199 (2020) (citation omitted). In demonstrating justifiable reliance, plaintiffs must also show that they exercised reasonable diligence in relying on the defendants' representations. *See Griffin v. State Bank,* 718 S.E.2d 35, 40 (Ga. Ct. App. 2011); *see also GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.,* 537 S.E.2d 677, 682 (Ga. Ct. App. 2000) ("Misrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence.").

The Court will analyze whether Plaintiffs have adequately shown that common questions both exist and predominate over the elements of their fraud claim.

### i.    *Misrepresentations*

Plaintiffs assert that Defendants "made numerous knowingly false affirmative misrepresentations and intentional omissions of material fact to Plaintiffs and members of the Class[.]" (Am. Compl., Doc. 155 ¶ 351). These alleged misrepresentations and omissions, as they relate to Defendants Aprio and Mr. Greenberger's conduct, included, in particular: advising class members that the charitable deductions claimed on their tax forms were based on the fair market value of the conservation easement (*Id.* ¶ 351(29)); advising class members that the value of the conservation easement and the value of the charitable contribution deduction that should be used on their income tax returns was proper (*Id.* ¶ 351(46)); failing to advise class members that the appraisals upon which the conservation easements' value was based were not qualified appraisals (*Id.* ¶ 351(50, 51)); failing to advise class members that the appraisal summaries (Forms 8283) were not properly prepared and submitted (*Id.* ¶ 351(61-65)); and advising the class members that the Schedule K-1 tax forms reporting the charitable contribution deduction were accurate (*Id.* ¶ 351(67-69)).

In their supplemental briefing, Plaintiffs point primarily to the IRS promoter penalty investigation lodged against Mr. Greenberger (discussed at length *supra* in Section III(B) (Standing)) as proof that common evidence can be used to establish that Defendants made misrepresentations to the putative class.

(*See generally* Doc. 385). Plaintiffs focus inordinately on the fact that the IRS's Promoter Penalty Report grouped forty-six of the Syndicates together after assessing whether the charitable tax deductions were fraudulent. Plaintiffs emphasize that the IRS "issued one set of document requests to Greenberger . . . issued one summons enforcement action to secure discovery . . . issued one investigation report . . . [and] assessed one aggregate penalty for all transactions." (*Id.* at 6). Plaintiffs conclude that the IRS's decision to group these forty-six Syndicates together in its report means that common evidence can be used to prove that misrepresentations were made across all Syndicates.

While the IRS Promoter Penalty Report contains important findings that Mr. Greenberger employed deceptive common business practices across forty-six Syndicates, those findings do not alone demonstrate whether Plaintiffs' fraud claim is appropriate for class treatment. Plaintiffs ignore the fact that while the IRS may have issued one report with its findings about those forty-six Syndicates, it did not base its findings on an inquiry into just one Syndicate. Nor did the IRS use common evidence to draw conclusions about all forty-six Syndicates. Rather, the IRS Promoter Penalty Report indicates that the IRS conducted a thorough investigation into all forty-six Syndicates' individual financial statements, tax forms, and related documents in drawing its conclusions.[9] (*See, e.g.,* Doc. 385-3

---

[9] The Promoter Penalty Report uses one Syndicate, Maple Landing, as an example throughout the report to illustrate the IRS's findings. This still does not indicate that class treatment is appropriate here. Even while using Maple Landing as an illustrative example

(showing that the IRS requested from Mr. Greenberger: "**all** client files for **all** returns [he] prepared for tax years 2010, 2011, and 2012," "**all** manuals, operations handbooks, prospectuses, offering documents, or other documents which describe the plan, operations, or structuring of the conservation easement transactions you have organized or assisted in the organization of," and "**all** documents and records used to promote, market, advertise or otherwise describe charitable contributions of conservation easements or the purchase or sale of conservation easement tax credits")). It was only after reviewing all of these individual records that the IRS reached the conclusions set forth in the Promoter Penalty Report.

The IRS's decision to penalize Mr. Greenberger for the actions he took across those forty-six Syndicates certainly shows that the IRS identified a similar tax scheme underlying these transactions. The IRS's determination, however, does not by itself create a complete, common evidentiary basis which Plaintiffs here can rely upon in establishing that Aprio and Mr. Greenberger made misrepresentations to the putative class. While the Promoter Penalty Report outlines misrepresentations Mr. Greenberger made to the *IRS* in relation to the forty-six Syndicates, the Report does not contain information about similar misrepresentations Mr. Greenberger may or may not have made to members of the *putative class*. It may be reasonable to assume that if Mr. Greenberger made misrepresentations to the IRS, he necessarily made similar misrepresentations to individuals who invested in the

---

of the tax scheme, the Report nevertheless acknowledges and discusses several variations and differences that permeated across each Syndicate. (*See generally* Doc. 385-2).

Syndicates and claimed the resulting tax deductions. But the record evidence presented by Plaintiffs does not establish a foundation for the Court to discern whether Mr. Greenberger's firm systematically made misleading investment representations to potential class members regarding the security and legality of their investments in the Syndicates. In fact, deposition transcripts show that just among the three named Plaintiffs that were deposed, the information they received from Aprio or Mr. Greenberger – or even from non-defendant third parties – about the investment opportunity may have varied widely.

For example, Plaintiff Lechter testified that he was not initially solicited to invest in the Syndicates by Aprio or Mr. Greenberger, but instead, by Mr. James Jowers – a former defendant who was voluntarily dismissed without prejudice several months before Plaintiffs moved for class certification. (Lechter Dep., Doc. 332-3 at 10[10]; Stipulation of Dismissal of Def. James Jowers, Doc. 311). Plaintiff Dalba also testified that he was introduced to the investment opportunity and was recommended to invest by his personal friend – not Aprio or Mr. Greenberger. (Dalba Dep., Doc. 332-1 at 6-7). And Plaintiff Thompson first learned of the investment opportunity from her employer, not Aprio or Mr. Greenberger. (Thompson Dep., Doc. 332-2 at 3).

The three named Plaintiffs who were deposed also had varying conversations about conservation easements with Mr. Greenberger – or appear to

---

[10] Page numbers in citations to the Lechter, Dalba, and Thompson depositions refer to ECF pagination.

33

have conducted no substantive conversations at all. Plaintiff Lechter testified that he had several conversations directly with Mr. Greenberger about investment opportunities over the course of multiple years. (Lechter Dep., Doc. 332-3 at 5). Plaintiff Dalba testified that he met Mr. Greenberger briefly at a social function, exchanged an email, had one phone call, and didn't recall that he had any other conversations with him. (Dalba Dep., Doc. 332-1 at 6-8). Plaintiff Thompson testified that she also met Mr. Greenberger at a social function, during which time they did not have a substantive conversation. (Thompson Dep., Doc. 332-2 at 7). Later, when Ms. Thompson spoke to Mr. Greenberger about the investment opportunity, he "just explained the conservation easement" to her and "told [her] how it would work." (*Id.* at 4-5). Ms. Thompson testified that Mr. Greenberger explained that "whatever [she] contribute[d], [she] could take the 2.5 ratio of that contribution and then it would be a tax deduction." (*Id.* at 4). Beyond that, she also exchanged emails with him confirming that she was interested in investing. (*Id.* at 5).

Common questions are ones where the same evidence will suffice for each member, and individual questions are ones where the evidence will vary from member to member. *Brown*, 817 F.3d at 1234. Here, the significant variances, just among the three named Plaintiffs who were deposed, in the communications and representations they received, suggest that a jury would have to probe singularly into each investor's communications with Mr. Greenberger and Aprio in order to determine whether each investor received misrepresentations or omissions from

either remaining Defendant. This is a tell-tale sign that a claim is inappropriate for class treatment. *See Sellers*, 941 F.3d at 1040 (noting that where, "plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims," certification is not appropriate).

Plaintiffs also point to the Forms 8283, tax forms that were prepared by appraisers for each Syndicate, as examples of common evidence that can be used to prove that Defendants misrepresented the property's appraisal value to the putative class. (*See, e.g.,* Maple Landing 8283, Doc. 183-4; Oakhill Woods 8283, Doc. 183-5). There are several problems with this assertion. First, at this juncture, the record shows that the Aprio Defendants did not prepare the Forms 8283 – the property appraisers did. (*See* Greenberger Dep., Doc. 383-1 at 39-41 (testifying that he *reviewed* the Forms 8283 but did not *prepare* them)). Moreover, the Forms 8283 and the appraisals varied for each conservation easement. (Am. Compl., ¶¶ 56-57; *see also* Maple Landing Form 8283, Doc. 138-3; Oakhill Woods 8283, Doc. 138-5). In a trial, Plaintiffs would have to present individualized evidence to show that each conservation easement's appraisal value was artificially inflated in the Form 8283. Beyond having to produce the Form 8283 for each Syndicate, proving this assertion might require Plaintiffs to present each conservation easement's deed, purchase records, the value of the land before and after the conservation easement, and potentially other individualized evidence unique to each Syndicate. For these reasons, the Forms 8283 cannot serve as

common evidence to prove Aprio or Mr. Greenberger's misrepresentations to the putative class.

Finally, Plaintiffs assert that the Schedule K-1 Forms, which Aprio and Mr. Greenberger did prepare, could serve as common evidence to prove that Defendants misrepresented the charitable tax deduction that each investor could claim on their individual tax returns. Plaintiffs are correct that the Schedule K-1 Forms might show that Aprio and Mr. Greenberger misrepresented the appraisal value for each conservation easement. But again, to do so, Plaintiffs would have to first use *common* evidence to prove that the appraisal value was inflated to begin with, which Plaintiffs have not presented. Depending on the circumstances, this would potentially require Plaintiffs to present individualized evidence as to an unknown number of Syndicates. This might include documentation such as the conservation easement deed, purchase records, the Form 8283 for each conservation easement, and each investor's K-1 Form associated with the donor Syndicate. Again, where individualized evidence such as this must be introduced in order to prove an element of a claim, class treatment is not appropriate.

After a thorough review of the record, it appears to the Court that each putative class member will likely have to provide some individualized proof that they received misrepresentations from Aprio and Mr. Greenberger. For instance, each plaintiff would likely have to provide evidence of how they were introduced to the investment opportunity, the communications they received from Aprio and Mr. Greenberger that convinced them to invest in a Syndicate, representations

36

either Defendant made about the potential tax deduction, and so forth. Simply stated, the Court cannot certify a class action here based on fraud-related claims when the potential class members appear to have interacted with Aprio and Mr. Greenberger in very different ways and received varying representations from them, or from non-defendant third parties, that influenced their investment decisions. Plaintiffs have had ample opportunity to gather, present, and argue how common evidence might prove this element of their claim on a class-wide basis. And the Court has both allowed and requested many instances of supplementary briefing on the issue of class certification. (*See, e.g.,* Doc. 349 (Plaintiffs' Supplemental Evidence in Support of Class Cert.); Doc. 357 (Plaintiffs' Supplemental Information); Doc. 385 (Plaintiffs' Supplemental Brief in Support of Class Cert.); Doc. 409 (Plaintiffs' Notice of Supplemental Evidence & Legal Authorities)). The Court does not doubt that some individual Plaintiffs may be able to make a prima facie showing that Defendants made material misrepresentations to them individually. But the lack of common evidence in the record to prove this element, after years of opportunity to present such evidence on a class wide basis, indicates that this claim is not appropriate for class certification.

### ii.   *Justifiable Reliance*

The Court finds it prudent to discuss the justifiable reliance element of the evidence and claims at this juncture, because the question of commonality and predominance are particularly salient as to this element. "Justifiable reliance is an essential element of fraud." *Spivey v. Smith*, 693 S.E.2d 830, 834 (Ga. Ct. App.

2010) (citing *Peacock v. Kiser*, 611 S.E.2d 747, 749 (2005)). This element requires a plaintiff to not only show that they relied on a defendant's alleged misrepresentations, but also that they were *justified* in relying on the alleged misrepresentations because they exercised independent due diligence and common prudence prior to taking action. *Griffin v. State Bank of Cochran,* 718 S.E.2d 35, 40 (Ga. Ct. App. 2011); *see also GCA Strategic Investment Fund v. Joseph Charles & Assocs.,* 537 S.E.2d 677 (Ga. Ct. App. 2000) ("Misrepresentations are not actionable unless the complaining party was justified in relying thereon in the exercise of common prudence and diligence.")).

In arguing that this element can be proven through common evidence, Plaintiffs rely primarily on the Eleventh Circuit's holding in *Klay v. Humana* that "the simple fact that reliance is an element in a cause of action is not an absolute bar to class certification." (Doc. 327 at 33 (quoting *Klay v. Humana, Inc.,* 382 F.3d 1241, 1258 (11th Cir. 2004)). The *Klay* court found that the record contained "circumstantial evidence that [could] be used to show reliance is common to the whole class." *Id.* at 1259. The common evidence in question included uniform written representations sent by the defendants to the plaintiffs. *Id.* Further, the Eleventh Circuit found that common evidence could also include "legitimate inferences based on the nature of the alleged misrepresentations at issue." *Id.*

But the facts here are distinguishable from *Klay* in crucial ways. In *Klay*, every defendant made, and every class member received, the same written representations from the same defendants. On the other hand, here, the record

38

does not contain any "uniform written representations sent by the defendants to the plaintiffs." *Id.* Moreover, here, the record varies widely even among just the named Plaintiffs as to representations they received and from whom. For example, Ms. Thompson initially heard about the investment opportunity from her employer before meeting Mr. Greenberger at a social function, and later speaking with him once about the investment opportunity on a brief phone call. (Thompson Dep., Doc. 332-2 at 3-4). Ms. Thompson also spoke and worked with another accountant when preparing her tax returns and deciding what amount she would claim as a charitable tax deduction on her individual tax return. (*Id.* at 17). This other accountant, unaffiliated with Aprio, also reviewed the K-1s she received from Aprio before advising her. (*Id.*) Mr. Lechter, on the other hand, learned about the investment opportunity from Mr. James Jowers, a former defendant, before speaking with Mr. Greenberger several times over the course of a year about the opportunity. (Lechter Dep., Doc 332-3 at 5-6).

But, as discussed previously, Plaintiffs now attempt to minimize the significance of any representations that may have influenced the putative class members' decision to invest as a component of the reliance element of their fraud claim. (*See generally* Doc. 340). Instead, they argue that the crux of the case is the class members' decision to claim tax deductions *after* investing in the transactions. In essence, Plaintiffs argue that the Defendants' misrepresentations in the Schedule K-1 Forms are the only relevant misrepresentations as to the reliance element of their claims, and that all other pre-investment representations and

third-party representations should be ignored for the purpose of assessing whether reliance can be proven on a class-wide basis.

Even if other pre-investment representations and third-party involvement were ignored for the reliance inquiry, the record still indicates that some amount of individualized evidence would need to be introduced to either prove or disprove class members' reliance on Defendants' misrepresentations on the Schedule K-1 Forms. Defendants contend that the only way a jury could find that the putative class relied on the tax forms that Defendants prepared "would be through individual examinations of each member." (Doc. 341-1 at 19). To prove that Plaintiffs relied on Defendants' representations in the K-1 Forms, Plaintiffs would have to present a meaningful sample of investors' individual tax returns and compare the claimed charitable tax deduction with the amount stated on the respective K-1 Form. Ms. Thompson's deposition testimony illustrates this issue. Ms. Thompson testified that the K-1 she received from Aprio for the Sky View Holdings Syndicate indicated that her charitable deduction amount was $75,987. (Thompson Dep., Doc. 332-2 at 24). But she testified that after having a conversation with her personal accountant, she ultimately decided not to claim that full amount on her tax return. (*Id.*) Mr. Lechter and Mr. Dalba were not asked in their depositions about whether they claimed the full deduction amount from the K-1 on their individual tax returns. And none of the Plaintiffs' individual tax returns or corresponding K-1 forms were filed in the record. As such, Ms. Thompson's testimony that she did not rely on the K-1 when preparing her

individual tax return is the only concrete evidence in the record related to the named Plaintiffs' reliance on the K-1 Forms.

Ultimately, these variances and gaps in the record demonstrate that even if establishing the reliance element was limited to Defendants' representations on the tax forms, it remains an individualized inquiry whether the class members actually did rely on the tax forms in claiming their charitable tax deductions. A jury would have to compare each Schedule K-1 Form with the corresponding investor's individual tax return for the applicable donation year to determine whether an investor relied on the K-1 and claimed the recommended deduction. Perhaps it is a reasonable inference that each investor simply copied the charitable tax deduction amount from their K-1 Form onto their individual tax return. After all, it does seem implausible that an investor would choose not to claim the full charitable tax deduction on their individual tax return, given that the tax deduction was the raison d'être of the investment in the first place. But there is simply no evidence in the record that allows the Court to draw an inference either way. Again, Ms. Thompson's deposition testimony is the only evidence in the record that addresses the question of whether the investors relied on the K-1s. Plaintiffs have not presented any of the putative class members' individual tax returns or any of the corresponding K-1 Forms. And the other two named Plaintiffs who were deposed – Mr. Dalba and Mr. Lechter – were not asked about their reliance on the K-1 Forms. It is very possible that many investors reported the charitable tax deduction amount from the Aprio-prepared K-1 form on their individual tax forms.

41

But Plaintiffs have filed no evidence in the record upon which the Court can reasonably draw that inference or conclusion. This individualized inquiry makes class certification inappropriate for this claim.

Yet another issue that Plaintiffs fail to adequately address is what common evidence can be used to establish that the putative class exercised reasonable diligence — which is a requirement to prove justifiable reliance — in relying on and ultimately discovering Defendants' alleged misrepresentations. *See GCA Strategic Inv. Fund, Ltd. v. Joseph Charles & Assocs., Inc.*, 537 S.E.2d 677, 682 (2000). Even if the Schedule K-1 Forms provide sufficient common evidence to demonstrate reliance, Plaintiffs have not presented any evidence or argument that common evidence can be used to prove Plaintiffs' due diligence in that reliance. Rather, the record suggests that in making that determination, a jury would have to inquire into what actions each class member did or did not take after learning about the investment opportunity, as well as what actions each class member did or did not take after receiving their Schedule K-1 Form.

For example, named Plaintiff Mr. Dalba stated in his deposition that Mr. Greenberg told him investing in a Syndicate was a "good deal," and that this statement "was valid enough" for him to decide to invest. (*See* Dalba Dep., Doc. 332-1 at 13). Mr. Dalba does not indicate that he undertook any additional research or due diligence in making his decision. (*See generally id.*) Mr. Lechter similarly stated that Mr. Greenberger also told him that investing would be a "good deal." (Lechter Dep., Doc. 332-3 at 11). But Mr. Lechter's and Mr. Dalba's due diligence

differs because Mr. Lechter also testified that he spoke to several other individuals, including other accountants, before deciding to invest in several conservation easements, which it appears Mr. Dalba did not do. (*Id.*). Ms. Thompson testified that she had a personal accountant but did not discuss the investment opportunity with him prior to investing. (Thompson Dep., Doc. 332-2 at 16). She did use her personal accountant's services in preparing her individual tax return and deciding the amount she would claim as a charitable tax deduction. (*Id.* at 17-18). The significant differences in the record show that assessing whether members of the class exercised reasonable diligence in deciding to invest or in discovering Defendants' misrepresentations would require individualized inquiries.

Another category of evidence in the record further suggests that Plaintiffs will need to present individualized evidence to prove the due diligence element of their claim: the private placement memoranda ("PPMs") that the putative class received for each Syndicate they invested in.[11] Each PPM contained a wide range of information about individual Syndicates and the opportunity to invest, including descriptions of the property, general information about conservation easements, and the terms of investing. (*See, e.g.,* Docs. 332-23 (Maple Landing PPM); 332-24 (Mossy Rock PPM); 333-14 (Little Mountain PPM); 333-12 (Big K

---

[11] The record indicates that neither Aprio nor Mr. Greenberger prepared or disseminated the PPMs to investors. (Doc. 332-4 at n.2 ("Aprio did not prepare PPMs, and generally only collected them as part of its engagement to assist with IRS audits.")). Nevertheless, the Court discusses the contents of the PPMs because each investor allegedly received them prior to investing, and they contain information that is relevant to determining whether the putative class's reliance can be proven through common evidence.

PPM); 333-13 (Cottonwood Place PPM)). As they relate to the reliance inquiry specifically, the PPMs also contained extremely strong language, often in all capital letters and bold font, urging investors to conduct their own due diligence before deciding to invest. (*See, e.g.,* Maple Landing PPM, Doc. 332-23 at 2 ("In making an investment decision[,] investors must rely on their own examination of the person or entity creating the securities and the terms of the offering, including the merits and risks involved."), ("An investment in the units or in our company is speculative, involves a high degree of risk, and should be considered only by investors who can bear the economic risks of their investment for an indefinite period and that can afford to sustain a total loss of their investment."), at 20 ("Prospective investors are urged to consult with and rely upon the advice of their own tax advisors with regard to all tax aspects of investment in the company with specific reference to their own tax situations."), at 36 ("You should assume that the IRS will audit the company's tax return, and that such an audit could result in the loss of some or all of the tax benefits anticipated to be derived from an investment in the company. […] You are urged to consult with and rely upon your own personal tax advisors with respect to the tax consequences arising from the purchase of the units before making a decision to invest in the company.")).

The presence of the warnings in the PPMs has an important implication on the Court's determination of whether Plaintiffs can prove reliance and due diligence on a class-wide basis. The warnings indicate that in order to prove that the putative class members exercised due diligence in relying on Aprio and Mr.

44

Greenberger's representations, Plaintiffs would have to identify investors that read these storm warnings, solicited counsel from an independent tax advisor, conducted an independent examination of the legitimacy of the offering, or engaged in any other due diligence prior to investing. It is very possible that many, if not all, of the investors took such steps. Even so, Plaintiffs would have to engage in a highly individualized inquiry to prove that at trial. At this juncture, Plaintiffs have presented no common evidence of this nature that would reasonably allow this Court or a jury to reach a conclusion either way.

Georgia courts have emphasized that justifiable reliance is an essential element of a fraud claim. *See, e.g., Spivey v. Smith,* 693 S.E.2d 830, 834 (Ga. Ct. App. 2010) (citing *Peacock v. Kiser,* 611 S.E.2d 747, 749 (Ga. Ct. App. 2005)). And Georgia courts have also stated that whether a claimant exercised reasonable diligence in discovering a cause of action entails an individualized jury question that turns on "the facts and exigencies of each particular case." *Jim Walter Corp. v. Ward*, 265 S.E.2d 7, 9 (Ga. 1980); *see also Fed. Ins. Co. v. Westside Supply Co.*, 590 S.E.2d 224, 229 (Ga. Ct. App. 2003); *see also Barrett v. United Ins. Co. of Am., Inc.,* 418 F. Supp. 3d 1274, 1291 (S.D. Ga. 2019). The record here shows that proving or disproving this essential element will primarily require the parties to present individualized evidence at trial, making this claim unsuitable for class treatment.

Thus, due to the Court's finding that Plaintiffs have not presented sufficient common evidence to prove either the misrepresentation or justifiable reliance

elements of the fraud claim, the Court finds that this claim is not suitable for class treatment under Rule 23(b)(3). Based on the Court's findings discussed above, the Court denies Plaintiffs' Motion for Class Certification as to Plaintiffs' common law fraud claim (Count IX).

### b.      Negligent Misrepresentation (Counts V & VI)

In Georgia, the tort of negligent misrepresentation and fraud share nearly all the same elements. *See Trico Env't Servs., Inc. v. Knight Petroleum Co.*, 849 S.E.2d 538, 544 (Ga. Ct. App. 2020) (noting that negligent misrepresentation and fraud claims in Georgia require the same elements, except negligent misrepresentation does not require a showing of defendants' knowledge and falsity of the information disclosed). Critically, one of these elements is also justifiable reliance, which requires a showing of reasonable diligence.

For the same reasons that the Court finds that Plaintiffs could not provide class-wide proof to show that misrepresentations were made or to prove justifiable reliance and reasonable diligence on their fraud claim (*supra* Section III(C)(3)(a)), the Court also finds that Plaintiffs cannot do so on their negligent misrepresentation claim. Accordingly, the Court denies Plaintiffs' Motion for Class Certification on their negligent misrepresentation (Counts V & VI) claims.

### c.      Georgia RICO (Count II) (based on the predicate acts of mail and wire fraud)

To establish a valid civil RICO claim in Georgia, a plaintiff must show (1) that the defendant violated or conspired to violate Georgia's RICO Act, and (2) that the RICO violation proximately caused the plaintiff's injury. *Kearney v.*

46

*Oppenheimer & Co., Inc.,* 915 S.E.2d 709, 715 (Ga. Ct. App. 2025), cert. denied (Sept. 25, 2025). The proximate cause element of Georgia's RICO Act requires a plaintiff to "show that his injury flowed *directly* from at least one of the predicate acts." *Id.* at 715-16 (emphasis in original). Importantly, this burden is not met in cases where "a plaintiff shows merely that his injury was an *eventual consequence* of the predicate act or that he would not have been injured but for the predicate act." *Id.* (quoting *Hansford v. Veal,* 894 S.E.2d 215, 224 (Ga. Ct. App. 2023)) (internal quotations omitted) (emphasis in original).

Defendants argue that proving proximate cause "would require the jury to examine evidence of each alleged misrepresentation and omission made to each putative class member by each actor" involved in the alleged scheme. (Doc. 333 at 33). Defendants point to *Roqueta v. Avon Products* and *Atlas Roofing,* in which other district courts in this Circuit. found that where multiple potential sources of the plaintiffs' alleged harm existed, common evidence was not appropriate to establish the proximate cause element of their claims. *Roqueta v. Avon Prods., Inc.,* No. 05-21315-CIV, 2006 WL 8432004 (S.D. Fla. July 19, 2006); *In re Atlas Roofing Corp. Chalet Shingle Prods. Liab. Litig.,* No. 1:13-CV-2195-TWT, 2017 WL 2536846 (N.D. Ga. June 9, 2017). Ultimately, Defendants assert that common evidence cannot be used to show the proximate cause element of the Georgia RICO claim because there are too many differences in the communications each putative class member had with Aprio or Mr. Greenberger, and because there were many non-defendant third parties who may have proximately caused harm.

For similar reasons to the Court's analysis of the justifiable reliance element of Plaintiffs' fraud and negligent misrepresentation claims, the Court agrees with Defendants and finds that Plaintiffs have not established that common evidence can be used to establish proximate cause. The record shows that putative class members had varying introductions to the investment opportunities from different individuals (*compare* Lechter Dep., Doc. 332-3 at 33 (testifying he was solicited to invest by Mr. James Jowers, a former defendant), *with* Dalba Dep. at 9-10 (testifying that he was introduced to the investment opportunity by his personal friend)); had varying conversations about conservation easements with the Defendants (or had no substantive conversations at all) (*compare* Lechter Dep. at 24 (testifying that he had several conversations directly with Mr. Greenberger about investment opportunities over the course of multiple years) *with* Dalba Dep. at 9-13 (testifying that he met Mr. Greenberger briefly at a social function, exchanged an email, had one phone call, and didn't recall any other conversations with him) *and* Thompson Dep. at 12-13 (testifying that she met Mr. Greenberger at a social function, before she had even heard about the investment opportunity, then never spoke to him again); and had varying conversations with third parties, including their own accountants, that could have influenced their decisions (Thompson Dep. at 32-34 (testifying that she spoke with her personal accountant about claiming a charitable tax deduction on the conservation easement and worked with another accountant to decide the amount she would claim).

Thus, the record shows that just among the three named Plaintiffs who were deposed, the nature of representations and conversations they had with Defendants and third parties varied wildly. In their reply brief, Plaintiffs assert the insignificance of the fact that third parties may have been involved in influencing putative class members' decisions to invest in the Syndicates. (Doc. 340). They state that focusing on third party influence and the variation in communications "ignores the unique role that the K-1s and Forms 8283 play" in establishing proximate cause, arguing that the mere existence of these forms demonstrates that class members used them for their tax returns, thus proximately causing their injuries. (Doc. 340 at 14). But as discussed earlier, the record shows that at least one of the named Plaintiffs did not rely on the K-1 Form when claiming a charitable tax deduction on their individual return. (Thompson Dep. at 77:11-25 (testifying that she did not use the deduction amount on the provided K-1 when preparing her tax return)). And there is simply no other common evidence in the record to allow the Court to draw the inference that the putative class members did rely on the K-1 Form.

For all these reasons, the Court finds that class certification of Plaintiffs' Georgia RICO claim (Count II) is not viable under the facts of the case.

### d. Malpractice (Count V) & Breach of Fiduciary Duty (Count VII)

In its March 2023 Order, the Court indicated its preliminary finding that Plaintiffs' grounds for certifying a class in relation to the malpractice and breach

of fiduciary duty claims were weak.[12] (Doc. 362 at 9). The Court remains unconvinced that these claims can be proven through common evidence. Resolution of these claims would turn on individualized inquiries unique to each Plaintiff's circumstances, making them inappropriate for class consideration. (*Id.*)

To succeed on the malpractice claim, for example, Plaintiffs must show: (1) employment of the defendant; (2) failure of the defendant to exercise ordinary care, skill, and diligence; and (3) that such negligence was the proximate cause of damage to the plaintiff. *See Hill, Kertscher & Wharton, LLP v. Moody,* 839 S.E.2d 535, 539 (Ga. Sup. Ct. 2020). In order to determine whether each putative class member was an Aprio client, however, a jury would have to engage in individualized inquiries, and Plaintiffs do not argue otherwise. Similarly, the

---

[12] In fact, it is not readily apparent from Plaintiffs' Motion for Class Certification whether they actually seek certification of a class for their malpractice and breach of fiduciary duty claims. Plaintiffs all but omitted these claims in their Motion for Class Certification and related supplementary briefings. In Plaintiffs' Motion for Class Certification, for example, the only mention of the breach of fiduciary claim appears in a single sentence with no supporting record evidence cited: "Plaintiffs can also show that the Aprio Defendants breached their fiduciary duties through misrepresentations and omissions that worked to advance the SCE strategy that defrauded Plaintiffs instead of serving Plaintiffs' best interests." (Doc. 327 at 27). There is no mention of the malpractice claim beyond the following: "Misrepresentations and omissions can also establish that the advice challenged as negligence or malpractice was incorrect." (*Id.* at 26-27).

After Defendants pointed this omission out in their Response (Doc. 332 at 35-39), Plaintiffs attempted to justify it in their Reply: "Plaintiffs argue that the same misrepresentations and omissions central to their fraud and negligent misrepresentation claims will also support their breach of fiduciary duty claims ... thus, the Opposition is wrong that Plaintiffs made no attempt to meet their Rule 23 burden on this claim." (Doc. 340 at n.4).

Plaintiffs' Supplemental Brief in Support of their Motion for Class Certification contains no mention of the malpractice or the breach of fiduciary duty claim. (*See generally* Doc. 385).

breach of fiduciary duty claim requires Plaintiffs to show (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach. *Jysk Bed 'N Linen v. Dutta-Roy,* 787 F. App'x 608, 613 (11th Cir. 2019). In assessing these elements, a jury would have to engage in individualized inquiries to determine the existence of a fiduciary relationship and whether Aprio and Greenberger owed a fiduciary duty to each individual Plaintiff in the first place.

Since the Court's March 2023 Order, Plaintiffs have not provided any meaningful additions to their evidence and assertions in their supplementary briefings that alter the analysis of whether these two claims satisfy the predominance requirement of Rule 23. Plaintiffs have presented no common evidence that can demonstrate that the putative class members were clients of Aprio and Mr. Greenberger, which is a fundamental element of both the malpractice and breach of fiduciary duty claims. The fact remains that in order to establish either claim at trial on a class wide basis, Plaintiffs would have to rely on individualized evidence, running afoul of Rule 23(b)'s predominance requirement and making these claims inappropriate for class treatment. Given that Plaintiffs have not provided any authority or evidence to show how they would prove the elements of the malpractice and breach of fiduciary duty claims at trial without relying on individualized evidence, the Court finds that Plaintiffs have not established that common questions of fact or law predominate in connection with these two claims. Accordingly, the Court denies Plaintiffs' Motion for Class

51

Certification on their malpractice (Count V) and breach of fiduciary duty (Count VII) claims.

### 4.   Typicality, Adequacy, and Superiority

Having found that none of the Plaintiffs' claims meet the predominance requirement of Rule 23(b)(3) and therefore cannot be certified for class action treatment, the Court will not assess whether the claims satisfy the remaining Rule 23 requirements.

### D.   Subject Matter Jurisdiction

As federal courts are courts of limited jurisdiction, the Court is "obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Williams v. Chatman,* 510 F.3d 1290, 1293 (11th Cir. 2007).

In their Amended Complaint, Plaintiffs asserted that the Court had subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d) because the Class Action Fairness Act of 2005 ("CAFA") confers diversity jurisdiction when minimal diversity is established. (Am. Compl., Doc. 155 at ¶ 10). CAFA establishes federal jurisdiction over class actions that meet three requirements: (1) minimal diversity exists; (2) the amount in controversy exceeds $5,000,000; and (3) the number of proposed class members is at least 100. 28 U.S.C. § 1332(d)(2), (d)(5). Minimal diversity exists where "at least one plaintiff and one defendant are from different states." *Evans v. Walter Indus., Inc.,* 449 F.3d 1159, 1163 (11th Cir. 2006). Plaintiffs also contended that the Court had subject matter jurisdiction under federal question jurisdiction pursuant to 28 U.S.C. § 1331 and/or 28 U.S.C. § 1337.

(*Id.*). Plaintiffs' federal question claims have since been dismissed, so federal question jurisdiction no longer applies here on that basis. (*See* Order on Defs.' Mtn. to Dismiss, Doc. 248).

The dismissal of certain defendants in 2021 (Doc. 248) resulted in the remaining named parties all being Georgia citizens for purposes of diversity. At the time, it seemed that the minimal diversity required by CAFA was no longer satisfied. Therefore, in November 2024, the Court ordered the parties to show cause why CAFA permitted the Court to continue exercising jurisdiction over the case. (*See* Doc. 408). The parties filed a joint letter contending that minimal diversity under CAFA was still satisfied for two reasons: (1) at least one unnamed putative class member was a citizen of a state other than Georgia; and (2) Aprio's status as a limited liability partnership rendered it a citizen of several non-Georgia states. (*See* Doc. 413 at 2). Now, however, the Court has declined to certify a class for any of Plaintiffs' claims. Because CAFA is the only remaining basis for federal subject matter jurisdiction alleged in Plaintiffs' Amended Complaint (Am. Compl., Doc. 155 at ¶ 10), the Court finds it prudent to inquire into whether it still has subject matter jurisdiction over this matter, given that no class has been certified for any of Plaintiffs' claims.

The Court begins by noting that the Eleventh Circuit has over the last years modified its treatment of the question of district courts' continuing CAFA jurisdiction in failed class action cases. In *Walewski v. Zenimax Media, Inc.*, for example, the Eleventh Circuit held that "absent certification as a class action, the

district court lacks subject matter jurisdiction over [a plaintiff's] individual claim." 502 F. App'x 857, 862 (11th Cir. 2012). After *Walewski*, it appeared that a district court's subject matter jurisdiction over a CAFA case was lost upon denial of class certification, provided no other basis for subject matter jurisdiction existed.

But the Eleventh Circuit clearly altered its course four years later in *Wright Transportation, Inc. v. Pilot Corporation*, 841 F.3d 1266, 1267 (11th Cir. 2016). In *Wright*, the court addressed the question of whether federal courts that are given original subject-matter jurisdiction over state-law claims by CAFA retain that jurisdiction even when the class claims are dismissed before the class is certified. *Id.* In contrast to *Walewski*, the Eleventh Circuit found in *Wright* that "CAFA continues to confer original federal jurisdiction over the remaining state-law claims" in a suit, even after a court denies a motion for class certification. *Id.* at 1272. The Eleventh Circuit has applied and affirmed the holding in *Wright* several times since its publication. *See, e.g., Pearce v. State Farm Fla. Ins. Co.*, No. 23-14081, 2026 WL 1078129 (11th Cir. Apr. 21, 2026) ("[A] court should assess CAFA jurisdiction based on the time the operative pleading was filed … Post-filing events, including those that do away with the class claims, do not destroy the court's jurisdiction over a case under CAFA." (quoting *Wright*, 841 F.3d at 1272) (internal formatting omitted)); *see also Cherry v. Dometic Corp.*, 986 F.3d 1296 (11th Cir. 2021) ("Federal jurisdiction under the Class Action Fairness Act does not depend on certification, so a district court retains jurisdiction even after it denies certification." (quoting *Wright*, 841 F.3d at 1271) (internal formatting omitted)).

In sum, the holding in *Wright* establishes that in a putative CAFA class action suit filed in federal court and with only state and common law causes of actions remaining, "the district court *retains* jurisdiction over a plaintiff's remaining, individual claims after denial of class certification, *unless* the plaintiff's claims contain frivolous attempts to invoke CAFA jurisdiction *or* [the plaintiffs] lack[ed] the expectation that a class may be eventually certified." *Perisic v. Ashley Furniture Indus., Inc.*, No. 8:16-cv-3255-EAK-SPF, 2018 WL 8581976, at \*5 (M.D. Fla. Nov. 7, 2018) (citing *Wright*, 841 F.3d 1271-73) (emphasis in original)). Applying that rule here, the Court finds that it does not lose CAFA jurisdiction even though it has declined to certify a class as to any of Plaintiffs' remaining state and common law claims. The Court had CAFA jurisdiction over Plaintiffs' claims at the time their Complaint was filed, and there is no indication that Plaintiffs' claims against Aprio and Mr. Greenberger were frivolous or otherwise deficient under CAFA. Therefore, even though the Court has declined to certify a class for any of Plaintiffs' claims in the instant Order, the Court will continue to exercise its jurisdiction over the individual Plaintiffs' remaining state and common law claims.

## IV. CONCLUSION

For all the reasons explained above, Plaintiffs' Motion for Class Certification [Doc. 326] is **DENIED.**

The Court finds it important to acknowledge that its decision to decline certification of a class is not necessarily reflective of its view of the merits or strengths of Plaintiffs' claims. It is certainly possible that Aprio and Mr.

Greenberger did, in fact, defraud or make misrepresentations to Plaintiffs and several hundreds of other unnamed investors through the SCE strategy. But the possibility of fraud and the propriety of certifying a class under Federal Rule of Civil Procedure 23 are two distinct inquiries. The Court's decision not to certify a class is based solely on the lack of sufficient class-wide evidence in the record to support Plaintiffs' claims. In other words, this decision is simply the result of the Court's finding that Plaintiffs' claims are not appropriate for class treatment. If this case moves forward on the litigation path, Plaintiffs may present evidence to support the substance of their individual claims at summary judgment or at trial, and the Court or a jury will assess that evidence accordingly.

Given the nature of this case as well as the considerable resources and length of time invested in litigation thus far, the Court is not inclined to entertain any motions for reconsideration of class certification at this time. Rather, the Court finds the parties would benefit greatly from mediating this case at this juncture. Thus, the parties are **DIRECTED** to file a joint status report **within twenty days of this Order** notifying the Court of whether they would prefer to mediate with a private mediator or with a magistrate judge in this district court. If the parties wish to mediate with a magistrate judge, the Court will order and refer the case to the Chief Magistrate Judge for assignment to the next magistrate judge available on the wheel for mediation. If mediation ultimately fails, the Court will schedule a telephone conference with the parties to discuss how best to manage the case moving forward.

57

**IT IS SO ORDERED** this 17th day of June, 2026.

_____
**Amy Totenberg**
**United States District Judge**